CENTER FOR CONSTITUTIONAL RIGHTS
Nancy Chang (NC 5331)
Barbara J. Olshansky (BO 3635)
Rachel Meeropol (RM 3878)
Shayana Kadidal
Jennifer Green (JG 3169)
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6420


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

IBRAHIM TURKMEN; ASIF-UR-REHMAN    :
SAFFI; SYED AMJAD ALI JAFFRI;    :
YASSER EBRAHIM; HANY IBRAHIM;    :
SHAKIR BALOCH; AKHIL SACHDEVA;    :
and ASHRAF IBRAHIM,    :
on behalf of themselves and all others    : 02 CV 2307 (JG)
similarly situated,    :
   :
   :
              Plaintiffs,    : **THIRD AMENDED CLASS**
   : **ACTION COMPLAINT AND**
          - against -    : **DEMAND FOR JURY TRIAL**
   :
JOHN ASHCROFT, Attorney General of the    :
United States; ROBERT MUELLER, Director of    :
the Federal Bureau of Investigation; JAMES W.    :
ZIGLAR, Commissioner of the Immigration and    :
Naturalization Service; DENNIS HASTY,    :
former Warden of the Metropolitan Detention    :
Center (MDC); MICHAEL ZENK, MDC Warden;    :
MDC Associate Warden for Custody SHERMAN;    :
MDC Captain SALVATORE LOPRESTI; MDC    :
Lieutenants STEVEN BARRERE, WILLIAM    :
BECK, LINDSEY BLEDSOE, JOSEPH CUCITI,    :
HOWARD GUSSAK, MARCIAL MUNDO,    :
DANIEL ORTIZ, STUART PRAY, and    :
ELIZABETH TORRES, and MDC Correctional    ;
Officers PHILLIP BARNES, SIDNEY CHASE,    :
MICHAEL DEFRANCISCO, RICHARD DIAZ,    :
KEVIN LOPEZ, MARIO MACHADO, MICHAEL  :
MCCABE, RAYMOND MICKENS, JOHN    :
OSTEEN, BRIAN RODRIGUEZ, SCOTT    :
ROSEBERY, and CHRISTOPHER WITSCHEL,    :
MDC Counselors RAYMOND COTTON,    :

1

CUFFEE, and CLEMMET SHACKS; JOHN :
DOES 1-20, Metropolitan Detention Center, :
Corrections Officers, and the UNITED :
STATES, :
 :
      Defendants. :
-----------------------------------------------------------------x

  Plaintiffs Ibrahim Turkmen, Asif-ur-Rehman Saffi, Syed Amjad Ali Jaffri, Yasser

Ebrahim, Hany Ibrahim, Shakir Baloch, Akhil Sachdeva, and Ashraf Ibrahim (collectively

"Plaintiffs" or "Named Plaintiffs") by and through their attorneys, the Center for Constitutional

Rights, allege the following:

### **NATURE OF ACTION**

 1. Plaintiffs bring this class action on behalf of themselves and the class of male non-

citizens from the Middle East, South Asia, and elsewhere who are Arab or Muslim or have been

perceived by Defendants to be Arab or Muslim, who have been arrested and detained on minor

immigration violations at the Metropolitan Detention Center ("MDC") in Brooklyn, New York

and/or the Passaic County Jail in New Jersey, following the September 11, 2001 terrorist attacks

on the United States ("post-9/11 detainees"), treated as "of interest" to the government's

terrorism investigation and subjected to a blanket "hold until cleared" policy pursuant to which

the Immigration and Naturalization Service ("INS") denied them bond without regard to

evidence of dangerousness or flight risk, and detained them until the Federal Bureau of

Investigation ("FBI") cleared them of terrorist ties.  (OIG Report[1] at 69-70).  All Plaintiffs and

virtually all class members were in fact cleared of any connection to terrorism. (Id. at 27).

---

[1] References throughout to the "OIG Report" are to a report released by the Office of the
Inspector General of the U.S. Department of Justice on June 2, 2003, entitled "The September 11
Detainees:  A Review of the Treatment of Aliens Held on Immigration Charges in Connection
with the Investigation of the September 11 Attacks."  A copy of this report was appended to the
Second Amended Complaint as Exhibit 1 and is incorporated by reference.  It is also available at
http://www.usdoj.gov/oig/special/0306/full.pdf.

Plaintiffs and class members have been subjected to one or more of the following unconstitutional policies and practices: (a) once placed in detention, they were not timely served with a Notice to Appear or any other notice of the charges on which they were being held and were thereby impaired in their ability to understand the reason for their detention, obtain legal counsel, and request release on bond (id. at 27-31); (b) some were classified as being "of high interest" to the government's terrorism investigation, or as "Witness Security" and/or "Management Interest Group 155" detainees in the absence of adequate standards or procedures for making such a determination or evidence that they were involved in terrorism and, on the basis of these classifications, housed in one of the most highly restrictive prison settings possible, the MDC's Administrative Maximum Special Housing Unit ("ADMAX SHU") (id. at 18, 115-16); (c) they were subjected to a communications blackout and other actions that interfered with their access to counsel and their ability to seek redress in the courts (id. At 112-14); (d) they were denied release from detention on bond pursuant to a blanket no-bond policy and other fundamentally unfair procedures; and/or (e) after receiving final removal orders or grants of voluntary departure, they were held in immigration custody far beyond the period necessary to secure their removal or voluntary departure from the United States, again without regard to whether they posed a danger or flight risk, and never afforded on a timely basis a hearing before a neutral judicial officer for a determination as to whether probable cause existed to justify detaining them beyond the time necessary to secure their removal or voluntary departure from the United States (id. at 105).

2.   As a matter of policy and practice, Defendants have kept Plaintiffs and class members in custody for extended time periods without evidence that they posed a danger of flight risk pursuant to a "hold until cleared policy," not for any legitimate immigration law enforcement

purpose, but to incarcerate them – without probable cause – while law enforcement authorities sought to determine whether they had any ties to terrorism.  Individuals were deemed "of interest" to the terrorism investigation even where Defendants had no affirmative evidence of a connection to terrorism, so long as the FBI could not immediately rule out any connection. (Id. at 18).  After the September 11 attacks, Defendants also adopted a policy of denying bond to any non-citizen deemed "of interest" to the terrorism investigation, even when Defendants had no evidence that the person was dangerous, a flight risk, or connected to terrorism.  (Id. at 76, 78).  Instead of being presumed innocent until proven guilty, these post-9/11 detainees have been presumed guilty of terrorism until proven innocent to the satisfaction of law enforcement authorities.  By adopting, promulgating, and implementing these policies and practices, Defendants John Ashcroft, Robert Mueller, James Ziglar, and others have intentionally or recklessly violated rights guaranteed to Plaintiffs and class members by the Fourth and Fifth Amendments to the United States Constitution, customary international law, and treaty law.

3.   While in detention, the Plaintiffs and class members have been subjected to unreasonable and excessively harsh conditions.  Like Plaintiffs Turkmen and Sachdeva, some class members have been held in overcrowded and unsanitary county jail facilities and housed with potentially dangerous criminal pretrial detainees, even though they themselves have never been charged with a crime.  Like Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, and A. Ibrahim, other class members have been kept in federal facilities, such as the ADMAX SHU of the MDC where they were placed in tiny cells for over 23 hours a day and strip-searched, manacled, and shackled when taken out of their cells.  Like Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, and A. Ibrahim, some class members have suffered physical and verbal abuse by their guards.  Many, including Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, and A. Ibrahim, have been badly

4

beaten.  Like the Plaintiffs, many class members have been denied access to counsel and to the

judicial system.  Like the Plaintiffs, many class members have been denied the ability to practice

their faith during their detention.   By subjecting Plaintiffs and class members to excessive force,

unreasonable and excessively harsh and inhumane conditions, and penalizing them for the

practice of their faith, the Defendants in this action have intentionally and/or recklessly violated

rights guaranteed to Plaintiffs and class members under the First, Fourth, and Fifth Amendments

to the United States Constitution, and under customary international law and treaty law.

    4.   Even though Defendants have kept Plaintiffs and other class members in detention for the

sole purpose of criminal investigation, Defendants have not provided them with the rights to

which those suspected of crimes are entitled under the Constitution.  Defendants have failed to

provide them with a hearing before a neutral judicial officer to determine whether Defendants

had probable cause to believe that the Plaintiffs and other class members were engaged in

criminal activity.  In addition, Defendants have failed to provide Plaintiffs and other class

members with a criminal indictment or information citing criminal charges on which the

detention was based, much less with counsel or a speedy trial.  Instead of being afforded these

fundamental protections, Plaintiffs and other class members were detained indefinitely pending

the outcome of FBI and INS "clearances." In adopting, promulgating, and implementing this

policy and practice, Defendants Ashcroft, Mueller, Ziglar, and others have intentionally or

recklessly violated rights guaranteed to Plaintiffs and class members by the Fourth and Sixth

Amendments to the Constitution.

    5.   Defendants adopted policies and practices that impeded and interfered with Plaintiffs'

ability to obtain legal representation and thereby gain access to court.  They did so by, among

other things, not serving Notices to Appear on a timely basis, thereby delaying bond

redetermination hearings (id. at 27-31); imposing an initial communications blackout (id. at 112-14) and severely limiting phone calls to lawyers even after the blackout ended (id. at 130-31); and assigning certain Plaintiffs to the ADMAX SHU. (Id. at 18, 115-116).  In adopting, promulgating, and implementing this policy and practice, Defendants Ashcroft, Mueller, Ziglar, Hasty, Zenk, and others have intentionally or recklessly violated rights guaranteed to Plaintiffs and class members by the First and Fifth Amendments to the Constitution.

6.   At the time of Plaintiffs' arrests, Defendants confiscated personal identification, money, and valuable personal items from all Plaintiffs and many class members.  In addition, Defendants searched the homes of Plaintiffs and other class members while they were in detention and confiscated items in their homes. When Plaintiffs Turkmen, Baloch, and other class members demanded the return of these items upon release for removal or voluntary departure from the United States, Defendants deliberately deprived Plaintiffs and other class members of these items.  By adopting, promulgating, and implementing this policy and practice, Defendants Ashcroft, Mueller, and Ziglar, and others have intentionally violated rights guaranteed to Plaintiffs and class members under the Fifth Amendment to the Constitution.

7.   During their confinement, Defendants subjected Plaintiffs such as Saffi, Ebrahim, H. Ibrahim, Baloch, A. Ibrahim, and other class members to coercive and involuntary custodial interrogation designed to overcome their will and coerce involuntary and incriminating statements from them.  By adopting, promulgating, and implementing this policy and practice, Defendants Ashcroft, Mueller, Ziglar, John Does 1-20, and others have intentionally violated rights guaranteed to Plaintiffs and class members under the Fifth Amendment to the Constitution.

8.   In arresting Plaintiffs and class members, denying them bond without an adequate evidentiary basis, detaining them under unreasonable and excessively harsh conditions, and

holding them far beyond the time necessary to effectuate their removal, Defendants Ashcroft, Mueller, Ziglar, and others have also engaged in racial, religious, ethnic, and/or national origin profiling.  Plaintiffs' and class members' race, religion, ethnicity, and/or national origin have played a determinative role in Defendants' decision to detain them initially, to subject them to a blanket no-bond policy, to subject them to punishing and dangerous conditions of confinement, and then to keep them detained beyond the point at which removal or voluntary departure could have been effectuated, in violation of the rights guaranteed to them by the Fifth Amendment to the Constitution.

9.   Plaintiffs and other class members seek a judgment declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, are illegal and violate the constitutional rights of Plaintiffs and class members as to each applicable count.  Plaintiffs and other class members also seek a declaration that each individual Plaintiff's detention was unjustified, unconstitutional, unlawful and without probable cause to believe that he had any involvement in the September 11 terrorist attacks or other terrorist activity.  Plaintiffs further seek an injunction compelling Defendants to return all personal identification, money and valuable personal items that were confiscated from them. In addition, Plaintiffs seek compensatory and punitive damages for themselves and all class members, and an award of costs and reasonable attorneys' fees.

10. Plaintiffs also seek relief under the Federal Tort Claims Act, 28 U.S.C. §2671, et seq., ("FTCA") for the torts of false imprisonment, negligence, assault, battery, and the intentional infliction of emotional distress.  Plaintiffs seek compensatory damages from the United States for the harm suffered as a result of Defendants' tortious conduct.  All Defendants were acting within the scope of their employment by the United States when they committed the conduct in

question.  The conduct in question occurred at the times and places where Defendants were performing the duties of their employment, that are traditionally a part of their employment duties in their service to the United States.  All Defendants employed at MDC at the time of the conduct at issue in this suit were working as law enforcement officers under 28 U.S.C. § 2680(h).

## JURISDICTION AND VENUE

11. This action is brought pursuant to the First, Fourth, Fifth, and Sixth Amendments to the Constitution, customary international law, and treaty law as incorporated into federal common law and statutory law.

12. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act), and 28 U.S.C. § 1350 (the Alien Tort Claims Act).

13. The Federal Tort Claims Act confers original jurisdiction on the federal district courts to hear tort claims against the United States. 28 U.S.C. § 1346

14. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## JURY DEMAND

15. Plaintiffs demand trial by jury in this action on each and every one of their claims except that, in keeping with 28 U.S.C. § 1346, Plaintiffs do not demand trial by jury for their claims arising under the FTCA.

# PARTIES

## The MDC Plaintiffs

16. Plaintiff ASIF-UR-REHMAN SAFFI is a native of Pakistan and a citizen of France.  He currently lives on Reunion Island with his wife and three children.  He is a Muslim.  An employee of Pakistani International Airlines for the past 19 years, Saffi came to the United States on July 6, 2001 on a three-month tourist visa.  He has no criminal record in this country or in any other country.  Saffi has never been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, he abhors terrorism.

17. Plaintiff SYED AMJAD ALI JAFFRI is a native of Pakistan and a landed immigrant of Canada.  Jaffri, a Muslim, has a wife and four children who reside in Lahore, Pakistan.  Since May 1997, Jaffri has periodically visited family and friends in the United States, entering this country from Canada or Pakistan on tourist visas.  He has no criminal record in this country or in any other country.  Jaffri has never been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, he abhors terrorism.

18. Plaintiffs YASSER EBRAHIM and HANY IBRAHIM ("H. Ibrahim"), brothers whose surnames are spelled differently, and who are not related to plaintiff Ashraf Ali Ibrahim, are natives of Egypt and Muslims.  Since 1992, Yasser has visited the United States on four occasions, each time on a tourist visa.  In 1996, while in this country on a tourist visa, he married a United States citizen, with whom he lived in Queens, New York, until they separated in 1998.  Shortly thereafter, Yasser returned to Egypt.  In September 2001, Yasser and Hany were in the United States on tourist visas. Neither Yasser nor Hany has a criminal record in this country or in any other country.  Neither has ever been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, both Yasser and Hany abhor terrorism.

19. Plaintiff SHAKIR BALOCH is a native of Pakistan.  Baloch, a Muslim, comes from a prominent political family.  He himself is a member of the Progressive Peoples Party, which is dedicated to the promotion of progressive secularism in Pakistan.  Baloch holds a medical degree from Bolan Medical College in Quetta, Pakistan.  He briefly worked as a family physician in government service in that country.  Baloch became a landed immigrant in Canada in 1989 and a Canadian citizen in 1994.  He has a wife and a 15 year old daughter, both of whom reside in Toronto.  Unable to find work in Canada, Baloch has entered and stayed in the United States for several extended periods over the past decade, most recently in April 2001. Baloch has never been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, he abhors terrorism.

20. Plaintiff ASHRAF IBRAHIM ("A. Ibrahim") is a native of Egypt.  He entered the United States on a six month visa in January 1992.  A. Ibrahim lived continuously in the United States for ten years without petitioning for an adjustment of status.  In August, 2001, A. Ibrahim started up a bottled-water distribution business in Philadelphia.  Mr. Ibrahim has never been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, he abhors terrorism.

**The Passaic Plaintiffs**

21. Plaintiff IBRAHIM TURKMEN is a native and citizen of Turkey, where he lives with his wife and four daughters.  A Muslim Imam by profession, Turkmen came to the United States on October 4, 2000, on a six-month tourist visa.  He has no criminal record either in this country or in any other country.  Turkmen has never been involved with terrorists, terrorist organizations, or terrorist activity.  Indeed, he abhors terrorism.

22. Plaintiff AKHIL SACHDEVA is a native of India and a Hindu.  He holds a bachelor of arts degree in commerce from the University of Delhi.  In December 1998, Sachdeva was

granted landed immigrant status in Canada, and in December 2003, he became a citizen of Canada. Between 1995 and April 2002, when he was deported to Canada following the events complained of herein, Sachdeva had lived in the United States for extended periods of time. In 1998, while working as a travel agent in Canada, Sachdeva married a green card holder who owned a gas station in Long Island, New York. For the next several years, Sachdeva lived with his wife in Long Island and worked at her gas station. During this period, Sachdeva applied to the INS for resident status in the United States. In early 2001, however, Sachdeva and his wife decided to divorce, and he briefly returned to Canada. In late September or early October 2001, Sachdeva re-entered the United States to finalize his divorce and pack his belongings for his move back to Canada. Mr. Sachdeva has never been involved with terrorists, terrorist organizations, or terrorist activity. Indeed, he abhors terrorism.

**Defendants**

23. Defendant JOHN ASHCROFT is the Attorney General of the United States. As Attorney General, Defendant Ashcroft has ultimate responsibility for the implementation and enforcement of the immigration laws. He is a principal architect of the policies and practices challenged here. On information and belief, he also authorized, condoned, and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs and other class members have been detained. Defendant Ashcroft is being sued in his individual capacity.

24. Defendant ROBERT MUELLER is the Director of the Federal Bureau of Investigation. Defendant Mueller was instrumental in the adoption, promulgation and implementation of the policies and practices challenged here. On information and belief, he also authorized, condoned, and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs and

other class members have been detained.  Defendant Mueller is being sued in his individual capacity.

25. Defendant JAMES W. ZIGLAR is the former Commissioner of the INS.  As INS Commissioner, Defendant Ziglar had immediate responsibility for the implementation and enforcement of the immigration laws.  He was the INS's chief executive officer.  Defendant Ziglar was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged here.  On information and belief, he also authorized, condoned and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs and other class members have been detained. Defendant Ziglar is being sued in his individual capacity.

The MDC Defendants

26. Defendant DENNIS HASTY, until the spring of 2002, was the Warden of the MDC.  While warden, Defendant Hasty had immediate responsibility for the conditions under which Plaintiffs and other class members have been confined at the MDC.  While Warden, Defendant Hasty subjected Plaintiffs and other class members confined at the MDC to unreasonable and excessively harsh conditions in violation of the Constitution and international law norms.  Defendant Hasty is being sued in his individual capacity.

27. Defendant MICHAEL ZENK is currently the warden of the MDC.  As Warden, Defendant Zenk has immediate responsibility for the conditions under which Plaintiffs and other class members have been confined at the MDC.  On information and belief, as Warden, Defendant Zenk has subjected Plaintiffs and class members confined at the MDC to unreasonable and excessively harsh conditions in violation of the Constitution and international law norms. Defendant Zenk is being sued in his individual capacity.

28. Defendant SHERMAN, at all times relevant to this complaint, was the MDC Associate Warden for Custody.  Sherman is being sued in his individual capacity

29. Defendant SALVATORE LOPRESTI, at all times relevant to this complaint, was a Captain at the MDC.  LoPresti is being sued in his individual capacity

30. Defendant STEVEN BARRERE, at all times relevant to this complaint, was a Lieutenant at the MDC.  Barrere is being sued in his individual capacity.

31. Defendant WILIAM BECK, at all times relevant to this complaint, was a Lieutenant at the MDC.  Beck is being sued in his individual capacity.

32. Defendant LINDSEY BLEDSOE, at all times relevant to this complaint, was a Lieutenant at the MDC.  Bledsoe is being sued in his individual capacity.

33. Defendant JOSEPH CUCITI, at all times relevant to this complaint, was a Lieutenant at the MDC.   Cuciti is being sued in his individual capacity

34. Defendant HOWARD GUSSAK, at all times relevant to this complaint, was a Lieutenant at the MDC.  Gussak is being sued in his individual capacity.

35. Defendant MARCIAL MUNDO, at all times relevant to this complaint, was a Lieutenant at the MDC.   Mundo is being sued in his individual capacity.

36. Defendant DANIEL ORTIZ, at all times relevant to this complaint, was a Lieutenant of the MDC.  Ortiz is being sued in his individual capacity

37. Defendant STUART PRAY, at all times relevant to this complaint, was a Lieutenant at the MDC.  Pray is being sued in his individual capacity.

38. Defendant ELIZABETH TORRES, at all times relevant to this complaint, was a Lieutenant at the MDC. Torres is being sued in her individual capacity.

39. Defendant PHILLIP BARNES, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Barnes is being sued in his individual capacity.

40. Defendant SIDNEY CHASE, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Chase is being sued in his individual capacity.

41. Defendant MICHAEL DEFRANCISCO, at all times relevant to this complaint, was a Correctional Officer at the MDC.  DeFrancisco is being sued in his individual capacity.

42. Defendant RICHARD DIAZ, at all times relevant to this complaint, was a Correctional Officer at the MDC. Diaz is being sued in his individual capacity.

43. Defendant KEVIN LOPEZ, at all times relevant to this complaint, was a Correctional Officer at the MDC. Lopez is being sued in his individual capacity.

44. Defendant MARIO MACHADO, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Machado is being sued in his individual capacity.

45. Defendant MICHAEL MCCABE, at all times relevant to this complaint, was a Correctional Officer at the MDC.  McCabe is being sued in his individual capacity.

46. Defendant RAYMOND MICKENS, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Mickens is being sued in his individual capacity.

47. Defendant JOHN OSTEEN, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Osteen is being sued in his individual capacity.

48. Defendant BRIAN RODRIGUEZ, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Rodriguez is being sued in his individual capacity.

49. Defendant SCOTT ROSEBERY, at all times relevant to this complaint, was a Correctional Officer at the MDC.  Rosebery is being sued in his individual capacity.

50. Defendant CHRISTOPHER WITSCHEL, at all times relevant to this complaint, was a Correctional Officer at the MDC. Witschel is being sued in his individual capacity.

51. Defendant RAYMOND COTTON, at all times relevant to this complaint, was a Counselor at the MDC.  Cotton is being sued in his individual capacity.

52. Defendant CUFFEE, at all times relevant to this complaint, was a Counselor at the MDC. Cuffee is being sued in his individual capacity.

53.  Defendant CLEMMET SHACKS, at all times relevant to this complaint, was a Counselor at the MDC.  Shacks is being sued in his individual capacity.

## CLASS ACTION ALLEGATIONS

54. Plaintiffs seek to represent a certified Plaintiff class consisting of all male non-citizens from the Middle East, South Asia and elsewhere who are Arab or Muslim or have been perceived by Defendants as Arab or Muslim and who have been:

> (a)     arrested by the INS or FBI after the September 11, 2001 terrorist attacks and charged with immigration violations;

> (b)     treated as being "of interest" to the government's terrorism investigation and subjected to a blanket "hold until cleared" policy pursuant to which they were held without bond, without regard to evidence of dangerousness or flight risk, until cleared of terrorist ties by the FBI; and

> (c)     detained at the MDC or the Passaic County Jail.

In addition, Plaintiffs and the other members of the class were subjected to one or more of the following policies and practices:

> (a)     once placed in detention, they were not timely served with a Notice to Appear or any other notice of the charges on which they were being held and were thereby impaired in their ability to understand the reason for their detention, obtain legal counsel, and request release on bond;

> (b)     some were classified as being "of high interest" to the government's terrorism investigation or as "Witness Security" and/or "Management Interest Group 155" detainees in the absence of adequate standards or procedures for

making such a determination or evidence that they were involved in terrorism and, on the basis of these classifications, housed in the highly restrictive ADMAX SHU of the MDC in Brooklyn, New York;

(c)      they were subjected to a communications blackout and other actions that interfered with their access to counsel and their ability to seek redress in the courts;

(d)      they were denied release from detention on bond pursuant to a blanket no-bond policy and other fundamentally unfair procedures; and/or

(e)      after receiving final removal orders or grants of voluntary departure, they were held in immigration custody far beyond the period necessary to secure their removal or voluntary departure from the United States, without regard to any evidence that they were dangerous or a flight risk, and never afforded, or else not timely afforded, a hearing before a neutral judicial officer for a determination as to whether probable cause existed to justify detaining them beyond the time necessary to secure their removal or voluntary departure from the United States.

55. The members of the class are too numerous to be joined in one action, and their joinder is impracticable in part because Defendants have kept their identities secret.  While the exact number is presently unknown to Plaintiffs' counsel, the Department of Justice Office of Inspector General was able to identify approximately 475 September 11 detainees who were held at MDC and Passaic and were subjected to the policies challenged in this action.  (OIG Report at 5). Moreover, the subclass of Plaintiffs detained after they could have been deported likely exceeds 87 individuals.  See Though Not Linked to Terrorism, Many Detainees Cannot Go Home, N.Y. Times, Feb. 18, 2002, at A1 (reporting that the United States Department of Justice blocked the departure of 87 mostly Arab or Muslim non-citizens who received voluntary departure or removal orders, "while investigators comb[ed] through information pouring in from overseas to ensure that they have no ties to terrorism").

56. Common questions of law and fact exist as to all class members and predominate over questions that affect only the individual members.  These common questions include, but are not limited to:

(a)       whether Defendants adopted, promulgated, and implemented a policy and practice of depriving Plaintiffs and class members of their Fourth Amendment right to be free from unreasonable seizures by detaining them months longer than necessary to secure their removal or voluntary departure from the United States;

(b)       whether Defendants adopted, promulgated, and implemented a policy and practice depriving Plaintiffs and class members of their liberty without due process of law in violation of the Fifth Amendment and customary international law by detaining them months longer than necessary to secure their removal or voluntary departure from the United States;

(c)       whether Defendants adopted and implemented a policy of denying bond to all "of interest" detainees, without regard to evidence of danger or flight risk;

(d)       whether Defendants adopted, promulgated, and implemented policies and practices depriving Plaintiffs and class members of their liberty without due process of law in violation of the Fifth Amendment and in violation of their rights under customary international law, by subjecting them to outrageous, excessive, cruel, inhumane, and degrading conditions of confinement;

(e)       whether Defendants adopted, promulgated and implemented a policy and practice depriving Plaintiffs and class members of their rights under the Fourth and Sixth Amendments, including the right to a probable cause determination made by a neutral judicial officer, the right to be provided on a timely basis with a criminal indictment or information citing the criminal charges on which the detention is based, and the right to a speedy trial;

(f)       whether Defendants adopted, promulgated, and implemented a policy and practice under which Plaintiffs and class members were subjected to coercive and to involuntary custodial interrogation designed to overcome their will and to coerce involuntary and incriminating statements from them, depriving Plaintiffs and class members of their right to due process of law under the Fifth Amendment;

(g)       whether Defendants adopted, promulgated, and implemented a policy depriving Plaintiffs and class members of equal protection of the law in violation of the Fifth Amendment by detaining them months longer than necessary to secure their removal or voluntary departure from the United States because of their race, religion, ethnicity, and/or national origin;

(h)       whether Defendants adopted, promulgated, and implemented a policy confiscating the personal property of Plaintiffs and class members in violation of the Fifth Amendment;

(i)     whether Defendants adopted, promulgated, and implemented a policy under which Plaintiffs and class members were interrogated by FBI and other federal agents and deprived of the opportunity to obtain counsel in violation of the Sixth Amendment to the Constitution; and

(j)     whether Defendants adopted, promulgated, and implemented a policy which violated Plaintiffs' and class members' rights under the First Amendment to practice their religion.

57. Plaintiffs' claims are typical of those of the class for reasons that include the following. First, each Plaintiff is a male non-citizen of Middle Eastern or South Asian descent who is Arab or Muslim or has been perceived by Defendants to be Arab or Muslim. Second, each Plaintiff was arrested and detained subsequent to the September 11 terrorist attacks and charged with minor (but deportable) immigration violations. Third, each Plaintiff has been treated as "of interest" to the government's terrorism investigation, and subjected to a blanket "hold until cleared" policy pursuant to which he was held in INS detention without regard to evidence of danger or flight risk, until cleared of terrorist ties by the FBI. Fourth, each Plaintiff subsequently received a removal or voluntary departure order and was held for months longer than necessary to secure his removal or voluntary departure from the United States while he was cleared of terrorist ties, again without regard to evidence of danger or flight risk. Fifth, each Plaintiff was held under unreasonable and excessively harsh conditions of confinement and those housed in MDC were subjected to a communications blackout. Sixth, each Plaintiff was never afforded, or else not afforded on a timely basis, a hearing before a neutral judicial officer to determine whether there was probable cause to detain them beyond the time when all legitimate immigration law enforcement purposes had been served. Seventh, the race, religion, ethnicity and/or national origin of each plaintiff played a determinative role in Defendants' decision to detain them.

58. The legal theories on which Plaintiffs rely are the same or similar to those on which all class members would rely, and the harms suffered by them are typical of the harms suffered by the other class members.

59. Plaintiffs will fairly and adequately protect the interests of the class.  The interests of the class representatives are consistent with those of the class members.  In addition, Plaintiffs' counsel are experienced in class actions and civil rights litigation.

60. Plaintiffs' counsel know of no conflicts of interest among class members or between the attorneys and class members that would affect this litigation.

61. Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court which individual litigation of these claims would impose.

62. The Plaintiff class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("Rule 23(b)(3)") for determination of liability because Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory relief appropriate.

63. Common questions of law and fact also clearly predominate within the meaning of Rule 23(b)(3).  Class action treatment provides a fair and efficient method for the adjudication of this controversy, affecting a large number of persons, joinder of whom is impracticable.  The class action provides an effective method whereby the enforcement of Plaintiffs' and class members' rights can be fairly managed without unnecessary expense and duplication.

## STATEMENT OF FACTS

**General Allegations**

64. In the wake of the September 11 terrorist attacks, the INS arrested and detained well over 1,200 male, non-citizens from the Middle East, South Asia, and elsewhere, who appeared to be Arab or Muslim, mostly on minor immigration violations -- such as overstaying visas, working illegally on tourist visas, or failing to meet matriculation and/or course work requirements for student visas.  While the INS has sometimes in the past sought to remove non-citizens for these violations, it generally has not detained them during their removal proceedings.

65. On information and belief, the INS has taken a different approach with post-9/11 detainees, not because they violated the immigration laws -- that alone does not justify detention under the immigration laws -- but rather because federal law enforcement authorities deemed them potential (but not actual or even probable) terrorists, often based on vague suspicions rooted in racial, religious, ethnic, and/or national origin stereotypes rather than in hard facts.

66. On information and belief, many post-9/11 detainees have been held for weeks, even months in INS facilities or county jails, without any charges being filed against them and without any hearing on the reasons for their detention.  Eventually, the INS has filed charges against most post-9/11 detainees, alleging that they committed minor immigration violations and not criminal offenses.

67. On information and belief, after immigration hearings, many post-9/11 detainees have received final removal orders or accepted voluntary departure orders.  Even though the INS could have promptly secured the removal or voluntary departure of these individuals, it has kept them in custody in some cases over six months after the issuance of their final immigration orders -- far longer than necessary to secure their removal or voluntary departure from the United

20

States, and well beyond the time that the INS is statutorily authorized to detain them.  8 U.S.C. §

1231(a)(1) (90-day removal period); 8 U.S.C. § 1229c(b)(2) (60-day period for voluntary

departure granted at the conclusion of removal proceedings).

68. On information and belief, most, if not all, post-9/11 detainees have been kept in custody

after the issuance of final removal or voluntary departure orders until they have received two

"clearances" -- one from the FBI and the other from INS -- absolving them of any linkage to

terrorists or terrorist activities.  In effect, federal law enforcement authorities have deemed post-

9/11 detainees "guilty of terrorism until cleared," instead of "innocent until proven guilty."  The

FBI and INS clearances have frequently taken four months or longer.

69. On information and belief, from the outset, the arrest, processing, and detention of post-

9/11 detainees have been shrouded in extreme secrecy.  Most were held incommunicado for the

first few weeks of their detention.  Family members thus initially had great difficulty finding out

whether their loved ones had been arrested and detained, and if so, where they were being held.

To add to the secrecy, the INS has designated post-9/11 detainees as "special interest cases,"

which had the effect of closing their immigration hearings, not only to the general public but also

to family members, and sealing the records in their cases.

70. On information and belief, while in INS custody, most post-9/11 detainees have been

repeatedly interrogated by both FBI and INS agents.  Very few have been represented by counsel

during these interrogations.  Many have not even been told of their right to counsel.  Others have

been coerced to waive that right, even though they could not read the printed English language

on the waiver forms which they were instructed to sign and even though they did not fully

understand the nature of the right being waived.  When post-9/11 detainees have asked to

adjourn interrogations so they can consult with an attorney, FBI and INS agents have generally

refused to do so.

71. On information and belief, post-9/11 detainees have had great difficulty obtaining legal representation, even after they were no longer held incommunicado. Some post-9/11 detainees have been held for months following their arrest, with their status and whereabouts unknown to their lawyers and their families. Others have been moved to different facilities without their lawyers' knowledge. For several months after the September 11 terrorist attacks, post-9/11 detainees held at the MDC were allowed to make only one call per month to their attorneys and only one call per month to their families. At both the MDC and the Passaic County Jail, post-9/11 detainees are allowed to make only collect calls, which few law offices accept from strangers. While INS detainees typically receive a list of organizations that might provide free legal services, the lists given to post-9/11 detainees have been woefully inadequate, containing much inaccurate and outdated information.

72. On information and belief, while civil liberties, civil rights, and immigrant advocacy organizations have been ready, willing, and able to provide free legal services to post-9/11 detainees, Defendants Ashcroft, Mueller, Ziglar, Hasty, Zenk and their employees, agents, and contractors have substantially limited such organizations' access to post-9/11 detainees. They have imposed a virtual "blackout" on information on post-9/11 detainees, refusing to disclose their names, the facilities in which they are being held, or information about their cases. They have also denied requests by civil liberties, civil rights, and immigrant advocacy organizations to visit INS facilities or county jails to screen post-9/11 detainees in need of legal assistance.

73. On information and belief, even though non-citizen INS detainees must be advised of their right to seek assistance from their consulates under Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77 ("Vienna Convention"), many

post-9/11 detainees have not been advised of this right.  Others have been coerced to waive that right, even though they cannot read the printed English language on the waiver forms which they are asked to sign and do not understand the nature of the right being waived.  When post-9/11 detainees have sought to contact their consulates, their requests have been denied.

74. On information and belief, shortly after the September 11 terrorist attacks, Defendants Ashcroft, Mueller, and Ziglar adopted, promulgated and implemented policies within the INS and the FBI to detain Arab or Muslim men of Middle Eastern and South Asian origin as suspects in a criminal investigation, notwithstanding the fact that in many instances they lacked probable cause to do so, in violation of the Fourth Amendment.  To accomplish this goal, Defendants used the pretext of violations of the INA to detain Plaintiffs and the class for criminal purposes.  The circumstances of most of these detentions deviated from standard INS practice in the following respects:

> (a)      nearly all of the detainees are Arab or Muslim men of Middle Eastern or South Asian origin;
>
> (b)      nearly all have been arrested and detained for minor immigration violations and on scant evidence of dangerousness or flight risk;
>
> (c)      nearly all have often been held for more than 48 hours without notice of the charges against them;
>
> (d)      nearly all have been denied bond; and
>
> (e)      nearly all have been held in detention without cause for as long as six months after their final deportation or voluntary departure orders could have been carried out.

75. Even though Plaintiffs and other class members have been detained indefinitely for the purposes of a criminal investigation, Defendants have deliberately denied them the mandatory constitutional, statutory, and common law protections afforded criminal defendants, including

access to the courts, by, among other things:

> (a)    failing to comply with the requirement that a detained suspect in a criminal investigation be brought promptly before an independent magistrate for a probable cause determination;

> (b)    precluding them from obtaining legal representation by holding them incommunicado and refusing access to legal services and civil rights organizations that would have provided legal assistance;

> (c)    subjecting them to coercive interrogation, while in detention, despite repeated requests for adjournment to contact counsel;

> (d)    subjecting them to outrageous, excessive, cruel, inhuman, and degrading conditions of confinement, and excessive force; and

> (e)    coercing them to waive their right to consular access.

76. Defendants have adopted, promulgated, and implemented their detention policies, in whole or in part, based on invidious animus against Arabs and Muslims, in violation of the First and Fifth Amendments to the Constitution. Such invidious animus is evidenced by, among other things:

> (a)    the above-mentioned unconstitutional policies have not been applied to all non-citizens in the United States alleged to have violated the immigration laws. Since the September 11 terrorist attacks, virtually all of these non-citizens arrested and detained on minor immigration violations have been Arab or Muslim or perceived to have been Arab or Muslim;

> (b)    they have been detained in situations where similarly situated non-Arabs and non-Muslims have not been detained;

> (c)    they have been detained beyond the time necessary to secure their removal or voluntary departure from the United States, while similarly situated non-Arab and non-Muslim detainees have been removed or allowed to depart within a matter of days or weeks after final removal or voluntary departure orders have been issued;

> (d)    they have been verbally abused and subjected to statements slandering the Muslim faith and their adherence to it by the Defendants, including Defendant Ashcroft, who has expressed anti-Muslim sentiments, including, reportedly, a statement proclaiming the inferiority, moral and otherwise, of the Muslim people,

to wit: "Islam is a religion in which God requires you to send your son to die for him. Christianity is a faith in which God sends his son to die for you;" and

(e)      they have been targeted for disparate treatment by Defendant Ashcroft who announced the policy that Plaintiffs and class members would be arrested and detained for any reason regardless of the *de minimis* nature of their infractions, and thereby eliminated for Plaintiffs and class members any access to the fair and reasonable discretion of law enforcement officials.  This fair and reasonable discretion remains available to non-Arab and non-Muslim individuals who are non-citizens.  Defendant Ashcroft's policy announcement stated:  "Let the terrorists among us be warned.  If you overstay your visa even by one day, we will arrest you.  If you violate a local law we will...work to make sure that you are put in jail and...kept in custody as long as possible."

## Inspector General's June 2003 Report on the September 11 Detainees

77. On June 2, 2003, the Office of the Inspector General of the United States Department of Justice released a 198-page report entitled "The September 11 Detainees:  A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks" ("OIG Report").  The OIG Report provides a wealth of details concerning the Government's treatment of the post-9/11 detainees.  A copy of this report is attached to the Second Amended Complaint as Exhibit 1 and is incorporated by reference.

78.  According to the OIG Report, the INS consistently delayed in issuing and serving the post-9/11 detainees with charging documents (known as Notices to Appear or NTAs) far beyond the 48-hour period specified in its regulations at 8 C.F.R.  §  287.3 for issuing an NTA and its post-9/11 goal of serving an NTA within 72 hours. (OIG Report at 29-30).  In doing so, the INS impaired the ability of detainees to know the charges on which they were being held, obtain legal counsel, and seek release on bond. (Id. at 35.)  On information and belief, Plaintiffs Ebrahim and H. Ibrahim were not served with NTAs until seventeen days after their respective arrests; Plaintiff Sachdeva was not served until seven days after his arrest; Plaintiff Jaffri was not served until four days after his arrest; service of an NTA on Plaintiff A. Ibrahim was unreasonably

delayed; and, on information and belief, other class members were similarly impacted by these delays.

79. According to the OIG Report, as a matter of custom and policy, Defendants and other federal officials instituted a blanket "no bond" policy for all individuals arrested in connection with September 11 investigations that was applied without regard to whether the person posed a flight risk or a danger. (Id. at 76, 78.) INS District Directors were ordered to make an initial determination of no bond for all post-9/11 detainees. (Id. at 76-77.) Moreover, Defendants and other federal officials ordered INS Trial Attorneys to seek continuances and delays of bond redetermination hearings and to oppose bond even when there was no evidence to support the denial of bond. (Id. at 78-80.) All of the Plaintiffs and class members were subjected to Defendants' blanket no bond policy.

80. According to the OIG Report, many post-9/11 detainees were classified as "of high interest" to the Government's terrorism investigation without specific criteria or a uniform classification system. (Id. at 18.) The FBI requested that the INS place these "of high interest" detainees at Metropolitan Detention Center ("MDC"). (Id.) Once assigned to MDC, the Bureau of Prisons ("BOP") classified the detainees as "Witness Security" and/or "Management Interest Group 155" detainees without individual assessment or uniform criteria of any sort. (Id. at 115-16.) Upon information and belief and according to the OIG Report, BOP regulations require an employee known as the Segregation Review Official to conduct a weekly review of the status of each inmate housed in the Special Housing Unit ("SHU") after he has spent seven days in administrative detention or disciplinary segregation. (Id. at 118.) The Segregation Review Official is also required to conduct a formal hearing every 30 days assessing the inmate's status. (Id.) These review processes were not conducted for the post-9/11 detainees. (Id.) Officials at

MDC were told by BOP headquarters that until the FBI had cleared a particular detainee, that detainee's report was to be automatically annotated with the phrase "continue high security," no hearing was to take place, and the detainee was to remain under restrictive detention in the Administrative Maximum ("ADMAX") SHU.  (Id.)  Upon information and belief, Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, A. Ibrahim, and other class members were improperly designed as high security status and denied a fair review process as the result of these procedures.

81. These arbitrary and capricious classifications resulted in severe deprivations of liberty. The "of high interest" detainees were placed in the ADMAX SHU, a particularly restrictive type of SHU uncommon to most BOP facilities because the normal SHUs "are usually sufficient for correcting inmate misbehavior and addressing security concerns."  (Id. at 118-19.)  The ADMAX SHU at MDC was established after September 11, 2001 to make available more restrictive confinement.  (Id. at 119.)  Unlike regular SHUs, ADMAX SHUs enforce four-man hold restraint policies, use hand-held cameras to record detainee movements, and have cameras in each cell to monitor detainees. (Id.)  Unlike detainees in the general population at MDC, detainees in the ADMAX SHU were not allowed to move around the unit, use the telephone freely, or to have electronic equipment (such as small radios).  (Id.)  ADMAX SHU detainees could only move outside their cells while restrained and accompanied by four staff members, and only then for specific purposes.  (Id.)  ADMAX SHU detainees were strictly limited in their telephone use in terms of both frequency and duration of calls.  (Id.)  Unlike the general MDC population, all attorney and family visits were non-contact, with a clear partition between the parties.  (Id. at 123.)  Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, A. Ibrahim, and other

class members were subjected to these restrictive conditions in the ADMAX SHU for between three and eight months.

82.  According to the OIG Report, detainees at the ADMAX SHU in MDC were subjected to a communications blackout that barred them from receiving telephone calls, visitors, mail, or placing telephone calls. (Id. at 113.)  During this period, detainees were unable to make any contact with attorneys or their families.  (Id. at 114.)  Compounding this situation, the detainees' classification as "Witness Security" and/or "Management Interest Group 155" led MDC to turn away lawyers and family members who came to the facility seeking individual detainees by falsely stating that the individuals were not detained inside.  (Id. at 115.)   Upon information and belief, Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, A. Ibrahim, and other class members were subjected to the communications blackout for a period of time ranging from two weeks to two months or even longer.

83. According to the OIG Report, the detainees arbitrarily labeled "of high interest" were placed in the ADMAX SHU and subjected to the communication blackout pursuant to a joint policy of the FBI, INS, and Bureau of Prisons ("BOP").  (Id. at 18.)  INS Commissioner Ziglar, FBI Director Mueller, and Attorney General Ashcroft ordered and/or condoned the prolonged placement of these detainees in extremely restrictive confinement.  (Id. at 17, 37-39, 66, 77.)

84. According to the OIG Report, the INS held detainees long after removal could have been effectuated, simply because the FBI had not completed its "clearance" process.  As a matter of policy and practice, and in keeping with its "hold until cleared" policy, INS did not conduct post-order custody reviews for post-9/11 detainees held more than 90 days after their final removal orders. (Id. at 91, 107-108.)  These reviews are required by the INS regulations at 8 C.F.R. § 241.4, and provide that detainees must be given 30 days notice of the review and that the INS

complete the review 90 days after the issuance of a final removal order.  On information and belief, Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Sachveda, A. Ibrahim, and other class members were not given notice of such a review and no such review was conducted.

**The Challenged MDC Policies and Customs and the Inspector General's December 2003 Supplemental Report on the September 11 Detainees**

85. In December 2003, the OIG released a 47-page report entitled "Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York" ("Supp. OIG Report") (attached without appendices as Exhibit 1, and available at http://www.usdoj.gov/oig/special/0312/final.pdf).  The Supplemental Report sheds further light on the Government's mistreatment of Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Sachveda, Baloch, A. Ibrahim ("MDC Plaintiffs"), and other class members who were detained at MDC.

86. None of the MDC Plaintiffs or class members had terrorist ties or posed any danger to others.  Yet, because the FBI and BOP classified them as "high interest" or "WTC" detainees, the MDC Defendants viewed the MDC Plaintiffs and class members as terrorists responsible for the bombings of the World Trade Center and displayed tremendous anger towards them.  (See id. at 4, 26.)  In the highly charged atmosphere at MDC in the weeks and months following the September 11 attacks, the MDC Plaintiffs and class members were routinely subjected to threats and violence, despite the fact that they were fully compliant and the use of force was completely unnecessary and against BOP policy.  (See id. at 8, 10, 11, 13, 15.)  Not only were the MDC Correctional Officers ("CO's") out of control, their Lieutenants condoned and even encouraged the physical and verbal abuse and in some cases joined in it.

**COMMUNICATIONS BLACKOUT AT MDC**

**Policy to Hold Detainees Incommunicado**

87. From the outset, the arrest, processing, and detention of the post-9/11 detainees were shrouded in extreme secrecy. Most were held incommunicado for the first few weeks of their detention. Family members, friends, and even attorneys initially had great difficult finding out whether their loved ones had been arrested and detained, and if so, where they were being held. The classification of Post-9/11 Detainees as "special interest cases" had the effect of closing their immigration hearings, not only to the general public, but also to family members, and the sealing of their case records. (OIG Report at 115-18.)  During this period, the MDC Plaintiffs and class members were subjected to a communications blackout and were unable to make any contact whatsoever with attorneys or their families. (See id. at 113-14.)  Compounding this situation, their classification as "Witness Security" and/or "Management Interest Group 155" led MDC staff to turn away their lawyers and family members who came to the facility seeking individual detainees by falsely stating that the individuals were not detained in the facility. (See id. at 115.)

**Policy To Deny Detainees Access to Counsel**

88. While in custody, the MDC Plaintiffs and class members were not told of their right to counsel during interrogations by INS and FBI agents or were coerced into waiving that right. Moreover, the MDC Plaintiffs and class members were repeatedly and deliberately denied access to counsel. (Id. at 42.)  When Plaintiffs Ebrahim, H. Ibrahim, Baloch, and other class members asked to adjourn interrogations so they could consult with an attorney, FBI and INS agents refused to do so. Plaintiffs Ebrahim and H. Ibrahim and other class members signed affidavits indicating that they had been informed of their right to counsel and that they were willing to make their statements without anyone else present only after they had asked to call an attorney

again and again and their requests were denied, leading them to conclude that they would not be permitted access to counsel in any case.

89. Upon information and belief, the MDC Plaintiffs and class members had great difficulty obtaining legal representation, and some were held for months following their arrest while their lawyers and their families made unsuccessful requests to learn their status and whereabouts.

90. Upon information and belief, even when the MDC Plaintiffs and class members were finally permitted to make telephone calls in or about the end of October, 2001, they were allowed to make only one call per week to their attorneys and only one social call per month; in practice, they were frequently denied even these limited calls.  According to the OIG Report, "detainees complained that legal calls that resulted in a busy signal or calls answered by voicemail counted as their one legal call for that week," leading the OIG to conclude that counting calls that "only reached a voicemail, resulted in a busy signal, or went to the wrong number was unduly restrictive and inappropriate."  (OIG Report at 161.)

91. On information and belief, the officers in charge of inmate phone calls were Raymond Cotton, Cuffee, and Clemmet Shacks.  These officers, but especially Cotton, consistently and deliberately obstructed the MDC Plaintiffs and class members in their efforts to make phone calls.  The officers would bring a phone around to each cell, often before offices opened for business, and each inmate who requested a phone call was required to place a call request form outside of their cell.  Upon information and belief, Cotton, Cuffee, and Shacks would regularly pretend to dial a number or deliberately dial the wrong number and then claim that the line was dead or busy. They would then refuse to dial again, saying the call failed to go through and that the detainee had exhausted his quota for calls for the week or month. As a result, the MDC Plaintiffs and class members' access to attorneys was impaired.

92. Once the MDC Plaintiffs and class members were permitted social calls at MDC in or about the end of October 2001, these, too, were severely restricted.  Furthermore, the MDC Plaintiffs and class members were denied access to paper, pens, envelopes, and stamps and were unable to communicate to their worried families via mail.

93. Some MDC Plaintiffs found their access to counsel blocked even during immigration hearings. Plaintiff A. Ibrahim repeatedly requested permission to make phone calls but was not permitted to contact his family or a lawyer until October 17, 2001, despite having had two hearings scheduled before an immigration judge between his detention and that date.  After a hearing on October 3, 2001, at which Immigration Judge Vomacka told MDC personnel that A. Ibrahim should be permitted to contact a lawyer, A. Ibrahim repeated his requests for a legal phone call.  His requests were again denied.  Moreover, Officer Chase and Raymond Cotton ridiculed A. Ibrahim when he made these requests.  For example, Raymond Cotton would say in a sarcastic tone "Oh yeah, right away," but then fail to act on A. Ibrahim's request.

94. The MDC Plaintiffs and class members were not provided with sufficient information to obtain legal counsel.  Immigration detainees typically receive a list of organizations that might provide free legal services, but the lists given to post-9/11 detainees were woefully inadequate, containing much inaccurate and outdated information.  (See OIG Report at 137-38, 161.)

95. The OIG concluded that "the manner in which the MDC inquired whether the detainees wanted to place a legal call was unclear and inappropriate.  In many instances, the unit counsel inquired whether September 11 detainees in the ADMAX SHU wanted their weekly legal call by asking, 'are you okay?'  For some period, several detainees told the OIG that they did not realize that an affirmative response to this rather casual question meant they opted to forgo their legal call for that week."  (Id.)

32

96. While civil liberties, civil rights, and immigrant advocacy organizations sought to provide free legal services to post-9/11 detainees, the MDC substantially limited such organizations' access to post-9/11 detainees.  (OIG Report at 137.)  The MDC refused to disclose detainees' names, the facilities in which they were held, or information about their cases.  They also denied requests by civil liberties, civil rights, and immigrant advocacy organizations to visit INS facilities or county jails to screen post-9/11 detainees in need of legal assistance.  (Id. at 136.)  On information and belief, MDC Defendants applied these policies to the MDC Plaintiffs and class members, further obstructing their access to counsel and contact with family members.

**Video and Audio Taping Attorney/Client Conversations Policy**

97. MDC instituted a policy of intentionally videotaping and audiotaping detainees' visits with their attorneys in violation of the law. (Supp. OIG Report at 31.)  Such recording of inmates' meetings with attorneys is prohibited by 28 C.F.R. § 543.13(e), which provides that "Staff may not subject visits between an attorney and an inmate to auditory supervision."  (Supp. OIG Report at 31.)  While Attorney General Ashcroft instituted a directive allowing monitoring of attorney-inmate meetings under limited circumstances when approved by the Attorney General (28 C.F.R. § 501.3(d)), "[a]ccording to BOP's Office of General Counsel, this authority was not used at the MDC".  (Supp. OIG Report at 32.)  Similarly, a December 18, 2001 memorandum to wardens in the Northeast Region (including the MDC), provided guidance for *video* taping attorney visits, but clearly indicated "Visits from attorneys may be visually recorded, but not *voice* recorded."  (Id.)  "No BOP or MDC memorandum specifically authorized taping attorney visits for the September 11 detainees for identified reasons to depart from standard BOP policy or the federal regulation."  (Id.)

98. According to the Supplemental OIG Report, "[r]ecording the detainees' attorney visits . . . was not necessary for the MDC's security purposes."  (Id.)  The OIG concluded that "audio taping attorney visits violated the law and interfered with the detainees' effective assistance of counsel."  (Id. at 33.)

99. On information and belief, when Plaintiffs Ebrahim, H. Ibrahim, Baloch, and Jaffri and other class members finally succeeded in meeting with attorneys, their meetings were videotaped by MDC Defendants, with the sound recording turned on. Their attorneys' objections to the taping of meetings were ignored by the MDC Defendants.  As a result, they were extremely reluctant to speak candidly with their attorneys out of fear that their conversations were being recorded.

**Denial of Consular Rights Policy**

100.    According to the OIG Report, the classification of the post-9/11 detainees as "WITSEC" (Witness Security) by the BOP "made it difficult for consulates to contact detainees who were citizens of their countries.  (OIG Report at 142.)

101.    Though non-citizen immigration detainees must be advised of their right to seek assistance from their consulates under Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, TIAS 6820, 21 U.S.T. 77 ("Vienna Convention"), many Plaintiffs and class members were not advised of this right.  Others were coerced into waiving that right by signing forms they did not understand.  When the MDC Plaintiffs and class members sought to contact their consulates, their requests were repeatedly denied by the MDC Defendants.

**ABUSE AND INHUMANE CONDITIONS OF CONFINEMENT AT MDC**

**Physical Abuse**

102.   The MDC Plaintiffs and class members were routinely physically abused by MDC

staff, including by all of the MDC Correctional Officer Defendants.  Such abuse was more

frequent before the MDC began videotaping detainee escorts in early October 2001 (see Supp.

OIG Report at 4), but continued even after that time, as substantiated by the OIG investigation

103.   The OIG reported that "30 detainees reported allegations against approximately 20

MDC staff members."  (Id. at 6)  The OIG found six categories of physical abuse alleged by

detainees (id.), all of which were substantiated through interviews with MDC staff, detainees'

attorneys, and by observing MDC videotapes:

> (a) Slamming detainees against walls:  Many detainees alleged that MDC staff
> members slammed them in to walls during escorts, including when they first
> arrived and  on the way to attorney and doctor visits and recreation.  (Supp. OIG
> Report at 8.)  Upon arrival to the MDC, staff slammed post-9/11 detainees against
> the wall and pushed their faces into a t-shirt hanging on the wall which displayed
> the slogan "These Colors Don't Run" and the American Flag.  (Id. at 11-12, 14,
> 31, 37-38.)  The slamming caused extreme pain, bruises, and lacerations, at times
> drawing blood.  (Id. at 8, 12-13, 15.)  The OIG substantiated these allegations in
> interviews with a former MDC lieutenant (Id. at 10), and videotapes also show
> officers slamming detainees on walls, as well as a tennis-ball sized bruise on one
> detainee from wall-slamming (Id. at 11.)  The wall-slamming was also witnessed
> by a visiting attorney.  (Id.)

> (b) Bending or twisting detainees' arms, hands, wrists, and fingers: According to the
> Supplemental OIG report, ten detainees "alleged that while their hands were
> cuffed behind their backs, [staff] pulled their thumbs back, twisted their fingers
> and wrists, and bent their wrists forward towards their arms (referred to by MDC
> staff members as 'goosenecking.')"  (Id. at 16-17.)  The OIG substantiated these
> allegations through interviews with MDC staff and by observing MDC
> videotapes:  "[I]n our review of videotapes we observed several instances when
> MDC staff members bent compliant detainees' arms, hands, wrists, and fingers
> for no apparent reason."  (Id. at 17-18.)

> (c) Lifting detainees, pulling arms, and pulling handcuffs: Detainees alleged officers
> lifted them off the ground by their arms, and pulled on their arms and handcuffs to
> cause pain.  (Id. at 18-20.)

    (d) Stepping on detainees' leg restraint chains: According to the     Supplemental OIG Report, detainees "alleged that MDC staff members purposely stepped on their leg restraint chains while they were stationary and also while they were walking, injuring their ankles and causing them to fall."  (Id. at 20.)

    (e) Using restraints improperly: Detainees alleged that MDC staff used their physical restraints as a form of punishment by leaving them in a cell in restraints too long. (Id. at 23.)  The OIG found there was no evidence the detainees had engaged in misconduct, and that this treatment was in violation of BOP policy.  (Id.)

    (f) Handling detainees in an otherwise rough or inappropriate manner:  Detainees report a range of other rough or inappropriate physical mistreatment, which the OIG also observed on videotape and substantiated in interviews with MDC staff: "[V]ideotape and witness' statements indicate that some staff members often handled detainees roughly or inappropriately."  (Id. at 26-28.)

104.    According to the Supplemental OIG Report, all of the above forms of physical abuse were completely against BOP policy, which provides that it is improper for staff members to use more force than necessary on detainees or cause detainees unnecessary physical pain or extreme discomfort.  (Id. at 8, 9, 15, 16, 19, 20, 23, 28; BOP P.S. 5566.05.)  In each instance of abuse investigated by the OIG, it concluded that the officers' conduct violated policy.  (Id.)

105.    Furthermore, the OIG concluded that all post-9/11 MDC detainees were always fully compliant, making any use of force completely unnecessary and against BOP policy.  (Id. at 8, 10, 11, 13, 15.)  In fact, the OIG noted that the only incidences of detainee misconduct were peeling paint off walls, injuring themselves, hiding from cameras, or refusing to come to the cell door to be handcuffed.  (Id. at 15, n.15.)

106.    All MDC Plaintiffs and class members were frequently physically abused in the manner described above by, on information and belief, all of the MDC Correctional Officer Defendants and by MDC Supervisor Defendants, including Lt. Cuciti, Lt. Beck, and Lt. Ortiz.

On information and belief, all MDC Supervisor Defendants encouraged or were deliberately indifferent to these abuses, and failed to correct or prevent them.

**Verbal Abuse**

107.     According to the Supplemental OIG Report, detainees alleged that MDC staff members verbally abused them by referring to them as "terrorists" and other offensive names; threatened them with violence; cursed at them; insulted their religion; and made humiliating sexual comments during strip searches. (Supp. OIG Report at 6, 28-30.)  These allegations were substantiated by interviews, videotapes, and statements by a visiting attorney.  (Id. at 29-30.)

108.     According to the Supplemental OIG Report, all of the above forms of verbal abuse were contrary to BOP policy which provides that "An employee may not use . . . intimidation towards inmates," and "[a]n employee may not use profane, obscene, or otherwise abusive language when communicating with inmates.  [Employees] shall conduct themselves in a manner which will not be demeaning to inmates."  (Id. at 8, 29; BOP P.S. 3420.09.)

109.     All MDC Plaintiffs and class members were frequently verbally abused in the manner described above by, on information and belief, all of the MDC Correctional Officer Defendants and by all MDC Supervisor Defendants. On information and belief, all MDC Supervisor Defendants encouraged or were deliberately indifferent to these abuses, and failed to correct or prevent them.

**Physical Restraints**

110.     During transport between the MDC Receiving and Discharge Area ("R&D Area") and the ADMAX SHU on the ninth floor of the MDC, post-9/11 detainees at the MDC were "fully restrained in metal handcuffs attached to a waist chain that was connected to ankle cuffs." (Supp. OIG Report at 3.)  Similarly, "[d]uring routine escorts on the ADMAX SHU, the

detainees also were handcuffed behind their backs and placed in leg restraints.  When they were escorted to visits, interviews, or out of the MDC, the detainees were handcuffed in front, restrained in a waist chain, and placed in leg restraints."  (Supp. OIG Report at 4.)  On information and belief, the MDC Defendants subjected all MDC Plaintiffs and class members to such restraints routinely and as a matter of policy. In addition, MDC Defendants kept all MDC Plaintiffs and class members confined to their cells for nearly 24 hours a day almost every day while they were housing in the ADMAX SHU.

**Arbitrary and Abusive Strip Searches**

111.    Post-9/11 detainees were strip searched upon arrival to the MDC at the R&D Area and again after they had been escorted, shackled and under continuous guard, to the ninth floor ADMAX SHU.  (Supp. OIG Report at 3.)  "Some of the same officers who were present for a detainee's strip search in R&D were present for the detainee's strip search on the ADMAX SHU."  (Id. at 34.)  Detainees were also often strip searched after attorney and family visits and after using the recreation area.  (Id.)  The OIG found that it "[did] not appear that the MDC issued written policies regarding when detainees were to be strip searched."  (Id.)  In interviews, officers cited MDC policy for the basis of the frequent strip searches, but "they could not point . . . to any written policy."  (Id.)  Furthermore, "even if such searches were consistent with policy, they were applied inconsistently to the detainees and appeared to be unnecessary."  (Id.)

112.    Upon information and belief, strip searches were employed by MDC staff as a way to punish and humiliate the MDC Plaintiffs and class members, using such tactics as having female officers present, videotaping the strip searches against BOP policy, strip searching detainees unnecessarily, and making jokes and humiliating comments during strip searches.  According to the Supplemental OIG Report, detainees told OIG investigators that strip searches "were used by

MDC staff as punishment." (Id.) In observing videotapes of post-9/11 detainees' strip searches, "female voices can be heard in the background. In addition, one videotape shows a female staff member walking in the vicinity of a detainee undergoing a strip search." (Id.)

113. Furthermore, "many of the strip searches conducted on the ADMAX SHU were filmed in their entirety and frequently showed the detainees naked." (Id. at 33.) The OIG Report notes that "BOP P.S. 5521.05 provides that the strip search 'shall be made in a manner designed to assure as much privacy to the inmate as practicable.' . . . However, the very act of filming the entire search seems to run counter to this policy." (Id. at 33 n.27.) The OIG concluded that "it was inappropriate for staff members in the ADMAX SHU to routinely film strip searches showing the detainees naked . . ." (Id. at 35.)

114. The OIG Report also found that "[i]n a few videotapes . . . officers [were] laughing while observing the strip searches." (Id.) Additionally,

> in one videotape four officers escorted one detainee into a recreation cell and ordered him to strip while they berated him for talking too much with other detainees and for encouraging them to go on a hunger strike. We could see no correctional purpose or justification for strip searching this detainee, who had just been taken from his cell, pat searched, and then escorted into the recreation cell by the four officers. (Supp. OIG Report at 35.)

The OIG concluded that "staff members inappropriately used strip searches to intimidate and punish detainees," and "questioned the need for the number of strip searches." (Id.)

115. The MDC Plaintiffs and class members were strip searched every time they were removed from or returned to their cells, including before and after meeting with a lawyer, receiving medical care, using the recreation area, attending a court hearing, or being transferred to another cell. These strip searches occurred even when they had no conceivable opportunity to obtain contraband, such as before and after non-contact attorney visits which they had been

escorted to and from while shackled and under continuous four-man guard, and before and after being transferred directly from one cell to another.  As such, the strip searches had no rational relation to any legitimate penological objective. On information and belief, these strip searches were carried out by MDC Correctional Officer Defendants under the direction of MDC Supervisor Defendants.

116.     The strip searches caused all of the MDC Plaintiffs and class members embarrassment and humiliation.  MDC Correctional Officer Defendants, including CO DeFrancisco, routinely made inappropriate sexual comments and laughed at the MDC Plaintiffs' anatomy.  Defendant Lt. Elizabeth Torres would force Plaintiff Ebrahim to remove his clothes in front of her before she provided him with new clothes and a new towel. On one occasion, Defendant Torres refused to give Plaintiff Ebrahim a new towel because he had not returned his old towel, and forced him to stand naked in front of his cell while she searched his cell for the towel.  On information and belief, the MDC Correctional Officer Defendants carried out these deliberately humiliating practices under the supervision and often under the direct observation of MDC Supervisor Defendants, yet the MDC Supervisor Defendants did not prevent or correct the practices.

**Sleep Deprivation**

117.     The MDC Defendants deprived the MDC Plaintiffs and class members of sleep by keeping lights on in the cells at all times of the day or night until late February 2002.  (See OIG Report at 153-55; Supp. OIG Report at 3.) According to the OIG, "[m]any detainees alleged that officers loudly banged on their cell doors in an attempt to wake them up, interrupt their prayers, or generally harass them."  (Id at 35.)  The MDC Defendants, including, on information and belief, Barrere, McCabe, Machado, Osteen, Lopez, Chase, Diaz, and others, banged on cell doors

at night to disturb the MDC Plaintiffs and class members' sleep.  MDC and BOP policy required that staff count detainees at midnight, 3 a.m., and 5 a.m., "permit[ting] officers to wake detainees up at that time if they could not see their skin" (BOP P.S. 5500.09).  (Id.)  However, "detainees alleged that several officers went beyond what was required for the count by kicking the door hard with their boots, knocking on the door at night much more frequently than required, and making negative comments when knocking on the door."  (Id.)  Detainees reported that officers "walked by about every 15 minutes throughout the night, kicked the doors to wake up the detainees, and yelled things such as, "Motherfuckers," "Assholes," and "Welcome to America;" "officers made loud noises at night to keep the detainees awake and that these officers appeared to have fun conducting the counts by knocking on the cell doors;" "officers would not let the detainees sleep during the day or night."  (Id.)  One detainee's attorney reported that "his client stated that every time he fell asleep the officers came and kicked the doors to wake him up . . . not [as] part of the officers prescribed counts, but . . . the officers would watch the in-cell cameras and come kick on the doors as soon as they thought the detainee was asleep."  (Id.)

118.    MDC staff were not required to videotape nighttime activities in cells, but the OIG found that "a combination of cells being continuously illuminated and the BOP requirement that officers had to see the detainees during each count in the evenings caused detainees to be awakened regularly and suffer from sleep deprivation.  (Supp. OIG Report at 36.)

119.    All the MDC Plaintiffs and class members experienced sleep deprivation as a direct result of the actions and policies of the MDC Defendants.

**De Facto Denial of Recreation / Inadequate Clothing and Exposure to the Elements**

120.    The ADMAX SHU recreation cells were exposed to the elements and could be freezing cold.  Periodically, the MDC Plaintiffs and class members were offered transport to

these recreation cells, often at the early hour of 5 or 6 a.m., but they were denied any extra clothing besides their cotton prison garb.  Detainees who accepted these offers were often physically abused along the way by their MDC CO escorts, and were sometimes left for hours in the cold recreation cell, over their protests, as a form of punishment.  (See OIG Report at 152.) Thus, while "recreation" was nominally offered several times a week, the MDC Plaintiffs and class members were constructively denied exercise during the Fall and Winter months.

121.    Throughout the Fall and Winter, the cells of the MDC Plaintiffs and class members were extremely cold. On information and belief, MDC Defendants refused to give the MDC Plaintiffs sweaters or other warm clothing, or bedding adequate to keep them warm.

**Lack of Hygiene Items and Provision of Inadequate and Unhealthy Food**

122.    Upon information and belief, MDC Defendants intentionally deprived the MDC Plaintiffs and class members of adequate, healthy, and religiously appropriate food.

123.    The MDC Plaintiffs and class members were deliberately denied access to basic hygiene items like toilet paper, soap, towels, toothpaste, eating utensils, personal reading glasses, and a cup to drink water.  (See OIG Report at 155-56.)  For the first several months of their detention, the MDC Plaintiffs and class members were not allowed to keep a toilet paper, towel, soap, toothbrush, cup, or other personal hygiene items in their cells, making it difficult to maintain proper health and hygiene. For example, there were only a few days during his detention when Plaintiff Ebrahim was allowed to keep a cup in his cell, and this allowance was made only at the direction of Physician Assistant Lorenzo so that he could drink water during the day, as the sole "treatment" for a kidney stone condition.

124.    Meals in the ADMAX SHU were barely edible and meager, leaving the MDC Plaintiffs hungry.

**Inadequate Medical Attention**

125.     Upon information and belief, MDC Defendants deprived the MDC Plaintiffs and

class members of adequate medical care.  According to the Supplemental OIG Report, a doctor

conducting a medical investigation of a bruise caused by an officer slamming a detainee into a

wall did not ask the detainee how he got the bruise.  (Id. at 13.)  The OIG also found other

failures to examine injuries or discern how detainees were injured while at MDC.  (Id.)  This was

just one instance of a "don't look for signs of abuse, don't tell on the COs" creed that was

pervasive on the MDC medical staff.  The MDC Plaintiffs and the class members often did not

ask for doctors when they were abused for fear of retaliation by those officers.  (See id. at 13.)

126.     For example, after MDC Defendants physically abused Plaintiffs Ebrahim and H.

Ibrahim on their arrival at MDC, they were not treated for their injuries, even though both

received "physical exams" on October 2, 2001, the next day.  Physician Assistant Lorenzo, who

gave the brothers their medical exams, did not look at, ask about, comment on, or treat their

injuries.  Plaintiffs Ebrahim and H. Ibrahim were also denied necessary medical care for

subsequent ailments.  On information and belief, although Plaintiff H. Ibrahim tested positive for

tuberculosis and was suffering from a severe, painful and persistent cough, the medical staff at

MDC refused to treat him for this condition. Plaintiff Ebrahim complained about his kidney

stones to PA Lorenzo and she said she was not authorized to do anything to treat his kidney

stones.  Plaintiff Ebrahim's pain from the kidney stones was extremely severe, so much so that it

kept him awake at night and made him involuntarily cry out; the Tylenol offered him no relief

from this pain. PA Lorenzo told him to drink 12 cups of water a day, but he was only given one

cup with meals three times a day.  Even when PA Lorenzo arranged for him to keep his cup in

his cell, guards took it away after two or three days, when he was transferred to a new cell.

Plaintiff Ebrahim was also forced to wait weeks to get an x-ray and was deported before the results had returned. After returning to Egypt, Plaintiffs Ebrahim and H. Ibrahim both received confirmation from medical doctors that they were suffering, respectively, from tuberculosis and kidney stones, and obtained treatment for these conditions.

127.     Similarly, Baloch complained of an earache in his left ear. He had two surgeries on his left ear prior to being detained and had had repeated problems with ear infections.  PA Lorenzo refused to treat his earache, and the ear remained infected until after Plaintiff Baloch's release from detention. He was prescribed antibiotics in Canada after his deportation.  In addition, Plaintiff Baloch wrote a letter to the then-current Warden requesting a transfer to a new room because his roommate had tuberculosis. On information and belief, the Warden took no action in response to this letter, and Plaintiff Baloch was not transferred and remained with his roommate for approximately four weeks. Medical tests have since shown that he was exposed to tuberculosis.

**Deliberate Interference with Religious Rights**

128.     MDC Defendants adopted, promulgated, and implemented policies and customs that substantially burdened and interfered with the MDC Plaintiffs' and class members' ability to practice and observe their Muslim faith.  These policies and customs included:

(a) Refusing to given them a copy of the Koran, thereby deliberately denying the means to maintain their religious practices:  Soon after their arrival at MDC, the MDC Plaintiffs requested copies of the Koran.  They did not receive them until weeks or even months later. Plaintiff Saffi's repeated requests for the Koran were denied until mid-December 2001.  Saffi was, however, unable to read his Koran for several days more, because his eyeglasses had been confiscated from him on arrival at the MDC on October 1, 2001.  Finally, on December 18, 2001 he was brought to an eye doctor and given new glasses.

(b) Refusing to provide food which would allow them to conform to a Halal diet: While detained in the ADMAX SHU, the MDC Plaintiffs and class members were all denied the Halal food required by their Muslim faith, despite many

requests for Halal meals.  The MDC Plaintiffs and class members often chose not to eat the main part of their meals because they could not identify the type of meat it contained. This exacerbated the hunger caused by their already meager meals, and as a result, they were hungry almost every day of confinement at MDC. While in the ADMAX SHU, Plaintiff Baloch lost between 15 and 20 pounds. Sometimes the MDC Plaintiffs' hunger was so extreme that they ate the meat products, which caused them great emotional distress.

(c) Refusing to provide them the time of day in order to conform to their daily prayer requirements and refusing to disclose the dates to them, making it difficult for them to know when Ramadan began:  After their cell windows were painted over in late January or early February, the MDC Plaintiffs and class members became totally dependent on the MDC Defendants to tell them what time of day it was so that they could know when to say their daily prayers.  The MDC Defendants frequently withheld the time of day from them or deliberately told them the incorrect time.  As a result, they had to time their prayers by guesswork.  On one occasion, Plaintiff Ebrahim and another inmate were disciplined for being late for a prison count because they were in the midst of finishing their prayers.  The other MDC Plaintiffs had similar experiences.

(d) Constantly interrupting their prayers:  McCabe, Osteen, and other MDC COs constantly interrupted the MDC Plaintiffs and class members' prayers by regularly banging on cell doors, screaming derogatory anti-Muslim comments, and telling them to "shut the fuck up" while they were trying to pray.  (See OIG Report at 147-48.)

**Campaign of Intentional Infliction of Emotional Distress**

129.        Upon information and belief, MDC Defendants used the above-mentioned harsh detention conditions as an intentional means of punishing, harassing, and "breaking" the MDC Plaintiffs and class members.

**Failure to Provide Handbooks**

130.        The usual channels for filing complaints of mistreatment were cut off at MDC.  The MDC Plaintiffs and class members were not provided with MDC handbooks on how to file complaints about their treatment on a timely basis, if at all.  (OIG Report at 162.)  By putting them in an extremely isolated ADMAX SHU, imposing a communications blackout, and

shutting down their ability to file complaints, the MDC Defendants blocked the MDC Plaintiffs

and class members' access to normal channels for lodging complaints of abuse and mistreatment.

**Confiscated Items**

131.　　　At the time of Plaintiffs' arrests, Defendants confiscated personal

identification, money, and valuable personal items from Plaintiffs and many class members.  In

addition, Defendants searched the homes of Plaintiffs and other class members while they were

in detention and confiscated items from their homes.  When Plaintiffs demanded the return of

these items at the time of their release, Defendants deliberately deprived Plaintiffs and other

class members of these items.

132.　　　Plaintiffs Ebrahim and H. Ibrahim have made attempts to have personal

belongings and money confiscated from them during and following their arrests returned to

them, including $27 of H. Ibrahim's and $250 of Ebrahim's.  To date, none of these items have

been returned to them.  Upon information and belief, FBI and INS agents conducted a search of

Plaintiff Baloch's apartment without his consent. The agents seized his laptop computer and

other items from his apartment. Additionally, his personal identification, money, two watches,

and a briefcase, were confiscated upon his booking. These items have never been returned to

Baloch.  On information and belief, these or other government agents confiscated all of the

possessions in Plaintiff A. Ibrahim's home and over $300 cash. Upon information and belief, the

FBI took everything that A. Ibrahim had accumulated over ten years of living and working in

New York City, including $300-400  in cash, clothes, watches, cameras, books, documents, and

credit cards.  On information and belief, all of Plaintiff Saffi's personal belongings, including his

personal identification, eyeglasses, and $1492 in cash, were confiscated. On information and

belief, all of Plaintiff Jaffri's personal belongings, including his identification, were confiscated.

133.        By adopting, promulgating, and implementing this policy and custom,

Defendants have intentionally violated rights guaranteed to Plaintiffs and class members under

the Fifth Amendment to the Constitution.

**Personal Partipation of the Defendants**

134.        The MDC Policy and Implementation Defendants, MDC Supervisor

Defendants, MDC Correctional Officer Defendants, MDC Counselor Defendants, and the John

Doe Defendants are referred to collectively in this complaint as the "MDC Defendants."

MDC Policy and Implementation Defendants

135.        Former MDC Warden Dennis HASTY, MDC Warden Michael ZENK, MDC

Associate Warden for Custody SHERMAN, Captain Salvatore LOPRESTI, MDC Lieutenants

Steven BARRERE and Joseph CUCITI, and JOHN DOE Policy and Implementation Defendants

are referred to as "MDC Policy and Implementation Defendants."

136.        The MDC Policy and Implementation Defendants created the unconstitutional

and unlawful policies and customs relating to the manner in which the post-9/11 detainees were

detained at the MDC that are at issue in this suit. Moreover, they allowed the continuation of

these policies and customs, exhibited gross negligence and/or deliberate indifference in the

supervision of subordinates who committed unconstitutional acts, and/or participated directly in

the implementation of such policies or customs.  These policies and customs included: subjecting

the MDC Plaintiffs and class members to unreasonable and excessively harsh conditions; placing

and keeping them in the MDC's ADMAX SHU "without conducting the routine individualized

assessment" (see OIG Report at 112, 126-127) and maintaining them there for "days or weeks

after they were supposed to be transferred to the MDC's less restrictive general population"

following clearance by the FBI (see OIG Report at 127);  implementing the communications

47

blackout policies and other policies by which Plaintiffs and class members detained at the MDC were denied access to counsel (see OIG Report at 112, 113, 126-127) and access to their consulates (see OIG Report 140-142); overseeing the implementation of the BOP policy of audiotaping their conversations with their lawyers  (see Supp. OIG Report at 32); and developing procedures for the full restraint and strip searching of Plaintiffs and class members.

MDC Supervisor Defendants

137.	Captain LOPRESTI and Lieutenants Steven BARRERE, William BECK, Lindsey BLEDSOE, Joseph CUCITI, Howard GUSSAK, Marcial MUNDO, Daniel ORTIZ, Stuart PRAY, Elizabeth TORRES, and JOHN DOE Supervisor Defendants are referred to collectively as "MDC Supervisor Defendants."

138.	The MDC Supervisor Defendants were grossly negligent in supervising subordinate correctional officers who committed wrongful acts, or were deliberately indifferent to the constitutional rights of MDC Plaintiffs and the plaintiff class by failing to act on information that such wrongful and unconstitutional acts were occurring.  Upon information and belief MDC Supervisor Defendants were aware of the inappropriate and unconstitutional activities of their subordinates and nevertheless failed to act to stop such activities or to properly discipline their subordinates.

139.	The MDC Supervisor Defendants participated in the creation and continuation of inhumane conditions of confinement for Plaintiffs and other class members at the MDC, including but not limited to physical and verbal abuse, inhumane conditions of confinement, arbitrary and dehumanizing use of strip searches, disruption of sleep, deliberate interference with

48

religious rights, unreasonable restrictions on communications, inadequate provision of medical attention, de facto denial of recreation, and denial of hygiene items and adequate food.

140.     On information and belief, Defendants CUCITI, ORTIZ, BECK, and JOHN DOE Supervisor Defendants were also involved directly in deprivations of plaintiffs' constitutional rights, including the use of excessive force against Plaintiffs and other class members.  Upon information and belief, such use of force included pushing and slamming compliant MDC Plaintiffs and class members into walls, bending the arms and hands of compliant MDC Plaintiffs and class members in a manner that constituted excessive restraining force, and improperly using restraints to punish Plaintiffs and other class members.

141.     Upon information and belief, all MDC Supervisor Defendants directly incited other officers to treat the MDC Plaintiffs and class members in an unconstitutional fashion.

MDC Correctional Officer Defendants

142.     Correctional Officers Phillip BARNES, Sidney CHASE, Michael DEFRANCISCO, Richard DIAZ, Kevin LOPEZ, Mario MACHADO, Michael MCCABE, Raymond MICKENS, John OSTEEN, Brian RODRIGUEZ, Scott ROSEBERY, Christopher WITSCHEL, and JOHN DOE Correctional Officers are referred to collectively as the "MDC CO Defendants."

143.     The MDC CO Defendants directly infringed on the constitutional rights of Plaintiffs and other class members detained at the MDC, participated in the creation of the inhumane conditions of confinement challenged here, including physical and verbal abuse, inhumane conditions of confinement, arbitrary and dehumanizing use of strip searches, disruption of sleep, deliberate interference with religious rights, unreasonable restrictions on

communications, inadequate provision of medical attention, de facto denial of recreation, and denial of hygiene items and adequate food.

144.        On information and belief, all of the MDC CO Defendants engaged in physical and/or verbal abuse against the MDC Plaintiffs and class members, including but not limited to:

> (a) Beating and kicking them;
>
> (b) Pushing, slamming, and throwing them against walls (see OIG Supp. Report 8-11.);
>
> (c) Stepping on and tightening their leg restraints and handcuffs in an unduly harmful manner (see OIG Supp. Report 18-19, 20-22.);
>
> (d) Twisting, pulling, "goosenecking," and otherwise harmfully bending their fingers, arms, and hands while they were restrained and compliant, in order to cause injury, and which in fact caused injury (see OIG Supp. Report 16-18);
>
> (e) Verbally threatening and otherwise verbally abusing Plaintiffs and other class members (see OIG Supp. Report 28-30).

145.        On information and belief, MDC CO Defendants deliberately and unlawfully interfered with the free exercise of Plaintiffs' and other class members' religious practices by, *inter alia*, banging on cell doors or calling arbitrary counts during prayer times or group prayers.

146.        On information and belief, MDC CO Defendants deliberately and unlawfully interfered with attorney-client meetings and visitations for Plaintiffs and other class members by, *inter alia*, telling lawyers and clients they had to speak in English in order for their conversations to be recorded, and preventing Plaintiffs and other class members from speaking to their lawyers by phone. (See OIG Supp. Report 31-32.)

<u>MDC Counselor Defendants</u>

147.     Defendants Raymond COTTON, CUFFEE, Clemmet SHACKS, and JOHN
DOE Counselor Defendants are referred to collectively as "MDC Counselor Defendants."

148.     On information and belief, MDC Counselor Defendants engaged in conduct to
deliberately and unlawfully restrict Plaintiffs' and other class members' access to legal counsel,
their consulates, and the outside world generally, by, *inter alia*, severely limiting the use of MDC
phones by Plaintiffs and other class members. Said Defendants verbally taunted and threatened
Plaintiffs and other class members, denied them the opportunity to make phone calls, simply
pretended to make phone calls, or falsely claimed that no one was answering the phone number
dialed.

**Allegations Concerning the Plaintiffs**

**MDC PLAINTIFFS**

149.     Plaintiffs Asif Saffi, Syed Jaffri, Yasser Ebrahim, Hany Ibrahim, Shakir Baloch,
and Ashraf Ibrahim are collectively referred to herein as the "MDC Plaintiffs."   None of the
plaintiffs have ever been involved with terrorism and, pursuant to the challenged blanket "hold
until cleared policy," each was cleared of terrorism by the FBI and INS prior to his removal from
the United States.

**Plaintiff Asif-ur-Rehman Saffi**

150.     Asif-ur-Rehman Saffi entered the United States through Los Angeles on July 6,
2001, on a three-month tourist visa, which was to expire on October 4, 2001.  After briefly
staying with family and friends in Los Angeles, he flew to New York City to see other friends.
While in New York City, Saffi, who holds a Master's Degree in Political Science and is a

Microsoft Certified Professional, earned a small sum fixing computers and doing data entry for a small business.

151.     On September 29, 2001, shortly before his tourist visa was to expire, Saffi flew to Toronto to spend a few days.  Canadian immigration officials, however, refused to allow him into the country.   Consequently, Saffi flew back to New York City the next day, September 30, 2001.  He was arrested at LaGuardia Airport by an FBI agent and three INS agents as soon as he stepped off the plane at LaGuardia Airport.

152.     On that same day, September 30, 2001, after being interrogated by an INS agent, Saffi was taken to the INS facility on Varick Street in Manhattan, where he was again questioned by two FBI agents for approximately one to two hours.  Saffi, who is fluent in English, answered their questions truthfully.  He denied any involvement with terrorists or terrorist activity.  The two FBI agents, however, disputed Saffi's veracity, accusing him of involvement in the September 11 terrorist attacks.  Accusing Saffi with having a strong association with terrorists, the agents made threatening remarks to him such as "you will be rotting in jail if you don't give us names" and "Muslims are terrorists and we know you are one of them."  Taking two telephone books that Saffi had on his person, they told him that they would check every contact in his books and if they found any of them to be suspicious, he would be in serious trouble.  At the request of an INS agent, Saffi signed a written statement that he had been working in the United States without authorization.  Saffi asked to see the French Consulate.  That request was never granted, even after Saffi put that request in writing.

153.     The next day, October 1, 2001, Saffi was transported by van to the MDC in handcuffs with chains around his waist and shackles on his legs.  Saffi arrived in a caravan of two vans carrying a total of eight detainees.  At the MDC, Saffi was first taken from the sally

port area to the R&D Area.  On information and belief, Lt. Pray and a team of about four to five people dragged each of the eight detainees like ragdolls one by one out of the van, including Saffi, into the building, slamming his face into several walls on the way.  Despite the pain, Saffi offered no resistance, fearing that would only make matters worse.  On information and belief, after being fingerprinted, Saffi was strip-searched in the R&D area by Defendant Pray's team and given an orange jumpsuit.  All of his personal belongings, including his personal identification, eyeglasses, and cash in the amount of $1492.00, were confiscated.

154.     While still in handcuffs, chains, and shackles, Saffi was then taken by, on information and belief, Defendant Beck, a lieutenant, and four other junior officers, COs  Chase, Diaz, DeFrancisco, and Machado to the Special Housing Unit on the Ninth Floor of the MDC. On the way there, this team banged his head on the walls, kicked him, slammed him against the walls, and verbally abused him.  The lieutenant in charge did nothing to stop the abuse, nor did he instruct his team to stop.  Once there, this team again strip-searched Saffi and subjected him to physical and verbal abuse.  Among other things, they bent back his thumbs so far that he could not use them for ten days, stepped on his bare feet with their shoes, and pushed him into a wall so hard that he fainted.  After Saffi fell to the floor, they kicked him in the face and in the ribs. On information and belief, Defendant Beck, the lieutenant in charge, called Saffi a "terrorist," boasting that Saffi could expect continued harsh treatment because of his involvement in the September 11 terrorist attacks and vowed to make his stay as horrible as possible.  The lieutenant threatened to punish him if he even so much as smiled and that he would "take it as an offense and as an attack on my people."  The lieutenant also said that Saffi killed 7,000 people (then believed to be the number of people killed in the 9/11 attacks) and threatened to beat him if he did not behave.  Saffi offered no resistance.

155.     Like most or all of the other MDC Plaintiffs, Saffi was placed in the ADMAX SHU arbitrarily and without justification, subjected to a communications blackout, denied access to counsel and to his consulate, arbitrarily and abusively strip searched, and subjected to inhumane conditions of confinement including sleep deprivation, constructive denial of recreational activities and hygienic items, and deprivation of adequate food and medical attention.  Like most or all of the other MDC Plaintiffs, Saffi was, at all times relevant to the acts complained of, and remains, a devout Muslim, and the MDC Defendants deliberately and substantially interfered with his religious practice.  Like most or all of the other MDC Plaintiffs, Saffi was not provided with timely notice of MDC's complaint procedures and had his personal items confiscated by MDC Defendants.

156.     Saffi was placed in a 10-foot-by-six-foot cell shared by another post-9/11 detainee.  He was confined to his cell all day long, nearly every day, for the next five months. Saffi's cell was cold and uncomfortable on most days, though considerably warmer than the "recreation" cell.

157.      Saffi was denied all reading material initially.  The inmates were given a copy of the Bible and were denied the Koran until mid-December 2001, when the MDC Defendants finally gave him a copy of the Koran.  Saffi was, however, unable to read for several days more, because his eyeglasses were confiscated from him on October 1, 2001.  Finally, on December 18, 2001 he was brought to an eye doctor and given new glasses.

158.     While Saffi was confined at the MDC, the MDC Defendants deliberately interfered with his ability to observe the mandatory practices of his religion.  They denied him the Halal food required by his faith.  On one occasion, Saffi asked, on information and belief, Lt. Torres for Halal food and she responded that this was a jail not a hotel and to ask Allah for food.

The lieutenant was verbally abusive other times by referring to inmates as "sons of bitches, motherfuckers, and troublemakers."  For the first month or so, MDC Defendants constantly interrupted him during his daily prayers.  They further withheld from him the time of day making it impossible for Saffi, caged in a windowless cell, to know when to say his mandatory prayers.

159.     While confined at the MDC, Saffi received constant verbal abuse.  The MDC Defendants swore at him, belittled and insulted his religion, and degraded him.  They called him a "religious fanatic" and a "terrorist."

160.      On October 8, 2001, the District Director of INS for the New York District issued a removal order to Saffi ordering his removal from the United States.

161.     On October 14, 2001, two weeks after his arrest, Saffi was interrogated by two FBI agents and two INS agents, who asked him wide-ranging questions about his family back in France, his work for Pakistan International Airlines, his faith, and his political views.  Saffi again denied any involvement with terrorists, terrorist organizations or terrorist activity.  The FBI agents concluded thereafter that he had no knowledge of terrorist activity.  As early as October 14, 2001 a report by one of the FBI agents who had interviewed Saffi resulted in the following recommendation, "It is recommended that Saffi be allowed to return to France…Saffi's interview and the subsequent investigation have revealed nothing that indicate that Saffi had any knowledge of the attack on the World Trade Center, or any other terrorist activities"

162.     Three days later, on October 17, 2001, the issued removal order appears to have been served to Saffi.  When Saffi asked whether he needed a lawyer, an INS official told him that counsel was unnecessary since the INS would soon put him on a plane back to France.  Saffi nonetheless remained in custody for another four and one-half months.

163.     On information and belief, on November 2, 2001, Kenneth Maxwell, FBI

Assistant Special Agent in Charge, wrote to Daniel Molerio, INS Assistant District Director for

Investigations in New York, to inform him that the FBI did not have an investigative interest in

Saffi relating to the events of September 11, and instructed the INS to continue normal and

appropriate processing of Saffi.  Despite the fact that the FBI clearly had no more interest in

investigating Saffi for ties to terrorism after having issued this second "clearance" and the INS

could have effectuated his removal immediately, the INS without cause failed to timely release

or remove him.

164.     Instead, Saffi was detained for four and one-half months longer than necessary to

effectuate his removal from the United States solely on the remote possibility that law

enforcement authorities might someday connect him to terrorist activity.  He was never,

however, brought before a neutral judicial officer to determine whether there was probable cause

to believe that Saffi engaged in terrorist activity.  Nor was an indictment or information against

Saffi ever filed with a court citing criminal charges on which his continued detention was based.

165.     On December 18, 2001, an INS agent and a NYPD detective visited Saffi at the

MDC. They questioned him about his family back in France, his work for Pakistan International

Airlines, his faith, and his political views.  Saffi again denied any involvement with terrorists,

terrorist organizations or terrorist activity.  After the interrogation was over, Saffi's two

interrogators assured him that he would soon be released.  Saffi, however, remained detained at

the MDC for nearly three more months.

166.     On March 5, 2002, INS agents took Saffi from the MDC to JFK airport and put

him on an airplane to France, without, however, returning his critical employment identification

cards. The INS has yet to return his employment identification card that entitles him to discounted airfare.

167.     As a result of his prolonged detention in the United States, Saffi's employer, Pakistan International Airlines, has begun proceedings to terminate his employment, evidently deeming him a security risk.  A presumption of guilt thus continues to follow Saffi even after his deportation from the United States, despite the fact that he has never been involved in terrorist activity and the complete absence of any evidence that he has been involved in such activity. Saffi, who loves to travel, from now on has to explain when he enters some countries whether he has been banned from entry to other countries.  He then must disclose his ban on reentry into the United States, which is both embarrassing and causes difficulties with immigration officials.

168.     Saffi continues to suffer the emotional and psychological effects of his four and one-half months detention in the United States.  He has great difficulty, for example, sleeping at night because he continues to dwell on what happened to him at MDC.

### Plaintiff Syed Amjad Ali Jaffri

169.     In September 2001, Plaintiff Syed Amjad Ali Jaffri was living and working in the Bronx, New York, though without a valid visa.  He was renting a room in a three-room apartment leased to Melvin Curzado and his family.  One night, Jaffri and Curzado had a heated verbal dispute over the living arrangements.  Curzado threatened to report Jaffri to the INS.

170.     Several days later, on September 27, 2001, approximately 10 INS and FBI agents, accompanied by a United States Department of Labor official and several police officers, came to Curzado's apartment to see Jaffri.  They searched Jaffri's room, without a search warrant and without his consent, finding in a closet several stun guns that belonged not to Jaffri but rather to

57

Curzado's children.  Jaffri was arrested and charged with criminal possession of a weapon, a charge which was dismissed two days later because the stun guns did not belong to Jaffri.

171.     On September 28, 2001, Jaffri was taken to an INS facility in Manhattan. There, FBI and INS agents interrogated him about possible involvement in the September 11 terrorist attacks and other terrorist activity, without advising him of his right to counsel, or, for that matter, any of his Miranda rights.  One FBI agent asked Jaffri to sign a form retroactively consenting to the search of his room.  Jaffri, however, refused to do so, prompting the agent to angrily say: "Now you will learn the hard way."  Jaffri also asked that the Pakistani Consulate be notified and requested a hearing before an immigration judge.

172.     Two days after his arrest, on September 29, 2001, Jaffri was taken to the MDC, where he was strip searched, fingerprinted and given an orange jumpsuit.  All of his personal belongings, including his personal identification, were confiscated.  He was placed in a tiny solitary (windowless) cell in the SHU.  Jaffri was confined to that cell nearly all day, nearly every day, for the next six months, until April 1, 2002.

173.     Like most or all of the other MDC Plaintiffs, Jaffri was placed in the ADMAX SHU arbitrarily and without justification, subjected to a communications blackout, denied access to counsel and to his consulate, arbitrarily and abusively strip searched, and subjected to inhumane conditions of confinement including sleep deprivation, constructive denial of recreational activities and hygienic items, and deprivation of adequate food and medical attention.  Like most or all of the other MDC Plaintiffs, Jaffri was, at all times relevant to the acts complained of, and remains, a devout Muslim, and the MDC Defendants deliberately and substantially interfered with his religious practice.  Like most or all of the other MDC Plaintiffs,

Jaffri was not provided with timely notice of MDC's complaint procedures and had his personal items confiscated by MDC Defendants.

174.     Whenever Jaffri was removed from his cell, he was first strip searched and then placed in handcuffs, chains, and shackles.  Four or more MDC Defendants typically escorted him to his destination, frequently inflicting unnecessary pain along the way, for example, by deliberately kicking Jaffri's manacles and shackles into his lower body.  Despite the pain, Jaffri offered no resistance, fearing that resistance would only make matters worse.

175.     While there were other post-9/11 detainees held in adjoining cells, Jaffri was forbidden to talk with them, and vice-versa.  The MDC Defendants threatened to cut off visits from his attorney if he broke the rule.

176.     While Jaffri was confined in the MDC, he was subjected to repeated physical and verbal abuse by the MDC Defendants.  When he was first brought to the MDC's Special Housing Unit, for example, one MDC Defendant, in the presence of other MDC Defendants, told him: "Whether you [participated in the September 11 terrorist attacks] or not, if the FBI arrested you, that's good enough for me.  I'm going to do to you what you did."   Several MDC Defendants then slammed Jaffri's head into a wall, severely loosening his lower front teeth and causing him extreme pain.  Despite the pain, Jaffri offered no resistance, again fearing that resistance would only make matters worse.  Throughout his stay at the MDC, Jaffri felt pain and discomfort in the vicinity of his lower front teeth.  Although he made more than six requests to see a dentist, he was seen only once in 2001, and when seen again in late March 2002 he had advanced bone loss, advanced periodontal disease, and needed to have many teeth extracted.

177.     Jaffri was served with a Notice to Appear on October 1, 2001, four days after his arrest. That same day he requested a re-determination of his custody decision and signed a request for a prompt merits hearing before an immigration judge.

178.     On December 20, 2001, during a closed immigration hearing held at MDC, an immigration judge ordered Jaffri's removal.  On information and belief, no bond hearing was held prior to this date solely because of the hold until cleared policy.  Neither Jaffri nor the INS contested that order.  Jaffri, nonetheless, remained in custody for months until he received "clearances" from the FBI and INS, even though the INS could have effectuated his removal within a matter of days.

179.     Jaffri was detained for nearly three and one-half months longer than necessary to effectuate his removal from the United States solely on the remote possibility that law enforcement authorities might someday connect him to terrorist activity.  He was never, however, brought before a neutral judicial officer to determine whether there was probable cause to believe that Jaffri engaged in terrorist activity.  Nor was an indictment or information against Jaffri ever filed with a court citing criminal charges on which his continued detention was based.

180.     On April 1, 2002, INS agents took Jaffri to LaGuardia Airport, putting him on a plane to Canada, without any identification or money. On information and belief, the FBI has cleared Jaffri of any association with terrorism and closed its investigation of him.

**Plaintiffs Yasser Ebrahim and Hany Ibrahim**

181.     Plaintiff Yasser Ebrahim re-entered the United States on a tourist visa in January 2001, joining his younger brother, plaintiff Hany Ibrahim, who had entered the United States on a tourist visa in 1998.  For the next nine months, they shared an apartment in Brooklyn, New

York with several friends from Egypt and Morocco.  During that time, Ebrahim began a website design business, while H. Ibrahim continued his occasional work in a local delicatessen.

182.     On Sunday, September 30, 2001, at about 2 p.m., Ebrahim and H. Ibrahim, along with their roommates, were in their apartment when they heard a knock on the door.  When Ebrahim opened the door, he saw 12 men standing there, one of whom announced that they were FBI and INS agents and New York City police officers who wanted to talk with Ebrahim, H. Ibrahim, and their roommates about the September 11 terrorist attacks.  Ebrahim invited them in.

183.     Once inside the apartment, these FBI and INS agents and New York City police officers interrogated Ebrahim, H. Ibrahim, and their roommates separately, asking them questions about their immigration status and terrorist activity in the United States, without advising them of their right to counsel, or, for that matter, of any of their Miranda rights.  Ebrahim, H. Ibrahim, and their roommates all denied any involvement in the September 11 terrorist attacks or any other terrorist activity.  When the interrogation was over, the FBI and INS agents told Ebrahim, H. Ibrahim, and one Egyptian roommate that "we have to take you with us." The agents arrested and handcuffed all three, denying Ebrahim's and H. Ibrahim's request to call an attorney.  Without consent, the agents conducted a search of the apartment, seizing all of Ebrahim's religious and other books in the process.

184.     Ebrahim and H. Ibrahim were then held for approximately 24 hours at the Varick Street facility, before being taken to the MDC.  During this time, they were denied access to bathroom facilities and forced to sleep overnight on the floor.  All of their personal belongings, including their personal identification and money, were confiscated. Twenty-seven dollars were taken from H. Ibrahim, and $250 was taken from Ebrahim.

185.     Neither Ebrahim nor H. Ibrahim was served with a Notice to Appear (NTA) until October 17, 2001, seventeen days after their arrests.

186.     On November 6, 2001, Ebrahim and H. Ibrahim were taken separately from their cells, in handcuffs, waist chain, and leg shackles, to see Immigration Judge Alan Vomacka, who was holding closed immigration hearings for post-9/11 detainees on another floor of the facility. This was their first hearing of any kind since their arrest. On the way, CO Scott Rosebery whispered to Ebrahim, "The camera is your best friend.  If not for the camera, I would have smashed your faces, you mother fuckers."  When Ebrahim complained about this verbal abuse at his immigration hearing, Judge Vomacka abruptly cut Ebrahim off, stating "I don't care.  This is not my job."  Ebrahim complained verbally to Lt. Steven Barrere, who said he would speak with Rosebery's supervising lieutenant.  The supervising lieutenant told Ebrahim that he watched the videotape of the incident but did not see anything amiss.

187.     Ebrahim's and H. Ibrahim's immigration cases were heard together.  Marianne Yang of the Legal Aid Society, whom they had met for the first time that day, appeared on their behalf, while an INS trial attorney appeared on behalf of the government.  A female FBI or INS agent was also present, though she neither entered an appearance nor spoke on the record.  Ms. Yang asked that Ebrahim and H. Ibrahim be granted voluntary departure and bond.  The Immigration Judge, however, denied the request after the agent handed him a note off the record, stating that he could not grant bond until he received "clearance." The hearing was adjourned.

188.     Two weeks later, on November 20, 2001, Ebrahim and H. Ibrahim were again brought before Immigration Judge Vomacka at MDC.  This time they were represented by new counsel, Matthew Guadagno. The judge denied Ebrahim's and H. Ibrahim's request for bond, stating that they were "disappearance risks."  Desperate to expedite their release and return home

to their ailing mother in Egypt, Ebrahim and H. Ibrahim reluctantly accepted final deportation orders, effective immediately, upon being assured that they would be removed from the country within four to five days.  No appeal was taken from those orders.

189.     The INS could have secured Ebrahim's and H. Ibrahim's removal within a matter of days, but the agency kept Ebrahim and H. Ibrahim in custody for another six months. On information and belief, the INS made plans to deport H. Ibrahim two and a half months earlier than his actual deportation – going so far as to book a February 1, 2002 flight to deport him and issuing an order to escort him to JFK on that day for deportation. But this order was not carried out.

190.     On information and belief, FBI memos dated December 7, 2001 state that pre- and post-interview clearance checks on Ebrahim and H. Ibrahim were negative, and note with respect to Ebrahim that links to terrorist groups appear negative.

191.     Ebrahim and H. Ibrahim were detained for more than six months longer than necessary to effectuate their removal orders solely on the remote possibility that law enforcement authorities might someday connect them to terrorist activity.  However, they were never brought before a neutral judicial officer to determine whether there was probable cause to believe that they engaged in terrorist activity.  Nor were Ebrahim or H. Ibrahim ever charged with a crime.

192.     Ebrahim and H. Ibrahim arrived at the MDC on October 1, 2001, and were immediately assigned to the ADMAX SHU section of the facility. On information and belief, this assignment was made solely because of the entirely unfounded assumption that Ebrahim and H. Ibrahim were connected to the September 11 terrorist attacks. Once in the ADMAX SHU, Ebrahim and H. Ibrahim were placed in separate cells and were not allowed to see or speak with each other for 35 days.  On November 5, 2001, however, they were moved into the same cell.

While H. Ibrahim was eventually transferred out of the Special Housing Unit into MDC's general prison population on January 17, 2002, Ebrahim remained confined in the Special Housing Unit for the entire duration of his confinement at MDC.

193.     Like most or all of the other MDC Plaintiffs, Ebrahim and H. Ibrahim were placed in the ADMAX SHU arbitrarily and without justification, subjected to a communications blackout, denied access to counsel and to their consulate, arbitrarily and abusively strip searched, and subjected to inhumane conditions of confinement including sleep deprivation, constructive denial of recreational activities and hygienic items, and deprivation of adequate food and medical attention.  Like most or all of the other MDC Plaintiffs, Ebrahim and H. Ibrahim were, at all times relevant to the acts complained of, and remain, devout Muslims, and the MDC Defendants deliberately and substantially interfered with their religious practice.  Like most or all of the other MDC Plaintiffs, Ebrahim and H. Ibrahim were not provided with timely notice of MDC's complaint procedures and had their personal items confiscated by MDC Defendants.

194.     From the moment they arrived at the MDC on October 1, 2001, Ebrahim and H. Ibrahim were subjected to abuses and harsh and inhumane conditions of confinement, depriving them of basic life necessities such as adequate food, warmth, exercise, sleep, hygiene materials and medical care.  Ebrahim and H. Ibrahim were transported to the MDC from Varick Street in a van, handcuffed, chained, and shackled. On arrival at MDC, H. Ibrahim was pulled from the van by several large MDC guards, who were accompanied and supervised by a lieutenant who was a white, balding male with grey hair, blue eyes and a mustache. On information and belief, this lieutenant was Stuart Pray. Although H. Ibrahim was cooperative and compliant, and posed no threat to anyone, the guards slammed H. Ibrahim face-first into the sally port wall with the American flag t-shirt taped to it, causing him great pain and serious bruising of his nose.  H.

Ibrahim started to cry, and was told to "shut up," called a "motherfucker," and told to look at the flag on the t-shirt. Ebrahim was also pulled forcefully from the van, by a team of four guards, accompanied by a lieutenant who was a white, balding male with grey hair and a mustache. On information and belief, this lieutenant was Stuart Pray. Although Ebrahim was cooperative and compliant, he was also slammed face-first into the wall, causing him pain so severe that he felt as though his nose had been broken.  On information and belief, Lt. Pray witnessed this abuse, yet did nothing to prevent it and appeared to be overseeing it.

195.     Once inside the MDC's  R&D Area, Ebrahim and H. Ibrahim were fingerprinted, strip searched, and given orange jumpsuits to wear.  Ebrahim and H. Ibrahim were then taken from R&D to the ninth floor ADMAX SHU by, on information and belief, Lt. Barrere and COs Richard Diaz and Sidney Chase. On the way, H. Ibrahim and Ebrahim were forcefully pushed into every wall and door that they passed, causing them more pain and further bruising. Officers on the escort team pushed H. Ibrahim's wrist chains painfully into his hands, twisted his wrists and fingers painfully, and tightened his handcuffs so that his wrists bled. When H. Ibrahim was ordered to walk, guards would step on his leg chains, causing him to fall. When he fell, guards would pick him up and drag him by his cuffs or clothing, then stepping on his leg chains again and repeating the process, leaving H. Ibrahim's ankles bruised and bloodied. Ebrahim was subjected to the same tripping and dragging process, leaving his wrists painful and red for days afterwards. Throughout the trip, guards verbally abused the two brothers, calling them "fucking Muslims" and "terrorists."  When H. Ibrahim tried to explain that he and his brother were only there on immigration charges, one MDC CO told him to shut up, stating "If you open your mouth, I will crush you under the elevator, just like at the World Trade Center." The lieutenant on the team told H. Ibrahim, "I don't want to hear you breathe and don't look at me."

Throughout this ordeal, H. Ibrahim and Ebrahim were fully cooperative and compliant, and neither provoked nor posed a threat to anyone.

196.　　Ebrahim and H. Ibrahim each suffered serious injuries as a result of the beatings received upon their arrival at MDC.  Their arms and noses remained black and swollen for several days thereafter.  H. Ibrahim was so badly frightened by the beatings that he did not eat during the first three days of his detention at MDC. For several days, Ebrahim and H. Ibrahim had visible injuries, were in considerable pain, and had great difficulty breathing.  They were not treated for their injuries, even though both received physical exams on October 2, 2001, the day after their arrival at MDC. Physician Assistant Nora Lorenzo, who gave the brothers their medical exams, did not care to look at, ask about, comment on, or treat their obvious injuries.

197.　　Physical abuse was a regular part of Ebrahim and H. Ibrahim's lives at MDC, particularly during transports between their cells and other locations.  Examples of this include MDC Defendants twisting their arms and slamming them against walls and making their handcuffs painfully tight. Additionally, MDC Defendants frequently stepped on and kicked their ankle shackles while transporting them. On information and belief, COs Sidney Chase, Richard Diaz, and other MDC Defendants frequently abused Ebrahim and H. Ibrahim in these ways, though other MDC Defendants also perpetrated such abuses.

198.　　Ebrahim and H. Ibrahim were also subjected to regular verbal abuse throughout their detention at MDC, contributing to their feelings of being under threat of physical harm. On one occasion, when H. Ibrahim asked for pen and paper to write a letter, Lt. Barrere responded: "Are you going to write to Osama bin Laden?" CO Sidney Chase regularly harassed Ebrahim and blamed him for the World Trade Center attacks. When Ebrahim raised the issue of human rights to Clemmet Shacks, Shacks responded: "Forget about human rights.  Three thousand

people died in the World Trade Center. You have no rights." They were also regularly subjected to ethnic and anti-Muslim slurs.

199.     H. Ibrahim was released and deported on May 29, 2002.  Ebrahim was released and deported on June 6, 2002.  On the dates that they were deported, each was given old clothes (not their own), taken to the airport in handcuffs, chains, and shackles, and placed on a plane without any money.  Both Ebrahim and H. Ibrahim have made attempts to have personal belongings and money confiscated from them during and following their arrests returned to them.  To date, none of these items have been returned to them.

200.     Ebrahim and H. Ibrahim were each deported to Egypt.  Upon their respective arrivals in Cairo, Ebrahim and H. Ibrahim were summoned to Egyptian State Security Investigations, where each was detained and extensively interrogated for hours on his detention in the United States.  On information and belief, State Security Investigations retains dossiers on both Ebrahim and H. Ibrahim.  The presumption of guilt thus follows them even after their deportation from the United States, despite the fact that they have never been involved in terrorist activity and the complete absence of any evidence of their involvement in such activity.

201.     Ebrahim and H. Ibrahim continue to suffer extreme emotional and psychological distress as a result of their eight months of detention in the United States.  They each have sleepless nights thinking about the recent past.  H. Ibrahim in particular has had extreme difficulty coming to terms with his detention ordeal and has suffered a "nervous breakdown" after returning to Egypt, which necessitated professional counseling.  It was not until March 2003 that Ebrahim and H. Ibrahim had recuperated sufficiently to be able to work and hold jobs.

**Plaintiff Shakir Baloch**

202.    Plaintiff Shakir Baloch was taken into custody at his residence on September 19,

2001 by a group of INS, FBI, Department of Labor and NYPD officers. The officers were

conducting an investigation in connection with Amjad Baig for possession of a counterfeit social

security card.  Baig lived in the same apartment as Baloch. There, Baloch was interrogated for

nearly four hours, primarily about the events on September 11, 2001.  He was not advised of his

rights to counsel or his other Miranda rights.  Baloch denied any involvement with terrorists,

terrorist organizations, or terrorist activity, but disclosed that he had used the alias Faisal Kurd to

obtain false identification for employment purposes because he had previously been removed

from the United States under his real name. Baloch was arrested at the close of the interrogation.

Baloch was taken in handcuffs to the INS's Varick Street facility in Manhattan, where he was

held for two nights.

203.    On information and belief, FBI and INS agents conducted a search of Baloch's

apartment without his consent. The agents seized his laptop computer and other items from his

apartment. Additionally, his personal identification, money, two watches, and a briefcase, were

confiscated upon his booking. These items have never been returned to Baloch.

204.    On September 21, 2001, Baloch was processed for removal. Baloch was given a

Notice of Rights and Request for Disposition form, which he refused to sign. He  was not read

his Miranda rights prior to being questioned.

205.    On the night of September 21, 2001, Baloch was taken to MDC in Brooklyn, New

York.  Baloch was met at the MDC and taken from the sally port to another room on the first

floor by five MDC guards, including, on information and belief, Lt. Steven Barrere, COs

Michael McCabe, Kevin Lopez, and Jon Osteen. After escorting Baloch to an empty room, the

five guards worked as a team to pick him up from under the arms and throw him rapidly and forcefully from corner to corner in his cell, while hitting and kicking him in the back as he fell to the ground. As they did so, the some of the guards cursed at Baloch and called him "a fucking Muslim terrorist." They repeatedly said such things as: "For what you did to us, we will kill you," "You did this to us.  We're going to kill you," and "You know why you are in here.  The government thinks that you are a terrorist."  On information and belief, Lt. Barrere and COs McCabe, Lopez, and Osteen all participated in throwing Baloch into the corners of the room, hitting and kicking him, and verbally insulting him.

206.     Despite the fact that Baloch was being held on a civil immigration violation and that no evidence connected Baloch to any terrorist activities, Baloch was designated as a possible terrorist and placed in the Special Housing Unit (SHU).

207.     Like most or all of the other MDC Plaintiffs, Baloch was placed in the ADMAX SHU arbitrarily and without justification, subjected to a communications blackout, denied access to counsel and to his consulate, arbitrarily and abusively strip searched, and subjected to inhumane conditions of confinement including sleep deprivation, constructive denial of recreational activities and hygienic items, and deprivation of adequate food and medical attention.  Like most or all of the other MDC Plaintiffs, Baloch was, at all times relevant to the acts complained of, and remains, a devout Muslim, and the MDC Defendants deliberately interfered with his religious practice.  Like most or all of the other MDC Plaintiffs, Baloch was not provided with timely notice of MDC's complaint procedures and had his personal items confiscated by MDC Defendants.

208.     On September 22, 2001, INS reinstated a prior deportation order against Baloch. Because Baloch had a prior deportation order against him, he was not provided a hearing. Rather,

the prior order was simply reinstated. However, despite the fact that the INS could have effectuated Baloch's removal from the United States within a matter of days, Baloch continued to be held in the MDC, solely on the remote possibility that he might be connected to terrorist activity, despite the complete absence of any evidence of terrorist connections. Baloch was never brought before a neutral judicial officer to determine whether there was probable cause to believe that he engaged in terrorist activity.

209.    On Septmeber 28, 2001, Baloch was interviewed by SA Noreen Gleason (FBI) and SA Kevin Ryan (INS).  Baloch was asked questions about his immigration and work history. Baloch was read his Miranda rights. He was also questioned about his connections to terrorism. Baloch was interviewed again by these same two agents on October 11, 2001. On October 14, 2001, Baloch was interviewed at the MDC by agents from the NYPD, FBI and INS. Baloch signed a statement that was prepared for him stating that he purchased false identification and passports. On October 29, 2001, Baloch was interviewed by two FBI agents and an NYPD detective. He was questioned further about his false identification documents.  He was read his Miranda rights. During one of these interrogations, the agents threatened him by telling him things such as "If you don't cooperate with us, we will revoke your Canadian citizenship" and "If you're not cooperative, we'll put you in jail for 10 years or deport you back to Pakistan instead of Canada, where they'll put you in jail longer than 10 years."

210.    On about December 21, 2001, having been detained for more than three months without any prospect for release, Baloch filed a habeas corpus petition through pro bono counsel in the United States District Court for the Southern District of New York.   Less than two weeks later, on January 3, 2002, Baloch was indicted for illegal re-entry – a charge to which he pled

guilty on April 2, 2002.  Baloch was sentenced to time served.  Shortly thereafter, he was transferred from MDC to the Passaic County Jail.

211.     On information and belief, Defendants Ashcroft, Mueller, and Ziglar rarely seek indictment of minor immigration violators for the offenses for which Baloch was indicted.  On information and belief, Defendants Ashcroft, Mueller, and Ziglar caused Baloch to be indicted solely to prolong his detention for the purpose of their investigation into terrorist activity.

212.     On February 7, 2002, Baloch was cleared to be placed in the general population.

213.     On April 2, 2002, the INS took Baloch from Passaic County Jail to Newark Airport, where they put him on a plane to Toronto, without any personal identification or money. Since his deportation, Baloch has repeatedly requested return of the personal belongings confiscated from him during and after his arrest, including his personal identification. Defendants have, however, refused to comply with these requests.

214.     Baloch was subjected to on-going physical and verbal abuse while housed at the MDC. On information and belief, COs Michael McCabe, Mario Machado, Michael DeFrancisco, Kevin Lopez, Jon Osteen, Richard Diaz, and Brian Rodriguez would regularly drag Baloch forward by his waist chain, causing his ankle shackles to dig in; shove Baloch in the back while his chin was against the wall; slam Baloch into walls as they were transferring him; twist Baloch's hands, thumbs, and fingers; step on the chain connecting his ankle shackles, causing the ankle shackles to tighten painfully; and lift his arms or elbows painfully while his wrists were cuffed. On information and belief,  Lts. William Beck, Steven Barrere, Howard Gussak and Marcial Mundo witnessed this treatment and did nothing to stop it.

215.     On information and belief, Lts. Steven Barrere, Marcial Mundo, and Howard Gussak handled Baloch very roughly. They would regularly step on Baloch's leg chains, drag Baloch while he was shackled, and slam him into walls.

216.     On October 20, 2001, on information and belief, COs Richard Diaz and Mario Machado deliberately brutalized Baloch. CO Diaz held Baloch's left elbow, while CO Machado lifted his handcuffs, holding Baloch in an extremely painful position. On information and belief, Lt. Beck was present and did nothing to stop the rough handling of Baloch.

217.     Baloch was also subjected to constant verbal harassment by almost all the COs in the ADMAX SHU. CO Wilson regularly spoke to Baloch about getting revenge for the terrorist attacks. CO Kevin Lopez would regularly display his middle finger and curse Baloch. Lt. Barrere told Baloch, "Your lawyers can't help you out. You'll stay in here another 20 years." Similarly, Lt. Beck told Baloch "People have been here 20 years without seeing a judge." COs would regularly refer to Baloch as a "fucking Muslim" and "terrorist."

218.     At one point while on the first floor, one of the guards had difficulty unlocking his handcuffs; the guard brought out a large pair of cutters and threatened to cut Baloch's hands off to unlock the cuffs.

219.     Baloch requested to speak an attorney shortly after arriving at MDC and continuously thereafter.  However, Baloch was not permitted to speak with an attorney until on or about November 7, 2001, six weeks into his detention, at which time he placed a call to the Legal Aid Society. (While in INS custody, Baloch was given extremely limited access to the telephone.  He was denied all telephone access from the date of his arrest until early November 2001.)

220.      Baloch met with an attorney for the first time on November 19, 2001.  This interview was recorded on video with sound, as were all his subsequent meetings with his attorneys. Baloch was aware of the video camera in the room, and was very reluctant to speak candidly with his attorney because he feared the conversation was being recorded.

221.      On information and belief, when officials with the Canadian consulate inquired as to Baloch's whereabouts, officials at the MDC denied that Baloch was held there. Baloch did not meet with a consular official until on or about December 13, 2001.

222.      Baloch continues to suffer the effects of his detention in the United States.  He recently tested positive for tuberculosis for the first time -- a disease that he doubtless contracted during his incarceration.  He is also being treated for severe depression.  Because of nightmares and anxiety, he cannot sleep at night.  He is unable to take medication for his tuberculosis since the medication would exacerbate his depression.  His physician has recommended that he not work for the next six months.  Without his Canadian social insurance and health cards, which were confiscated at the time of his arrest and never returned, he has had difficulty securing the medical treatment he desperately needs to recover.  He and his wife have recently separated, due to the strains on their marriage brought about by his prolonged detention.  Baloch, although trained as a doctor, is unable to work in Canada since the Canadian Medical Board has found him unfit to practice until at least October 2004 due to depression.

**Plaintiff Ashraf Ali Ibrahim**

223.      Ashraf Ibrahim, a citizen of Egypt, entered the United States on January 23, 1992 on a six month visa.  A.Ibrahim lived in the United States continuously for ten years without petitioning for an adjustment of status.  On or about August 27, 2001, A.Ibrahim started up a

bottled-water distribution business in Philadelphia.  From September 7 to September 13, 2001, A.Ibrahim was in Philadelphia with his partner making the new business's first deliveries.

224.      Early in the morning on September 23, 2001, FBI and INS agents came to the door of his home and asked him to sign a document consenting to a search of his home, which he signed without reading. The agents told him that he would not need an attorney.  A.Ibrahim was then interrogated at his home for approximately two hours as to whether he had any involvement in the attacks of September 11, 2001, and as to his whereabouts on that date.  A.Ibrahim answered the agents' questions and explained that he had no involvement with the terrorist attacks of September 11 or any other terrorist activity. A.Ibrahim requested the opportunity to make a phone call but was refused.  These or other government agents confiscated all of the possessions in his home and over $300 cash.

225.      Later in the morning of September 23, 2001, A.Ibrahim was taken to the Varick Street INS facility in Manhattan where he was interrogated again, this time for approximately seven hours.  A.Ibrahim was cooperative and made it clear that he had no involvement with terrorism. A.Ibrahim was not advised of his right to counsel and despite his repeated requests to make a phone call he was not permitted to do so.  On information and belief, INS unreasonably delayed in providing a Notice to Appear advising A.Ibrahim of the charges against him. Following this interrogation A.Ibrahim was handcuffed, put in waist and ankle chains, and driven in a van to MDC.

226.      A.Ibrahim arrived at the MDC in the evening of September 23, 2001.  While A.Ibrahim was still in the transport van in the MDC sally port, a CO from MDC got into the van and told him, "open your fucking mouth."  The CO pointed a flashlight into A.Ibrahim's mouth. Referring to A.Ibrahim, someone then said, "unfasten his seatbelt before you drag him down."

A.Ibrahim was then pulled out of the van by two MDC CO Defendants and dragged by his handcuffed arms to the entrance of the MDC's R&D Area.  These MDC CO Defendants shoved A.Ibrahim hard against the wall of the building, stunning him and causing him great pain.  On information and belief, the lieutenant in charge of the team of COs that received A.Ibrahim when he arrived at the MDC was Lt. Gussak.  On information and belief, one or more member of the team forcefully pressed A.Ibrahim's body against the wall for several minutes.  The lieutenant not only observed his COs physically and verbally abuse A.Ibrahim without making any effort to stop them, but he encouraged them to act on their aggression by belligerently accusing A.Ibrahim of complicity in the World Trade Center bombing and by telling him, "If you make any move, you will hit the floor and you will hit it hard."

227.    When the CO team took A.Ibrahim for fingerprinting, they gripped him under his arms and forced him to run at a pace that he could not manage because of his ankle restraints. The COs standing behind A.Ibrahim  kept stepping on his ankle chains, causing him to fall forward while the COs at his sides held tightly to his armpits. This coordinated physical abuse by Lt. Gussak's team was humiliating and painful. Although pain and bruising on his ankles and arms persisted for about three weeks, A.Ibrahim's injuries were never treated.

228.    After A.Ibrahim was fingerprinted he was subjected to a strip search by, on information and belief, Lt. Gussak. After disrobing, A.Ibrahim was ordered to move his fingers through his pubic hair and lift his genitals.  Next, despite lacking reasonable suspicion that A.Ibrahim might have contraband in his anus following ten hours of continuous supervision while handcuffed, the lieutenant then ordered A.Ibrahim to bend over and spread his buttocks for a visual inspection.  On information and belief, A.Ibrahim was then transported to the 9th floor of MDC.  In the elevator A.Ibrahim was slammed into the wall causing him considerable pain and

heightening his fear.  When A.Ibrahim reached the 9th floor, he was received by a new team of guards and subjected to another strip search, conducted in the same manner previously described, despite the fact that it would have been impossible for him to gain access to any contraband much less store them in his body cavities while he was under continuous supervision and cuffed at the hands and legs.  A.Ibrahim was then locked alone in a cell on the 9th floor.

229.     Like most or all of the other MDC Plaintiffs, A.Ibrahim was placed in the ADMAX SHU arbitrarily and without justification, subjected to a communications blackout, denied access to counsel and to his consulate, arbitrarily and abusively strip searched, and subjected to inhumane conditions of confinement including sleep deprivation, constructive denial of recreational activities and hygienic items, and deprivation of adequate food and medical attention.  Like most or all of the other MDC Plaintiffs, A.Ibrahim was, at all times relevant to the acts complained of, and remains, a devout Muslim, and the MDC Defendants deliberately interfered with his religious practice.  Like most or all of the other MDC Plaintiffs, A.Ibrahim was not provided with timely notice of MDC's complaint procedures and had his personal items confiscated by MDC Defendants.

230.     A.Ibrahim was subject to a communications blackout for the first twenty-five days of his detention at the MDC.  A.Ibrahim requested permission to make phone calls many times. He made these requests to all the guards, including CO Chase, Lt. Barrere, and another CO on Barrere's team.  Nevertheless, he was not permitted to contact family members or a lawyer until October 17, 2001, despite having had two hearings scheduled before an immigration judge in that time period.

231.     Even after calls were allowed, on information and belief, Counselor Raymond Cotton thwarted A.Ibrahim's attempts to make legal and social calls by purposely dialing wrong

numbers and by generally making legal calls available at 8:00am or 9:00am, before most attorneys began work.  On other occasions Counselor Cotton would report to A.Ibrahim that the number he requested was busy and that he would therefore have to try again "next week" or "next month."

232.	For the first five months of A.Ibrahim's detention, he was never allowed to leave his cell without first being strip-searched. Following the ubiquitous strip searches, A.Ibrahim was handcuffed, chained and shackled. On information and belief, Lt. Beck would routinely over-tighten A.Ibrahim's  handcuffs and ankle restraints causing them to dig into his flesh and inflict pain.  During transport to other locations in MDC, A.Ibrahim was subjected to excessively rough handling. He was pushed or slammed against the wall for "pat-down" searches.  On information and belief, whenever these pat-down searches were conducted by CO Chase, CO Chase would grasp A.Ibrahim's genitals and squeeze them until it caused A.Ibrahim acute pain. This caused A.Ibrahim extreme pain and humiliation.

233.	On or about September 24, 2001, A.Ibrahim was taken from his cell to be photographed. Before leaving his cell, and at all times that he was taken to any location for the duration of his confinement, A.Ibrahim was handcuffed behind his back and chained at the ankles.  On information and belief CO Richard Diaz, CO Machado, another lieutenant and two other guards made up the team that transported A.Ibrahim to be photographed. Despite his complete cooperation, CO Richard Diaz and, CO Machado, along with a lieutenant and two other MDC guards, slammed A.Ibrahim's back into the wall, and held him there tightly while his photograph was taken.

234.	On or about October 3, 2001, on information and belief, Lt. Barrere and four officers informed A.Ibrahim that he would be going to court and then strip searched him in his

cell, despite the fact that he had had no opportunity to obtain any contraband.  A.Ibrahim was then cuffed, chained and shackled.  Outside the cell he was roughly slammed into the wall and had to undergo a  pat-down search.

235.	The lieutenant and his team then took A.Ibrahim to the elevator.  Inside the elevator A.Ibrahim was pushed up against the wall.  On information and belief, CO Rosebery told A.Ibrahim to "spread your fucking legs."  Then, on information and belief, CO Rosebery stepped on the chain in between his ankles while two other officers held him up, causing him great pain.

236.	A.Ibrahim informed the Immigration Judge Allan Vomacka that he had been treated violently in the elevator.  He also informed Judge Vomacka that he had not been permitted to make a phone call.  On information and belief, Judge Vomacka told one of the jail staff that A.Ibrahim should be permitted to use the phone.

237.	On information and belief, A.Ibrahim was pushed into the corner of the elevator on the way back from the immigration court, October 3, 2001.  An officer, on information and belief CO Rosebery, told A.Ibrahim to spread his legs wide and then stepped on his ankle chain, causing him great pain.  A.Ibrahim's ankles were bruised as a result of the officer standing on his ankle chain during the elevator rides to and from the immigration court room.

238.	Similar incidents of abuse, where, on information and belief, CO Rosebery or another officer ordered A.Ibrahim to spread his chained legs and then stepped on the ankle chain, were perpetrated against A.Ibrahim in the elevator on the way to and from his immigration hearings of October 11, 2001, October 16, 2001, and October 25, 2001. A.Ibrahim's ankles were badly bruised as a result of these incidents.

239.      On or about October 11, 2001, A.Ibrahim had a scheduled hearing in immigration court. After he was strip-searched in his cell by Lt. Beck and his team, cuffed, chained and shackled, an additional pat-down search was conducted during which, on information and belief, CO Chase intentionally squeezed A.Ibrahim's genitals, causing A.Ibrahim considerable pain and humiliation.

240.       The October 11 hearing was scheduled to be a bond hearing for A.Ibrahim, but the judge was absent.  No substitute immigration judge was provided and therefore no determination about whether A.Ibrahim should be able to post bond could be made.

241.      On or about mid-October, 2001, a CO, on information and belief CO Phillip Barnes, began a practice of twisting A.Ibrahim's fingers for no apparent reason while he was being held face to the wall, and continued to twist A.Ibrahim's fingers at every opportunity, causing A.Ibrahim severe pain. Even when there was a video camera running, the officer would block the camera's view with A.Ibrahim's body and then twist A.Ibrahim's fingers.

242.      Despite A.Ibrahim's desire not to make any trouble and willingness to comply with orders by MDC personnel, he was physically abused and verbally harassed by both Lieutenants and COs in the ADMAX-SHU, especially during the first five months or so of his detention, causing A.Ibrahim to constantly fear for his safety. On information and belief, Lt. Beck observed members of his team – over whom he had direct supervision – hurting, insulting or harassing A.Ibrahim but never stopped them from doing so.  The lieutenant himself inappropriately insulted A.Ibrahim on occasion. On information and belief, Lt. Barrere observed members of his team – over whom he had direct supervision – hurting, insulting or harassing A.Ibrahim but never stopped them from doing so.  The lieutenant himself made a point of intimidating and scaring A.Ibrahim while he was confined at MDC. On information and belief,

CO Michael McCabe was frequently violent and aggressive towards A.Ibrahim.  On information and belief, CO McCabe also shoved A.Ibrahim's back or pushed A.Ibrahim into walls on some of the days he was taken to the Immigration Court on the second floor. Despite A.Ibrahim's cooperativeness, McCabe shouted at him "Don't move! Don't talk!"  When assigned to escort A.Ibrahim, CO McCabe would frequently push A.Ibrahim into walls on the 9th floor.

243.     On or about October 16, 2001, A.Ibrahim had a hearing in immigration court. Because he had not yet been permitted to make a legal phone call, A.Ibrahim had no attorney present at the hearing.

244.     On or about October 19, 2001, A.Ibrahim was permitted to make his first social call.  He called a friend and asked him for money and help in retaining an attorney.

245.     On or about October 22, 2001, A.Ibrahim was taken to the interrogation room, where he was aggressively interrogated by a large male agent from INS and two FBI agents who said their names were Bob and Tony.  On information and belief, these agents told him that if he could not provide any information about September 11 he would stay in jail forever.  On information and belief, the INS agent told A.Ibrahim that his "chance to get out of this jail is very slim."  A.Ibrahim was interrogated in this manner for about two hours.

246.     On or about October 25, 2001, an attorney (Mr. Al-Shawi) retained for A.Ibrahim by a friend came to the MDC to represent him at his immigration hearing, which was scheduled for that day.  On information and belief, the officers at the front desk that day told Mr. Al-Shawi and A.Ibrahim's friend that there was no one in the MDC named Ashraf Ibrahim.  Mr. Al-Shawi had to leave the MDC without the opportunity to represent A.Ibrahim. Because his attorney was not present, the Immigration Judge Allan Vomacka rescheduled the hearing for November 6, 2001.

247.      On or about October 30, 2001, after being strip searched, handcuffed, shackled and chained, A.Ibrahim was escorted to a visiting room within the SHU range on the 9th floor of the MDC where he was permitted to meet with Mr. Al-Shawi.  They spoke to each other through a thick glass wall.  When A.Ibrahim arrived at the visiting room he noticed a video camera on a tripod about five feet away, outside the room.  A.Ibrahim believed that the video camera was on, but he was not positive that it would record his conversation with Mr. Al-Shawi.

248.      On or about November 6, 2001, A.Ibrahim had a hearing before the Immigration Judge with his attorney Mr. Al-Shawi present.  At the hearing A.Ibrahim requested bond in order to collect his belongings, which had been acquired over the ten years that A.Ibrahim had lived in New York City.  On information and belief, Judge Allan Vomacka refused this request and issued a final order of removal.  A.Ibrahim then told the judge that he would pay his own ticket back to Egypt if it meant he could avoid further detention at the MDC.  On information and belief, in response, Judge Vomacka explained that A.Ibrahim would be deported shortly because there was a limit to the time he could be detained after a final deportation order. Notwithstanding this assurance, A.Ibrahim was detained another 143 days in the ADMAX SHU at MDC.

249.      On or about March 28, 2002 A.Ibrahim was fingerprinted by INS agents and escorted in handcuffs to JFK airport where he was deported to Egypt. Upon arrival in Egypt, A.Ibrahim, along with other deported passengers was taken to the Egyptian State Security Investigation Office, where he was interrogated and detained overnight.  The next morning he was taken to a Cairo jail along with others, where he was detained for another three days. Finally, A.Ibrahim arrived in Alexandria, but his identification and other papers were confiscated.

250.     A.Ibrahim's experiences severe depression and anxiety resulting from during his detention which caused him to see a psychiatrist after returning to Egypt.

## PASSAIC PLAINTIFFS

251.     Plaintiffs Ibrahim Turkmen and Akhil Sachdeva are collectively referred to herein as the "Passaic Plaintiffs."

### Plaintiff Ibrahim Turkmen

252.     Ibrahim Turkmen entered the United States through New York City on a tourist visa in early October, 2000 to visit an old friend from Turkey who lived in Long Island.

253.     In late October 2000, Turkmen, at his friend's suggestion, found work at a service station in Bellport, Long Island.  He worked there several days a week until mid-January 2001, when he took a job at another service station in the same town.  Turkmen worked at the latter service station several days a week until mid-April 2001, when he began working part-time for a locally-based Turkish construction company.

254.     From his arrival in the United States until he was taken into INS custody, Turkmen frequently called his wife and four daughters back in Turkey.  While dearly missing them, he decided to remain in the United States to provide for their support.  Each week, Turkmen sent most of his meager earnings home to his family.

255.     Turkmen spoke almost no English when he came to the United States.  While here, he learned barely enough English words to conduct his limited daily business.  At the time that he was taken into custody, Turkmen understood very little spoken English, and he could not read English at all.

256.     At about 2:30 p.m. on October 13, 2001, slightly more than a month after the September 11 terrorist attacks, two FBI agents visited Turkmen at the apartment where he was

staying with several Turkish friends in West Babylon, New York.  Without advising him of his

right to counsel, they asked Turkmen whether he had any involvement in the September 11

terrorist attacks and whether he had any association with terrorists.  They also inquired as to his

immigration status, among other things.

257.     Turkmen had great difficulty understanding the FBI agents' questions given his

limited knowledge of English and the lack of an interpreter.  All the same, he did his best to

answer truthfully.  He denied any involvement with terrorists, terrorist organizations, or terrorist

activity.  The FBI agents, nonetheless, acccused Turkmen with being an associate of Osama bin

Laden, placed him under arrest, confiscated his personal items (passport, identification, credit

cards, etc.) and money, and searched his home without his consent. On information and belief,

Turkmen was fully interviewed on October 13, 2001 and no information was uncovered to

connect him to the terrorism investigation.

258.     Turkmen was taken to an INS facility in Nassau County, fingerprinted, and

further interrogated, this time by an INS official.  Once again, he was not advised of his right to

counsel.  Due to his limited knowledge of English and the lack of an interpreter, Turkmen again

had great difficulty understanding the questions.  Still, he did his best to answer them truthfully.

Turkmen again denied any involvement with terrorists, terrorist organizations, or terrorist

activity, and requested a hearing before an immigration judge to determine whether he could

remain in the United States.  He was held at the Nassau County INS facility for five or six hours.

259.     That evening, at approximately 11:30 p.m., Turkmen was brought to another INS

facility in Manhattan, where INS officials asked him still more questions in English.  Despite

great difficulty understanding the questions, and without the aid of an interpreter, Turkmen again

did his best to answer them truthfully.  For the third time, he denied any involvement with terrorists, terrorist organizations, or terrorist activity.

260.     Turkmen's interrogators then instructed him to sign certain papers, possibly waiving his right under Article 36 of the Vienna Convention to speak with his consulate -- papers which he could not read because they were in English.  Afraid that he would only make matters worse for himself if he refused to comply, Turkmen reluctantly signed the papers.

261.     Early the next morning, October 14, 2001, Turkmen was taken to the Passaic County Jail in Paterson, New Jersey, where he remained confined, except for a single trip to Immigration Court in Newark, New Jersey, until February 25, 2002, a period of nearly four and one-half months.

262.     Shortly after arriving at the Passaic County Jail, Turkmen received a Notice to Appear from the INS, charging him with overstaying his visa and scheduling a hearing at Immigration Court in Newark, New Jersey on October 31, 2001. On the same date, he received a Notice of Custody Determination and requested a re-determination of the custody decision by an immigration judge.

263.     On October 29, 2001, two FBI agents visited Turkmen at the Passaic County Jail. They asked him still more questions about his immigration status, his reasons for entering the United States, his work experience, his religious beliefs, and other personal matters.  Another Turkish post-9/11 detainee fluent in English translated the questions for Turkmen, who answered them all truthfully.  For the fourth time, he denied any involvement with terrorists, terrorist organizations, or terrorist activities.

264.     Two days later, on October 31, 2001, Turkmen was taken to Immigration Court in Newark, New Jersey, where he appeared pro se before an immigration judge.  Once again, he

was not advised of his right to counsel.  While Turkmen this time was provided with an interpreter, that interpreter (who was not of Turkish descent) was fluent in neither Turkish nor English.  After conceding that he had overstayed his tourist visa, Turkmen accepted a voluntary departure order requiring him to leave the United States by November 30, 2001.  He declined to request bond solely because the Judge assured him that he would be allowed to return to Turkey within a matter of days.  The INS never appealed the voluntary departure order issued to Turkmen.

265.    When he returned to the Passaic County Jail later that day, Turkmen called a friend to ask him to purchase a plane ticket for Turkmen's return to Turkey.  Two days later, on November 2, 2001, Turkmen's friend brought the ticket to the INS's offices in Newark, New Jersey.  Turkmen remained, nonetheless, in the Passaic County Jail for nearly four more months, until February 25, 2002, even though the INS could have effectuated his voluntary departure within a matter of days.  On information and belief, the INS prevented his compliance with the Immigration Judge's voluntary departure order and thereby caused an automatic entry of an order of removal with a future bar on reentry for 10 years.

266.    Turkmen was detained for nearly four more months longer than necessary to effectuate his voluntary departure from the United States solely on the remote possibility that law enforcement authorities might someday connect him to terrorist activity.  He was never, however, brought before a neutral judicial officer to determine whether there was probable cause to believe that Turkmen engaged in terrorist activity.  Nor was an indictment or information against Turkmen ever filed with a court citing criminal charges on which his continued detention was based.

267.     While confined in the Passaic County Jail, Turkmen was not allowed to call his wife and four daughters back home in Turkey.  He learned through a friend, however, that his wife had been hospitalized for a month with an undisclosed ailment so serious that she lost most of her hair and teeth.  Upon learning this, Turkmen was beside himself with worry.  Unable even to call his seriously ailing wife, he suffered extreme emotional distress.

268.     While confined in the Passaic County Jail, Turkmen, like other class members was:

> (a)     placed in the general prison population, forced to eat meals at the same tables, sleep in the same dormitories, and otherwise commingle with individuals charged with and/or convicted of violent crimes;
>
> (b)     deliberately denied the ability to observe the mandatory practices of his religion (for example, by regularly interrupting his daily prayers and refusing to serve him the Halal food);
>
> (c)     housed under severely overcrowded conditions (with individuals charged with and/or convicted of crimes); and
>
> (d)     threatened by guards with menacing dogs.

269.     Upon his arrival at the Passaic County Jail, Turkmen was given a list of telephone numbers to call for free legal services.  Most of the numbers, however, were incorrect or no longer valid.  For weeks, one of Turkmen's friends on the outside tried to call those numbers, with no success.  On information and belief, other post-9/11 detainees in the Passaic County Jail given the same list of telephone numbers to call for free legal services encountered the very same problem.

270.     While confined in the Passaic County Jail, Turkmen was unaware of his right under Article 36 of the Vienna Convention to consult with the Turkish Consulate.  Had he known that he had such a right, he could have, and would have, sought immediate assistance from the Consulate.

271.     On January 17, 2002, more than three months after he was taken into custody and more than two and one-half months after he received a voluntary departure order, Turkmen was visited by an INS agent.  The agent informed Turkmen that he had been "cleared" by the FBI but still needed to be "cleared" by the INS.  When Turkmen asked how long the latter "clearance" might take, the agent replied that he did not know.

272.     One month later, on February 17, 2002, Turkmen was visited by another INS agent, who told Turkmen that he had received INS "clearance" and would be allowed to depart the United States within the next two weeks.  Eight days later, on February 25, 2002, INS agents took Turkmen in handcuffs from the Passaic County Jail to Newark Airport, where they put him on a plane to Istanbul, Turkey -- without a single penny or lira in his pocket.  Although Turkmen requested the return of $52 confiscated from him at the time of his arrest -- money that he needed to pay for, among other things, the eight-hour bus trip from Istanbul Airport to his home in the City of Konya -- that request was denied.

273.     As soon as Turkmen debarked from the plane at Istanbul Airport, he was met by a Turkish police officer, who escorted him to a nearby police station, where he was interrogated for about an hour concerning his four-and-one-half month detention in the United States.  Once again, Turkmen denied any involvement with terrorists, terrorist organizations, or terrorist activity.  After the interrogation concluded, he was allowed to leave for Konya, though he still had no money to buy the bus ticket.  But for the kindness of a complete stranger who lent him the necessary funds, Turkmen might still be stranded in Istanbul.

274.     Turkmen was again interrogated at length concerning his detention in the United States, this time by Konya's Security Intelligence Division, following the filing of this lawsuit on April 17, 2002.  At the close of the interrogation, the Division's Superintendent told him to "be

careful." Approximately 10 days later, Turkmen's father was contacted by the Head of

Gendarmerie in Konya's Karapinar District, Turkmen's birthplace, to ascertain Turkmen's

current address, ostensibly to "give to the human rights organizations that are trying to reach

Turkmen." Several days later, the Head of Gendarmerie in Konya's Cumra District asked

Turkmen's former employer for Turkmen's personnel file. After reviewing the file, that

gendarme took with him all the documents relating to Turkmen's 16 years of public service.

275.     The presumption of guilt thus follows Turkmen even after his deportation from

the United States, despite the fact that he has never been involved in terrorist activity and the

complete absence of any evidence of his involvement in such activity. Because of this

presumption, Turkmen is deemed a "security risk" and thus unable to return to his prior

government position. After seeking employment for months, Turkmen had to settle for a low-

paying job as a service driver for a factory.

276.     Turkmen continues to suffer the emotional and psychological effects of his four

and one-half months detention in the United States. He regularly experiences nightmares about

his detention, making it difficult for him to sleep.

**Plaintiff Akhil Sachdeva**

277.     In late September or early October 2001, plaintiff Akhil Sachdeva returned to the

United States from Canada to finalize his divorce from his wife and collect his personal

belongings for his move back to Canada. Sometime in late November 2001, an FBI agent visited

the gas station owned by Sachdeva's ex-wife in Port Washington, New York, looking for a

Muslim employee. Not finding that individual, the agent left a message for Sachdeva's ex-wife

to contact the agent. She, in turn, asked Sachdeva to do so.

278.     In early December 2001, Sachdeva called the FBI agent, who asked Sachdeva to come to the agent's offices for an interview.  Sachdeva agreed to do so.  On December 9, 2001, Sachdeva met with two FBI agents at 26 Federal Plaza in Manhattan.  They proceeded to question him at length about the September 11 terrorist attacks and his religious beliefs, among other things, though without advising him of his right to counsel or his right to remain silent.  At the close of the interrogation, the agents examined Sachdeva's personal identification before allowing him to leave.

279.     Sachdeva continued to close out his affairs in the United States in anticipation of his move back to Canada.  In the early morning of December 20, 2001, while at his uncle's apartment, Sachdeva was arrested by INS agents.  He was taken to the INS offices at 26 Federal Plaza, where he was interrogated for five hours about his ties to the September 11 terrorist attacks.  At the close of the interrogation, INS agents confiscated all of Sachdeva's personal identification.  He was then taken to Passaic County Jail. On information and belief, on December 20, 2001 the FBI concluded that it had no further interest in Sachdeva related to the PENTTBOM investigation.

280.     On December 27, 2001, while confined in Passaic County Jail, Sachdeva received a Notice to Appear, charging him with illegal re-entry.  (He had overstayed a prior voluntary departure order.)  Sachdeva had a hearing on December 31, 2001, in Immigration Court in Newark, New Jersey. He was not given any extra clothing for the trip, despite the extreme cold. The Immigration Judge told Sachdeva that he would be deported to Canada or India "within 30 days."  The INS did not appeal that final deportation order.  Even though the INS could have effectuated Sachdeva's removal from the United States within a matter of days, Sachdeva was detained for another three and one-half months, until April 17, 2002.

281.     Sachdeva was detained for nearly three and one-half months longer than necessary to effectuate his removal from the United States solely on the remote possibility that law enforcement authorities might someday connect him to terrorist activity.  He was never, however, brought before a neutral judicial officer to determine whether there was probable cause to believe that Sachdeva engaged in terrorist activity.  Nor was an indictment or information against Sachdeva ever filed with a court citing criminal charges on which his continued detention was based.

282.     While confined in Passaic County Jail, Sachdeva was subjected to many of the same unreasonable and excessively harsh conditions as Turkmen.  He was housed under extremely crowded conditions and forced to eat and sleep with individuals charged with and/or convicted of violent crimes.  In mid-February, 2002, a well-built accused felon (being held on shooting and drug charges) punched Sachdeva several times in the face when Sachdeva did not hand over a newspaper as quickly as the assailant wanted. The assault loosened his teeth and caused permanent dental damage. Only approximately a quarter of the detainees Sachdeva was held with were immigration detainees; the rest were pretrial detainees, many with criminal histories. He was also threatened by menacing dogs.

283.     While confined in Passaic County Jail, Sachdeva, on four occasions, made written requests to consult with the Canadian Consulate.  All four requests were denied.  Sachdeva made frequent efforts during this time to contact the Canadian Consulate by phone. However, guards had to place the calls because the Consulate did not accept collect calls, and the guards would claim that the lines were busy or that there was no answer.  He finally managed to get through to the consulate in mid-March, 2002.

284.     On April 17, 2002, INS agents took Sachdeva, in old clothes, from Passaic County Jail to Newark Airport, putting him on a plane to Canada, though without his personal identification or any money.  Prior to his deportation, Sachdeva requested the return of these items.  His requests were, however, denied.

285.     Sachdeva continues to suffer the effects of his detention in the United States long after his deportation.  Upon his return to Canada, Canadian immigration officials suspended his landed immigrant status, taking away Sachdeva's work papers.  The presumption of guilt thus continued to attach to Sachdeva after his deportation from the United States, despite the fact that he has never been engaged in terrorist activity and the complete absence of any evidence that he has been engaged in such activity.

286.     Although Sachdeva's Canadian identification card was returned to him, Defendants have refused to return most of his personal belongings, including two motor vehicles and furniture confiscated from Sachdeva at the time of his arrest.  Sachdeva has repeatedly requested return of these items.

### FIRST CLAIM FOR RELIEF
### (Fourth Amendment: Seizure)

287.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

288.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

289.     In detaining Plaintiffs and class members months longer than necessary to secure their removal or voluntary departure from the United States without charging them with any crime and without affording them a hearing before a neutral judicial officer to determine whether there was probable cause to justify their continued detention, Defendants, acting under color of

law and their authority as federal officers, have intentionally or recklessly seized Plaintiffs and class members in violation of the Fourth Amendment to the United States Constitution.

290.     Plaintiffs and class members have no effective means of enforcing their Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

291.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SECOND CLAIM FOR RELIEF
### (Fifth Amendment: Due Process)

292.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

293.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

294.     In detaining Plaintiffs and class members longer than necessary to secure their removal or voluntary departure from the United States without any legitimate immigration law enforcement purpose, and without evidence that they posed a danger or flight risk, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiffs and class members to arbitrary and capricious detention, taking their liberty without due process of law in violation of the Fifth Amendment to the United States Constitution.

295.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

296.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### THIRD CLAIM FOR RELIEF
### (Fifth Amendment: Due Process)

297.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

298.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

299.      By adopting, promulgating, and implementing the policy and practice under which Plaintiffs and class members were unreasonably detained and subjected to outrageous, excessive, cruel, inhumane, and degrading conditions of confinement, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiffs and class members of their liberty interests without due process of law in violation of the Fifth Amendment to the United States Constitution.

300.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

301.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### FOURTH CLAIM FOR RELIEF
### (Fifth Amendment: Self-Incrimination Clause)

302.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

303.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

304.     By adopting, promulgating, and implementing the policy and practice under which Plaintiffs and class members were subjected to coercive and involuntary custodial

interrogation designed to overcome their will and to coerce involuntary and incriminating statements from them, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated the rights of Plaintiffs and the class to due process of law under the Fifth Amendment to the United States Constitution.

305.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

306.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

**FIFTH CLAIM FOR RELIEF**
**(Fifth Amendment: Equal Protection)**

307.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

308.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

309.     In detaining Plaintiffs and class members longer than necessary to secure their removal from the United States and subjecting them to harsh treatment not accorded similarly-situated non-citizens, Defendants, acting under color of law and their authority as federal officers, have singled out Plaintiffs and class members based on their race, religion, and/or ethnic or national origin, and intentionally violated their rights under the Fifth Amendment to the United States Constitution to equal protection of the law.

310.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment equal protection rights other than by seeking declaratory and other relief from the Court.

311.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### SIXTH CLAIM FOR RELIEF
### (Sixth Amendment: Right to a Speedy Trial)

312.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

313.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

314.     Defendants adopted, promulgated, and implemented policies under which plaintiffs and class members were arrested and held for extensive periods of time in what is tantamount to criminal detention without the filing of any indictment, information, or other formal criminal charge, and were not brought to trial within a reasonable period of time, resulting in oppressive and lengthy pretrial incarcerations.  In doing so, Defendants have intentionally or recklessly deprived Plaintiffs and class members of their right under the Sixth Amendment to a speedy trial.

315.      Plaintiffs and class members have no effective means of enforcing their right to a speedy trial that is guaranteed to them by the Sixth Amendment other than by seeking declaratory and other relief from the Court.

316.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### SEVENTH CLAIM FOR RELIEF
### (First Amendment: Free Exercise of Religion)

317.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

318.      Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

319.      Defendants have adopted, promulgated, and implemented policies and practices intended to deny Plaintiffs and class members the ability to practice and observe their religion. These policies and practices have included, among other things, the visitation of verbal and physical abuse upon Plaintiffs and class members, and the deliberate denial of all means by which they could maintain their religious practices, including their observance of Halal food and daily prayer requirements.  By such mistreatment, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated Plaintiffs' and class members' right to free exercise of religion guaranteed to them under the First Amendment to the United States Constitution.

320.      Plaintiffs and class members have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

321.      As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

**EIGHTH CLAIM FOR RELIEF**
**(Fifth Amendment: Confiscation of Personal Property)**

322.      Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

323.      Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

324.      Defendants have adopted, promulgated, and implemented a policy and practice of deliberately depriving Plaintiffs and class members of their personal property without providing them with a remedy to recover that property.  Defendants have refused to return to Plaintiffs and

class members, at the time of their removal or voluntary departure from the United States, the personal identification, money, and other valuable personal items that Defendants confiscated from Plaintiffs and class members upon arrest.  In doing so, Defendants, acting under color of law and their authority as federal officers, have intentionally violated Plaintiffs' and class members' right to due process of law under the Fifth Amendment to the United States Constitution.

325.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

326.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## NINTH CLAIM FOR RELIEF
### (Customary International Law: Arbitrary Detention)

327.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

328.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

329.     The acts described herein constitute arbitrary detention of Plaintiffs and class members in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

330.     Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers, have directed, ordered, confirmed, ratified, and/or conspired in bringing about the arbitrary detention of Plaintiffs and class members.

331.     As a result of Defendants' unlawful conduct, Plaintiffs and class members were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages.

**TENTH CLAIM FOR RELIEF**
**(Customary International Law: Cruel, Inhuman, or Degrading Treatment)**

332.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

333.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

334.     The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs and class members, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

335.     The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman, or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

336.     Defendants are liable for said conduct in that Defendants, acting under color of law and their authority as federal officers, directed, ordered, confirmed, ratified, and/or conspired to cause the cruel, inhuman or degrading treatment of Plaintiffs and class members.

337.     All Plaintiffs and class members were forced to suffer severe physical and psychological abuse and agony and are entitled to monetary damages.

## ELEVENTH CLAIM FOR RELIEF
### (Vienna Convention on Consular Relations: Consular Notification)

338.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

339.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

340.     Plaintiffs and class members were not notified by arresting authorities of their right to communicate with consular officials as required by the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, Art. 36.

341.     When Plaintiffs Saffi and Sachdeva requested to speak with officials from their respective consulates, Defendants further violated their Vienna Convention rights by failing to respond to their requests without delay and notify the consular posts of their detention.  Vienna Convention, Art. 36(1).

342.     Violations of the right to consular access are direct treaty violations, as specified above, and are also violations of customary international law.

343.     As result of Defendants' unlawful conduct, Plaintiffs and class members are entitled to monetary damages.

## TWELFTH CLAIM FOR RELIEF
### (Excessive Force - SAFFI)

344.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

345.     Plaintiff Saffi brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants.

346.      The intentional beatings of Plaintiff Saffi by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

347.      The intentional beatings of Plaintiff Saffi by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

348.      As a proximate result of the beatings by said Defendants, Plaintiff Saffi has sustained permanent injuries and incurred medical bills and other expenses.  These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

349.      As a result of the unlawful conduct of said Defendants, Plaintiff Saffi is entitled to monetary damages.

## THIRTEENTH CLAIM FOR RELIEF
### (Excessive Force - JAFFRI)

350.      Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

351.      Plaintiff Jaffri brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants. .

352.      The intentional beatings of Plaintiff Jaffri by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was

without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

353. The intentional beatings of Plaintiff Jaffri by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

354. As a proximate result of the beatings by said Defendants, Plaintiff Jaffri has sustained permanent injuries and incurred medical bills and other expenses.  These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

355. As a result of the unlawful conduct of said Defendants, Plaintiff Jaffri is entitled to monetary damages.

## FOURTEENTH CLAIM FOR RELIEF
### (Excessive Force -EBRAHIM)

356. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

357. Plaintiff Ebrahim brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants.

358. The intentional beatings of Plaintiff Ebrahim by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

359.     The intentional beatings of Plaintiff Ebrahim by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

360.     As a proximate result of the beatings by said Defendants, Plaintiff Ebrahim has sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

361.     As a result of the unlawful conduct of said Defendants, Plaintiff Ebrihim is entitled to monetary damages.

## FIFTEENTH CLAIM FOR RELIEF
### (Excessive Force – HANY IBRAHIM)

362.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

363.     Plaintiff Hany Ibrahim brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants.

364.     The intentional beatings of Plaintiff H. Ibrahim by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

365.     The intentional beatings of Plaintiff H. Ibrahim by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

366.     As a proximate result of the beatings by said Defendants, Plaintiff H. Ibrahim has sustained permanent injuries and incurred medical bills and other expenses.  These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

367.     As a result of the unlawful conduct of said Defendants, Plaintiff H. Ibrahim is entitled to monetary damages.

## SIXTEENTH CLAIM FOR RELIEF
### (Excessive Force – BALOCH)

368.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

369.     Plaintiff Baloch brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants.

370.     The intentional beatings of Plaintiff Baloch by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

371.     The intentional beatings of Plaintiff Baloch by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

372.     As a proximate result of the beatings by said Defendants, Plaintiff Baloch has sustained permanent injuries and incurred medical bills and other expenses.  These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

373.     As a result of the unlawful conduct of said Defendants, Plaintiff Baloch is entitled to monetary damages.

## SEVENTEENTH CLAIM FOR RELIEF
### (Delays in Serving Charging Documents - Fifth Amendment: Due Process)

374.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

375.     Plaintiffs Ebrahim, H. Ibrahim, Sachdeva, Jaffri, and A. Ibrahim bring this claim on their own behalf and on behalf of the class against all Defendants.

376.     In delaying the issuance and service of charging documents (known as Notices to Appear) on the post-9/11 detainees, Defendants have impaired the ability of the detainees to know the charges on which they are being held, obtain legal counsel, and seek release on bond. Further, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiffs and class members of their due process rights under the Fifth Amendment to the United States Constitution.

377.     Plaintiffs Ebrahim, H. Ibrahim, Sachdeva, Jaffri, and A. Ibrahim and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

378.     As a result of Defendants' unlawful conduct, Plaintiffs Ebrahim, H. Ibrahim, Sachdeva, Jaffri, and A. Ibrahim and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## EIGHTEENTH CLAIM FOR RELIEF
### (Blanket No Bond Policy – Fifth Amendment: Due Process)

379.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

380.      Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

381.      Defendants applied a blanket no bond policy to all post-9/11 detainees without regard to whether the detainee posed a flight risk or a danger and thereby deprived Plaintiffs and other class members of their right under the Fifth Amendment's Due Process Clause not to be detained arbitrarily in the absence of any finding or evidence that they posed a danger or flight risk.

382.      Plaintiffs and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

383.      As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

**NINTEENTH CLAIM FOR RELIEF**
**(Blanket No Bond Policy – Fifth Amendment: Equal Protection)**

384.      Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

385.      Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

386.      Defendants applied a blanket no bond policy to all post-9/11 detainees without regard to whether the detainee posed a flight risk or a danger.  Defendants arrested and denied bond to "of high interest" detainees on little or no evidence of terrorist connections but instead due to their ethnic or religious identity in violation of their right to equal protection of the laws under the Fifth Amendment's Due Process Clause.  Thus, Defendants intentionally or recklessly violated rights guaranteed to Plaintiffs and class members by the Fifth Amendment to the United States Constitution.

105

387.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

388.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### TWENTIETH CLAIM FOR RELIEF
### (Assignment to SHU – Fifth Amendment: Due Process)

389.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

390.     Plaintiffs Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim bring this claim on their own behalf and on behalf of the class against all Defendants.

391.     By adopting, promulgating, and implementing the policy and practice under which Plaintiffs Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim and class members were classified as "of high interest," "Witness Security," and/or "Management Interest Group 155" detainees in an arbitrary and unreasonable manner, without any defined criteria, individualized assessment of dangerousness or risk of flight, contemporaneous review, or process of any sort,  and by which classifications Plaintiffs experienced unnecessary and unreasonable restrictions on their liberty, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated the rights of Plaintiffs and the class to procedural due process of law under the Fifth Amendment to the United States Constitution.

392.     Plaintiffs Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

393.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTY-FIRST CLAIM FOR RELIEF
### (Communications Blackout and Interference with Counsel – First Amendment)

394.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

395.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

396.     By adopting, promulgating, and implementing the policy and practice under which Plaintiffs and class members were subjected to a "communications blackout" and other measures while in detention that interfered with their access to lawyers and the courts, Defendants intentionally or recklessly violated Plaintiffs' rights to obtain access to legal counsel and to petition the courts for redress of their grievances, in violation of their rights under the First Amendment of the United States Constitution.

397.     Plaintiffs and class members have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

398.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTY-SECOND CLAIM FOR RELIEF
### (Communications Blackout and Interference with Counsel – Fifth Amendment: Due Process)

399.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

400.     Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

401.     By adopting, promulgating, and implementing the policy and practice under which Plaintiffs and class members were subjected to a "communications blackout" and other measures while in INS detention that interfered with their access to lawyers and the courts, Defendants intentionally or recklessly violated Plaintiffs' rights to obtain access to legal counsel and to petition the courts for redress of their grievances, in violation of their rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

402.     Plaintiffs and class members have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

403.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### TWENTY-THIRD CLAIM FOR RELIEF
### (Excessive, Unreasonable, and Deliberately Humiliating and Punitive Strip Searches – Fourth and Fifth Amendments)

404.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

405.     The MDC Plaintiffs bring this claim on their own behalf and on behalf of the MDC class against all Policy and Implementation Defendants,  MDC Correctional Officer Defendants and MDC Supervisor Defendants.

406.     By subjecting MDC Plaintiffs and class members to excessive and unreasonable strip searches with no rational relation to a legitimate penological purpose when Defendants had no reasonable suspicion or rational reason to justify a strip search, and conducting the searches in a deliberately humiliating manner that was not reasonably related to any legitimate penological

purpose, MDC Correctional Officer Defendants and  MDC Supervisor Defendants intentionally or recklessly violated MDC Plaintiffs' and class members' rights to privacy and to be free from unreasonable searches, in violation of their rights under the Fourth Amendment to the United States Constitution

407.     MDC Supervisor Defendants were grossly negligent and/or deliberately indifferent in their supervision of MDC Correctional Officer Defendants and MDC Supervisor Defendants who subjected MDC Plaintiffs and class members to these excessive and unreasonable strip searches and thereby violated MDC Plaintiffs' and the plaintiff class's rights under the Fourth Amendment to the United States Constitution.

408.     By adopting, promulgating, and implementing the policy and practice under which MDC Plaintiffs and class members were subjected to these excessive and unreasonable strip searches the MDC Policy and Implementation Defendants intentionally or recklessly violated MDC Plaintiffs' and class members' rights to privacy and to be free from unreasonable searches, in violation of their rights under the Fourth Amendment to the United States Constitution.

409.     By subjecting MDC Plaintiffs and class members to strip searches so devoid of rational relation to any legitimate penological purpose that the searches' only possible purpose was punitive, abusive MDC Correctional Officer Defendants and MDC Supervisor Defendants intentionally or recklessly violated MDC Plaintiffs' and class members' rights to be free from punishment under the Due Process Clause of the Fifth Amendment to the United States Constitution

410.     MDC Supervisor Defendants were grossly negligent and/or deliberately indifferent in their supervision of abusive MDC Correctional Officer Defendants and  MDC

Supervisor Defendants who subjected MDC Plaintiffs and class members to these punitive strip searches and thereby violated MDC Plaintiffs' and the plaintiff class's right to be free from punishment under the Due Process Clause of the Fifth Amendment to the United States Constitution.

411.     By adopting, promulgating, and implementing the policy and practice under which MDC Plaintiffs and class members were subjected to these punitive strip searches Policy and Implementation Defendants intentionally or recklessly violated MDC Plaintiffs' and class members' right to be free from punishment under the Due Process Clause of the Fifth Amendment to the United States Constitution

412.     MDC Plaintiffs and class members have no effective means of enforcing their Fourth and Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

413.     As a result of Defendants' unlawful conduct, MDC Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTY-FOURTH CLAIM FOR RELIEF
### (FTCA: False Imprisonment of the Named MDC Plaintiffs)

414.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

415.     In detaining the Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, and A. Ibrahim months longer than necessary to secure their removal or voluntary departure from the United States without probable cause to suspect them of any crime, the MDC Defendants, acting within the scope of their employment as federal law enforcement officers, have intentionally, without consent or privilege, completely confined said Plaintiffs so as to constitute false imprisonment under the laws of the states where the relevant acts took place.

416.     Pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

417.     As a result of the MDC Defendants' unlawful conduct, said Plaintiffs have suffered loss of liberty, emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

### TWENTY-FIFTH CLAIM FOR RELIEF
### (FTCA: Negligence – Delay of Clearance of the Named Plaintiffs)

418.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

419.     In allowing the clearance investigations to linger for months rather than the mandated days due to failure to timely act and follow up on leads, misplaced files, poor communication, disorganization, and other forms of negligence, Defendants, acting under color of law and their authority as federal officers, have breached their duty of swift dispatch toward Plaintiffs Turkmen, Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, Sachdeva, and A. Ibrahim who, though they had committed no crime, depended for their liberty on the efficiency and diligence of the government officers investigating their cases.  Defendants' acts and omissions constitute negligence under the laws of the states where the relevant acts took place.

420.     Pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

421.      As a result of the Defendants' unlawful conduct, said Plaintiffs have suffered loss of liberty, emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

### TWENTY-SIXTH CLAIM FOR RELIEF
### (FTCA: Negligence – Denial of Medical Services to Named  MDC Plaintiffs)

422.      Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

423.      In refusing to provide Plaintiffs Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim with medical services necessary for their health and well-being, the MDC Defendants, acting under color of law and their authority as federal officers, have breached their duty under 18 U.S.C. § 4042(a)(2) to take ordinary diligence or reasonable care to keep said Plaintiffs safe and free from harm, so as to constitute negligence under the laws of the states where the relevant acts took place.

424.      Pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

425.      As a result of the MDC Defendants' unlawful conduct, said Plaintiffs have suffered loss of liberty, emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

### TWENTY-SEVENTH CLAIM FOR RELIEF
### (FTCA: Assault and Battery – Physical Abuse of the Named  MDC Plaintiffs)

426.      Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

427.     In striking, shoving, or holding Plaintiffs Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim without consent, at a time when they were not resistant, disruptive, or recalcitrant, and without a history of such conduct by them, MDC Defendants intentionally caused harmful and offensive contact with said Plaintiffs and did so without justification or service to a legitimate penological goal, so as to constitute battery under the laws of the states where the relevant acts took place.

428.     In committing the abovementioned batteries upon said Plaintiffs in such a manner that they were aware of the impending batteries, MDC Defendants put said Plaintiffs into a state of fear and apprehension of imminent harmful or offensive contact, and did so without justification or service to a legitimate penological goal, so as to constitute assault under the laws of the places where Plaintiffs were detained and confined.

429.     Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

430.     As a result of the MDC Defendants' unlawful conduct, said Plaintiffs have suffered loss of liberty, emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

## TWENTY-EIGHTH CLAIM FOR RELIEF
### (FTCA: Battery – Sleep Deprivation - Named  MDC Plaintiffs)

431.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

432.     In subjecting the Plaintiffs Jaffri, Ebrahim, H. Ibrahim, Baloch, Saffi, and A. Ibrahim to bright lights and loud noises for the purpose of interrupting their sleep, MDC

Defendants intentionally caused light and noise to harmfully contact them, causing sleep deprivation without justification or service to a legitimate penological goal, so as to constitute battery under the laws of the states where the relevant acts took place.

433.    Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

434.    As a result of the MDC Defendants' unlawful conduct, said Plaintiffs have suffered emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

## TWENTY-NINTH CLAIM FOR RELIEF
### (FTCA: Intentional Infliction of Emotional Distress on the Named Plaintiffs)

435.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

436.    From the time of their arrest to the time of their release from detention, the MDC Defendants intentionally engaged in a sustained and relentless campaign to inflict emotional distress on Plaintiffs Turkmen, Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, Sachdeva, and A. Ibrahim that included, but was not limited to, outrageous and unfounded accusations of being terrorists and mass murderers, gratuitous and humiliating insults to the named Plaintiffs' ethnicity, religion, and physical anatomy, threats of prolonged and permanent detention, torture, and death, inhumane conditions of confinement, and interference with religious practice.

437.     Defendants, without legitimate penological purpose, caused the Plaintiffs to suffer severe, substantial, and lasting emotional distress so as to constitute the tort of intentional infliction of emotional distress under the laws of the states where the relevant acts took place.

438.     Defendants' conduct was all the more outrageous in that it abused correctional officers' position of power over the Plaintiffs and their interests and took advantage of what Defendants knew to be the Plaintiffs' vulnerable emotional state caused by the violence and disorientation of detention.

439.     Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

440.     As a result of the Defendants' unlawful conduct, said Plaintiffs have suffered emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

## THIRTIETH CLAIM FOR RELIEF
### (FTCA: Conversion - Named  Plaintiffs)

441.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

442.     In refusing to return the possessions of Plaintiffs Turkmen, Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, Sachdeva, and A. Ibrahim after they were released from jail, Defendants intentionally deprived them completely and forever of all rights and use of those possessions so as to constitute the tort of conversion under the laws of the states where the relevant acts took place.

443.     Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented by said Plaintiffs to the Department of Homeland Security, the Federal Bureau of Investigation, and the Federal Bureau of Prisons in September 2003 and should be deemed denied by virtue of agency inaction.

444.	As a result of the Defendants' unlawful conduct, said Plaintiffs have suffered property loss, emotional distress, humiliation, and embarrassment, and are entitled to monetary damages.

### THIRTY-FIRST CLAIM FOR RELIEF
### (Excessive Force –ASHRAF IBRAHIM)

445.	Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

446.	Plaintiff A. Ibrahim brings this claim on his own behalf against the MDC Correctional Officer Defendants and MDC Supervisor Defendants.

447.	The intentional beatings of Plaintiff A. Ibrahim by said Defendants when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had no lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

448.	The intentional beatings of Plaintiff A. Ibrahim by said Defendants violated Plaintiff's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution, for which such officers are individually liable.

449.	As a proximate result of the beatings by said Defendants, Plaintiff A. Ibrahim has sustained permanent injuries and incurred medical bills and other expenses.  These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

450.	As a result of the unlawful conduct of said Defendants, Plaintiff A. Ibrahim is entitled to monetary damages.

## PRAYER  FOR  RELIEF

WHEREFORE, Plaintiffs and class members respectfully request that the Court enter a class-wide judgment:

1.  Certifying this suit as a class action;

2.  Declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, were illegal and violate the constitutional rights of Plaintiffs and class members as to each applicable count;

3.  Declaring that each individual Plaintiff's detention was unjustified, unconstitutional, unlawful, and without probable cause to believe that he had any involvement in the September 11 terrorist attacks or other terrorist activity;

4. Enjoining Defendants to return immediately to Plaintiffs and class members all personal identification, money and valuable personal items confiscated from them;

5.  Awarding compensatory and punitive damages to Plaintiffs and class members for the constitutional and customary international law violations they suffered in an amount that is fair, just, reasonable, and in conformity with the evidence;

6.  Appointing a neutral Special Master to assist in fashioning remedies and to monitor the implementation of those remedies;

7.  Ordering such further relief as necessary to ensure that Defendants operate the MDC and Passaic facilities in compliance with the United States Constitution and customary international law;

8. Awarding compensatory and other damages to Plaintiffs Turkmen, Saffi, Jaffri, Ebrahim, H. Ibrahim, Baloch, Sachdeva, A. Ibrahim based on their claims under the FTCA; and

9.  Ordering such further relief as the Court considers just and proper.

Dated: New York, New York
      September 13, 2004

Respectfully submitted,

Center for Constitutional Rights

By: _____
    Nancy Chang (NC 5331)

Barbara J. Olshansky (BO 3635)
Rachel Meeropol (RM 3878)
Shayana Kadidal
Jennifer Green (JG 3169)
666 Broadway, 7th Floor
New York, New York 10012
Tel.: (212) 614-6420
Fax: (212) 614-6499

*CCR Cooperating Counsel:*
David Cole
c/o Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 662-9078

*Attorneys for Plaintiffs*

Of Counsel:
C. William Phillips
Michael Winger
Stephanie Yu
COVINGTON & BURLING
1330 Avenue of the Americas
New York, New York 10019

William Goodman
MOORE & GOODMAN
740 Broadway
New York, New York 10003

Cynthia Soohoo
HUMAN RIGHTS CLINIC
COLUMBIA LAW SCHOOL

118

435 West 116th Street, Box C-16
New York, New York 10027

Paul Hoffman
SCHONBRUN, DE SIMONE, SEPLOW,
HARRIS & HOFFMAN, LLP
723 Ocean Front Walk
Venice, California  90201
Tel.:  (310) 396-0731

Martin Stolar (MS 1576)
351 Broadway Ave.
New York, New York 10013
Tel.:  (212) 219-1919

Claudia Slovinsky
LAW OFFICES OF CLAUDIA
SLOVINSKY
396 Broadway, Suite 601
New York, New York 10013

## Certificate of Service

I, Nancy Chang, certify that on September 13, 2004, I caused the foregoing Third Amended Complaint in Turkmen v. Ashcroft, 02 CV 2307 (JG) (E.D.N.Y.) to be electronically filed on ECS, emailed in pdf format to all opposing counsel, and served by mail on the following counsel who are not registered for electronic service in this suit:

**Counsel for Defendant John Ashcroft:**

Larry Gregg, Brian Miller and Richard Sponseller
Office of the United States Attorney, E.D. Va.
Civil Division
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
FAX (703) 299-3983
Larry.Gregg2@usdoj.gov,  Brian.Miller@usdoj.gov, and Richard.Sponseller@usdoj.gov

**Counsel for Defendant Robert Mueller:**

Craig Lawrence
U.S. Attorney's Office, D.D.C.
Civil Division
555 4th St NW
Washington, DC  20001
(202) 514-7151
FAX (202) 514-8780
Craig.Lawrence@usdoj.gov

**Counsel for Defendant Michael Zenk:**

Allan N. Taffet, Esq.
Duval & Stachenfeld LLP
300 East 42nd Street
New York, NY  10017
(212) 883-1700
FAX (212) 883-8883
ataffet@dsllp.com


Dated: September 13, 2004

Nancy Chang

# EXHIBIT 1

**U.S. Department of Justice**
Office of the Inspector General

# Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York



Office of the Inspector General
December 2003

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................... 1
  A.  Background ......................................................................................... 2
    1.  Detainee Arrival and Confinement at the MDC ........................... 2
    2.  Atmosphere at the MDC Following September 11 ....................... 4
    3.  The OIG Investigation ................................................................. 5
  B.  Report Outline .................................................................................. 7
II.  PHYSICAL AND VERBAL ABUSE ..................................................... 8
  A.  Physical Abuse ................................................................................. 8
    1.  Slamming, Bouncing, and Ramming Detainees Against Walls ..... 8
    2.  Bending Detainees' Arms, Hands, Wrists, and Fingers ............... 16
    3.  Lifting Detainees, Pulling Arms, and Pulling Handcuffs ........... 18
    4.  Stepping on Detainees' Chains .................................................. 20
    5.  Improper Application and Use of Restraints ............................... 22
    6.  Rough or Inappropriate Handling of Detainees ......................... 26
    7.  Conclusion ................................................................................ 28
  B.  Verbal Abuse ................................................................................. 28
III.  SYSTEMIC ISSUES RELATING TO THE MDC .............................. 30
  A.  Issues Addressed in the Detainee Report ....................................... 30
  B.  Video and Audio Taping Detainees' Meetings with Their Attorneys ......... 31
  C.  Strip Searches of Detainees ........................................................... 33
  D.  Banging on Cell Doors ................................................................... 35
  E.  T-Shirt with Flag and Slogan ......................................................... 37
  F.  Obtaining Videotapes from the MDC ............................................. 39
  G.  Some Staff Members Lacked Credibility During OIG Interviews .......... 42
IV.  OIG RECOMMENDATIONS .............................................................. 43
V.  CONCLUSION ..................................................................................... 46

## I.   INTRODUCTION

This report details the investigation conducted by the Office of the Inspector General (OIG) concerning allegations that staff members of the Federal Bureau of Prisons' (BOP) Metropolitan Detention Center (MDC) in Brooklyn, New York, physically and verbally abused aliens who were detained in connection with the terrorist attacks of September 11, 2001.[1]  In June 2003, we issued a broader, 198-page report evaluating the treatment of 762 detainees who were held on immigration charges in connection with the investigation of the September 11 attacks.[2]  In that report, we examined how the Department of Justice (Department) handled these detainees, including their processing, their bond decisions, the timing of their removal from the United States or their release from custody, their access to counsel, and their conditions of confinement.

In Chapter 7 of the Detainee Report, we described the treatment of September 11 detainees in the MDC, and we concluded that the conditions were excessively restrictive and unduly harsh.  Those conditions included inadequate access to counsel, sporadic and mistaken information to detainees' families and attorneys about where they were being detained, lockdown for at least 23 hours a day, cells remaining illuminated 24 hours a day, detainees placed in heavy restraints whenever they were moved outside their cells, limited access to recreation, and inadequate notice to detainees about the process for filing complaints about their treatment.

We also concluded in the Detainee Report that evidence showed some MDC correctional officers physically and verbally abused some September 11 detainees, particularly during the months immediately following the September 11 attacks.  However, we noted in our report that our investigation of physical and verbal abuse was not completed, and we stated that we would provide our findings in a separate report.  This report details our findings and conclusions from the investigation.

We have provided the results of our investigation to managers at BOP Headquarters for their review and appropriate disciplinary action.  In the report to the BOP, we include an Appendix identifying those staff members who we believe committed misconduct or exercised poor judgment and setting forth the

---

[1] In this report, "staff members" refers to MDC employees, including correctional officers, lieutenants, management officials, and other personnel.

[2] See "The September 11 Detainees:  A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks" ("Detainee Report"), issued June 2, 2003.  The report is located on the OIG's website at http://www.usdoj.gov/oig/special/03-06/index.htm.

specific evidence against them.  In the Appendix, we also describe the allegations against specific officers that we did not substantiate.

As discussed in detail below, our investigation developed evidence substantiating allegations that MDC staff members physically and verbally abused September 11 detainees.  In the Appendix referenced above, we recommend that the BOP consider taking disciplinary action against ten current BOP employees, counseling two current MDC employees, and informing employers of four former staff members about our findings against them.

### A.   Background

### 1.   Detainee Arrival and Confinement at the MDC

As discussed in detail in the Detainee Report, the Department used federal immigration laws to detain aliens in the United States who were suspected of having ties to the September 11 attacks or connections to terrorism, or who were encountered during the course of the terrorism investigation conducted by the Federal Bureau of Investigation (FBI).  In the first 11 months after the attacks, 762 aliens were detained in connection with the FBI terrorism investigation for various immigration offenses, including overstaying their visas and entering the country illegally.

A total of 84 of these aliens were confined at the MDC on immigration charges in the 11 months after the attacks.  The facility at which a September 11 detainee was confined was determined mainly by the FBI's assessment of the detainee's potential links to the September 11 investigation or ties to terrorism.  The FBI assessed detainees as "high interest," "of interest," or "undetermined interest."[3]  Generally, those labeled of "high interest" were confined at the MDC.

The MDC is a 9-story high-security BOP prison in Brooklyn, New York, that generally houses men and women either convicted of criminal offenses or awaiting trial or sentencing.[4]  The majority of the MDC inmates are housed in the facility's General Population Unit.  Some inmates are confined in the Special Housing Unit (SHU), which normally holds inmates who are disruptive, pose a security risk, or need protection as witnesses.  When MDC officials learned that they would receive aliens deemed potential suspects in the FBI's

---

[3] As we described in our Detainee Report, we concluded that the FBI in New York indiscriminately applied these labels to aliens and that the FBI took much longer than Department officials expected to clear these aliens of any connection to terrorism.

[4] During the period reviewed in our Detainee Report, the MDC housed 2,441 men and 181 women.

terrorism investigation, the MDC modified one wing of the SHU to accommodate these "high security" detainees and labeled the modified wing the "administrative maximum" or "ADMAX" SHU.  The ADMAX SHU was designed to confine the detainees in the most restrictive and secure conditions permitted by BOP policy.

The detainees began to arrive at the MDC on September 14, 2001.  They were transported often in armed convoys and generally by federal agents from the Immigration and Naturalization Service (INS).  The transport vehicles holding the detainees entered the MDC through the U.S. Marshal's sally port, which is similar to a large garage and is connected to the Receiving and Discharge (R&D) area of the MDC.  Once inside the sally port, the transport vehicle was met by four to seven BOP staff members who removed the detainee from the vehicle.  The staff members then put the detainee next to a wall directly adjacent to the transport vehicle and performed a "pat search" during which the detainee was frisked and the restraints in which the detainee arrived were exchanged for BOP restraints.  The BOP officers then walked the detainees up a ramp in the sally port through a set of doors leading to a holding cell in R&D.

In R&D, the detainees were taken one at a time from the holding cell to be fingerprinted, photographed, examined, and then strip searched with restraints removed.[5]  They received prison clothes, were once again fully restrained in metal handcuffs attached to a waist chain that was connected to ankle cuffs, and were taken up the elevator to the ninth floor of the MDC.

On the ninth floor, the detainees were taken to the ADMAX SHU, where they were strip searched again and locked in their cells alone or with one other detainee.  Detainees remained in their cells at least 23 hours a day.  Until late February 2002, the cells were constantly illuminated.

The ADMAX SHU range was shaped like a rectangle, with cells down one side of two long corridors.  Four recreation cells separated by chain-link walls and with chain-link, open-air ceilings were located in the middle of the rectangular range.  MDC staff members used a multipurpose room located at the end of the ADMAX SHU range for medical examinations, strip searches, and meetings.  A room adjacent to the multipurpose room was used as a lieutenant's office.

The ADMAX SHU was separated from the regular SHU by an area containing a holding cell, the SHU lieutenant's office, and a visiting area where attorneys and family members met with the September 11 detainees.  These

---

[5] The BOP technically refers to strip searches as "visual searches," but every MDC staff member we interviewed referred to them as "strip searches."

visits occurred in "non-contact" rooms, meaning a clear partition precluded any physical contact between parties.

As described in the Detainee Report, the MDC confined the September 11 detainees under highly restrictive conditions.  For example, the MDC instituted a four-man hold restraint policy with respect to moving the detainees.  This meant that whenever a detainee was taken from his cell, he was escorted by three officers and a lieutenant at all times.  During routine escorts on the ADMAX SHU, the detainees also were handcuffed behind their backs and placed in leg restraints.  When they were escorted to visits, interviews, or out of the MDC, the detainees were handcuffed in front, restrained in a waist chain, and placed in leg restraints.

On approximately October 5, 2001, as a result of an incident involving a detainee who alleged that he was injured by MDC staff members, the MDC instituted a policy requiring officers to videotape detainees with handheld video cameras whenever they were outside their assigned cells, including when they first arrived at the MDC.[6]  As described below, however, we found that staff members did not always adhere to this policy.

## 2.   Atmosphere at the MDC Following September 11

As we discussed in the Detainee Report, we recognize that the impact of the terrorist attacks of September 11, 2001, was particularly pronounced for people living or working in the New York City area.  Some of the MDC staff members lost relatives, friends, and colleagues in the attacks.  Moreover, the staff was working under difficult conditions on the ADMAX SHU, with many working 12-hour shifts, six or seven days a week, for extended periods of time.  In addition, based on the vague label attached to the detainees by the FBI, the MDC staff initially was led to believe that the detainees could be terrorists or that they may have played a role in the September 11 attacks.

Many of the staff members we interviewed described the atmosphere at the MDC immediately after September 11 as emotionally charged.  One of the lieutenants currently at the MDC said the staff "had a great deal of anger" after September 11 and that it was a chaotic time at the MDC.  Another lieutenant, one of the lieutenants responsible for escorting detainees, stated that upon entering the institution the detainees were handed over to teams of five to seven officers who were "spiked with adrenaline."  He said that there were some officers on the escort teams who were "getting ready for battle" and "talking crazy."  Another lieutenant responsible for escorting detainees similarly described the officers as "high on adrenaline."

---

[6] Later in October 2001, the requirement of videotaping all detainee movements became a BOP-wide policy.

Even though the atmosphere was emotionally charged, none of the current or former staff members we interviewed suggested that the terrorist attacks justified engaging in abusive behavior towards the detainees. To the contrary, nearly all of the MDC staff members we interviewed asserted that they and other staff members always behaved professionally with the detainees.

Yet, as we describe below, these staff members' depictions of their actions were undermined substantially by the consistent allegations of the detainees, the statements of several other MDC staff members, the statements of senior BOP officials, and the videotapes we reviewed.

### 3.   The OIG Investigation

In mid-October 2001, the BOP's Office of Internal Affairs (OIA) first referred to the OIG several allegations of physical abuse at the MDC. The OIG's New York Field Office (NYFO) initiated a criminal investigation into allegations that several detainees were slammed against walls by MDC staff members when they first arrived at the MDC. The NYFO interviewed the detainees who made allegations, obtained their medical records, and interviewed several MDC staff members. In conducting this investigation, the NYFO consulted with prosecutors from the Department's Civil Rights Division (CRT) and the United States Attorney's Office (USAO) for the Eastern District of New York.

In addition to the allegations investigated by the NYFO, the detainees made other allegations of physical and verbal abuse against MDC staff members. The CRT assigned some of these additional allegations to the FBI for investigation, and the OIG referred several allegations to the BOP OIA for investigation.

On September 25, 2002, the CRT and the USAO declined criminal prosecution of the MDC staff members who were the focus of the NYFO's investigation. However, even if a matter is declined criminally, the OIG can continue that investigation to determine if there was misconduct that should result in disciplinary or other administrative action. The OIG therefore pursued this investigation as an administrative matter after prosecution was declined.

Other allegations of detainee abuse assigned to the FBI and the BOP OIA also were considered and declined for criminal prosecution. In March 2003, the OIG took over all of the cases that had been referred to the FBI and the BOP OIA and consolidated them into a comprehensive administrative investigation into allegations that some MDC staff members physically and verbally abused some September 11 detainees. This administrative investigation was led by two OIG attorneys, one of whom is a former federal

prosecutor in the Public Integrity Section of the Department. This report describes the results of our investigation.

The relevant time period under review was from September 2001 to August 2002, when the detainees were housed in the ADMAX SHU of the MDC. Our review focused solely on complaints at the MDC.

After consolidating approximately 30 detainees' reported allegations against approximately 20 MDC staff members, we sorted the allegations of physical abuse into the following six categories:

1. Slamming detainees against walls;

2. Bending or twisting detainees' arms, hands, wrists, and fingers;

3. Lifting restrained detainees off the ground by their arms, and pulling their arms and handcuffs;

4. Stepping on detainees' leg restraint chains;

5. Using restraints improperly; and

6. Handling detainees in an otherwise rough or inappropriate manner.

The detainees also alleged that MDC staff members verbally abused them by referring to them as "terrorists" and other offensive names; threatened them; cursed at them; and made offensive comments during strip searches.

In the OIG's review of these allegations, we conducted more than 115 interviews of detainees, MDC staff members, and other individuals. The staff members we interviewed primarily were correctional officers and lieutenants who had been assigned to the ADMAX SHU after September 11, 2001, or were involved in escorting the detainees on and off the ADMAX SHU. Almost all of the interviews of the current staff members were administratively compelled, meaning that the employees were required to appear and answer questions.[7] In many cases a union representative, who also was a staff member at the MDC, attended the interview with the employees.

In addition to the correctional officers and lieutenants, we interviewed MDC management officials, internal affairs investigators, and the physician's

---

[7] In a compelled interview, Department employees are required to answer questions from the OIG. Compelled interviews normally occur after criminal prosecution of a subject is declined, or if a witness does not voluntarily agree to cooperate. The statements in a compelled interview cannot be used against the person in a criminal proceeding. If an employee refuses to answer the OIG's questions or fails to reply fully and truthfully in an interview, disciplinary action, including dismissal, can be taken against the employee.

assistant who was responsible for the detainees' medical needs and evaluations, including examining injuries and monitoring detainees' health during hunger strikes. We also interviewed a senior BOP official who until this year oversaw correctional operations at the BOP during the relevant period, and a senior BOP official who has been responsible since 2000 for training new BOP officers on restraint and escort techniques.

We also interviewed federal officers, mostly from the former INS, who were involved in transporting the detainees to the MDC. In addition, we interviewed an attorney for one of the detainees who visited his client at the MDC and said that he witnessed abuse.

We reviewed medical records and incident reports for the detainees from the MDC's files. We also reviewed MDC videotapes, including hundreds of tapes showing detainees being moved around the facility, tapes from cameras in the detainees' cells, and several tapes depicting officers using force in specific operations against certain detainees. As will be detailed later in this report, MDC officials repeatedly told the OIG that videotapes of general detainee movements no longer existed. That information was inaccurate. In late August 2003, the OIG discovered more than 300 videotapes at the MDC, primarily spanning the period from early October through November 2001, and we reviewed all of those tapes. While these tapes substantiated many of the detainees' allegations, detainees indicated to us that abuse dropped off precipitously after the video cameras were introduced.

## B.  Report Outline

This report is divided into three main sections. First, the report discusses the evidence regarding allegations that the detainees were physically and verbally abused at the MDC. Second, the report describes several issues of concern relating to the systemic treatment of the detainees at the MDC. Finally, the report offers recommendations to address the issues discussed in this report.

In an appendix to this report, we provide to the BOP our findings on specific MDC staff members, current and former, who handled the detainees. That section of the report will not be released publicly because of the privacy interests of those individuals as well as the potential of disciplinary proceedings against them. In the Appendix, we recommend that the BOP consider taking disciplinary action against ten current BOP employees, counseling two current MDC employees, and informing employers of four former staff members about our findings against them. We also recommend that the BOP take appropriate disciplinary action against several unidentified staff members who we observed on videotapes physically abusing detainees or behaving unprofessionally.

## II.   PHYSICAL AND VERBAL ABUSE

Our investigation developed evidence that approximately 16 to 20 MDC staff members, a significant number of the officers who had regular contact with the detainees, violated BOP policy by physically or verbally abusing some detainees.  For the purposes of this report, we consider "physical abuse" to be the handling of the detainees in ways that physically hurt or injure them without serving any correctional purpose.  Under BOP Program Statement (P.S.) 5566.05, improper handling includes instances when staff members use more force than necessary on the detainees or cause the detainees unnecessary physical pain or extreme discomfort.  Similarly, we consider "verbal abuse" to be insults, coarse language, and threats to physically harm or inappropriately punish detainees, all of which violate BOP P.S. 3420.09, "Standards of Employee Conduct."

We discuss in this section the general evidence that staff members physically and verbally abused some detainees.

### A.   Physical Abuse

#### 1.   Slamming, Bouncing, and Ramming Detainees Against Walls

Most of the detainees who made allegations of abuse specifically alleged that MDC staff members slammed them into walls.  Several detainees also alleged staff members slammed them into doors and the sides of the elevator that took them up to the ADMAX SHU.  According to approximately ten detainees, staff members slammed them against walls on their first day at the MDC while they were in R&D.  Detainees also alleged staff members sometimes slammed them into walls in the ADMAX SHU during escorts to and from attorney visits, doctor visits, or recreation, but not as frequently as in R&D.  The detainees alleged that these slamming incidents occurred when they were being fully compliant with the officers and were not resisting.

For example, one detainee told us that immediately after he arrived at the MDC, staff members took him out of the van, "slammed" him against a wall, and warned him that they would break his neck if he moved.  Another detainee also stated that officers repeatedly "slammed" him against the wall in R&D on the day he arrived.  Another detainee stated that on his first day at the MDC, officers painfully "slammed" him back and forth against walls in the ADMAX SHU all the way to his cell.  In addition, another detainee stated that he was "slammed" against the wall in the sally port and that the experience was very painful.  In all of these cases, the detainees claimed that they were fully compliant with staff members' instructions.

Detainees said they were slammed into walls much more frequently before the handheld video cameras were introduced in October 2001 than after. One detainee stated staff members told him things like, "If the camera wasn't on I would have bashed your face," and "The camera is your best friend." Detainees also told us that their treatment by the staff at the MDC was worse than their treatment by officers at other institutions. Few made complaints of mistreatment by other officers outside of the MDC.

Our efforts to substantiate or refute allegations that staff members slammed detainees against walls were hindered to some extent because: (1) detainees' escorts were not videotaped until early October 2001, after many of the detainees already had arrived; (2) even after the MDC instituted the policy requiring all detainee escorts be taped, some detainees' escorts were not taped;[8] and (3) a significant number of detainee videotapes were recycled or destroyed, in accordance with a regional policy directive issued in December 2001 that allowed the tapes to be re-used or destroyed after 30 days. These issues are discussed more fully below under section III (F), "Obtaining Videotapes from the MDC."

BOP policy prohibits staff members from using more force than necessary on inmates. BOP P.S. 3420.09, "Standards of Employee Conduct," states, "An employee may not use brutality, physical violence, intimidation toward inmates, or use any force beyond that which is reasonably necessary to subdue an inmate." Similarly, BOP P.S. 5566.05, "Use of Force and Application of Restraints on Inmates," authorizes staff members to use force on inmates only as a last alternative after all other reasonable efforts to resolve a situation have failed. It states that even when force is authorized, staff members must not use more force than necessary on the inmates, or cause them unnecessary physical pain or extreme discomfort.[9]

We spoke with two senior BOP officials concerning slamming or bouncing inmates against the wall. One of the officials, who had oversight responsibilities for correctional operations during the relevant time period, stated that unless an inmate is combative or resisting, slamming the inmate into a wall is improper and violates the BOP's policy on "use of force." The other official, who is responsible for training new BOP officers, confirmed that slamming a compliant inmate against the wall is not an appropriate control or

---

[8] An officer confirmed to us that not all escorts were recorded. He stated that some movements were not recorded because the officers were unable to find a camcorder. He said that even though seven camcorders were purchased for the ADMAX SHU, over time the camcorders started to disappear.

[9] BOP P.S. 5566.05 provides: When authorized, staff must use only that amount of force necessary to gain control of the inmate; to protect and ensure the safety of inmates, staff, and others; to prevent serious property damage; and to ensure institution security and good order.

escort technique.  Both officials stated that slamming, bouncing, and firmly pressing compliant inmates against the wall violates BOP policy.

A former MDC lieutenant, who was one of the lieutenants in charge of escorting the detainees to and from the ADMAX SHU (hereinafter "Lieutenant 1"), corroborated detainees' allegations of slamming.  He stated that before the MDC began videotaping all detainee movements, which was on or about October 5, 2001, almost all of the detainees were slammed against walls, particularly in the sally port.  He also stated he witnessed staff members "bounce" detainees against the wall.  Lieutenant 1 explained that "slamming" a detainee against the wall was when officers shoved the detainee into the wall and held him there, and "bouncing" a detainee off the wall was when officers shoved the detainee into the wall and then quickly pulled him back.  Lieutenant 1 said "pressing" a detainee against the wall was when officers used physical force to keep a detainee's chest against the wall.

Lieutenant 1 said he witnessed officers unnecessarily slam, bounce, and forcefully press detainees against the wall.  Lieutenant 1 told us that some officers took detainees off transport vehicles and bounced them against the wall every time they could get away with it.  Lieutenant 1 asserted the only time it would have been appropriate for an officer to press, bounce, or slam a detainee against the wall was if the detainee was aggressive, combative, or violent.  However, Lieutenant 1 said he never saw a detainee act in these ways.

According to Lieutenant 1, he confronted another lieutenant who was responsible for escorting detainees (hereinafter "Lieutenant 2") after seeing Lieutenant 2 slamming detainees against the wall.  Lieutenant 2 also supervised many of the officers who Lieutenant 1 witnessed slam detainees against the wall.  Lieutenant 1 stated that Lieutenant 2 told him that slamming detainees against the wall was all part of being in jail and not to worry about it.

When interviewed by the OIG, Lieutenant 2 maintained that his officers did not slam detainees against the wall, but he stated that it was possible an officer could have slipped by mistake and slammed a detainee into the wall.  He also stated that if the lieutenant supervising an escort was not paying "very, very close attention" and actively controlling the officers while trying to communicate with the detainee, then "anything could have happened."

Moreover, one current MDC officer implied, although did not state, in an affidavit that some staff members bounced detainees off the wall.  He wrote, "There were some lieutenants like [Lieutenant 1] who would [rein] in an officer for bouncing a detainee against the wall, but there were probably other lieutenants who would let more slide."

A federal agent who served on the INS's Special Response Team that transported many detainees to the MDC said he witnessed MDC staff members

briskly walk compliant detainees into walls without slowing them down before impact.  During two escorts we viewed on videotape, we observed officers escort detainees down a hall at a brisk pace and ram them into a wall without slowing down before impact, just as the INS agent described.

Further, an attorney for one detainee said he observed MDC staff members slam his client against the wall.  The attorney said that after his visit with his client in February 2002, MDC officers escorted his client out of the visiting room and threw him up against the wall face first.  The attorney stated that the officers then removed his client's shoes and banged them against the wall right by his face, clearly intending to intimidate him.  According to the attorney, this incident was not recorded by a video camera.

In our review of the videotapes, we saw staff members slam one detainee into two walls while he was being escorted from a recreation cell to a segregation cell.  In another incident, we saw staff members forcefully ram a second detainee into two walls while he was being escorted from the recreation deck to a segregation cell.  On several videotapes leading up to and following these incidents, we did not observe any conduct that would justify staff members using this amount of force on either of these detainees.  Instead, the videotapes show that both men were compliant before and during the escorts when staff members slammed and rammed them against walls.[10]

Many of the detainees also alleged that they were slammed against the wall in the sally port at the bottom of a ramp where a t-shirt was taped to the wall.[11]  The t-shirt, which is discussed below in greater detail under "T-Shirt with Flag and Slogan," had a picture of the U.S. flag and the phrase "These colors don't run" on it.

---

[10] These incidents are discussed below in detail under "Improper Application and Use of Restraints."

[11] Several officers and two INS agents stated that when the detainees were removed from their transport vehicles, they were pat searched against the wall, right where the t-shirt was located.  One officer who worked in R&D said that when staff members pat searched detainees, they leaned the detainees into the wall and placed their faces on the t-shirt.



**Image 1: The t-shirt in the sally port.**

Two staff members, Lieutenant 1 and a staff member from R&D, told us they observed blood on the t-shirt. Lieutenant 1 stated some of the bloodstains looked like a couple of bloody noses smudged in a row, and other stains looked like someone with blood in his mouth spit on the t-shirt. None of the current or former staff members we interviewed said they knew how blood got on the t-shirt. Moreover, none of the INS agents who brought the detainees to the MDC recalled any of the detainees being bloody before they arrived at the sally port. While we cannot say definitively whether the blood was from the detainees, the fact that two staff members saw blood on the t-shirt where detainees were "placed" provides some evidence that detainees were slammed into the t-shirt, as many alleged.

In addition, our investigation revealed that at least one detainee likely received a bruise on his arm from being slammed into a wall.[12] In his interview, the detainee said his bruise was caused by officers who repeatedly slammed him against the wall in R&D. According to Lieutenant 2, who examined the detainee when he arrived at the MDC, the detainee did not have any bruises when he entered the MDC during the evening of October 3, 2001. However, when the detainee left for court the following day, he had a large bruise on the side of his right upper arm. A videotape of the detainee's bruise showed that it was very dark, circular, and about the size of a tennis ball. Lieutenant 2 said that when he observed the bruise on the detainee's arm the next day, he concluded that the bruise was caused in the MDC, but he did not know how.

---

[12] Two other detainees also maintained they developed bruises after being slammed into the walls.

The detainee's bruise was examined by an MDC doctor on October 5, 2001, but the detainee's medical records do not indicate what caused his injury. On a videotape of his medical examination that we reviewed, the detainee told the doctor that his bruise "happened here," but the doctor did not ask how he got the bruise and instead said he only wanted to confirm which bruise he was supposed to examine.

The OIG obtained medical records for seven other detainees who alleged MDC staff members slammed them against walls. These records do not indicate that the detainees were bruised or otherwise injured from being slammed against the wall.[13] It is possible that the detainees were not injured. However, if they were injured, there are several explanations for why their injuries may not have been recorded in the detainees' medical records. First, some detainees did not seek medical treatment for their bruises because they would have been required to request treatment from the same officers who they alleged injured them. Second, detainees generally received their intake medical assessments shortly after they arrived, before bruises would have developed from being slammed against the wall in R&D. Third, MDC staff members who observed the bruises did not always offer detainees the opportunity to visit medical personnel, as one detainee alleged happened when he showed a lieutenant a bruise he obtained following a "use of force" incident on April 2, 2002. Fourth, some MDC medical personnel may have failed to examine detainees' injuries or discern how they were injured, as shown on the videotape of the medical examination of the detainee who had a bruised arm.

In our interviews of MDC staff members, most of them denied detainees ever were slammed or bounced against the wall. A few staff members did state that detainees were slammed against the wall, but only when they were noncompliant.[14] Almost all of the staff members we interviewed described the detainees, with the sole exception of Zacarias Moussaoui, as fully compliant and non-combative.

---

[13] One detainee alleged his chin was injured by officers who slammed him into a wall, but we did not find sufficient evidence to substantiate this allegation. The detainee obtained a two millimeter long laceration on his chin the day he arrived at the MDC. He alleged that MDC staff members slammed him into the wall while escorting him into R&D. According to staff members who were involved in the escort or who witnessed the incident, the two staff members escorting the detainee tripped over the feet of another staff member who was holding the door open at the top of the sally port ramp. The detainee's medical records indicate that at the time of the examination, he stated that his injury occurred when he "tripped going up."

[14] One lieutenant stated that he observed several detainees not complying when they resisted getting out of transport vehicles, refused to walk up the sally port ramp, or were unresponsive to staff members' commands, such as to lift their arms up during pat searches. This characterization was contradicted by most other witnesses we interviewed.

But many of the staff members who told us the detainees never were slammed against the wall or who said that the detainees were slammed against the wall only when they were violent, also told us the detainees never were pressed against the wall, the detainees' heads never touched the wall, or there never was a t-shirt with an American flag on it hanging in the sally port.  These claims were contradicted by numerous videotapes showing that staff members routinely pressed detainees into walls, regularly instructed detainees to place their heads against walls, and directed the detainees to face the t-shirt prominently displayed for months in the sally port.



**Image 2:  Officers face detainee towards t-shirt with flag.**



**Image 3:  Officers press detainees against walls.**

14

Furthermore, nearly all of the staff members we interviewed stated that the detainees were compliant, only a few of them were argumentative, and none of them were violent or hostile.[15]  For example, a current lieutenant at the MDC said that when the detainees arrived they were scared and visibly afraid.  He said it became apparent to him that the detainees were not terrorists.

In addition to alleging that they were slammed against walls, five detainees alleged MDC staff members used force on their heads or necks.  For example, one detainee stated that when certain officers pressed him against the wall, they put a lot of pressure on the back of his head and pressed his forehead against the wall.  He said whenever he moved his head away from the wall, the officers banged his head on the wall.  Similarly, another detainee told us that on the day he arrived at the MDC, one officer grabbed the back of his head in the elevator, pushed his whole face against the elevator wall, and squeezed his head behind his ear as hard as he could.  The detainee said, "It was very, very painful."

The two senior BOP officials we interviewed stated that pressing a compliant, non-combative inmate's head or neck against the wall is not an appropriate control technique.  The official responsible for training BOP officers said it never was acceptable to touch or use force on an inmate's head or neck unless the inmate was violent and staff members were trying to defend themselves.  As noted above, BOP policy prohibits staff members from using more force than necessary to control inmates, or causing them unnecessary physical pain or extreme discomfort.  See BOP P.S. 3420.09 and BOP P.S. 5566.05.

Lieutenant 1 identified two officers who regularly pressed detainees' heads against the wall.  He said one officer put detainees' faces against the wall and screamed at them, and the other officer frequently put his hand on the back of detainees' necks and put their heads on the wall.

When we interviewed the two officers Lieutenant 1 identified, however, both denied ever pressing detainees' heads into the wall or ever witnessing any officer touch a detainee's head or neck.  One of the officers commented to us that, "there could be serious damage" if officers put detainees' heads on the wall.

Similarly, nearly all of the other current and former staff members we interviewed maintained they never saw or heard of staff members touching detainees' necks or heads, or pressing detainees' heads against walls.  One

---

[15] While the detainees were largely compliant, staff members occasionally had to enter a few detainees' cells and use force to prevent detainees from engaging in conduct that violated ADMAX SHU rules, including peeling paint off the walls, injuring themselves, hiding from cameras, or refusing to come to the cell door to be handcuffed.

15

former officer stated, "we don't put hands on their heads," and another former officer said officers specifically told the detainees not to place their heads against the walls.

However, several videotapes showed officers pressing detainees heads against the wall. One tape showed an officer controlling a detainee by his head and firmly pressing his head and neck against the wall until a lieutenant, noticing the video camera, slapped the officer's hand away. On another videotape, we saw an officer grab a detainee by his hair and his neck, and firmly press his head against a wall. (Image 4) This particular incident was witnessed by one of the officers who told us that he never saw any staff member touch a detainee's neck or head, or press a detainee's head to the wall.



**Image 4: Officers firmly press detainee's head against the wall.**

In sum, we concluded based on videotape evidence, detainees' statements, and staff members who corroborated allegations of abuse, that several MDC staff members slammed and bounced detainees into the walls when they first arrived at the MDC and sometimes in the ADMAX SHU, without justification and contrary to BOP policy. We also concluded that some staff members, contrary to their denials, inappropriately used force on detainees' necks and heads, and pressed their heads against walls.

## 2.    Bending Detainees' Arms, Hands, Wrists, and Fingers

Ten detainees alleged that while their hands were cuffed behind their backs, MDC staff members inappropriately twisted or bent their arms, hands, wrists, or fingers during escorts on the ADMAX SHU or to and from R&D, causing them pain. The detainees said staff members bent their arms up into the middle of their backs, pulled their thumbs back, twisted their fingers and

16

wrists, and bent their wrists forward towards their arms (referred to by MDC staff members as "goosenecking").

As noted above, BOP policy prohibits staff members from using more force than necessary to control an inmate. Similarly, BOP P.S. 5566.05, "Use of Force and Application of Restraints on Inmates," authorizes staff members to use force on inmates only as a last alternative after all other reasonable efforts to resolve a situation have failed. In our interviews with two senior BOP officials, they indicated that twisting or bending hands, wrists, or fingers of compliant inmates is an inappropriate control technique. The BOP official who is responsible for training new BOP officers on restraint and escort techniques stated that staff members should not use pain compliance techniques, such as bending fingers or twisting wrists, unless the inmate is noncompliant or violent and confrontation avoidance through communication has failed. He stated that using pain compliance methods under any other circumstances would be using more force than necessary on an inmate and thus would violate BOP policy.

Two lieutenants and an officer told us that MDC staff members twisted and bent detainees' hands, wrists, and fingers. Lieutenant 1 stated that one officer always twisted detainees' hands during escorts, even when they were being compliant. He said that he had to correct this officer not to hold detainees' fingers or hands "in a manner which causes unnecessary pain." Lieutenant 2 told us he saw officers unnecessarily gooseneck detainees' wrists and said he had to correct them. In addition, an R&D staff member told us he saw officers control detainees by bending their wrists down in "modified gooseneck holds." He stated that these holds were "modified" because the officers were not bending detainees' wrists in order to hurt them, unlike the gooseneck hold. However, he said that the modified gooseneck holds made the detainees uncomfortable and caused some detainees to complain that they were in pain.

Other current and former MDC staff members we interviewed told us different things with respect to whether they or other officers bent detainees' thumbs and goosenecked their wrists. Some said officers never were supposed to hold or bend detainees' thumbs, and they never saw or heard of staff members bending detainees' thumbs or goosenecking their wrists. Others said it was appropriate to bend detainees' thumbs, gooseneck their wrists, or use pain compliance methods if the detainees were being noncompliant or combative, although many of them said the detainees never were noncompliant or combative. One lieutenant told us that it was possible that officers intentionally twisted the injured hand of one detainee who argued with the officers, "just because it's human nature."

Moreover, contrary to some officers' denials that staff members ever bent detainees' hands, wrists, or fingers, in our review of videotapes we observed

17

several instances when MDC staff members bent compliant detainees' arms, hands, wrists, and fingers for no apparent reason.  For example, we saw a staff member gratuitously gooseneck a detainee's wrist during a routine escort, even though the detainee was fully cooperative and compliant.  (Image 5)



| **Image 5:  Officer uses thumb to gooseneck compliant detainee's wrist.** |
| --- |

Based on the consistency in the detainees' allegations, witnesses' observations, and videotape evidence, we believe some staff members inappropriately twisted and bent detainees' arms, hands, wrists, and fingers, and caused them unnecessary physical pain, in violation of BOP P.S. 5566.06.

### 3.   Lifting Detainees, Pulling Arms, and Pulling Handcuffs

Several detainees alleged that MDC staff members carried them, pulled their handcuffs or waist chains, dragged them, or lifted them off the ground by their restraints and arms.  Some detainees also alleged staff members pulled their arms up while their hands were cuffed behind their back, which exerted great pressure on their handcuffs and hurt their wrists.  Many of these allegations related to the detainees' first day at the MDC.

For example, one detainee stated staff members dragged him along the ground from R&D to his cell on the ADMAX SHU the day he arrived at the MDC.  Similarly, a second detainee alleged MDC staff members pulled him by his arms from R&D to the ADMAX SHU.  Furthermore, a third detainee told us that staff members linked their arms through his cuffed elbows to lift him off the ground every time they moved him for the first three days he was at the MDC, even though he was compliant.  Another detainee said that staff members lifted him off the floor by his chains and ran with him, even though he was fully restrained and compliant.

According to the senior BOP official responsible for training BOP officers on restraint and escort procedures, it is unnecessary and inappropriate for staff members to lift compliant inmates' restrained arms up behind their backs, even to pat search their lower back area.  He also stated that it is not appropriate for staff members to lift or carry inmates if they are compliant and willing to walk on their own.  He said using these techniques on compliant inmates violates the BOP's policies because it can cause the inmates unnecessary pain.  As noted above, BOP policy prohibits staff members from using physical violence, causing inmates unnecessary physical pain or extreme discomfort, or using any force beyond that which is reasonably necessary to subdue an inmate.  See BOP P.S. 3420.09 and 5566.05.

Several MDC staff members and a detainee's attorney told us they witnessed staff members carry detainees, lift detainees, pull detainees' restraint chains, or pull detainees' arms.  For example, Lieutenant 1 stated he had to correct an officer for making detainees walk on their toes by lifting their arms or restraints in a painful way.  Another MDC lieutenant said there were times officers pulled on detainees' handcuffs too much, and he had to slap the officers' hands away.  In addition, one detainee's attorney told us that even though his client was in leg restraints, the officers hurried him down the hall so quickly that they nearly were picking him up off the ground when they brought his client to meet with him.

Most current or former MDC staff members we interviewed told us they did not see, hear, or ever recall staff members carrying detainees, lifting detainees, pulling detainees' restraint chains, or pulling detainees' arms to hurt their wrists.

On videotapes of the detainees, however, we observed MDC staff members carry compliant detainees, pull detainees' arms in a way that painfully strained their handcuffed wrists, and forcefully hurry detainees during escorts.  For example, we saw staff members in separate incidents quickly move two detainees by carrying them horizontally to the floor, even though there was no indication the detainees refused to walk.  We also saw several officers raise compliant detainees' handcuffed arms up behind their backs in a way that bent the detainees' elbows and appeared to hurt the detainees' arms and wrists. (Image 6)



> **Image 6:  Officers raise compliant detainee's arms up behind his back.**

The senior BOP official responsible for training new officers reviewed some of these instances on the videotapes and stated that the officers' use of these techniques was inappropriate.

We determined from the videotapes and witnesses' statements that some staff members inappropriately carried or lifted detainees, and raised or pulled their arms in painful ways.  However, we did not substantiate detainees' allegations that staff members dragged them on the ground, lifted them solely by their chains, or refused to let their feet touch the ground for days.

### 4.  Stepping on Detainees' Chains

Several detainees alleged that MDC staff members purposely stepped on their leg restraint chains while they were stationary and also while they were walking, injuring their ankles and causing them to fall.  According to one detainee, after staff members stepped on his leg restraint chain and caused him to fall, they dragged him by his handcuffs and clothes, stood him up, stepped on his chain again, and repeated the process.

The senior BOP official who trains new BOP officers stated that staff members are never taught to step on inmates' leg restraint chains, even if the inmate is non-compliant, because there is no correctional purpose served in doing so.  In his opinion, the only reason officers would step on an inmate's leg restraint chain would be to inflict pain.  Again, BOP policy specifically prohibits staff members from using more force than necessary to control inmates, inflicting unnecessary physical pain on inmates, or causing inmates extreme discomfort.

Lieutenant 2 acknowledged that he observed officers step on detainees' leg restraint chains when they were placed against the wall, although he said he did not like it.  He explained that because the detainees' legs were spread apart and the leg restraint chain was taut, the leg restraints could have bruised the detainees' ankles when officers stepped on the chain.  Lieutenant 2 said he tried to correct officers when he saw them step on detainees' leg restraint chains.

An R&D staff member also said he saw officers step on detainees' leg restraint chains during pat searches in R&D.  According to this staff member, officers stepped on the detainees' leg restraint chains when the detainees first started arriving at the MDC, although they stopped stepping on their leg restraint chains as time passed.

Similarly, an INS agent witnessed MDC staff members step on two detainees' leg restraint chains while firmly holding them against the wall.  The agent said the more pressure the officers put on the leg restraint chains, the more the detainees squirmed and complained; and the more the detainees squirmed and complained, the "worse it got" for them.

One MDC correctional officer who assisted with approximately 7 to 10 detainee escorts from R&D to the ADMAX SHU said he observed staff members stepping on detainees' leg restraint chains.  The officer incorrectly thought that security procedures required officers to step on detainees' leg restraint chains whenever they were stopped or whenever officers needed to remove their leg restraints.  The officer said staff members stepped on detainees' leg restraint chains when they came out of their cells before going to recreation, when officers had to apply or remove leg restraints, or when officers escorting a detainee had to wait for elevators or doors.  He stated, however, that he thought the officers only stepped on excess chain that was on the ground and not on chain that was stretched tight between the detainees' legs.

Our investigation found evidence that some detainees had substantial bruises and scabs around their ankles caused by the leg restraints.  For example, we reviewed a videotape that showed that by one detainee's second day at the MDC, his ankles were badly bruised.[16]

Similarly, another detainee's attorney said that he observed significant black and blue bruises on his client's ankles and that his client told him they were caused by staff members who stepped on his leg restraint chains.  Based

---

[16] An MDC doctor who examined the detainee suggested in the videotapes that his bruises were caused by irritation from the leg restraints and said that he recommended the detainee wear his leg restraints over his socks to prevent further bruising.  However, a videotape of the detainee's medical examination showed the detainee already had been wearing the leg restraints over his socks.

on the statements of MDC staff members, we believe these injuries were the result of staff members stepping on detainees' leg restraint chains, although tight leg restraints that restricted blood flow also may have contributed to bruising around detainees' ankles.[17]

In our interviews, numerous current or former MDC staff members who handled the detainees asserted they never saw or heard of staff members stepping on detainees' leg restraint chains.  Several of them, including a senior MDC management official, said it never would be appropriate for staff members to restrain detainees by stepping on their leg restraint chains, unless there was an emergency, because it would have hurt the detainees' legs or caused them to trip.

However, these denials were belied by the statements of other officers, which we described above.  Moreover, despite the senior MDC management official's statement that it never was appropriate to step on a detainee's leg restraint chain, we saw a videotape in which he and another staff member appeared to restrain a detainee by stepping on his leg restraint chain during a non-emergency medical examination.[18]

Based on the consistency in the detainees' allegations, eyewitness statements by several staff members, videotape evidence of detainees' ankle injuries, and videotape evidence of the senior MDC management official and another staff member stepping on a detainee's leg restraint chain, we believe some staff members violated BOP policy by stepping on detainees' leg restraint chains.  However, the evidence is inconclusive regarding whether MDC staff members stepped on detainees' leg restraint chains while they were walking or repeatedly tripped them and dragged them on the floor, as one detainee alleged.

### 5.   Improper Application and Use of Restraints

As described in the June 2003 Detainee Report, the BOP treated all September 11 detainees as "high security" inmates, which meant that they were placed in the ADMAX SHU and subjected to the strictest form of confinement whenever they were taken out of their cells.  For example, the

---

[17] We discuss this further under "Improper Application and Use of Restraints" in section 5 below.

[18] In this incident, it appeared that stepping on the detainee's leg restraint chain did not pull on the detainee's ankles and may have been intended to ensure that the detainee would not hurt himself or others by bucking his legs.  Yet, after reviewing the videotape with us, the senior MDC management official continued to maintain that he did not step on the chain.  The other employee on the videotape acknowledged that he believed he and the senior MDC management official stepped on the detainee's leg restraint chain.

22

detainees were restrained with what the BOP calls "hard restraints:" steel handcuffs, leg restraints, and sometimes waist chains.

Nine detainees alleged that staff members applied handcuffs or leg restraints too tightly, punished the detainees by squeezing their handcuffs tighter, did not loosen restraints after the detainees complained that they were very painful, or left detainees restrained in their cells for long periods of time. For example, one detainee filed a formal complaint against one officer for squeezing his handcuffs tightly during an escort and causing his wrists to bruise. Similarly, another detainee told us that some of the MDC staff members intentionally hurt the detainees by tightening their restraints. This detainee said that if the detainees were "mouthy" or cursed, staff members punished them by applying their restraints tightly. He also said that if a detainee complained that his restraints hurt, the staff members tightened his restraints even more.

While the proper application of restraints may result in some discomfort, the BOP prohibits staff members from using restraints to punish inmates, cause unnecessary physical pain or extreme discomfort with overly tight restraints, or restrict blood circulation in any manner. See BOP P.S. 5566.05 and 3420.09. When staff members apply restraints to inmates in "use of force" incidents, for example, the BOP prohibits staff members from continuing to restrain the inmates after they have gained control of them. See BOP P.S. 5566.05. In addition, the BOP prohibits staff members from applying restraints to an inmate in an administrative detention cell, such as an ADMAX SHU cell, without approval of the Warden or his designee. See BOP P.S. 5566.05.

The senior BOP official who trains new BOP officers stated that all BOP officers are taught how to apply restraints in a way that does not cause pain or restrict blood circulation. However, we observed a few instances on videotapes when medical personnel examining a detainee determined a detainee's restraints were applied too tightly and needed to be loosened. While these videotapes show that staff members applied some detainees' restraints too tightly, we did not substantiate particular detainees' allegations that staff members injured them by tightening their restraints or punished them by applying their restraints too tightly.

However, our investigation developed evidence that staff members punished at least two detainees by leaving them restrained in segregated cells for at least seven hours. According to the senior BOP official responsible for training new officers, inmates can be left in restraints in their cells only so long as they are combative. He stated a lieutenant has to check on the restrained inmates every two hours to determine if they are still physically combative. See BOP P.S. 5566.05. As soon as a lieutenant determines the inmate has regained physical control and is no longer a threat to himself, other inmates, or

23

property, his restraints must be removed.  The official said staff members violate BOP policy if they keep inmates restrained longer than necessary, or if they restrain inmates to punish or discipline them.  He further stated that if inmates are being disruptive or noncompliant by yelling, it is entirely ineffective to place them in restraints because handcuffing them will not stop them from yelling.  He said the only appropriate action would be to move them to another cell where their yelling cannot be disruptive.

On November 8, 2001, two detainees began yelling in their cells and banging on their cell doors in response to screams from a third detainee who was in the medical room having a blood sample taken.[19]  On videotapes, we heard a couple of detainees yelling, "What are you doing to [the third detainee]?" immediately after the third detainee began screaming.  We also observed that as soon as these detainees began yelling and banging on their cell doors, a senior MDC management official abruptly turned and walked out of the medical exam room with his deputy following after him.  Of the ten staff members in the medical exam room at the time, only the senior MDC management official and his deputy responded immediately to the detainees.  Shortly after the senior MDC management official left the medical examination room, we heard a staff member, who sounded like the senior MDC management official, say things to the detainees like, "What do you want?" and "Are you done?"

Subsequently, according to staff members' memoranda and official reports, staff members activated an emergency alarm to request assistance on the ADMAX SHU and performed an "emergency use of force" on the two detainees who had yelled and banged on their cell doors.  These memoranda and reports allege that the two detainees were staging a group demonstration and encouraging other detainees to riot and engage in a hunger strike.  As part of the "emergency use of force," the two detainees were taken to recreation cells, left there for about half an hour, and then transferred to segregation cells.

In the videotapes of the two detainees initially being escorted from their cells to the recreation deck, we observed that they fully complied with the staff members and that the staff members were not aggressive with them.  We saw no "use of force" employed or needed during these escorts from their cells.[20]

---

[19] The detainee alleged he was screaming in part because one of the officers had bent his thumb back severely while his blood was being taken.  While we could not determine by viewing a videotape of the incident whether this officer had bent the detainee's thumb back, on the videotape it appeared that the officer held the detainee's thumb during part of the medical examination.

[20] According to MDC policy, all "use of force" incidents must be videotaped and the tapes given to the Special Investigative Section (SIS) as evidence to be stored in the SIS evidence safe (continued)

While the two detainees were on the recreation deck, we heard staff members discuss the incident off-camera.  The staff members never indicated the two detainees were inciting a riot or staging a group demonstration.  Instead, one staff member stated to the others that the ADMAX SHU could not house the detainees adequately because there were too many detainees for the staff to handle.  Another staff member responded, "Well, things are quiet now.  They are not yelling or nothing."  Finally a third staff member, who sounded like the senior MDC management official, replied, "Right.  We gotta follow up.  We've got to leave them in restraints and make them behave – that this is not appropriate."

Shortly after this discussion, we saw on videotapes staff members escorting the two detainees from the recreation deck to segregation cells.  These escorts were much more aggressive than the previous escorts to the recreation deck.  We saw the officers rush the detainees down the corridors, slam one detainee into walls, ram the second detainee into walls, and hold both of them by their heads or necks.  Two lieutenants present during these escorts submitted memoranda alleging that the two detainees were "placed against the wall" because they were uncooperative or resisting staff members.  On videotapes of the escorts, however, the two detainees did not appear to be uncooperative or resisting staff members.

The two detainees were then left in hard restraints for more than seven hours in segregation cells.[21]  Although staff members submitted memoranda or reports indicating that the officers had handled the two detainees in accordance with BOP policy, the evidence we reviewed indicates that staff members violated BOP policy by using more force than necessary to gain control of the detainees – who appeared compliant – and by leaving them restrained in their cells for an inappropriately long period of time.

Based on our review of the videotapes that were recorded at different locations on the ADMAX SHU, it did not appear that the two detainees were staging a group demonstration, inciting a riot, or doing anything but yelling and banging on their cell doors in response to the screams of the third detainee who was in the medical exam room.  While detainees are not permitted to yell, bang on doors, or curse at staff under ADMAX SHU rules, we do not believe the two detainees' behavior in this instance amounted to inciting a riot or required them to be locked in hard restraints in segregation cells for seven hours.  Rather, the evidence suggests that in this incident, staff members used rough treatment and restraints to punish the two detainees, in violation of BOP policy.

---

for two-and-a-half years.  However, there were no tapes of these detainees for this date in the SIS safe, according to MDC officials.

[21] An official report from the MDC states they were restrained from 2:00 p.m. to 9:10 p.m.

### 6.   Rough or Inappropriate Handling of Detainees

Several detainees alleged MDC staff members handled them roughly or inappropriately, asserting that they were punched, kicked, beaten, or otherwise physically abused.

According to the BOP official who trains new BOP officers, officers are not to handle inmates roughly, aggressively, or in any manner that causes them unnecessary pain.  He reiterated that using any more force than necessary in handling inmates violates BOP policy.

Several MDC staff members confirmed detainees' allegations that officers used unnecessary force and handled detainees roughly.  A current MDC lieutenant who was assigned briefly to the ADMAX SHU stated that a lot of detainees were treated "pretty roughly" when they were brought into the sally port and R&D.  Another lieutenant said, "We were not using kid gloves with these guys."

In addition, two former MDC lieutenants and a current lieutenant stated that some officers took their anger and frustration about the September 11 terrorist attacks out on the detainees.  They stated they had to tell the officers to "ease up" when handling the detainees, and they had to remove some officers from escort teams because they were too rough with the detainees or were not able to handle them professionally.  One of the lieutenants said that some officers "tried to prove that they were men or prove that America was superior" by being unprofessional or overly aggressive with the detainees.

An R&D staff member said he and other R&D staff members had to take officers off escort teams because they were "rambunctious" and "excited."  In addition, the R&D staff member told us officers were unnecessarily rough while pat searching the detainees the first few days they arrived.  He commented, "You feel bad if you're roughing up someone who is crying."  This staff member also stated that he witnessed officers take off detainees' shoes during pat searches in R&D and knock them against the wall right next to the detainees' faces.

Despite these staff members' statements, many other current and former MDC staff members we interviewed claimed that officers never were aggressive with or used unnecessary force on the detainees.  Many also denied that detainees were ever pressed or held to the wall.  One lieutenant maintained that the detainees were "treated with kid gloves."

On the videotapes, however, we observed that staff members often handled detainees roughly or inappropriately.  For example, we observed that staff members regularly pressed and held detainees to the wall.  In addition, we saw one officer sharply slap a detainee on the shoulder and grab another

detainee's shoulder and push him.  We also saw another officer firmly poke a detainee in the shoulder without any provocation.

One detainee alleged that in late October 2001 staff members punished him twice for talking too much by stripping him, giving him only a sleeveless t-shirt, and locking him in a cell for 24 hours without food or blankets.  A second detainee stated he saw officers put the first detainee in cell number 1 with no clothes or blankets, and throw water on the cell floor.  The second detainee said that cell number 1 was the punishment cell and the officers kept the first detainee in there all the time.  A third detainee also told us that staff members used cell number 1 to punish detainees.

The first detainee identified three staff members who allegedly punished him by locking him in a cell in a sleeveless t-shirt without food or blankets.  When interviewed by the OIG, one of the staff members denied generally that any detainees were mistreated.  The other two staff members said the detainee never was placed in a cell without food, although he had been placed on suicide watch once or twice and was stripped, given a suicide watch gown, and put in a different cell so he could be monitored.

However, the detainee's medical records do not indicate that he ever was suicidal or needed to be placed on suicide watch.  His file also does not contain any suicide risk assessments or suicide watch records.  If the detainee was suicidal, his suicide risk assessment or suicide watch should have been documented, as was done for more than ten other detainees.

We did not receive any videotapes that showed the detainee being placed on or monitored during a suicide watch, even though we received videotapes of other detainees who were placed on suicide watch.  However, we observed on videotape an incident in which four staff members, including the two who maintained the detainee had been suicidal, cornered the detainee in a recreation cell while a lieutenant threatened him to stop inciting and talking to other detainees.  The lieutenant told him that if he did not do what the staff members said, they would send him to a penitentiary where he would have even less privacy and freedom than at the MDC.  The lieutenant said, "You think we can't break you?  [The penitentiary] will."  This incident indicates that staff members were irritated with the detainee and lends credibility to the detainee's allegation that some of the same staff members later punished him by locking him in a segregated cell because he talked too much.

While the evidence is not conclusive, it suggests that the detainee was not suicidal and staff members inappropriately and unnecessarily stripped him down to a sleeveless t-shirt and locked him in a segregation cell for 24 hours as a form of punishment.

In addition, videotape evidence and witnesses' statements indicate that some staff members often handled detainees roughly or inappropriately. However, we did not find evidence that staff members punched, kicked, or beat detainees, as some detainees alleged.

### 7.   Conclusion

In sum, we concluded, based on videotape evidence, detainees' statements, witnesses' observations, and staff members who corroborated some allegations of abuse, that some MDC staff members slammed and bounced detainees into the walls at the MDC and inappropriately pressed detainees' heads against walls.  We also found that some officers inappropriately twisted and bent detainees' arms, hands, wrists, and fingers, and caused them unnecessary physical pain; inappropriately carried or lifted detainees; and raised or pulled detainees' arms in painful ways.  In addition, we believe some officers improperly used handcuffs, occasionally stepped on compliant detainees' leg restraint chains, and were needlessly forceful and rough with the detainees – all conduct that violates BOP policy.  See BOP P.S. 5566.06.

### B.   Verbal Abuse

Twenty-two detainees alleged that staff members verbally abused them by calling them names, cursing at them, threatening them, or making vulgar or otherwise inappropriate comments during strip searches.  For example, detainees alleged staff members called them names like "terrorists," "mother fuckers," "fucking Muslims," and "bin Laden Junior."  They also said staff members threatened them by saying things like:

> "Whatever you did at the World Trade Center, we will do to you."
>
> "You're never going to be able to see your family again."
>
> "If you don't obey the rules, I'm going to make your life hell."
>
> "You're never going to leave here."
>
> "You're going to die here just like the people in the World Trade Center died."

Several of the detainees said that when they arrived at the MDC, they were yelled at and told things like:

> "Someone thinks you have something to do with the terrorist attacks, so don't expect to be treated well."
>
> "Don't ask any questions, otherwise you will be dead."
>
> "Put your nose against the wall or we will break your neck."
>
> "If you question us, we will break your neck."
>
> "I'm going to break your face if you breathe or move at all."

One detainee stated that when the detainees prayed in the ADMAX SHU, officers said things like, "Shut the fuck up!  Don't pray.  Fucking Muslim. You're praying bullshit."  Another detainee alleged that when the officers were mistreating the detainees, the officers sometimes said, "Welcome to America."

The BOP P.S. 3420.09, "Standards of Employee Conduct," specifically prohibits verbal abuse of inmates, stating, "An employee may not use . . . intimidation toward inmates," and "[a]n employee may not use profane, obscene, or otherwise abusive language when communicating with inmates. [Employees] shall conduct themselves in a manner which will not be demeaning to inmates."

Nearly all of the staff members we interviewed denied ever verbally abusing the detainees or witnessing any other staff member verbally abuse detainees.  Several of them denied ever hearing another staff member even utter a curse word around the detainees.  One officer told us that all the staff members were "very polite" with the detainees and that they would ask the detainees, "Can you please do this?" and "Can you please do that?" instead of ordering them around.

However, in our interviews with several current and former staff members, we found evidence that corroborated some of the detainees' allegations of verbal abuse and refuted the officers' denials.  For example, one current lieutenant told us that when some detainees requested more food, he heard some officers respond, "You're not getting shit because you killed all those people."

Another current lieutenant told us about one officer who referred to the detainees as "fuckers."  In addition, a staff member from R&D stated that officers cursed around the detainees, and told each other jokes and made derogatory statements about the detainees during strip searches.[22]

One officer acknowledged to us that officers sometimes let their personal feelings get in the way of their professional responsibilities and said things they should not have said.  Moreover, a former officer, who maintained that he and fellow officers never verbally abused the detainees, frequently called the detainees "terrorists," "dirtbags," and "scumbags" during one of our interviews of him.

In addition to these current and former staff members, witnesses from outside the MDC also provided some corroboration for the detainees' allegations of verbal abuse.  One detainee's attorney said he heard MDC

---

[22] Strip searches are discussed further below under section III (C), "Strip Searches of Detainees."

officers constantly refer to the detainee as "the terrorist," "the 9/11 guy," or "the bomber." Similarly, an INS agent told us the detainees were read "the riot act" when they first were brought into the MDC.

We also found evidence on videotapes that suggested officers made inappropriate statements regarding the detainees. For instance, contrary to what many staff members told us, we heard on videotapes staff members curse repeatedly around the detainees. We also saw staff members behave unprofessionally during some strip searches, as the R&D staff member described; on videotapes, staff members laughed, exchanged suggestive looks, and made funny noises before and during strip searches.

We also observed one officer, who was assisting in a routine escort of a detainee, suddenly shout to another staff member in a threatening way, "This guy over here (gesturing to the detainee) thinks by getting nasty with a female officer and disobeying orders, he's going to get shit (legal calls) from you." At this point, the video camera operator admonished the officer to watch what he said on camera. At the end of the escort, the officer leaned over to the detainee and quietly said something that could not be heard on camera.

Similarly, as discussed above, we observed four staff members corner one detainee in a recreation cell. A lieutenant told him that if he did not do what the staff members said, they would send him to a penitentiary where officers would "break" him. This incident is very similar to threats that another detainee alleged a lieutenant made to him. The other detainee told us that a lieutenant against whom he filed a complaint came to his cell and threatened him by saying, "If you guys make too much noise, you're going to the [penitentiary]. And those guys are killers. You won't survive an hour there."

From the statements of several staff members and witnesses outside the MDC and from the videotapes that we reviewed, we concluded that some staff members violated BOP policy by verbally abusing some detainees.

## III.  SYSTEMIC ISSUES RELATING TO THE MDC

### A.   Issues Addressed in the Detainee Report

The June 2003 Detainee Report described various issues related to the treatment of detainees at the MDC, including problems with detainees receiving timely access to counsel, detainees being held under extremely harsh conditions of confinement such as cells being lighted 24 hours a day, detainees being held in lockdown for at least 23 hours a day, detainees being placed in full restraints every time they were moved, and detainees not receiving

adequate recreational opportunities.[23]  Because those issues were discussed in detail in the Detainee Report, we do not repeat them in this report.

In the course of this investigation, however, we found other systemic problems and further information on several issues previously discussed in the Detainee Report regarding the treatment of MDC inmates, which we describe below.  These include staff members using a t-shirt taped to the wall in R&D to send detainees an inappropriate message, audio taping detainees' meetings with their attorneys, unnecessarily and inappropriately strip searching detainees, and banging on detainees' cell doors excessively while they were sleeping.  In addition, we describe the difficulties we had in obtaining videotapes from the MDC, despite our repeated requests, and our general assessment of the cooperation and credibility of many officers we interviewed.

**B.   Video and Audio Taping Detainees' Meetings with Their Attorneys**

We found that MDC staff members not only videotaped the detainees' movements when taken from their cells to visit with their attorneys, they also recorded detainees' visits with their attorneys using video cameras set up on tripods outside the attorney visiting rooms.  In total, we found more than 40 examples of staff videotaping detainees' attorney visits.[24]  On many videotapes, we were able to hear significant portions of what the detainees were telling their attorneys and sometimes what the attorneys were saying as well.

It appeared that detainees' attorney visits were recorded intentionally.  On one occasion, an officer instructed the detainee not to speak in Arabic with his attorney because the meeting was being videotaped.  In another videotape, a lieutenant told the detainee and his attorney that he had been instructed that they were required to speak in English during the visit.  We also observed on several occasions that officers lingered outside the attorney visiting rooms and appeared to be listening to the conversations.

Audio taping inmates' meetings with attorneys is prohibited by federal regulation.  Chapter 28 C.F.R. § 543.13(e) provides that "Staff may not subject visits between an attorney and an inmate to auditory supervision."  On

---

[23] Many detainees said they declined to go to the limited recreation because it often was offered only in the early morning when it was cold, and they had only short-sleeve jumpers and no shoes.  Some detainees also complained that they were routinely strip searched after recreation, even though they were frisked before and videotaped during their recreation.  In reviewing the videotapes, we found that many times the detainees were in the recreation cells before 7:00 a.m. and they appeared to be uncomfortably cold.  We also saw videotapes of detainees being kept in restraints during their recreation period.

[24] Nearly every time we saw a detainee escorted to an attorney visit, his visit was videotaped.  While we could hear audio on each of these videotapes, sometimes it was difficult to understand the detainees.

October 31, 2001, the Attorney General signed a directive that permitted monitoring of attorney-inmate meetings only under limited circumstances when the Attorney General approved the monitoring of the conversations and notice was given to the inmate and the inmate's lawyer.  28 C.F.R. § 501.3(d).  According to BOP's Office of General Counsel, this authority was not used at the MDC.  In a December 18, 2001, memorandum to wardens in the Northeast Region (which includes the MDC), M.E. Ray, the Regional Director, provided specific guidance on videotaping attorney visits for the detainees:  "Visits from attorneys may also be visually recorded, but not voice recorded."  No BOP or MDC memorandum specifically authorized taping attorney visits for the September 11 detainees or identified reasons to depart from standard BOP policy or the federal regulation.

When interviewed prior to the OIG obtaining all of the videotapes, MDC Warden Michael Zenk told the OIG that, initially, attorney visits were video and audio taped, but in November 2001, after one of the attorneys complained, the video camera was moved far enough away that the audio of the visits was not recorded.[25]  However, as late as February 2002, conversations between detainees and their attorneys are still audible on many of the tapes.  When confronted with this information, Warden Zenk stated that the visits should not have been audio taped.  He also said his staff thought moving the camera away from the attorney visiting rooms ensured that the visits would not be audio taped.

Recording the detainees' attorney visits also was not necessary for the MDC's security purposes.  The attorney visits took place in non-contact rooms separated by thick glass, and the MDC required the detainees to be restrained in handcuffs, leg restraints, and waist chains during the visits.[26]  The detainees also were pat searched or strip searched after these meetings.

Taping detainees' attorney visits potentially stifled detainees' open and free communications with legal counsel and discouraged them from making allegations against specific staff members.  Nevertheless, in some of the taped conversations, we heard the detainees tell their attorneys detailed allegations about the poor and abusive treatment they had received at the MDC.  They described being slammed against the wall, physically abused, verbally abused, and intentionally kept awake at night.  Their statements were consistent with what the detainees related to the OIG when they were interviewed months later.

---

[25] Warden Zenk arrived at the MDC in late April of 2002 and provided this information based upon briefings by his staff members.

[26] See the October 18, 2001, official memorandum from a senior MDC management official to all MDC lieutenants.

In sum, we concluded that audio taping attorney visits violated the law and interfered with the detainees' effective access to legal counsel.

## C.   Strip Searches of Detainees

Upon arriving at the MDC, consistent with MDC and BOP policy, detainees were strip searched in R&D and provided prison clothing.  Also in accordance with MDC policy, the detainees were strip searched in R&D when they returned from court appearances or anytime they left the MDC.  Very few of the detainees complained about the strip searches that occurred in R&D.  However, many complained about strip searches that occurred in the ADMAX SHU.

Detainees complained that they were strip searched on the ADMAX SHU for no apparent reason, either minutes after they had been thoroughly searched in R&D and immediately escorted by officers to the ADMAX SHU, or when they had not even left the ADMAX SHU.  Several detainees also stated that the staff members performing or observing the strip searches laughed at the detainees during the searches.  Detainees complained that the strip searches on the ADMAX SHU often were filmed and that sometimes women were present or in the immediate vicinity during the searches.  A few detainees maintained that MDC staff members used strip searches as a form of punishment.

In R&D, the strip searches were conducted in a room that contained detainees' prison clothing.  The room had small dividers along the wall that blocked viewing from either side.  When regular videotaping of the detainees started in October 2001, the video camera operators turned off the video cameras or filmed detainees only above the waist in R&D.

In contrast, on the ADMAX SHU the strip searches were conducted in either the multipurpose medical examination room, which is completely visible to anyone in the main ADMAX SHU corridor and the recreation cells, or in one of the empty cells on the range.  Furthermore, many of the strip searches conducted on the ADMAX SHU were filmed in their entirety and frequently showed the detainees naked.  Staff members consistently stated in interviews that filming a strip search in its entirety was against BOP policy.[27]  While on some occasions the filming of the strip search was partially blocked by an officer observing the strip search, this did not appear to be an intentional strategy to give detainees more privacy.  In a few videotapes, we heard the officers laughing while observing the strip searches.

---

[27] BOP officials informed us that there is no national policy specifically prohibiting videotaping inmate strip searches.  BOP P.S. 5521.05 provides that the strip search "shall be made in a manner designed to assure as much privacy to the inmate as practicable."  However, the very act of filming the entire search seems to run counter to this policy.

It does not appear that the MDC issued written policies regarding when detainees were to be strip searched. According to the detainees and MDC staff, the strip searches on the ADMAX SHU were conducted on the following occasions: (a) always when detainees entered the unit; (b) sometimes when they departed from the unit; (c) often after attorney and social visits on the unit; (d) infrequently after recreation sessions on the unit; and (e) infrequently before medical examinations on the unit.

Staff members informed us that when the detainees arrived on the ADMAX SHU, the detainees had to be strip searched even if they had just been strip searched moments before in R&D.[28]  Sometimes the same officers who were present for a detainee's strip search in R&D were present for the detainee's strip search on the ADMAX SHU. Several of the videotapes showed detainees' confusion as they futilely tried to explain that they had just been strip searched in R&D.

On the ADMAX SHU, whenever the detainees were outside their cells, they were handcuffed at all times and almost always were placed in leg restraints. As noted above, attorney and social visits were held in no-contact rooms separated by thick glass, detainees were restrained, and the visits were filmed. Nevertheless, detainees often were strip searched after their attorney and social visits. In interviews with the OIG, several officers stated it was standard MDC policy to strip search detainees following attorney or family visits, but they could not point us to any written policy. Yet, even if such searches were consistent with policy, they were applied inconsistently to the detainees and appeared to be unnecessary. Indeed, some staff members told us that the reason attorney and family visiting rooms were on the same floor as the ADMAX SHU was to avoid having to strip search the detainees.

Several detainees alleged that sometimes women were present during strip searches on the ADMAX SHU, which one detainee told the OIG he viewed as an affront to his religious beliefs.[29]  During several of the videotaped strip searches, female voices can be heard in the background. In addition, one videotape shows a female staff member walking in the vicinity of a detainee undergoing a strip search.

Some detainees complained that the strip searches were used by the MDC staff as punishment. For example, in one videotape four officers escorted

---

[28] However, we found that detainees who were taken off the ADMAX SHU to other locations in the institution, like the health unit or meeting rooms, were not always strip searched when they returned to the ADMAX SHU.

[29] BOP policy does not address whether staff members of the opposite gender may be present during strip searches, but BOP P.S. 5521.05 requires that staff of the same gender conduct the strip search unless there are exigent circumstances that are documented.

one detainee into a recreation cell and ordered him to strip while they berated him for talking too much with other detainees and for encouraging them to go on a hunger strike.  We could see no correctional purpose or justification for strip searching this detainee, who had just been taken from his cell, pat searched, and then escorted into the recreation cell by the four officers.

In sum, we concluded that it was inappropriate for staff members in the ADMAX SHU to routinely film strip searches showing the detainees naked, and that on occasion staff members inappropriately used strip searches to intimidate and punish detainees.  We also questioned the need for the number of strip searches, such as after attorney and social visits in non-contact rooms where the detainees were fully restrained and videotaped.

### D.   Banging on Cell Doors

Many detainees alleged that officers loudly banged on their cell doors in an attempt to wake them up, interrupt their prayers, or generally harass them.[30]  Under MDC and BOP policy, counts were conducted throughout the day and night, including midnight, 3:00 a.m., and 5:00 a.m.[31]  During these counts, officers were required to see detainees' "human flesh."  See BOP P.S. 5500.09.  As a result, officers were permitted to wake detainees up at these times if they could not see their skin.[32]  According to the officers, during the counts the detainees usually waved their hands from under their blankets, which generally were pulled over their heads to block out the cell lights that were illuminated at all times until at least February 2002.

While several detainees acknowledged to us they understood that the officers were required to conduct periodic counts, these detainees alleged that several officers went beyond what was required for the count by kicking the door hard with their boots, knocking on the door at night much more frequently than required, and making negative comments when knocking on the door.

---

[30] Due to the physical characteristics of the metal cell doors and the acoustics on the range, the sound from a light knock on a cell door would reverberate loudly inside and outside the cell.  Officers complained to us and to each other on videotapes regarding the loud sounds that came from the detainees banging on the cell doors.

[31] Counts on the ADMAX SHU were actually double counts.  One officer went through the entire range and conducted a count, and then immediately afterwards a second officer conducted an independent second count.  At the end, the officers confirmed that they counted the same number of detainees.

[32] BOP P.S. 5500.09 directs staff members to use a flashlight judiciously during nighttime counts, but to use enough light that there is no doubt the staff member is seeing "human flesh."  On the ADMAX SHU, however, for months the cells continually were lit by two lights.

For example, one detainee claimed that officers kicked the doors non-stop in order to keep the detainees from sleeping.  He stated that for the first two or three weeks he was at the MDC, one of the officers walked by about every 15 minutes throughout the night, kicked the doors to wake up the detainees, and yelled things such as, "Motherfuckers," "Assholes," and "Welcome to America." Similarly, another detainee stated that when officers kicked the doors to wake the detainees up, they said things like, "Motherfuckers sleeping?  Get up!"  A third detainee also claimed that a few officers made loud noises at night to keep the detainees awake and that these officers appeared to have fun conducting the counts by knocking on the cell doors.  Another detainee said that officers would not let the detainees sleep during the day or night from the time he arrived at the MDC in the beginning of October through mid-November 2001.

One detainee's attorney told us that his client stated that every time he fell asleep the officers came and kicked the doors to wake him up.  The attorney told us that the detainee said this was not part of the officers' prescribed counts, but that the officers would watch the in-cell cameras and come kick on the doors as soon as they thought the detainee was asleep.

The officers we interviewed denied that they gratuitously or loudly knocked, kicked, or banged on the detainees' doors.  One of the officers stated that for the counts, including the ones in the middle of the night, he knocked on the detainees' cell doors and might have used his foot, but he did not kick the doors very hard.  This same officer stated that another officer also used his boot to kick cell doors for counts, but he said that neither he nor the other officer ever used expletives with the detainees or said anything inappropriate or unprofessional.  Nevertheless, this officer acknowledged that the detainees experienced "sleep deprivation" from a combination of having cell lights illuminated around the clock and the frequent counts.  Another officer confirmed that detainees often were awake for the midnight and 3:00 a.m. counts.

Because the detainees were not moved from their cells during the night, staff members were not required to video record nighttime activities.  As a result, none of the videotapes we reviewed showed the ADMAX SHU at night or showed the officers conducting counts at night.  Due to the lack of videotape evidence and officers' denials, we were unable to substantiate the detainees' allegations that the officers gratuitously banged on the cell doors or woke up detainees unnecessarily.  However, the combination of cells being continuously illuminated and the BOP requirement that officers had to see the detainees' skin during each count in the evenings caused detainees to be awakened regularly and suffer from sleep deprivation.

### E.   T-Shirt with Flag and Slogan

As discussed above, many detainees alleged that staff members slammed or pushed them into the wall in the sally port where they were pat searched upon first arriving at the MDC.  Numerous detainees recalled that a t-shirt was taped to a wall and that their faces were pressed against the t-shirt.  For example, a detainee told us that staff members put his face right in the t-shirt, like he had to "kiss it."

In 11 videotapes we reviewed of a detainee entering the MDC, the staff members placed the detainee's face or head against or right next to the t-shirt while performing a pat search and exchanging the detainee's restraints.[33]  The tapes show that the t-shirt was taped to the wall at eye-level near the bottom of the ramp in the sally port, across from where vehicles parked to unload detainees.  In large, typed print on the t-shirt below the American flag were the words, "These colors don't run."  The t-shirt was taped to the right of a large, red plastic sign reminding law enforcement personnel to lock up their firearms before entering the facility.  The t-shirt was noticeable, especially because it seemed clearly out of place against a large block wall that was unadorned, except for the professionally designed plastic sign.

Most officers we interviewed who were involved in escorting detainees through R&D either specifically denied seeing the t-shirt or said they did not recall a t-shirt on the wall in the sally port area.  A few officers said they remembered a t-shirt or flag on the wall in the sally port.  While several claimed that the t-shirt was innocuous and merely a patriotic gesture, three staff members told us they were troubled by how the t-shirt was being used.

One of the three staff members worked in R&D and remembered that the t-shirt was placed on the wall in mid-September 2001, several days after the detainees began arriving at the MDC.  He said that when the detainees were pat searched, officers leaned them into the wall and placed their faces against the t-shirt.  The R&D staff member believed the purpose of the t-shirt was to send a message to the detainees.  He did not know when the t-shirt was taken down, although he remembered seeing it on the floor once before it was placed again on the wall.

The second staff member, a lieutenant, told us that he was disturbed when he observed officers abusing the t-shirt by using it to "acclimate detainees to the MDC" and send a message to them.  He said that when the detainees were in front of the t-shirt, the officers roughed them up and

---

[33] As stated above, even though the MDC instituted a policy beginning in early October 2001 to videotape all movements of detainees, including their escort through R&D, approximately 13 of the more than 300 videotapes that we received showed detainees in R&D.

"manhandled" them more aggressively than necessary.  He said he brought his concerns about the t-shirt to the attention of a senior MDC management official, and he thought the t-shirt finally was taken down after he reported it.[34]

The third staff member, also a lieutenant, said he thought the t-shirt was "inappropriate and unprofessional."  He claimed that he took the t-shirt down and threw it on the ground on five separate occasions, but staff members kept placing it back up on the wall.  The lieutenant said he finally threw it in the trash before mid-November 2001.

We found, however, that in the earliest and latest videotapes that we viewed – in early October 2001 and mid-February 2002 – the t-shirt was displayed in the sally port where the detainees entered the institution.  We observed the t-shirt on the wall in every video of the sally port during this time period.  These videotapes contradict staff members' denials that the t-shirt existed and the lieutenant's claim that he took the t-shirt down five times and finally threw it away before mid-November 2001.

These videotapes further show that the way staff members used the t-shirt leaves little doubt that its placement was intentional.  For example, in one videotape a staff member loudly ordered a detainee to, "Look straight ahead!" while he firmly pressed the detainee's upper torso into the wall and the t-shirt so that the detainee's eyes were directly in front of the phrase, "These colors don't run."  Several other videotapes also indicate that the officers intentionally placed the detainees against the wall on or near the t-shirt.

Three videotapes of the lieutenant who claimed that he removed the t-shirt from the wall on five separate occasions showed him leading and pressing detainees against the t-shirt when he was searching them.  This lieutenant never appeared uncomfortable with the t-shirt or the way in which it was used, as he maintained in his interview with us.  For example, in one videotape he ordered a detainee to lift his head up twice until the detainee was looking directly at the flag and the phrase on the t-shirt.

In our view, the way in which the t-shirt was used by staff members was highly unprofessional.  See BOP P.S. 3420.09 ("It is essential to the orderly running of any Bureau facility that employees conduct themselves professionally.")  We also did not find credible staff members' claims that they lacked knowledge about the t-shirt, especially when we subsequently viewed videotapes showing several of these same officers in front of the t-shirt frisking detainees.

---

[34] The senior MDC management official denied that any lieutenant brought concerns about the t-shirt to his attention until after it was already taken down.

### F.   Obtaining Videotapes from the MDC

Shortly after the September 11 attacks, BOP Headquarters sent out a national directive to all regional directors to install video cameras in each September 11 detainee's cell.[35]  Some MDC staff members told the OIG that the cameras were installed in the detainees' cells by mid-October 2001, although we learned from other staff members that the cameras were not operating in the cells until February 2002, which is the date on the earliest cell tape the MDC provided us.[36]  A senior MDC official confirmed to us that the cell cameras in the ADMAX SHU were not operational until early February 2002.[37] He attributed the delay to logistical and electrical problems.

We determined that the MDC began on October 5, 2001, to videotape the movements of the detainees with handheld camcorders.  The impetus for this practice was that a detainee complained to a judge on October 4, 2001, that he had been physically abused by staff members upon entering the MDC the previous day.  According to an October 18, 2001, memorandum issued by a senior MDC management official, the purpose of taping detainee movements was to address "serious security concerns."  In a memorandum dated October 9, 2001, the BOP Northeast Regional Director instructed all wardens in the region, which included the MDC warden, to videotape any movement of September 11 detainees outside their cells.  The memorandum stated that the videotape policy was intended to deter unfounded allegations of abuse by the detainees.  The memorandum also directed the wardens to preserve the videotapes indefinitely.

After wardens complained about the difficulties of storing and purchasing vast quantities of videotapes, the policy of preserving the videotapes indefinitely changed when a new regional director, M.E. "Mickey" Ray, issued a memorandum on December 18, 2001, which stated that videotapes had to be retained for only 30 days.  After 30 days, videotapes had to be recorded over or incinerated.  The only exception was for tapes showing "use of force" incidents and incidents where a detainee alleged abuse; these tapes had to be kept for two years and preserved as evidence in the SIS safe.

---

[35] This policy was communicated by BOP Assistant Director Michael Cooksey to all BOP Regional Directors in a series of video conference calls that occurred between September 13 and September 20, 2001.

[36] When we requested the tapes in July 2003, the MDC had cell tapes for February 17, 2002, 3 days in March, 14 days in April, and every day from May through August 2002 when the last September 11 detainee was transferred out of the ADMAX SHU.

[37] Yet, this MDC official, in a memorandum dated October 5, 2001, certified that the in-cell cameras were installed and operating in 31 cells on the South Tier of the SHU where the detainees were held.

During the course of our investigation, we made several requests to MDC officials for videotapes. However, the officials' responses to our requests were inconsistent and inadequate. In response to each of our requests, we obtained additional videotapes that we previously had been told were destroyed or reused.

When the OIG first initiated an investigation of the detainee abuse allegations in October 2001, we requested all tapes for the detainees from the date they first arrived to a date in November 2001. The MDC provided the OIG with 14 tapes and indicated that tapes from other dates had been taped over or destroyed.[38]

In the spring of 2002, the OIG requested from the MDC all videotapes of the detainees from September 2001 to April 2002. Warden Zenk told the OIG that copying such a large number of tapes would be onerous, that the MDC already had given the OIG all the tapes relating to abuse allegations from detainees, and that the MDC received permission in December 2001 to begin recycling or destroying tapes. Warden Zenk and the OIG staff agreed that the MDC would give the OIG nine days of videotapes that related to allegations of abuse raised by detainees interviewed by the OIG. However, the OIG received tapes for only six days, totaling approximately 45 tapes.

In June 2003, the OIG again specifically requested all the videotapes pertaining to all detainees. In response, the MDC provided us with eight tapes from the SIS safe that had not been provided previously.

In early July 2003, we met with an MDC Special Investigative Agent (SIA) and asked for a further explanation of the MDC's procedure for handling and storing videotapes. The SIA mentioned a storage room, only accessible to the SIS staff, in which he thought there still might be videotapes of the detainees from October and November 2001. We requested that he send us those and any other videotapes of the detainees that we did not already have. After about a month, we still had not received the requested tapes, and we contacted Warden Zenk to ask about the tapes. He referred us to a former SIA who previously had been responsible for the videotapes and had since transferred to the BOP regional office. We asked the former SIA for an inventory of the tapes in the storage room.

Despite frequent prompting, we did not receive an inventory from the MDC until August 13, 2003, approximately five weeks from the time we first asked for the videotapes in the storage room. The inventory was largely unhelpful in that it listed over 2,000 tapes, mostly from April 2002 through

---

[38] Four of the 14 tapes provided by the MDC either were blank or did not have footage of any of the detainees.

August 2002, and it was unclear whether the tapes were from in-cell or handheld cameras.  The earliest tapes listed on the inventory were from February 17, 2002.

On August 20, 2003, we visited the MDC to make sense of the inventory and visit the storage room where the tapes were located.  The SIA we met with in July escorted us to the storage room that was located in a second building of the MDC.  Upon entering the room, we immediately observed a significant number of boxes of videotapes lining much of the wall.  The boxes were clearly marked in large handwriting, "Tapes" with dates beginning on October 5, 2001, and continuing to February 2002.  These tapes were the only ones omitted from the August 2003 inventory of tapes that had been provided to us by the MDC staff.  The SIA said that he did not know why these tapes were not included on the inventory.  We took the 308 newly discovered videotapes to review.[39]  These 308 tapes provided much of the evidence discussed in this report corroborating many of the detainees' allegations.  Many of the tapes contradicted statements of MDC staff members about the treatment of the detainees.

Discovering such a substantial number of videotapes so late in our investigation also caused a significant delay in our ability to complete this report.  Moreover, even with these newly discovered tapes, significant gaps existed in the MDC's production of videotapes.  For example, we received less than 15 tapes that depicted the detainees being brought into the MDC, either for the first time or when they returned from court appearances or other meetings.[40]  In addition, many tapes start or stop in the middle of detainees' escorts.  There also are no tapes from some "use of force" incidents, even though these tapes should have been preserved for two years under BOP policy.  MDC officials could not explain these omissions.

As discussed previously, we confirmed many of the detainees' allegations by reviewing the tapes, even though the detainees alleged that the abuse dropped off precipitously after video cameras were introduced.  Several detainees said that officers referred to the cameras as the detainees' "best friend."  Conversely, the videotapes did not refute any of the detainees'

---

[39] We also took four tapes from February 17, 2002, that were listed on the MDC's inventory and a tape from April 2, 2002, that was not listed on the inventory.  While searching in the room, we noticed that there was no tape from April 2, 2002, the date that a detainee alleged staff members physically abused him during a "use of force" incident.  When we asked the SIA where it was, he said that a senior MDC management official had it in his office because he was reviewing it, and the SIA retrieved it from the office for us.

[40] An MDC officer confirmed to us that not all escorts were recorded.  He said that some movements were not recorded because officers were unable to find a camcorder.  He said that while seven camcorders initially were purchased for the unit, over time the camcorders disappeared.

allegations.  It is also apparent from our review of several hundred tapes that the officers were cognizant of the presence of the cameras.  In one tape, the camera operator reminded an officer who was berating a detainee that the tape was running, which caused the officer to control himself immediately.  On another videotape, when an officer was holding the head of a detainee firmly against the wall, a lieutenant appeared to notice the video camera and quickly swatted away the officer's hand from the detainee's head.

We also heard a lieutenant twice order someone to turn the camera off when he was discussing matters with other officers that he apparently did not want videotaped.  A few minutes after giving his instruction to turn off the tape and apparently not knowing that the audio was still running, this lieutenant suggested how the officers could break some detainees' hunger strikes:   "We'll cure them . . . I want them to stay on a hunger strike.  Don't cure anybody; let 'em stay.  Let's get a team.  Let's go with a tube.  The first guy that gets this tube shoved down his throat, they'll be cured!"  He then stated, "We're going hard," to which another officer responded, "Outstanding!"  The lieutenant repeated his statement, "We're going hard."

Sometimes staff members' remarks caught on the audio portion of the videotape substantiated certain allegations by detainees about conditions in the MDC.  For example, detainees complained continually that they were deprived of adequate opportunities to make legal calls.  In an off-camera remark, one of the lieutenants can be heard stating that the MDC official responsible for giving the detainees their legal calls often waited to provide legal calls until just before a detainee was scheduled to go to court.  This confirmed that the official was not regularly offering detainees legal phone calls as required.

### G.   Some Staff Members Lacked Credibility During OIG Interviews

The videotapes also led us to conclude that several officers lacked credibility in their interviews with the OIG.  In our interviews, most staff members, particularly ones still employed by the BOP, denied all detainees' allegations of physical and verbal abuse.  In many cases, the staff members were adamant that neither they nor anyone else at the MDC engaged in any of the alleged misconduct.

Because of the delay in the MDC's providing us the videotapes, for almost all interviews of MDC staff members we did not have the benefit of the MDC videotapes.  Upon viewing them after the interviews, we saw that some staff members engaged in the very conduct they specifically denied in their interviews.  This finding caused us to question the credibility of these staff members and their denials in other areas for which we did not have videotape evidence.

For example, three staff members stated in OIG interviews that they did not press compliant detainees against the wall because that would be inappropriate.  In viewing videotapes, however, we saw these same officers pressing compliant detainees into walls.  In addition, three other staff members denied that they, or anyone else, had bent or twisted detainees' arms, hands, fingers, or thumbs.  Again, we observed on videotapes these same staff members twisting compliant detainees' arms, hands, wrists, or thumbs.  Another former officer told us he never saw any officer bend detainees' wrists or pull their thumbs, but in one videotape we saw him bend a compliant detainee's fingers in a way that seemed very painful and did not appear to serve any correctional purpose.  Similarly, a lieutenant asserted that he never saw or heard about staff members slamming, pushing, pressing, or firmly placing detainees against the wall, but in a videotape we observed that this lieutenant witnessed staff members forcefully ram a compliant detainee into the wall.[41]  In a memorandum he submitted after the incident, the lieutenant described the incident by writing, "The staff placed [the detainee] on the wall until they gained complete control of the inmate and resumed the escort."

Further, another lieutenant claimed to be very disturbed by the t-shirt taped to the wall, but in several videotapes he led detainees right to the t-shirt and exchanged their restraints while officers pressed them against the t-shirt. In another example, an officer adamantly asserted to us that staff members never cursed in front of the detainees.  Yet, the videotapes showed several instances when staff cursed in front of this officer and the detainees.  In addition, we noted one incident where this officer reminded a colleague that the camera was recording when the colleague cursed about and harassed a detainee.

## IV.  OIG RECOMMENDATIONS

We recognize that the MDC faced enormous challenges after the September 11 attacks and that many MDC staff members responded to these challenges by maintaining their professionalism and appropriately performing their duties under difficult and emotional circumstances.  However, we believe some staff members acted unprofessionally and abusively.  In Appendix A, we describe these specific offenses and the evidence relating to them.  We believe that appropriate administrative action should be taken against those employees.

In addition, we believe that the BOP and the MDC should review the evidence from our investigation to better prepare for and respond to future emergencies involving detainees, as well as to improve its routine handling of

---

[41] This incident is discussed in detail under "Improper Application and Use of Restraints" in section II (A)(5).

inmates. We therefore offer a series of recommendations to address issues of concern relating to the MDC's treatment of the detainees.

1.  During our investigation, we encountered a significant variance of opinion among MDC staff members regarding what restraint and escorting techniques were appropriate for compliant and noncompliant inmates. We recommend that the BOP provide clear, specific guidance for BOP staff members on what restraint and escorting techniques are and are not appropriate. This guidance could take the form of written policy and demonstrations or examples given during training. The guidance should address techniques at issue in this investigation, including placing inmates' faces against the wall, stepping on inmates' leg restraint chains, and using pain compliance methods on inmates' hands and arms.

2.  We found that the MDC regularly audio taped detainees' meetings with their attorneys, in violation of 28 C.F.R. § 543.13(e) and BOP policy. We recommend that BOP management take immediate steps to educate its staff on the law prohibiting, except in specific limited circumstances, the audio monitoring of communications between inmates and their attorneys.

3.  While the staff members denied verbally abusing the detainees, we found evidence of staff members making threats to detainees and engaging in conduct that was demeaning to the detainees. We recommend that the BOP and MDC management counsel MDC staff members concerning language that is abusive and inappropriate and remind them of the BOP policy concerning verbal abuse.

4.  Because specific officers were not pre-assigned to escort detainees to and from the ADMAX SHU, the lieutenants in charge of escorts used available staff from throughout the institution for the escort teams. Several lieutenants told us that the lack of designated teams contributed to the potential for abuse on escorts. Likewise, while specific staff members were assigned to the ADMAX SHU, we observed on videotapes that staff members from all over the institution, including staff members who had little or no experience handling inmates, were on the ADMAX SHU and had physical contact with the detainees. We recommend that institutions select and train experienced officers to handle high security and sensitive inmates, enforce the policy that a comprehensive log of duty officers and a log for visitors be maintained on the unit, and restrict access to the unit to the assigned staff members, absent exigent circumstances. MDC staff members advised us that officer logs, visitor logs, and restrictions on access to the unit were in place for the ADMAX SHU, but the videotapes showed that the procedures were not followed.

5.   By requiring that all detainees' movements be videotaped and installing cameras in each ADMAX SHU cell, BOP and MDC officials took steps to help deter abuse of September 11 detainees and to refute unfounded allegations of abuse.  Once the MDC began videotaping all detainee movements, incidents and allegations of physical and verbal abuse significantly decreased.  We therefore recommend that the BOP analyze and consider implementing a policy to videotape movements of sensitive or high-security inmates as soon as they arrive at institutions.

6.   We found evidence indicating that many of the strip searches conducted on the ADMAX SHU were filmed in their entirety and frequently showed the detainees naked.  The strip searches also did not afford the detainees much privacy, leaving them exposed to female officers who were in the vicinity.  In addition, the policy for strip searching detainees on the ADMAX SHU was applied inconsistently, many of the strip searches appeared to be unnecessary, and a few appeared to be intended to punish the detainees.  For example, many detainees were strip searched after attorney and social visits, even though these visits were in no-contact rooms separated by thick glass, the detainees were restrained, and the visits were filmed.

We believe that the BOP should develop a national policy regarding the videotaping of strip searches.  We also believe MDC management should provide inmates with some degree of privacy when conducting these strip searches, to the extent that security is not compromised.

In addition, MDC staff members complained to us and to each other off-camera of inadequate resources on the ADMAX SHU to handle the large number of detainees.  Because a strip search involves three or four officers, the BOP should review its policies of requiring strip searches for circumstances where it would be impossible for an inmate to have obtained contraband, such as after no-contact attorney or social visits, unless the specific circumstances warrant suspicion.

7.   We found evidence that some MDC medical personnel failed to ask detainees how they were injured or to examine detainees who alleged they were injured.  We recommend MDC and BOP management reinforce to health services personnel that they should ask inmates how they were injured, examine inmates' alleged injuries, and record their findings in the medical records.

## V.   CONCLUSION

This report details our investigation of allegations of physical and verbal abuse against some detainees at the MDC.  It is important to note that these allegations were not against all officers at the MDC, and that most MDC officers performed their duties in a professional manner under difficult circumstances in the aftermath of the September 11 terrorist attacks.  After the attacks, the MDC staff worked long hours for extended periods, without detailed information about the detainees' connections to the attacks or to terrorism in general.  Moreover, some MDC staff members lost relatives, friends, and colleagues in the attacks.  The atmosphere at the MDC was highly charged and emotional, particularly in the initial period after the attacks.

However, these circumstances do not justify any abuse towards any detainee, as the BOP officers we interviewed readily acknowledged.  We concluded that some MDC staff members did abuse some of the detainees.  We did not find that the detainees were brutally beaten, but we found evidence that some officers slammed detainees against the wall, twisted their arms and hands in painful ways, stepped on their leg restraint chains, and punished them by keeping them restrained for long periods of time.  We determined that the way these MDC officers handled some detainees was in many respects unprofessional, inappropriate, and in violation of BOP policy.

As described in detail in this report, we based our conclusion on a variety of factors.  First, the detainees' allegations were specific and, although not identical, largely consistent.  In addition, several detainees appeared credible to us when we interviewed them.

Second, the detainees did not make blanket allegations of mistreatment, but distinguished certain MDC officers as abusive and others as professional.  Also, the detainees' allegations about their treatment at the MDC contrasted with their description of their treatment at other detention facilities.  Most detainees did not have complaints about their treatment at other institutions or by other officers – their allegations of abuse generally were confined to their treatment at the MDC.

Third, several MDC officers provided first-hand corroboration for allegations of mistreatment, including the identities of the offending officers.  These officers also made distinctions among officers and practices, lending credence to their testimony.

Fourth, we found unpersuasive the general and blanket denials of mistreatment by many MDC officers who were the subjects of our review.  Some officers denied taking actions that we knew occurred based on videotape evidence and other officers' testimony, and other officers we interviewed described some of their actions in terms that lacked credibility.  For example,

46

some said that detainees never were pressed against the wall or even touched the wall, which we know to be untrue.  Others claimed that officers were extraordinarily polite to the detainees, or that they never heard officers curse in the prison, or that they treated the detainees with "kid gloves."  We found many officers lacked credibility and candor regarding their descriptions of what occurred in the MDC, which calls into question their categorical denials of any instances of abuse.

Fifth, videotapes of officers' interactions with detainees, which we were ultimately able to obtain from the MDC after much difficulty, provided support for the detainees' allegations and also undercut the statements of various officers.  We were told that the abuse of detainees declined when the officers' actions were being videotaped, which one would expect.  Nevertheless, the videotapes showed instances of a detainee being slammed against the wall and detainees being pressed by their heads or necks, despite officers' denials that this ever occurred and despite statements by senior BOP officials that such actions were not appropriate.  Also, contrary to statements made by several officers in their interviews with the OIG, we heard officers on the videotapes using curses in front of the detainees and making derogatory statements about detainees off-camera.  The videotapes also confirm that officers placed detainees against an American flag t-shirt in the sally port, which was taped to the wall in the same place for many months, despite officers' denials of the existence of such a t-shirt or claims that it was removed after a short time.

Moreover, the videotapes showed that some MDC staff members misused strip searches and restraints to punish detainees and that officers improperly and illegally recorded detainees' meetings with their attorneys.

In sum, we believe that the evidence developed in our investigation shows physical and verbal abuse of some detainees by some MDC staff members.  We believe that the BOP should take administrative action against those employees who committed these abuses.  Further, we believe the BOP should take steps to prevent these types of abuse from occurring in the future, including implementing the recommendations we made in this report.  We therefore are providing this report to the BOP for appropriate action.