UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

IBRAHIM TURKMEN,
ASIF-UR-REHMAN SAFFI, SYED AMJAD
ALI JAFFRI, YASSER EBRAHIM, HANY
IBRAHIM, SHAKIR BALOCH, AKIL
SACHDEVA, and ASHRAF IBRAHIM
on behalf of themselves and
all others similarly situated,

Plaintiffs,

-against-

JOHN ASHCROFT, Attorney General of
the United States, ROBERT MUELLER,
Director of the Federal Bureau of
Investigation, JAMES W. ZIGLAR,
Commissioner of the Immigration and
Naturalization Service, DENNIS HASTY,
former Warden of the Metropolitan
Detention Center (MDC), MICHAEL ZENK,
MDC Warden, MDC Associate Warden for
Custody SHERMAN; MDC Captain
SALVATORE LOPRESTI; MDC Lieutenants
STEVEN BARRERE, WILLIAM BECK,
LINDSAY BLEDSOE, JOSEPH CUCITI,
HOWARD GUSSAK, MARCIAL MUNDO,
DANIEL ORTIZ, STUART PRAY, and
ELIZABETH TORRES, and
MDC Correctional Officers PHILLIP BARNES,
SIDNEY CHASE, MICHAEL DEFRANCISCO,
RICHARD DIAZ, KEVIN LOPEZ,
MARIO MACHADO, MICHAEL MCCABE,
RAYMOND MICKENS, JOHN OSTEEN,
BRIAN RODRIGUEZ, SCOTT ROSEBERY,
and CHRISTOPHER WITSCHEL,
MDC Counselors RAYMOND COTTON, CUFFEE,
and CLEMMET SHACKS; JOHN DOES 1-20,
Metropolitan Detention Center Corrections Officers,
and the UNITED STATES,

Defendants.

------------------------------------------------------X

FOR ONLINE
PUBLICATION ONLY

MEMORANDUM
AND ORDER
02 CV 2307 (JG)

A P P E A R A N C E S:

BARBARA J. OLSHANSKY
NANCY CHANG
RACHEL MEEROPOL
SHAYANA KADIDAL
MATTHEW STRUGAR
JENNIFER GREEN
        Center for Constitutional Rights
        666 Broadway, 7th Floor
        New York, NY 10012
        Attorneys for Plaintiffs

PETER D. KEISLER
        Assistant Attorney General

JONATHAN F. COHN
        Deputy Assistant Attorney General

DIMPLE GUPTA
        Counsel to Assistant Attorney General

PHYLLIS J. PYLES
        Director, Torts Branch

DAVID J. KLINE
        Principal Deputy Director
        Office of Immigration Litigation

DAVID V. BERNAL
        Assistant Director
        Office of Immigration Litigation

MADELINE HENLEY
        Trial Attorney
        Torts Branch

ERNESTO H. MOLINA, JR.
        Senior Litigation Counsel
        Office of Immigration Litigation
        United States Department of Justice
        Civil Division
        P.O. Box 878, Ben Franklin Station
        Washington, D.C. 20044
        Attorneys for the United States

PAUL J. MCNULTY
 United States Attorney for the
  Eastern District of Virginia
LARRY LEE GREGG
BRIAN D. MILLER
RICHARD W. SPONSELLER
DENNIS C. BARGHAAN
 Assistant United States Attorneys
 2100 Jamieson Avenue
 Alexandria, Virginia  22315

JOHN F. WOOD
 Office of the Attorney General
 Main Justice Building
 950 Pennsylvania Ave., Room 5116
 Counselor to the Attorney General
 Attorneys for Defendant John Ashcroft

R. CRAIG LAWRENCE
 Assistant United States Attorney
 United States Attorney's Office for the
  District of Columbia
 Civil Division
 10th Floor
 555 4th Street, N.W.
 Washington, D.C.  20001
 Attorneys for Defendant Robert Mueller

WILLIAM ALDEN McDANIEL, JR.
 McDaniel, Bennett & Griffin
 116 West Mulberry Street
 Baltimore, MD 21201-3606
 Attorney for Defendant James Ziglar

MICHAEL L. MARTINEZ
SHARI ROSS LAHLOU
 Crowell & Moring
 1001 Pennsylvania Avenue, N.W.
 Washington, D.C. 20004-2595
 Attorney for Defendant Dennis Hasty

ALLAN N. TAFFET
 Duval & Stachenfeld
 300 East 42nd Street
 New York, NY 10017
 Attorney for Defendant Michael Zenk

JOHN GLEESON, United States District Judge:

This case raises important issues concerning the arrest, detention, and treatment of aliens of Middle Eastern origin in the immediate aftermath of the terrorist attacks of September 11, 2001.  The plaintiffs were all illegal aliens at the time.  In broad strokes, their claims in this case fall into two categories.  First, they contend that the government used their status as illegal aliens as a cover, as an excuse to hold them in jail while it pursued its real interest -- determining whether they were terrorists, or could help catch terrorists.  Second, the plaintiffs claim the conditions of their confinement flagrantly violated our Constitution.

In general, the latter claims survive this motion to dismiss, largely for the reasons set forth in *Elmaghraby v. Ashcroft*, 2005 WL 2375202 (E.D.N.Y.).

The claims in the first category, however, are dismissed.  After the September 11 attacks, our government used all available law enforcement tools to ferret out the persons responsible for those atrocities and to prevent additional acts of terrorism.  We should expect nothing less.  One of those tools was the authority to arrest and detain illegal aliens.  If the plaintiffs' allegations are true -- and I accept them as true on this motion to dismiss -- then the government held them in a jail for months not because that amount of time was necessary to remove them to their countries of citizenship, but because it wanted to have them available here in the United States in the event criminal charges could be brought against them.

But the government was allowed to do that.  An ulterior motive in this context does not render illegal conduct that was within the bounds of the government's authority.  An officer who wants to search a suspect's car for a handgun can pull him over (a Fourth Amendment "seizure") for changing lanes without using his blinker (a traffic violation), even if the officer has no interest in enforcing the laws requiring drivers to signal a lane change.  *See*

*United States v. Scopo*, 19 F.3d 777 (2d Cir. 1994). Similarly, the government may use its authority to detain illegal aliens pending deportation even if its real interest is building criminal cases against them.

For the reasons set forth below, the defendants' motion to dismiss is granted in part and denied in part.

BACKGROUND

A.    Overview of the Case

The plaintiffs, eight male, non-U.S. citizens, were arrested on immigration violations following the September 11, 2001 attacks. They were held in immigration custody for periods ranging from three to almost seven months after receiving final orders of removal or grants of voluntary departure. All but one are Muslims of Middle Eastern origin (the exception, Akil Sachdeva, is a native of India and is Hindu). They bring this putative class action on behalf of themselves and the class of male non-citizens who are Arab or Muslim, or were perceived by the defendants to be Arab or Muslim, who were (1) similarly arrested by the Immigration and Naturalization Service ("INS") or the Federal Bureau of Investigation ("FBI") after September 11, 2001 and charged with immigration violations ("post-September 11 detainees"); (2) detained at the Metropolitan Detention Center ("MDC") or Passaic County Jail; (3) treated as "of interest" to the government's terrorism investigation into the September 11 events; and (4) subjected to a blanket no-bond policy pursuant to which they were held without bond until cleared by the FBI of any terrorist connections.

The plaintiffs assert that post-September 11 detainees at the MDC were not served with timely notice of the charges against them; were classified "of high interest" to the government's terrorist investigation (or as "Witness Security" or "Management Interest Group

155" detainees) without adequate procedures for making such a determination, and as a result were placed in highly restrictive custody; were subjected to a communications blackout and other actions that interfered with their access to counsel and to the courts; and were detained for far longer than necessary after receiving final orders of removal or grants of voluntary departure without being afforded a timely hearing to determine whether continued detention was warranted.

The plaintiffs assert that post-September 11 detainees at the MDC and Passaic County Jail were subjected to excessively harsh conditions of confinement, including being subjected to physical and verbal abuse, confined in tiny cells for over 23 hours a day, subjected to arbitrary and abusive strip searches, handcuffed and shackled whenever taken out of their cells, deprived of sleep, provided with inadequate medical care, and constructively denied exercise and necessary hygiene items. The plaintiffs allege that MDC defendants deliberately interfered with detainees' religious practices, and failed to return detainees' personal items (including personal identification and money) confiscated upon their arrest or when their homes were searched.

The plaintiffs assert that post-September 11 detainees in the Passaic County Jail (the "Passaic Jail" or "Passaic Facility") were held in overcrowded conditions and housed with potentially dangerous criminal pretrial detainees.

The plaintiffs assert that their race, religion, ethnicity, and national origin played a determinative role in the decisions to detain them, to hold them without bond in punitive conditions of confinement, and to keep them detained beyond the point at which removal or voluntary departure could have been effectuated.

The Third Amended Complaint (the "complaint" or "TAC"), filed on September 13, 2004, alleges 31 claims: 14 claims against all defendants for violations of post-September 11 detainees' constitutional rights under the First, Fourth, Fifth and Sixth Amendments;[1] three claims against all defendants for violations of international law, brought pursuant to the Alien Tort Statute, 28 U.S.C. § 1350; seven claims against MDC defendants for the use of excessive force and for conducting unreasonable strip searches in violation of plaintiffs' Fourth and Fifth Amendment rights; and seven claims brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674. Plaintiffs seek both monetary and equitable relief.[2]

The following individuals are named as defendants: (1) John Ashcroft, the former Attorney General of the United States; Robert Mueller, the Director of the FBI; and James W. Ziglar, the former Commissioner of the INS (collectively, "the Washington-based defendants"); (2) Dennis Hasty and Michael Zenk (former wardens of the MDC) (collectively, "the Wardens"); and (3) MDC officials, or former MDC officials, of a rank below warden.[3]

By consolidated motion, the United States and defendants Ashcroft, Mueller, Ziglar, Hasty, and Zenk have moved to dismiss pursuant to Federal Rule of Civil Procedure 12. The United States seeks partial dismissal, and the individual defendants seek to dismiss all

---

[1]     Plaintiffs have withdrawn claims alleging violations of the self-incrimination clause of the Fifth Amendment and violations of the right to a speedy trial under the Sixth Amendment. *See* Pl. Br. at 5 n.4.

[2]     Plaintiffs have withdrawn their requests for declaratory relief. The equitable relief sought is an injunction requiring defendants to return confiscated personal property.

[3]     The named MDC defendants are: MDC Associate Warden for Custody James Sherman; MDC Captain Salvatore Lopresti; MDC Lieutenants Steven Barrere, William Beck, Lindsey Bledsoe, Joseph Cuciti, Howard Gussak, Marcial Mundo, Daniel Ortiz, Stuart Pray, and Elizabeth Torres; MDC Correctional Officers Phillip Barnes, Sidney Chase, Michael DeFrancisco, Richard Diaz, Kevin Lopez, Marion Machado, Michael McCabe, Raymond Mickens, John Osteen, Brian Rodriguez, Scott Rosebery, and Christopher Witschel; and MDC Counselors Raymond Cotton, James Cuffee, and Clemmet Shacks.

claims against them. James Sherman, the MDC Associate Warden for Custody, has separately moved to dismiss all claims brought against him, as has Unit Manager Clemmet Shacks.[4]

B.    Procedural History

The original complaint in this case was filed on April 17, 2002. The First Amended Complaint was filed on July 27, 2002. The government moved to dismiss on behalf of all named defendants on August 26, 2002, and oral argument on the motion took place on December 19, 2002. On June 2, 2003, the Office of the Inspector General of the United States Department of Justice released a 198-page report entitled "A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks" (the "OIG Report"). In light of the OIG Report, the plaintiffs sought leave by letter dated June 5, 2003 to amend their complaint. Around that time, the government withdrew from representing the named defendants in their individual capacities, and substitute counsel filed notices of appearance.

On June 18, 2003, the plaintiffs filed the Second Amended Complaint, attaching the April 2003 OIG Report. Supplemental briefs in support of and opposing the motions to dismiss were filed. Then, in December 2003, the Office of the Inspector General filed another report -- its 47-page "Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York" (the "Supplemental OIG Report"). On September 7, 2004, plaintiffs requested leave to file a Third Amended Complaint in order to, among other things, (1) add an additional named plaintiff (Ashraf Ibrahim); (2) identify defendants previously listed as John Doe or John Roe and detail their alleged conduct; (3) add additional defendants; (4) amend various claims based on information contained in the

---

[4]        Because the motions of Sherman and Shacks do not present materially different arguments from those of Wardens Hasty and Zenk, they will not be discussed separately herein. All claims against Sherman and Shacks are treated in same manner as the claims against Hasty and Zenk.

Supplemental OIG report; and (5) assert several new claims, including a *Bivens* claims based upon unreasonable strip searches and claims under the Federal Tort Claims Act. I granted leave, and the Third Amended Complaint was filed on September 14, 2004, after which followed yet another round of briefing on the motions to dismiss.

At a hearing on October 21, 2004, I ordered that discovery could begin on claims involving the conditions of confinement and the use of excessive force. The Wardens moved to dismiss these claims as against them, arguing that they were entitled to qualified immunity. The motion was denied by order dated December 3, 2004, and a motion for reconsideration and vacatur of the December 3, 2004 order was denied on January 14, 2005. Familiarity with the December 3, 2004 order is assumed.

## C.      The Named Plaintiffs

The Third Amended Complaint, by itself and by incorporating the two OIG reports annexed thereto, alleges the following facts. Many of the allegations are in dispute, but of course, on a motion to dismiss pursuant to either Fed. R. Civ. P. 12(b)(1) or (6), the court must assume that all factual allegations in the complaint are true. *See Shipping Fin. Serv. Corp v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (Rule 12(b)(1)); *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995) (Rule 12(b)(6)).

### 1.      The MDC Plaintiffs

#### a.      Shakir Baloch

Baloch is a Muslim and a native of Pakistan. He holds a medical degree from Bolan Medical College in Quetta, Pakistan. He immigrated to Canada in 1989 and became a Canadian citizen in 1994. Both his wife and his daughter reside in Canada. Several times over

the past decade, Baloch has entered the United States in order to find work. He most recently entered the country in April 2001.

On September 19, 2001, FBI, INS, Department of Labor, and NYPD officers who were conducting an investigation of Baloch's apartment-mate went to Baloch's apartment. There they interrogated Baloch for approximately four hours about the terrorist attacks on September 11, 2001. At no point was he advised of his right to counsel or given *Miranda* warnings. Baloch denied any involvement with terrorism, but disclosed that he had previously been removed from the United States and had used the alias Faisal Kurd in order to obtain false identification documents. FBI and INS agents searched his home and seized several items, including his laptop computer. Baloch was arrested and taken in handcuffs to an INS facility on Varick Street in Manhattan, where all of his personal belongings, including identification and money, were confiscated. Baloch was held for two nights at the Varick Street facility.

On September 21, 2001, Baloch was "processed for removal." He was given a "Notice of Rights" and "Request for Disposition" form, which he refused to sign. TAC ¶ 204.

That night, he was taken to the MDC. Five MDC guards, including Lt. Barrere and correctional officers ("COs") McCabe, Lopez, and Osteen, escorted Baloch to an empty cell. Baloch alleges that the five guards, working as a team, picked him up from under his arms and threw him from corner to corner in the cell, hitting and kicking him in the back as he fell to the ground. Some of the officers cursed at Baloch, calling him a "fucking Muslim terrorist," and saying things like: "You did this to us. We're going to kill you," and "You know why you are in here. The government thinks that you are a terrorist." TAC ¶ 205. Baloch was designated "as a possible terrorist" and placed in the ADMAX SHU.

On September 22, 2001, the INS reinstated a prior deportation order. Because of this prior order, Baloch was not provided with a hearing.

On September 28, 2001, Baloch was interviewed by FBI agent Noreen Gleason and INS agent Kevin Ryan about his immigration status, work history, and connections to terrorism. On October 11, 2001, he was again interviewed by these same agents. On October 14, 2001, Baloch was interviewed by agents from the FBI, INS, and NYPD. During this interview, Baloch signed a prepared statement that he purchased false identification documents and passports. On October 29, 2001, Baloch was interviewed by two FBI agents and an NYPD detective, who further questioned him about his use of false documents. During one of these interrogations, Baloch was told things like, "If you're not cooperative, we'll put you in jail for 10 years or deport you back to Pakistan instead of Canada, where they'll put you in jail longer than 10 years." TAC ¶ 209.

Shortly after arriving at the MDC, Baloch requested to speak with an attorney. He continued to make such requests, but it was not until November 7, 2001, about six weeks after his arrival at the MDC, that he was allowed to place a call to the Legal Aid Society. Baloch first met with an attorney on November 19, 2001. This meeting, like all of Baloch's subsequent meetings with his attorneys, was recorded, including both video and audio. Baloch was aware of the camera, and was very reluctant to speak candidly because he was being recorded.

When officials from the Canadian consulate inquired about Baloch's whereabouts, MDC officials denied that Baloch was being detained there. He first met with a consular official on December 13, 2001.

On December 21, 2001, after approximately three months of detention, Baloch filed a habeas corpus petition in the United Stated District Court for the Southern District of New

11

York.  On January 3, 2002, he was indicted for illegal re-entry into the United States.  On February 7, 2002, Baloch was transferred from the ADMAX SHU to MDC's general population unit.  On April 2, 2002, he pleaded guilty and was sentenced to time served.  Shortly thereafter, he was transferred to the Passaic Jail.

Baloch was subjected to physical and verbal abuse while in the ADMAX SHU. He alleges that MDC defendants would regularly drag him by his waist chain, causing his ankle shackles to dig in; shove him in the back while his chin was against the wall and slam him into walls while he was being transferred to and from his cell; and twist his hands, thumbs, and fingers, step on the chain connecting his ankle shackles, causing the shackles to tighten painfully, and lift his arms or elbows while his wrists were cuffed.  Baloch further alleges that some MDC lieutenants participated in physically abusing him, while others witnessed the treatment but did nothing to stop it.

Baloch was subjected to constant verbal harassment by officers in the ADMAX SHU, who would regularly refer to him as a "fucking Muslim" and a "terrorist."  In particular, Baloch alleges that CO Wilson regularly spoke to him about getting revenge for terrorist attacks; CO Lopez regularly gave Baloch the finger and cursed him; and Lieutenant Barrere told him that "Your lawyers can't help you out.  You'll stay here for another 20 years without seeing a judge." At one point, when a guard had difficulty unlocking Baloch's handcuffs, he brought over a large pair of shears and threatened to cut Baloch's hands off to unlock the cuffs.

On April 16, 2002,[5] more than six months after Baloch's prior deportation order was reinstated, the INS took Baloch to Newark Airport and put him on a plane bound for Toronto without any personal identification or money.  None of the items confiscated from

---

[5]     The Third Amended Complaint states that Baloch was deported on April 2, 2002, but it appears that the correct date is April 16, 2002 (the date given in the Second Amended Complaint).

Baloch was returned to him. Since his deportation, Baloch has requested the return of these items, but that request has been denied.

Baloch experiences both physical and psychological effects of his detention in the United States. He is being treated for severe depression, and he has tested positive for tuberculosis. Among the items confiscated from him were social insurance and health cards. Without them, he has had trouble obtaining medical treatment in Canada. The effects of his detention have put a strain on his marriage, causing his recent separation from his wife. Because of Baloch's depression, the Canadian Medical Board found him unfit to practice medicine for a time.

b.    Yasser Ebrahim and Hany Ibrahim

Yasser and Hany,[6] who are brothers, are Muslim and natives of Egypt. Hany entered the United States on a tourist visa in 1998; Yasser re-entered the United States on a tourist visa in January 2001. Yasser had previously lived in the United States, arriving on a tourist visa on four different occasions. On one such visit in 1996, he married a U.S. citizen, with whom he lived in Queens, New York until they separated in 1998. Shortly thereafter, he returned to Egypt and did not visit the United States again until January 2001.

In 2001, the brothers lived with Egyptian and Moroccan friends in Brooklyn. Yasser began a website design business, and Hany worked occasionally at a delicatessen.

On September 30, 2001, twelve men, identifying themselves as FBI and INS agents and NYPD officers, visited the apartment where Yasser and Hany were staying and interrogated the two brothers and their friends about the September 11 attacks. Yasser, Hany,

---

[6]        Though they are brothers, Yasser and Hany spell their surnames differently in English.

and their friends were each questioned separately about their possible terrorist activity and their immigration status.  They each denied involvement in terrorist activity.

Following the interrogations, the FBI and INS agents told Yasser, Hany, and one Egyptian roommate that "we have to take you with us."  TAC ¶ 183.  The three were arrested and handcuffed.  Yasser's and Hany's requests to call an attorney were denied, and the agents searched their apartment, seizing all of Yasser's books, including some religious texts.

Yasser and Hany were taken to the INS facility on Varick Street, where they were held for approximately 24 hours.  All their personal belongings, including personal identification and money ($27 belonging to Hany, and $250 belonging to Yasser), were confiscated.  Throughout the 24-hour period, they were not permitted to use the bathroom.  At night, they were forced to sleep on the floor.

On the following day, October 1, 2001, Yasser and Hany were transported by van in handcuffs, chains, and shackles to the MDC.  On arrival, they were pulled from the van by several MDC guards.  The guards slammed Hany face-first into a wall that had an American-flag t-shirt taped to it.  Hany began to cry and was told to "shut up."  He was called a "motherfucker" and told to look at the flag.  Yasser was also slammed face-first into the wall, which caused him pain so severe that he thought his nose was broken.

Once inside the MDC's Receiving and Discharge area ("R&D area"), the brothers were fingerprinted, strip searched, and given orange jumpsuits to wear.  Escorted by Lieutenant Barrere and COs Diaz and Chase to the ADMAX SHU, the brothers were forcefully pushed into walls and doors along the way.  While escorting Hany, the officers twisted his wrists and tightened the handcuffs until his wrists bled.  The officers repeatedly stepped on his leg chains while ordering him to walk, causing him to fall, and leaving his ankles bruised and bloodied.

Yasser underwent similar abuse. During this trip to the ADMAX SHU, the brothers were called "fucking Muslims" and "terrorists." Hany attempted to explain that he and his brother were being detained only on immigration violations, but one MDC CO said, "If you open your mouth, I will crush you under the elevator, just like at the World Trade Center." TAC ¶ 195.

The abuse of Yasser and Hany upon arrival at the MDC caused serious injury to their arms and noses, both of which remained black and swollen for several days. The injuries to their noses made breathing difficult and painful. Yasser and Hany received a physical examination on October 2, 2001, the day after their arrival. Nina Lorenzo, the physician assistant who performed the exams, did not ask about or treat their obvious injuries. The brothers were placed in separate cells and were not allowed to see or speak to one another for 35 days.

On October 17, Hany and Yasser were served with Notices to Appear. On November 5, 2001, they were moved into the same cell. On the next day, November 6, 2001, they were brought in handcuffs, chains, and shackles, to Immigration Judge Alan Vomacka. On the way to the hearing, CO Scott Rosebery whispered to Yasser, "The camera is your best friend. If not for the camera, I would have smashed your faces, you mother fuckers." TAC ¶ 186. Yasser attempted to tell the immigration judge what Rosebery had said to him but the judge interrupted him, stating, "I don't care. This is not my job." *Id.*

Yasser and Hany were heard together in a closed immigration hearing. Marianne Yang, a Legal Aid attorney, represented both men and requested that they be granted voluntary departure and bond. "The Immigration Judge, however, denied the request, after [an FBI or INS agent who was present but did not enter an appearance] handed him a note off the record, stating that he could not grant bond until he received 'clearance.'" TAC ¶ 187. The hearing was

adjourned until November 20, 2001, when the judge denied the request for bond on the ground that Yasser and Hany were "disappearance risks." *Id.* Yasser and Hany accepted final deportation orders, having been informed that they would be removed within four to five days. No appeals were taken from these orders.

FBI memos dated December 7, 2001 state that clearance checks on Yasser and Hany were "negative," and "note with respect to [Yasser] that links to terrorist groups appear negative." TAC ¶ 190.

On January 17, 2002, Hany was transferred to MDC's general population unit. The INS booked a flight to deport Hany on February 1, 2002 and issued an order to escort him to JFK, but this order was not carried out. Yasser remained in the ADMAX SHU for the duration of his detention.

Yasser and Hany were regularly subjected to physical abuse while in the ADMAX SHU, particularly when being transported between their cells and other locations. They allege, for example, that MDC defendants slammed them against walls, twisted their arms, made their handcuffs painfully tight, and stepped on and kicked their ankle shackles.

The brothers were also regularly subjected to verbal abuse. On one occasion, when Hany asked for pen and paper, defendant Barrere responded, "Are you going to write to Osama bin Laden?" TAC ¶ 73. When Yasser raised the issue of human rights to defendant Shacks, he allegedly responded: "Forget about human rights. Three thousand people died in the World Trade Center. You have no rights." TAC ¶ 198.

Hany was released and deported on May 29, 2002, six months and nine days after the immigration judge had ordered him removed. Yasser was released and deported on June 6, 2002, six months and 17 days after he had been ordered removed. When the men were deported,

they were put on a plane to Cairo without any money or any of the personal belongings confiscated from them when they were arrested.

Upon their respective arrivals in Cairo, Yasser and Hany were "summoned to Egyptian State Security Investigations, where each was detained and extensively interrogated for hours on his detention in the United States."  TAC ¶ 200.

Yasser's and Hany's detention in the United States continues to plague the two men both psychologically and physically.  Hany in particular has struggled, suffering a "nervous breakdown" after returning to Egypt.  It was not until March 2003 that either brother had recuperated sufficiently to be able to work.

   c. <u>Ashraf Ali Ibrahim</u>

Ashraf Ibrahim, a citizen of Egypt, entered the United States on a six-month visa on January 23, 1992 and remained in the United States for the next ten years.  In late August 2001, Ashraf started a bottled-water distribution business in Philadelphia.

On September 23, 2001, FBI and INS agents came to Ashraf's home and asked him to sign a document consenting to a search of the home, which Ashraf signed.  The agents interrogated Ashraf for about two hours regarding his whereabouts on September 11, 2001 and whether he was involved in the attacks.  Ashraf stated that he had no involvement with terrorism.  Ashraf requested to make a phone call but the request was denied.  The agents confiscated "all of the possessions" in his home, including money.  TAC ¶ 224.

Later that morning, Ashraf was taken to the Varick Street facility where he was again interrogated for approximately seven hours.  Ashraf made repeated requests to make a phone call but was not permitted to do so.  Following this interrogation, Ashraf was handcuffed, put in waist and ankle chains, and driven by van to the MDC.

Upon arrival at the MDC, an officer got into the van, told Ashraf to "open [his] fucking mouth," and pointed a flashlight into his mouth. Two MDC defendants then dragged Ashraf by his arms to the R&D area. The officers shoved Ashraf against the wall, stunning him and causing him great pain. The officers forcefully pressed Ashraf against the wall for several minutes. Lieutenant Gussak, who was in charge of the officers, observed the abuse but did nothing to stop it. Gussak told Ashraf that "if you make any move, you will hit the floor and you will hit it hard." TAC ¶ 226.

While being taken for fingerprinting, the officers held Ashraf's arms while forcing him to run at an unmanageable pace for a person in ankle restraints. In addition, officers standing behind him would step on his ankle chains, causing him to fall forwards. The pain and bruising from this treatment persisted for about three weeks; the injuries were never treated.

After Ashraf was fingerprinted, Lt. Gussak conducted a strip search, including ordering Ashraf to move his fingers through his pubic hair and lift his genitals, and then bend over and spread his buttocks for a visual examination. Ashraf was then taken by elevator to the ADMAX SHU on the ninth floor. In the elevator, officers slammed Ashraf into the wall. When he reached the ADMAX SHU, he was received by a new team of guards and again strip searched, even though he had been under continuous supervision and in hand and leg restraints since the first strip search took place.

For the first 25 days Ashraf was in the ADMAX SHU, he was subjected to a communications blackout, despite his repeated requests for permission to make phone calls and his scheduled hearings before an immigration judge. He continued to be prohibited from making legal calls even though at a hearing before Immigration Judge Vomacka, on October 3, 2001, the judge told MDC officers that Ashraf should be permitted to contact a lawyer. Ashraf was

allowed to make calls after October 17, 2001, but he alleges that defendant Cotton would limit his ability to call his attorney by, among other means, purposely dialing wrong numbers, telling Ashraf the number he requested was busy and that he would have to try again "next week" or "next month," and generally making legal calls available only between 8:00 and 9:00 a.m., before most attorneys began work.

For the first five months of Ashraf's detention, he was never allowed to leave his cell without being strip searched, handcuffed, chained, and shackled. Ashraf alleges that defendant Beck routinely over-tightened his restraints. During transportation to and from his cell, Ashraf was pushed or slammed against the wall for "pat-down" searches. Whenever defendant Chase conducted pat-down searches, he would grab Ashraf's genitals and squeeze them until it caused Ashraf acute pain.

Especially during the first five months, Ashraf was physically and verbally harassed by MDC defendants. Defendant McCabe was frequently violent towards Ashraf, pushing him into walls while escorting him to or from his cell. Defendants Beck and Barrere observed officers under their supervision "hurting, insulting, or harassing" Ashraf, but did nothing to stop the abuse. TAC ¶ 242. Further, Beck inappropriately insulted Ashraf on occasion, and Barrere "made a point of intimidating and scaring Ashraf." *Id*.

Ashraf alleges several specific incidents of physical abuse. On September 24, 2004, Officers Diaz and Machado slammed Ashraf's back into the wall and held him there while his photograph was taken. On October 3, 2001, on the way to immigration court, Ashraf was slammed into the wall and subjected to a pat-down search. In the elevator, Officer Rosebery told him to "spread your fucking legs," and then stepped on his ankle chain while two other officers held him up, causing him great pain. Ashraf informed Immigration Judge Vomacka that he had

been treated violently in the elevator. On the way back from court, Rosebery again told him to spread his legs and again stepped on his ankle chain. Similar abuse took place while Ashraf was being taken to and from immigration hearings on October 11, 16, and 25, resulting in badly bruised ankles. On October 11, 2001, after Ashraf was strip searched and shackled in preparation for an immigration hearing, defendant Chase conducted a pat down search, intentionally squeezing Ashraf's genitals. Finally, beginning in mid-October 2001, defendant Barnes began a practice of twisting Ashraf's fingers while Ashraf was being held face to the wall. Barnes continued to twist Ashraf's fingers at every opportunity.

On October 11, 2001, Ashraf was brought for a bond hearing in immigration court. No immigration judge was present, and therefore no bond determination was made. On October 16, 2001, Ashraf had a hearing in immigration court.[7]

On October 22, 2001, Ashraf was interrogated by INS and FBI agents for about two hours. These agents told Ashraf that "if he could not provide any information about September 11 he would stay in jail forever." TAC ¶ 245. An INS agent also allegedly told Ashraf that "his chance to get out of this jail is very slim." *Id.*

On October 25, 2001, Al-Shawi, an attorney retained for Ashraf by a friend, came to represent him at an immigration hearing scheduled for that day. The officers at the front desk of the MDC told Al-Shawi that there was no one by the name of "Ashraf Ibrahim" at the MDC.

On November 6, 2001, a hearing was held with Al-Shawi present. Immigration Judge Vomacka denied Ashraf's request for bond in order to collect his belongings (which had been acquired over ten years of living in New York), and issued a final order of removal. The

---

[7]    The complaint does not specify what occurred at this hearing. Ashraf had no attorney at the time. He had yet to be permitted to make a "legal" phone call. TAC ¶ 243.

judge told Ashraf that he would be deported shortly because there was a limit to the time he could be detained after the issuance of a final deportation order.

On March 28, 2002, four months and 22 days after he was ordered removed, Ashraf was escorted in handcuffs to Kennedy Airport and deported to Egypt. Upon arrival, he was taken to the Egyptian State Security Investigation Office, where he was interrogated and detained overnight. The next morning, he was taken to a Cairo jail and detained there for another three days before he was released.

As a result of his detention, Ashraf experiences severe depression and anxiety. He saw a psychiatrist after returning to Egypt.

       d.    <u>Syed Amjad Ali Jaffri</u>

Jaffri, a Muslim and native of Pakistan, immigrated to Canada. His wife and four children live in Lahore, Pakistan. Since May 1997, Jaffri has periodically visited family and friends in the United States, entering this country from either Canada or Pakistan on tourist visas. In September 2001, Jaffri was living and working illegally in the Bronx.

On September 27, 2001, approximately ten INS and FBI agents, accompanied by a United States Department of Labor official and several police officers, went to the apartment where Jaffri was staying. They searched Jaffri's room and found several stun guns belonging to other occupants of the apartment. Jaffri was arrested and charged with criminal possession of a weapon. The charges were dismissed two days later because Jaffri did not own the stun guns.

On September 28, 2001, Jaffri was taken from the apartment to an INS facility in Manhattan, where FBI and INS agents interrogated him about his possible involvement in terrorist activity. At no point during this interrogation was Jaffri given *Miranda* warnings. An FBI agent asked Jaffri to sign a form consenting to the search of his room, which had already

taken place, and Jaffri refused. The agent allegedly responded, "Now you will learn the hard way." TAC ¶ 171. Jaffri requested that the Pakistani Consulate be notified, and requested a hearing before an immigration judge.

On September 29, 2001, Jaffri was taken to the MDC, where he was strip searched, fingerprinted, and given an orange jumpsuit. All his personal possessions were confiscated and he was placed in a cold, solitary, windowless cell in the ADMAX SHU. Jaffri remained confined in that cell nearly every day for the next six months. Although there were other post-September 11 detainees held in adjoining cells, Jaffri was forbidden to talk to them and vice-versa. The MDC defendants threatened to cut off visits from Jaffri's attorney if he broke the rule prohibiting communication with detainees in adjoining cells.

For the first two months of his detention, Jaffri was denied a bar of soap. He received only two squares of toilet paper per day and his meals were served without eating utensils. For months he was denied all reading material.

Jaffri was subjected to repeated physical and verbal abuse. Specifically, plaintiffs allege that when Jaffri was first brought to the ADMAX SHU, he was told by an MDC defendant, that "whether you [participated in the September 11 attacks] or not, if the FBI arrested you, that's good enough for me. I'm going to do to you what you did." TAC ¶ 176. Several MDC defendants then slammed Jaffri's head into a wall, severely loosening his lower front teeth and causing him extreme pain. *Id.* As a result of this blow, Jaffri experienced pain in his mouth throughout his detention. He requested to see a dentist six times, but was seen only once in 2001 and once again in late March 2002. The March 2002 visit revealed advanced bone loss, advanced periodontal disease, and the need to have "many teeth" extracted. *Id.*

Whenever Jaffri was taken out of his cell, he was strip searched and placed in handcuffs, chains, and shackles. He was usually escorted by at least four MDC officers, who abused him en route by, for example, kicking his handcuffs and shackles into his lower body. TAC ¶ 174.

On October 1, 2001, Jaffri was served with a Notice to Appear. Jaffri requested a re-determination of the decision to place him in custody, and signed a request for a merits hearing before an immigration judge.

On December 20, 2001, during a closed immigration hearing held at the MDC, an immigration judge ordered Jaffri's removal from the United States. No bond hearing was held prior to this hearing. Neither Jaffri nor the INS contested the removal order.

On April 1, 2002, three months and 12 days after the removal order, INS agents escorted Jaffri to LaGuardia Airport and put him on a plane to Canada. Neither his money nor his identification documents were returned to him.

e.      Asif-Ur-Rehman Saffi

Saffi is a Muslim native of Pakistan and a citizen of France. He currently resides on Reunion Island, in the Indian Ocean east of Madagascar. He had been working for Pakistan International Airlines for 19 years when he came to the United States on July 6, 2001 on a three-month tourist visa. He first entered the country in Los Angeles to visit with friends there, then he flew to New York City, also to visit friends.

Saffi, who holds a Master's Degree in Political Science, is a "Microsoft Certified Professional," and earned money while in New York doing computer repair and data entry for a small business.

On September 29, 2001, before his visa expired, Saffi flew to Toronto, but immigration officials there refused to allow him to enter the country, so he returned to New York the following day.[8] Upon his arrival at LaGuardia Airport on September 30, 2001, he was arrested by FBI and INS agents. Saffi, who is fluent in English, was interrogated by an INS agent and taken to the INS facility on Varick Street.

At the Varick Street facility, Saffi was interrogated by two FBI agents for about two hours. The FBI agents accused him of taking part in the September 11 terrorist attacks. They allegedly told him, "You will be rotting in jail if you don't give us names," and "Muslims are terrorists and we know you are one of them." TAC ¶ 34. They took two address books from Saffi and threatened that he would be in serious trouble if any person he associated with was "suspicious." *Id.* At the request of an INS official, Saffi signed a written statement that he had been working in the United States without authorization. Saffi requested to contact the French consulate, but that request was never granted, even after he put the request in writing.

On the following day, October 1, 2001, Saffi was moved to the MDC with eight other detainees in two vans. He was transported there with chains around his waist and shackles around his legs. Lieutenant Pray and four or five MDC officers dragged Saffi into the R&D area, slamming his face against several walls along the way. He was strip searched and given an orange jumpsuit to wear. His personal items, including money, were confiscated.

Plaintiffs allege that several MDC defendants led Saffi, still in handcuffs, chains and shackles, to the ADMAX SHU. On the way there, the officers banged his head and slammed him against the walls, kicked him, and verbally abused him. When they arrived at the ADMAX SHU, Saffi was again strip searched and subjected to further physical abuse. MDC officers bent

---

[8] The complaint does not state why Saffi was denied entry into Canada.

his thumbs back so far he could not use them for ten days, stepped on his bare feet, and pushed him into a wall so hard that he lost consciousness.  When Saffi fainted, the officers kicked him in the face and ribs.  Lieutenant Beck called Saffi a "'terrorist,' boasting that [he] could expect continued harsh treatment because of his involvement in the September 11th terrorist attacks."  TAC ¶ 154.  Beck vowed to make Saffi's detention as horrible as possible, and threatened to punish Saffi "if he even so much as smiled."  *Id.*  Beck also said that Saffi had killed 7,000 people,[9] and threatened to beat him if he did not behave.

Saffi was placed in a ten foot by six foot windowless cell with another post-September 11 detainee.  The cell was cold and uncomfortable.  Saffi was confined to this cell all day, nearly every day, for the next five months.

Initially, Saffi was denied all reading material.  Though he was subsequently given a copy of the Bible, it was not until mid-December 2001 when he was given a copy of the Koran.  Saffi was still unable to read for several more days because his eyeglasses had been confiscated upon his arrival.  On December 18, 2001, Saffi was brought to an eye doctor and given new glasses.

While in detention, Saffi had difficulty practicing his religion. He was denied Halal food.  Once, Saffi asked Lieutenant Torres for Halal food, and she responded that the MDC is a jail, not a hotel, and that Saffi should ask Allah for food.[10]  For the first month, MDC defendants constantly interrupted him during his morning prayers.  They also refused to inform him of the time of day, making it impossible for him to know when to conduct his daily prayers.

---

[9]      The 7,000 figure represents the number of people thought to have been killed in the September 11, 2001 attacks at the time Saffi was brought to the MDC.  TAC ¶ 154.

[10]      Plaintiffs allege that Liutenant Torres was verbally abusive to inmates, referring to them as "sons of bitches, motherfuckers, and troublemakers."  TAC ¶ 158.

The MDC defendants also "swore at [Saffi], belittled and insulted his religion, and degraded him. They called him a 'religious fanatic' and a 'terrorist.'" TAC ¶ 159.

On October 8, 2001, the District Director of the INS for the New York District issued a removal order for Saffi. On October 14, 2001, two FBI and two INS agents interrogated Saffi on various topics, including his family in France, his work for Pakistan International Airlines, his religious faith and his political views. During this interrogation, Saffi again denied any involvement in terrorist activity. A report by one of the FBI agents who interviewed Saffi "recommended that Saffi be allowed to return to France," stating that "Saffi's interview and the subsequent investigation ... revealed nothing to indicate that Saffi had any knowledge of the attack on the World Trade Center, or any other terrorist activity." TAC ¶ 161.

On October 17, 2001, the removal order "appears to have been served to Saffi." TAC ¶ 162. Saffi asked an INS official whether he needed a lawyer and was told that he did not since the INS would soon put him on a plane back to France. *Id.*

On November 2, 2001, Kenneth Maxwell, FBI Special Agent in Charge, wrote to Daniel Molerio, INS Assistant Director for Investigations in New York, to inform him that the FBI did not have an investigative interest in Saffi relating to the events of September 11.

On December 18, 2001 an INS agent and a NYPD detective interrogated Saffi at the MDC, again questioning him about his family, religious and political views, and his work for Pakistan International Airlines. Saffi again denied any involvement with terrorists. At the end of this interrogation, the two officers assured Saffi that he would soon be released.

On March 5, 2002, four months and 18 days after the issuance of his removal order, INS agents took Saffi to LaGuardia Airport and put him on an airplane to France without the money or the employment and identification cards that had been confiscated from him.

Pakistan National Airlines has initiated proceedings to terminate Saffi's employment, allegedly because, as a result of his detention in the United States, he has been deemed a security risk. Saffi suffers both emotional and psychological effects from his detention in the United States. He has great difficulty, for example, sleeping at night because he continues to dwell upon what happened to him at the MDC.

2. The Passaic Plaintiffs

a. Ibrahim Turkmen

Turkmen, a Muslim Imam, is a citizen of Turkey. He came to the United States on October 4, 2000, on a six-month tourist visa to visit a friend from Turkey, who lived on Long Island in New York. Shortly after his arrival, Turkmen found work at a service station in Bellport, New York. He worked there until January 2001, when he took a job at another service station in the same town. In April 2001, he left that job and began to work part-time for a local Turkish construction company.

Turkmen spoke virtually no English when he first arrived in the United States. During his stay, he learned only the words necessary for his limited daily interaction with English-speakers. At the time that he was taken into custody, Turkmen understood very little spoken English, and he could not read English at all.

On October 13, 2001, two FBI agents visited Turkmen at the apartment where he was staying with several Turkish friends in West Babylon, New York. They asked him whether he had any involvement in the September 11 terrorist attacks and whether he had any association with terrorists. They also inquired as to his immigration status. Turkmen had difficulty understanding the questions posed to him by the FBI, and no interpreter was provided. Turkmen denied any involvement with terrorists or terrorist activity.

The FBI agents accused Turkmen of being an associate of Osama bin Laden, placed him under arrest, confiscated his personal items, including $52 in U.S. currency, his passport and identification and credit cards, and searched his home. The INS then took Turkmen to an INS facility in Nassau County. There, he was fingerprinted and interrogated by an INS official. At no point during this or any other subsequent interrogation by either the FBI or INS was he advised of his right to counsel or given *Miranda* warnings. Because no interpreter was provided, Turkmen struggled to understand the questions posed to him.

On the evening of the day he was arrested, Turkmen was taken to the Varick Street facility, where he was again questioned in English without the aid of an interpreter. Turkmen was instructed to sign an English-language document, which he did, though he did not understand what it said.[11]

The next morning, October 14, 2001, Turkmen was taken to the Passaic Jail. Shortly after arriving there, Turkmen received a Notice to Appear from the INS, charging him with overstaying his visa and scheduling a hearing at immigration court in Newark, New Jersey on October 31, 2001. Turkmen also received a Notice of Custody Determination, and he requested a re-determination of the custody decision.

On October 29, 2001, two FBI agents visited Turkmen in jail and questioned him on various topics, including his immigration status, his reasons for entering the United States, his work experience and his religious beliefs. Another Turkish detainee translated the questions for Turkmen. As he had done during the previous interrogations, Turkmen denied any involvement with terrorists or terrorist activity.

---

[11]     Plaintiffs speculate that the documents signed by Turkmen may have included a waiver of the right under Article 36 of the Vienna Convention to speak with the Turkish consulate.

On October 31, 2001, Turkmen appeared *pro se* before an immigration judge in Newark, New Jersey. An interpreter was provided during this proceeding but the interpreter apparently "was fluent in neither Turkish nor English." TAC ¶ 264. Turkmen admitted that he had overstayed his tourist visa and accepted a voluntary departure order requiring him to leave the United States by November 30, 2001. The judge assured him that he would be allowed to return to Turkey within a matter of days and, as a result, Turkmen declined to request bond. *Id.* The INS did not appeal the voluntary departure order.

On November 2, 2001, responding to a request from Turkmen, a friend brought a plane ticket for Turkmen's return to Turkey to the INS offices in Newark. However, Turkmen was not permitted to return to Turkey until February 25, 2002. Until then, he was detained in the Passaic Jail.[12]

While in jail, Turkmen was placed in the general prison population. He was housed under severely overcrowded conditions with individuals charged with or convicted of violent crimes. He was denied the ability to observe the mandatory practices of his religion: he could not obtain the prescribed Halal food and he could not conduct his daily prayers without interruption. Turkmen further alleges that he was "threatened by guards with menacing dogs." TAC ¶ 268. He was never informed of his right under Article 36 of the Vienna Convention on Consular Relations to contact the Turkish consulate.

Turkmen remained in Passaic Jail for three months and twenty-five days after he received his voluntary departure order. On February 25, 2002, INS agents took Turkmen in handcuffs to the Newark Liberty International Airport and put him on a plane to Istanbul,

---

[12] Plaintiffs contend that by "preventing" Turkmen from complying with a voluntary departure order, an automatic order of removal with a 10-year ban on re-entry to the United States was entered. TAC ¶ 265.

without the $52 confiscated from him at the time of his arrest. He arrived in Istanbul without any means to pay for the eight-hour bus ride to Konya, where his family resides.

When he arrived in Turkey, Turkmen was met at the airport by a Turkish police officer and escorted to a nearby police station. There, he was interrogated for approximately an hour about his detention in the United States. Turkmen denied any involvement in terrorist activity. He was then permitted to leave for Konya.

Once settled in Konya, sometime in late April 2002, following the filing of this lawsuit, Turkmen was interrogated by Konya's Security Intelligence Division about his detention in the United States. At the end of the questioning, Turkmen was instructed by the Division's Superintendent to "be careful." TAC ¶ 274. After the interrogation, Turkmen's father was contacted by the Head of the Gendarmerie in a district of Konya and asked for information regarding Turkmen's current address. The official explained that he sought the information because human rights organizations were trying to reach Turkmen. Several days later, the same official obtained Turkmen's personnel file from Turkmen's former employer.

Turkmen suffers emotionally and psychologically due to his detention in the United States. He has nightmares regularly about his detention.

       b.     <u>Akil Sachdeva</u>

Sachdeva is a native of India and is Hindu. He holds a bachelor of arts degree in commerce from the University of Delhi. Since 1995, he has entered the United States for extended periods of time. In December 1998, Sachdeva immigrated to Canada. In 1998, while working as a travel agent in Canada, Sachdeva married a United States legal permanent resident who owned a gas station on Long Island. For the next several years, Sachdeva lived with his wife in the United States and worked at her gas station. During this period, he applied to the INS

for resident status in the United States.  In early 2001, however, Sachdeva and his wife divorced.

He then briefly returned to Canada until sometime in September or October of 2001, when he

returned to finalize his divorce.

Sometime in late November 2001, an FBI agent visited the gas station owned by

Sachdeva's ex-wife in Port Washington, New York, looking for a Muslim employee.  Failing to

locate the employee, the agent left a note requesting that Sachdeva's ex-wife contact him.  She

passed on the request to Sachdeva, who called the agent in early December 2001.  The FBI agent

asked Sachdeva to come to the agent's offices for an interview, and Sachdeva complied on

December 9, 2001.  At the interview, two FBI agents questioned Sachdeva about the September

11 attacks and his religious beliefs.  Following the interview, the agents examined Sachdeva's

personal identification and then permitted him to leave.

On December 20, 2001, INS agents arrested Sachdeva at his uncle's apartment

and took him to INS's offices in Manhattan, where he was interrogated for five hours about the

September 11 terrorist attacks.  After the interrogation, INS agents confiscated all of Sachdeva's

personal identification and took him to Passaic Jail, where he was confined until he was deported

on April 17, 2002.

On December 27, 2001, Sachdeva received a Notice to Appear, charging him with

illegal re-entry (he had overstayed a prior voluntary departure order).  On December 31, 2001,

Sachdeva was taken before an immigration judge in Newark, who ordered Sachdeva deported to

Canada or India within 30 days.  The INS did not appeal this order.

Plaintiffs allege that the treatment of Sachdeva during his detention and the

conditions of his confinement were similar to that of Turkmen, who was also detained at the

Passaic Jail.  Like Turkmen, Sachdeva was in daily contact with individuals charged with or

convicted of violent crimes. Only around a quarter of the detainees with whom Sachdeva was confined were immigration detainees. The rest were pre-trial detainees, many with criminal histories. In mid-February 2002, a "well-built" felon punched Sachdeva in the face several times for not handing over a newspaper quickly enough. The assault loosened teeth and caused permanent dental damage.

On four occasions, Sachdeva requested, in writing, that the Canadian consulate be contacted. Each time his request was denied. Sachdeva also made frequent efforts to contact the consulate by telephone. Because the consulate did not accept collect calls, however, guards had to place the calls for Sachdeva, and they would claim that the line was busy or there was no answer. Sachdeva was unable to contact the consulate until mid-March 2002.

On April 17, 2002, three months and seventeen days after he had been ordered deported, Sachdeva was taken by INS agents to Newark Airport and put on a plane to Canada. Despite his requests, the items confiscated from him upon his arrest were not returned to him before he returned to Canada. However, sometime after he arrived, his Canadian identification card was returned to him.

When Sachdeva arrived in Canada, Canadian immigration officials suspended his landed immigrant status and took away his work papers.

D.    The Plaintiffs' Claims

1.    Delayed Service of Notices to Appear

The plaintiffs allege that the INS consistently delayed issuing and serving its charging document, called a "Notice to Appear" ("NTA"), on post-September 11 detainees far beyond the 48-hour period specified by regulation. By doing so, the INS impaired the ability of detainees to know the charges on which they were being held, obtain legal counsel, and seek

release on bond.  Yasser Ebrahim and Hany Ibrahim were served with NTAs 17 days after their arrest.  Other named plaintiffs also did not receive NTAs in a timely manner:  Sachdeva (seven days); Jaffri (four days); and Ashraf Ibrahim (an unreasonable delay).

### 2. Blanket No Bond Policy

The plaintiffs allege that the defendants, among other federal officials, instituted a blanket "no bond" policy for all post-September 11 detainees, regardless of whether an individual detainee posed a flight risk or danger.  INS District Directors were ordered to make an initial determination of "no bond" for all post-September 11 detainees.  When detainees requested bond re-determination hearings, INS Trial Attorneys were ordered to seek continuances and to oppose bond even where there was no evidence to support the denial of the bond.  *See* OIG Report at 76, 78.

### 3. Classification as "of High Interest" and Assignment to the ADMAX SHU

Post-September 11 detainees were classified as "of high interest" to the government's terrorism investigation, but there was no specific criteria or uniform system for making such a classification.  The FBI requested that the INS place "of high interest" detainees in the ADMAX SHU, a special housing unit at the MDC created specifically to house post-September 11 detainees in highly restrictive conditions ("Administrative Maximum" refers to the most restrictive type of detention permitted under BOP procedures).[13]  These restrictive conditions included:  enforcing a four-man hold restraint policy; using video cameras to record detainee movement and placing cameras in each cell; prohibiting detainees from moving around

---

[13]     *See*  28 C.F.R. § 541.22 ("Administrative detention is the status of confinement of an inmate in a special housing unit in a cell by self or with other inmates which serves to remove the inmate from the general population.").  Prior to September 11, the MDC had a special housing unit, but it did not have one designated as Administrative Maximum, which provides more restrictive confinement than normal SHUs.  *See* April 2003 OIG Report at 118-119.

the unit; limiting telephone access; and providing for only non-contact visits with attorneys or family members, with a clear partition between the parties.

Once assigned to the ADMAX SHU, the detainees were further classified as "Witness Security" and/or "Management Interest Group 155" detainees, again without uniform criteria for making such determinations.[14]

Post-September 11 detainees housed in the ADMAX SHU were not provided with the periodic individual reviews required by BOP regulations.[15] Instead, MDC officials were told by BOP headquarters that until the FBI had cleared a particular detainee, that detainee's report was to be automatically annotated with the phrase "continued high security."

### 4. Conditions of Confinement at the MDC

#### a. Physical Abuse

Plaintiffs allege that post-September 11 detainees at the MDC were subjected to frequent physical abuse by many of the MDC defendants -- all of the correctional officer defendants and several of their supervisors -- and that other supervisory defendants encouraged or were indifferent to the abuse. Physical abuse was more frequent before the MDC began videotaping detainee escorts in early October 2001, but it continued after that date.

---

[14]    The BOP initially classified all post-September 11 detainees as "Witness Security" or "WITSEC" inmates -- inmates who are cooperating with a government investigation. Because the cooperation of a typical Witness Security inmate places him in danger, information about such inmates is carefully guarded. A Memorandum dated October 1, 2001 directed that post-September 11 detainees be designated under a new classification called "Management Interest Group 155," in part to address the lack of information the BOP was providing attorneys and family members. However, because the memorandum also directed that post-September 11 detainees continue to be confined in the most restrictive conditions possible until cleared by the FBI, the BOP continued to use WITSEC as the primary designation for the detainees and added Management Interest Group 155 only as a secondary designation, and the information restrictions associated with the WITSEC designation continued to apply. *See* April 2003 OIG Report at 116-117.

[15]    *See* 28 C.F.R. § 541.22(c) (requiring formal reviews and hearings for each inmate in administrative detention to determine whether their continued administrative detention is warranted).

In the reports on its investigations, the OIG detailed allegations of abuse by MDC officers, which it divided into six categories: (1) slamming detainees against walls; (2) bending or twisting arms, hands, wrists, and fingers; (3) lifting restrained detainees off the ground by their arms, and pulling detainees' arms and handcuffs; (4) stepping on detainees' leg restraint chains; (5) using restraints improperly (for example, making restraints too tight, or leaving detainees in restraints while in their cells); and (6) handling detainees in an otherwise rough or inappropriate manner.[16] OIG Report at 6. The OIG's investigation substantiated many allegations of abuse at the MDC, some of which were recorded by videotape (including videotape showing MDC officers slamming a detainee "into two walls while being escorted from the recreation deck to a segregation cell," and pressing detainees heads against the wall). *Id.* at 8-28.

b.     <u>Verbal Abuse</u>

Many of the MDC defendants subjected post-September 11 detainees at the MDC to frequent verbal abuse, including referring to them as "terrorists" and other offensive names, threatening them with violence, cursing at them, insulting their religion, and making humiliating sexual comments during strip searches. The OIG's investigation substantiated many allegations of verbal abuse. *Id.* at 28-30. All of the MDC correctional officer and supervisory defendants engaged in verbal abuse, and the supervisory defendants encouraged or were deliberately indifferent when their subordinates verbally abused the detainees.

---

[16] The OIG concluded that "some MDC staff members slammed and bounced detainees into the walls at the MDC and inappropriately pressed detainees' heads against the walls. We also found that some officers inappropriately twisted and bent detainees' arms, hands, wrists, and fingers, and caused them unnecessary physical pain; inappropriately carried or lifted detainees; and raised or pulled detainees' arms in painful ways. In addition, we believe some officers improperly used handcuffs, occasionally stepped on compliant detainees' leg restraint chains, and were needlessly forceful and rough with the detainees -- all conduct that violates BOP Policy." Supplemental OIG Report at 28.

c.        Strip Searches

Post-September 11 detainees at the MDC were strip searched every time they were removed from or returned to their cells, including before and after non-contact attorney visits (to and from which they were escorted in shackles and under continuous four-man guard), when receiving medical care, using the recreation area, attending a court hearing, or being transferred to another cell.  Post-September 11 detainees were strip searched upon arrival to the MDC at the R&D area and again after they had been escorted, shackled and under continuous guard, to the ninth floor ADMAX SHU.  Supp. OIG Rep. at 3.  "Some of the same officers who were present for a detainee's strip search in R&D were present for the detainee's strip search on the ADMAX SHU."  *Id.* at 34.  The OIG found that it "[did] not appear that the MDC issued written policies regarding when detainees were to be strip searched."  *Id.*  The OIG further found that "even if such searches were consistent with policy, they were applied inconsistently to the detainees and appeared to be unnecessary."  *Id.*

The plaintiffs allege that the strip searches were both unnecessary and conducted to punish and humiliate the detainees.  The OIG Report substantiates allegations that female officers were present during the searches, that strip searches were videotaped in their entirety (which runs counter to BOP policy to assure as much privacy as practicable to a detainee, *see* BOP P.S. 5521.05), that MDC officers laughed while the searches were being conducted, and that "on occasion staff members inappropriately used strip searches to intimidate and punish detainees."  Supp. OIG Report at 33-35.  For example, the OIG states that

> in one videotape four officers escorted one detainee into a recreation cell and ordered him to strip while they berated him for talking too much with other detainees and for encouraging them to go on a hunger strike.  We could see no correctional purpose or justification for strip searching this detainee, who had just been taken from his cell, pat searched, and then escorted into the recreation cell by four officers.

36

*Id.* at 34-35.  The plaintiffs allege that MDC defendants routinely made inappropriate sexual comments and laughed at the plaintiffs' anatomy.

        d.      <u>Sleep Deprivation</u>

The plaintiffs allege that the MDC defendants sought to deprive post-September 11 detainees at the MDC of sleep by keeping lights on in the cells 24 hours a day (until February 2002), banging on their cell doors, and engaging in other conduct designed to keep them from sleeping.  The OIG reported allegations by detainees that MDC officers "loudly banged on their cell doors in an attempt to wake them up, interrupt their prayers, or generally harass them." Supp. OIG Report at 35.  Detainees alleged that officers "went beyond what was required for the count[17] by kicking the door hard with their boots, knocking on the door at night much more frequently than required, and making negative comments when knocking on the door."  *Id.*

> For example, one detainee claimed that officers kicked the doors non-stop in order to keep the detainees from sleeping.  He stated for the first two or three weeks he was at the MDC, one of the officers walked by about every 15 minutes throughout the night, kicked the doors to wake up the detainees, and yelled things such as, "Motherfuckers," "Assholes," and "Welcome to America."

*Id.* at 36.  One detainee's attorney reported that officers would constantly wake his client by watching the in-cell camera, and then kicking the cell door as soon as they thought he had fallen asleep.  *Id.*

        e.      <u>Constructive Denial of Exercise</u>

The plaintiffs allege that post-September 11 detainees at the MDC were given the "opportunity" to go to the recreation area several times a week, but were deprived of adequate clothing and thus were constructively denied exercise during the fall and winter.  The ADMAX

---

[17]      A "count" is conducted at midnight, 3:00 a.m. and 5:00 a.m., and officers are required to see detainees' skin, *see* BOP P.S. 5500.09.

SHU recreation area was exposed to the elements, and could be freezing cold. MDC plaintiffs were periodically offered transport to the area, but it was often at 5 or 6 in the morning, and the detainees were not offered any extra clothing besides their cotton prison garb. In addition, detainees who accepted such offers were often physically abused along the way, and were sometimes left for hours in the cold recreation cell, over their protests, as a form of punishment.

f.      <u>Denial of Hygiene Items and Adequate Food</u>

For the first several months of their detention, MDC plaintiffs were not allowed to keep personal hygiene items in their cells, including toilet paper, towels, soap, toothbrushes, or cups to drink water, making it difficult to maintain proper health and hygiene. MDC plaintiffs were also provided with meals that were meager and barely edible.

g.      <u>Inadequate Medical Attention</u>

MDC plaintiffs allege they were not provided with adequate medical care. For example, Yasser Ebrahim and Hany Ibrahim were physically abused (including being slammed face-first into a wall) upon their arrival at the MDC. The following day, Nina Lorenzo, a physician assistant, conducted their physical examinations, but did not ask about, comment upon, or treat their obvious injuries.

Although Hany Ibrahim tested positive for tuberculosis, and was suffering from a painful and persistent cough, MDC staff refused to treat him for his condition.

Yasser Ebrahim complained of painful kidney stones to Lorenzo, who told him she was not authorized to do anything to treat the condition. The pain from the kidney stones was severe. Lorenzo told Ebrahim to drink 12 cups of water a day, but he was only given one cup with meals three times a day (and was not allowed to keep a cup in his cell). Lorenzo

subsequently arranged for Ebrahim to be allowed to keep a cup in his cell in order to drink water more frequently, but guards took the cup away when he was transferred to a new cell.

Baloch had repeated problems with ear infections prior to his detention. When he complained of an earache, Lorenzo refused to treat it, and his ear remained infected until after his release from detention.

Baloch wrote a letter to the warden requesting a transfer because his cellmate had tuberculosis. No action was taken in response. Baloch remained in the cell with the tubercular cellmate for approximately four weeks, and tests have since shown that he was exposed to tuberculosis.

### h.   Deliberate Interference with Religious Rights

Plaintiffs allege that as a matter of policy, MDC defendants interfered with their ability to observe their Muslim faith. This interference included: (1) refusing to provide plaintiffs with a copy of the Koran for weeks or even months; (2) refusing to provide food that would conform to a Halal diet; (3) refusing to tell plaintiffs the time of day so that they could conform to daily prayer requirements or deliberately providing them with the incorrect time; and (4) constantly interrupting their prayers by banging on cell doors, screaming derogatory anti-Muslim comments, and telling plaintiffs to "shut the fuck up" while they were trying to pray.

### 5.   Communications Blackout at the MDC

#### a.   Holding Detainees Incommunicado

Most post-September 11 detainees were held incommunicado during the first weeks of their detention. Family members, friends, and attorneys had great difficulty finding out whether someone had been arrested and detained, and if so, where they were being held. In addition, the classification of post-September 11 detainees as "Witness Security" or

"Management Interest Group 155" inmates led MDC staff falsely to tell lawyers and family members that the individual detainee for whom they were looking was not at the MDC. The INS also designated post-September 11 detainees as "special interest cases," which had the effect of closing their immigration hearings to both the general public and to family members.

b.     Interference with Access to Counsel

Post-September 11 detainees had great difficulty obtaining legal representation. Some were held for months following their arrest while their lawyers and families made unsuccessful attempts to learn their status and whereabouts. Although various advocacy organizations sought to provide free legal services to post-September 11 detainees, the MDC refused to disclose detainees' names, the facilities in which they were held, or other information about the individual detainees' cases. MDC officials denied requests to visit post-September 11 detainees in need of legal assistance. In addition, while INS detainees typically receive a list of organizations that might provide free legal services, the lists given to the post-September 11 detainees contained inaccurate and outdated information.

After the initial "incommunicado" period, post-September 11 detainees were permitted to make one telephone call per week to their attorneys, and one social call per month. In practice, detainees were frequently denied these limited calls, because calls that resulted in busy signals or calls answered by voicemail "counted" as a legal call. In addition, MDC defendants (in particular Raymond Cotton) deliberately obstructed detainees' efforts to telephone lawyers. The officers would bring a phone around to each cell, often before law offices were open, and each inmate who requested a phone call was required to place a call request from outside of their cell. The officers would regularly pretend to dial a number or deliberately dial a wrong number and then claim the line was dead or busy. They would then refuse to dial again,

saying that the detainee had exhausted his quota for calls. MDC officers also were deliberately vague in ascertaining whether detainees wanted to make calls. In many instances, the unit counselor would ask "are you okay?" Several detainees told the OIG investigators that they did not realize that an affirmative response to this casual question meant that they opted to forgo their legal calls for the week.

The MDC also instituted a policy of videotaping detainees' visits with their attorneys, including the recording of sound.[18] As a result, post-September 11 detainees, including Baloch, Yasser Ebrahim, Hany Ibrahim, and Jaffri, were reluctant to speak candidly to their attorneys.

6.    <u>Denial of Consular Rights</u>

Many post-September 11 detainees were not advised of their right to seek assistance from their consulates (under Article 36 of the Vienna Convention, non-citizen detainees must be advised of this right). Other detainees were coerced into waiving the right by signing forms they did not understand. When post-September 11 detainees did request to contact their consulates, those requests were repeatedly denied.

7.    <u>Failure to Provide Handbooks</u>

Post-September 11 detainees confined in the ADMAX SHU were not timely provided with the MDC handbooks that explain the procedures for filing complaints about mistreatment (or they were not provided with them at all).

E.    <u>The Defendants' Personal Involvement</u>

Plaintiffs allege that former Attorney General Ashcroft was a "principal architect" of the challenged policies and practices, and that FBI Director Mueller and former INS

---

[18]     Audio taping of inmates' meetings with attorneys is prohibited by federal regulation. *See* 28 C.F.R. § 543.13(e). The OIG "concluded that audio taping attorney visits violated the law and interfered with the detainees' effective access to legal counsel." Supp. OIG Report at 33.

Commissioner Ziglar were instrumental in the adoption, promulgation and implementation of the challenged practices. TAC ¶¶ 23-25. Plaintiffs allege that these three Washington-based Defendants "authorized, condoned, and/or ratified" the harsh conditions under which post-September 11 detainees were held at the MDC and the Passaic Jail. *Id.*

Plaintiffs allege that the MDC Wardens, along with Associate Warden Sherman and other supervisory MDC defendants, "created the unconstitutional and unlawful policies and customs relating to the manner in which the post-9/11 detainees were detained at the MDC that are at issue in this suit." TAC ¶ 136. Moreover, plaintiffs allege that these defendants exhibited gross negligence and deliberate indifference in their supervision of subordinates who had direct contact with post-September 11 detainees.

F. The Third Amended Complaint

For ease of reference, in the Third Amended Complaint the plaintiffs assert the following claims, on their own behalf and on behalf of the putative class (unless otherwise indicated). The paragraph number reflects the claim number indicated in the complaint.

1. Detaining plaintiffs for months longer than necessary to secure removal or voluntary departure from the United States without (a) charging them with a crime or (b) affording them a hearing before a neutral judicial officer to determine whether there was probable cause to justify their continued detention, constituted an unreasonable seizure under the Fourth Amendment. Plaintiffs assert this claim against all defendants.

2. Detaining plaintiffs longer than necessary to secure removal or voluntary departure from the United States without any legitimate immigration law enforcement purpose, and without evidence that they posed a danger or flight risk, violated plaintiffs' due process rights under the Fifth Amendment. Plaintiffs assert this claim against all defendants.

3.	The policy of "unreasonably detain[ing]" plaintiffs and subjecting them to inhumane conditions of confinement violated their due process rights under the Fifth Amendment.  Plaintiffs assert this claim against all defendants.

5.[19]	Detaining plaintiffs longer than necessary to secure removal from the United States and subjecting them to harsher treatment than that accorded to similarly-situated non-citizens because of plaintiffs' race, religion, and national origin violated plaintiffs' right to equal protection under the Fifth Amendment.  Plaintiffs assert this claim against all defendants.

7.[20]	The policies and practices of deliberately interfering with plaintiffs' religious practices, including (1) subjecting them to verbal and physical abuse; and (2) denying them the means for maintaining a religious practice, including the means to observe Halal food or daily prayer requirements, violated plaintiffs' free exercise rights under the First Amendment.  Plaintiffs assert this claim against all defendants.

8.	The policy of taking plaintiffs' property and not returning it at the time of their removal or voluntary departure from the United States violated their right to due process under the Fifth Amendment.  Plaintiffs assert this claim against all defendants.

9-10.	The arbitrary detention and cruel, inhuman, and degrading treatment of plaintiffs violated international law.  Plaintiffs assert claims for this violation under the Alien Tort Statute, 28 U.S.C. § 1350, against all defendants.

11.	The failure to notify plaintiffs of their right to communicate with consular officials violated plaintiffs' rights under the Vienna Convention on Consular Relations, April 24,

---

[19]	Plaintiffs have withdrawn Claim 4, asserting violations of the self-incrimination clause of the Fifth Amendment.  *See* Pl. Br. at 5 n.4.

[20]	Plaintiffs have withdrawn Claim 6, asserting a violation of the right to a speedy trial under the Sixth Amendment.  *See* Pl. Br. at 5 n.4.

1963, TIAS 6820, 21 U.S.T. 77, Art. 36.  Further, the failure to notify consular posts without delay when plaintiffs requested to speak with officials from their respective consulates also violated the Vienna Convention.  Plaintiffs assert this claim against all defendants.

12-16: The intentional beatings of Baloch, Ebrahim, Hany Ibrahim, Jaffri, and Saffi violated their rights under the Fourth and Fifth Amendments.  These plaintiffs assert claims on their own behalf against various MDC defendants, including Hasty, Zenk, and Sherman.[21]

17.     Delaying the issuance of Notices to Appear violated plaintiffs' right to due process under the Fifth Amendment.  Plaintiffs assert this claim against all defendants.[22]

18.     Denying bond without regard to whether the detainee posed a flight risk or danger (the blanket "no-bond" policy) violated plaintiffs' right to due process.  Plaintiffs assert this claim against all defendants.

19.     Subjecting plaintiffs to the blanket no-bond policy because of their ethnic or religious identity violated their equal protection rights under the Fifth Amendment.  Plaintiffs assert this claim against all defendants.

20.     The policy of classifying plaintiffs as "of high interest," "Witness Security," or "Management Interest Group 155" detainees without any defined criteria or individualized assessment of dangerousness or risk of flight (which led to "unnecessary and unreasonable

---

[21]     Specifically, plaintiffs assert this claim against the "MDC Correctional Officer Defendants" and "MDC Supervisor Defendants".  It was not clear from the complaint whether plaintiffs intended also to include the Wardens in their excessive force claims (because the Wardens are included in the group plaintiffs designate "MDC Policy and Implementation Defendants" but not in the group called "MDC Supervisor Defendants").  For the reasons stated on the record at a hearing dated January 14, 2005, I find that the Wardens are included as defendants on these claims.  I note, however, that Zenk was not appointed Warden of the MDC until April 22, 2002.  By that time, Baloch, Jaffri, and Saffi had been removed from the United States.  Accordingly, claims 12 (Saffi), 13 (Jaffri), and 16 (Baloch) are dismissed as to Zenk.

[22]     This claim is brought by five plaintiffs (Ebrahim, A. Ibrahim, H. Ibrahim, Jaffri, and Sachdeva) on their behalf and on behalf the putative class.

restrictions on their liberty"), violated their procedural due process rights under the Fifth Amendment. Plaintiffs assert this claim against all defendants.[23]

21.     The policy of subjecting plaintiffs to a "communications blackout," as well as other measures that interfered with their access to lawyers and to the courts, violated their right to free speech under the First Amendment. Plaintiffs assert this claim against all defendants.

22.     The policy of subjecting plaintiffs to a "communications blackout," as well as other measures that interfered with their access to lawyers and to the courts, violated their due process rights under the Fifth Amendment. Plaintiffs assert this claim against all defendants.

23.     Subjecting plaintiffs to excessive and unreasonable strip searches unrelated to a legitimate penological purpose violated plaintiffs' rights to privacy and due process under the Fifth Amendment, and violated the Fourth Amendment's prohibition against unreasonable searches. Plaintiffs assert these claims against MDC defendants, including Hasty, Zenk, and Sherman.

24.     Detaining the named MDC plaintiffs for months longer than necessary to secure their removal or voluntary departure constituted false imprisonment, for which plaintiffs seek monetary damages from the United States pursuant to the FTCA.[24]

25.     Delaying the "clearance investigations" of the named plaintiffs constituted negligence, for which plaintiffs seek monetary damages pursuant to the FTCA.

26.     Denying adequate medical services to the named MDC plaintiffs constituted negligence, for which plaintiffs seek monetary damages pursuant to the FTCA.

---

[23]     This claim is brought by six plaintiffs (Baloch, Ebrahim, A. Ibrahim, H. Ibrahim, Jaffri, and Sachdeva) on their behalf and on behalf of the putative class.

[24]     This claim is brought by the six MDC plaintiffs (Baloch, Ebrahim, A. Ibrahim, H. Ibrahim, Jaffri, and Saffi).

27.     The physical abuse of the named MDC plaintiffs and the manner in which that abuse was carried out constituted assault and battery, for which plaintiffs seek monetary damages pursuant to the FTCA.

28.     Subjecting the named MDC plaintiffs to bright lights and loud noises for the purpose of interrupting their sleep constituted battery, for which plaintiffs seek monetary damages pursuant to the FTCA.

29.     The treatment of the named plaintiffs, including (1) accusing them of being terrorists and mass murderers; (2) subjecting them to gratuitous and humiliating insults to their ethnicity, religion, and physical anatomy; (3) threatening them with prolonged and permanent detention, torture, and death; (4) subjecting them to inhumane conditions of confinement; and (5) interfering with their religious practices, constituted the intentional infliction of emotional distress, for which plaintiffs seek monetary damages pursuant to the FTCA.

30.     Refusing to return plaintiffs' property constituted conversion, for which plaintiffs seek monetary damages pursuant to the FTCA.

31.     The intentional beating of Ashraf Ibrahim violated his rights under the Fourth and Fifth Amendments.  Ibrahim asserts this claim against various MDC defendants, including Hasty and Sherman.[25]

## DISCUSSION

A.      The Motion to Dismiss Standard

In considering a motion to dismiss under Rule 12(b)(1) or (6), a federal court is required to accept as true the factual assertions in the complaint and to draw all reasonable inferences in favor of the plaintiff.  *Zinermon v. Burch*, 494 U.S. 113, 118 (1990) (Fed. R. Civ. P.

_____

[25]     To the extent plaintiffs seek to assert this claim against Zenk, it is dismissed.  Zenk did not become Warden until after Ashraf Ibrahim was deported.

12(b)(6)); *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (Rule 12(b)(1)).

The motion may not be granted unless "it appears beyond doubt ... that the plaintiff can prove no

set of facts which would entitle him to relief," *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d

326, 329 (2d Cir. 1997) (internal quotation marks omitted), because the question on a motion to

dismiss is not "whether the plaintiff will ultimately prevail but, [rather,] whether the claimant is

entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)

(overruled on other grounds). However, in order to survive a motion to dismiss, the complaint

must allege facts which, if "assumed to be true, confer a judicially cognizable right of action."

*York v. Ass'n of the Bar of New York*, 286 F.3d 122, 125 (2d Cir. 2002).

B.     Constitutional Claims

     1.     Subject Matter Jurisdiction

I begin by addressing the defendants' several arguments that the Illegal

Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110

Stat. 3009 (Sept. 30, 1996), deprives the court of jurisdiction over certain of the plaintiffs'

constitutional claims.

     a.     Section 1252(b)(9)

The defendants argue that 8 U.S.C. § 1252(b)(9) precludes review of claims 17-19

and 21-22 because those claims are subject to judicial review only by a petition for review of a

final order of removal in the appropriate court of appeals.[26]

     Section 1252(b)(9) provides:

---

[26]     Specifically, 8 U.S.C. § 1252(a)(1) says that "judicial review of a final order of removal ... is governed only by chapter 158 of Title 28," known as the Hobbs Act, which vests exclusive jurisdiction for judicial review of certain final orders of a federal agency in the courts of appeals. 28 U.S.C. § 2342. Upon such review, the court of appeals may "enjoin, set aside, suspend (in whole or in part) or determine the validity of" the administrative order. *Id.*

With respect to review of an order of removal under subsection (a)(1) of this section, the following requirements apply:

...

(9) Consolidation of questions for judicial review

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Congress's purpose in enacting this provision was "to consolidate judicial review into one proceeding," *INS v. St. Cyr*, 533 U.S. 289, 313 (2001), not to eliminate it altogether. *See Arar v. Ashcroft*, 2006 WL 346439, *18-19 (E.D.N.Y.); *see also Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999) (describing § 1252(b)(9) as a "zipper clause"). Accordingly, the Supreme Court has held that § 1252(b)(9) "applies only 'with respect to review of an order of removal under subsection (a)(1)'" and therefore, "by its own terms, does not bar ... jurisdiction over [actions] not subject to judicial review under § 1252(a)(1) ...." *St. Cyr*, 533 U.S. at 313.

Not surprisingly, the plaintiffs argue that "the challenges presented here could not have been reviewed on a petition for review" because the plaintiffs contest only their detention, not their removal. Pl. Br. at 8. With respect to claims 18 and 19, challenging the plaintiffs' having been denied bond, this is simply not true. The regulations governing the jurisdiction of the Board of Immigration Appeals specifically provide that the Board may review appeals from "[d]eterminations relating to bond, parole, or detention of an alien," 8 C.F.R. § 1003.1(b)(7); *see*

*also* 8 C.F.R. § 1236.1(d).  Had the plaintiffs invoked the Board's jurisdiction, they could have sought review of the Board's decision when their orders of removal became final.  Of the two plaintiffs who allege they applied for bond, both admit that the Immigration Judge denied their requests because he was not convinced that they would appear at future hearings.  TAC ¶ 188.  The denial of bond, serving to assure the plaintiffs' presence for later removal proceedings, appears on its face to "aris[e] from ... action taken ... to remove" the plaintiffs.  8 U.S.C. § 1252(b)(9).  Claims 18 and 19 are accordingly dismissed.[27]

Claims 21-22 allege that the "communications blackout" violated the plaintiffs' rights (1) to due process under the Fifth Amendment and (2) to obtain access to legal counsel and to petition the courts for redress of their grievances under the First Amendment.  An alien has a right to counsel "in proceedings before an Immigration Judge ... at no expense to the government."  8 C.F.R. 1003.16(b); *In re Madrigal-Calvo*, 21 I. & N. Dec. 323 (1996) ("The right to counsel in immigration proceedings derives from the Due Process clause, the [INA], and the regulations promulgated under the [INA], and entitles an alien to obtain counsel at his own expense.").  And claims by an alien that the right to counsel has been denied may properly be presented to the BIA and then to the court of appeals on a petition for review.  *See Michel v. INS*, 206 F.3d 253, 258 (2d Cir. 2000) (reviewing alien's claim that he was denied the right to counsel in immigration proceedings).  Therefore, to the extent the plaintiffs challenge the communications blackout as having prejudiced them *in immigration proceedings*, their claims could have been brought in a petition for review.

---

[27]     Plaintiff Turkmen is wrong in asserting that because he was granted voluntary departure he was not subject to a final order of removal and therefore could not have filed a petition for review in the court of appeals after exhausting his administrative remedies.  The Second Circuit routinely entertains petitions for review filed by aliens who have been granted voluntary departure.  *See, e.g.*, *Paul v. Gonzalez*, 444 F.3d 148 (2d Cir. 2006) (granting petition for review brought by alien who was allowed voluntary departure).

Whether the communications blackout was "action taken ... to remove an alien from the United States" presents a separate issue. In ordinary usage, an action taken "to" do something means an action taken "for the purpose of" doing the thing. *See* Webster's Third New International Dictionary Unabridged (2002). It does not appear, however, even from the defendants' briefs on this motion, that one of the purposes of the communications blackout was "to remove" the plaintiffs; rather, the purposes were to investigate the terrorist attacks of September 11, to prevent further attacks, and to preserve institutional security. *See*, *e.g.*, Def. Br. at 70 ("the possibilities that one terrorist might tell another which of their members were compromised by the investigation, and which were not, or might convey the substantive and geographic focus of the investigation were dangers that the Government had an obligation to prevent"). I conclude that the defendants did not subject the plaintiffs to the communications blackout for the purpose of removing them, and therefore claims 21-22 are not barred by § 1252(b)(9).[28]

Claim 17, which challenges the Attorney General's delay in serving the plaintiffs with Notices to Appear after having detained them, survives on similar terms. Before an alien detainee has been served with a Notice to Appear, there has been no "action taken" or "proceeding brought"; the alien has simply been detained but not charged with a violation of any kind. Moreover, before a formal charge is made, the act of detaining an alien, standing alone, has no objectively identifiable purpose -- perhaps the authorities are still pondering what charges,

---

[28]     It might be argued on this reasoning that the plaintiffs' bond claims should not be dismissed, because the real purpose (according to the complaint) for denying bond was to hold the plaintiffs until they were cleared of terrorist connections. The decision whether to grant the plaintiffs bond, however, was justified by a judicial officer for a facially legitimate reason:  to secure their presence at later hearings and ultimately for removal. It would circumvent the intention of a zipper clause like § 1252(b)(9) altogether to hold that it does not apply when an alien doubts whether the Immigration Judge was being candid in stating that bond was denied to ensure the alien's presence for removal. In short, I do not think the Congress intended for courts, outside the context of a petition for review, to look behind the Immigration Judge's decision denying bond.

if any, will be made -- and it therefore cannot be said that the purpose of the detention is "to

remove an alien."  It is only upon the filing of a charge that the purpose of the detention is

declared, both to the alien and to the adjudicator.  The plaintiffs' challenge to the period of time

the Attorney General constitutionally may refrain from charging an alien after detaining him thus

challenges a failure to act or bring proceedings, which I conclude is outside the sweep of §

1252(b)(9).

> b.    Section 1252(g)

The defendants next argue that § 1252(g) deprives the court of jurisdiction over

claims 1, 2, 5, and 17.  Section 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law
> (statutory or nonstatutory), including section 2241 of title 28, United States Code,
> or any other habeas corpus provision, and sections 1361 and 1651 of such title, no
> court shall have jurisdiction to hear any cause or claim by or on behalf of any
> alien arising from the decision or action by the Attorney General to commence
> proceedings, adjudicate cases, or execute removal orders against any alien under
> this chapter.

As the Supreme Court held in *AADC*, this provision "applies only to three discrete actions that

the Attorney General may take:  her 'decision or action' to '*commence* proceedings, *adjudicate*

cases, or *execute* removal orders,'" and does not cover "all claims arising from deportation

proceedings."  525 U.S. at 482.  In *Zadvydas v. Davis*, addressing a set of constitutional

challenges to the lengthy detention of aliens who had been ordered removed, the Court held that

§ 1252(g) did not apply.  533 U.S. 678, 687-88 (2001) ("Congress has enacted several statutory

provisions that limit the circumstances in which judicial review of deportation decisions is

available.  But none applies here.").[29]  That holding covers claims 1-2, which allege, quite

---

[29]      As Justice Kennedy noted in dissent, the Government conceded the issue of jurisdiction in *Zadvydas*.  533
U.S. at 724.  The Court could not have simply assumed jurisdiction for the purpose of deciding the merits, *see Steel
Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-102 (1998) ("For a court to pronounce upon the meaning or the
constitutionality of a state or federal law when it has no jurisdiction  to do so is, by very definition, for a court to act

similarly to the claims in *Zadvydas*, that the length of the plaintiffs' post-removal detention violated due process, as well as claim 5, which alleges that the plaintiffs were singled out for longer detention on the basis of their race, religion, and national origin. Although the Court in *Zadvydas* based its jurisdiction on "the primary federal habeas corpus statute, 28 U.S.C. § 2241," 533 U.S. at 687, there is no indication it concluded that § 1252(g) was inapplicable to such claims in an attempt to construe that provision narrowly to avoid a constitutional question under the Suspension Clause. U.S. Const., art. 1 § 9. Rather, the limitation seems to me based on the notion that detaining an alien *in between* the discrete actions specified in § 1252(g) -- namely, between adjudicating the alien's case and actually removing him -- is beyond the scope of § 1252(g); such detention is instead one of the "many other decisions or actions that may be part of the deportation process" acknowledged by the Court *AADC*. 525 U.S. at 482.[30]

As for claim 17, according to the defendants, "the statute makes clear that decisions on *when* to commence immigration proceedings ... are matters of prosecutorial discretion" and are therefore unreviewable. Def. Br. 22 (emphasis added). That argument mischaracterizes claim 17. As explained above, the plaintiffs do not challenge the Attorney General's authority to decide when to "commence proceedings" against them. They challenge his authority to detain them longer than 48 hours *without* commencing proceedings against them. The latter is a far cry from "prosecutorial discretion." Section 1252(g) covers (among other things of course) the Attorney General's decision whether to commence proceedings or not, as in

---

ultra vires."), and therefore its conclusion that no provision of the IIRIRA deprived it of jurisdiction was essential to its decision and constitutes a precedent binding upon this court.

[30]     The Government has not argued that the plaintiffs' length-of-detention claims (1-2, and 5) are barred by the seemingly broader § 1252(b)(9). I assume this is due to the limitation read into that provision in *St. Cyr* described above, that it "does not bar ... jurisdiction over [actions] not subject to judicial review under § 1252(a)(1) ...." 533 U.S. at 313, and I am satisfied that had jurisdiction over such claims relating to the length of post-removal detention been available on a petition for review, the defendants would have pressed the argument here.

*AADC.* 525 U.S. at 484-85. It has nothing to do with how long the Attorney General may detain an alien while deciding whether to commence proceedings, and thus it does not apply to claim 17.

        c.       <u>Section 1252(a)(2)(B)(ii)</u>

        The Supreme Court's brief jurisdictional explanation in *Zadvydas* also disposes of the defendants' argument that § 1252(a)(2)(B)(ii) divests the court of jurisdiction over claims 1-2, and 18-20. That section provides:

>         Notwithstanding any other provision of law ... no court shall have jurisdiction to review --
>
>         ...
>
>         (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

As in *Zadvydas*, the plaintiffs here "do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority .... And the extent of that authority is not a matter of discretion." 533 U.S. at 688; *see also Demore v. Kim*, 538 U.S. 510, 516-17 (2003) ("Respondent does not challenge a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release. Rather, respondent challenges the statutory framework that permits his detention without bail.").

        In sum, the IIRIRA requires dismissal only of the plaintiffs' claims that they were denied bond in violation of the Constitution. That no statute deprives the Court of jurisdiction,

however, does not alone indicate that the plaintiffs' remaining constitutional claims are redressable through an implied right of action. I turn now to that issue.

### 2. *Bivens* Liability

In *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that a private cause of action under the Constitution was available to recover damages against federal officers for violations of Fourth Amendment rights. This cause of action was later extended to allow recovery for other constitutional violations. *See, e.g.*, *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment); *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment); *cf. Bush v. Lucas*, 462 U.S. 367, 377-80 (1983) (refusing to allow a *Bivens* suit on the ground that Congress had created adequate alternative remedies, but generally recognizing the existence of such a cause of action for violations of the First Amendment). Courts generally treat a *Bivens* claim as analogous to the cause of action created by 42 U.S.C. § 1983, which permits recovery where federal rights are violated by state officials. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("Although this case involves suits under both § 1983 and *Bivens*, the qualified immunity analysis is identical under either cause of action."); *Butz v. Economou*, 438 U.S. 478, 498-99 (1978) (treating a *Bivens* claim as directly analogous to a § 1983 claim). As in § 1983 actions, there is no *respondeat superior* liability in a *Bivens* action. *See Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691-95 (1978); *Ellis v. Blum*, 643 F.2d 68, 85 (2d Cir. 1981). Accordingly, in order to state a *Bivens* claim against a federal officer, the plaintiff must allege that the defendant had personal involvement in the alleged constitutional violation. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) ("Proof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on a claim for damages under § 1983.").

The Supreme Court has carved out two exceptions to the availability of *Bivens* damages. A *Bivens* remedy is unavailable (1) "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective," *Carlson*, 446 U.S. at 18-19; and (2) where there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.*; *see, e.g.*, *United States v. Stanley*, 483 U.S. 669, 683-84 (1987) (holding that the unique disciplinary structure of the military constituted "special factors counselling hesitation" such that no *Bivens* remedy "is available for injuries that arise out of or are in the course of activity incident to service") (internal quotation marks omitted); *Bush*, 462 U.S. at 388-89 (refusing to extend a *Bivens* claim to a federal employee in light of the comprehensive scheme Congress had established over the field of federal employment).

The defendants take up the second exception here, arguing that the "INA's comprehensive regulatory scheme constitutes a 'special factor'" counselling against "creation of a damages remedy" with respect to claims 1-2, 5, 7, 17, and 20-22. Def. Br. 25. Relying principally upon *Bush v. Lucas*, 462 U.S. 367 (1982), and *Schweiker v. Chilicky*, 487 U.S. 412 (1988), in which the Supreme Court refused to permit a *Bivens* remedy in the face of "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations," *Bush*, 462 U.S. at 388, the defendants argue that the INA "serves as a comprehensive regulatory scheme concerning the degree to which the United States, as a sovereign nation, allows aliens within its borders," Def. Br. at 26. Accordingly, the defendants argue, "Congress's failure to provide aliens a private cause of action for monetary damages cannot be seen as inadvertent." *Id.*

I do not find these arguments persuasive.  The constitutional rights the plaintiffs assert -- the rights to due process of law, to equal protection of the laws, and to be free from unreasonable searches and seizures -- apply not only to citizens but also to aliens present in our country.  By leaving the plaintiffs' conditions-of-confinement claims out of their "special factors" arguments, the defendants implicitly acknowledge that Congress should not lightly be presumed to contemplate that constitutional violations by executive branch officials should be left without a remedy.  Although, as the defendants say, the INA provides a comprehensive *regulatory* scheme for managing the flow of immigrants in and out of the country, it is by no means a comprehensive *remedial* scheme for constitutional violations that occur incident to the administration of that regulatory scheme.  As the Supreme Court explained in *Schweiker*, "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies."  487 U.S. at 423.  Yet the defendants point to no evidence that the Congress gave thought to what remedies should be available when immigration officials, for example, unconstitutionally detain an alien after he has been ordered removed.  Indeed, under the defendants' theory, the plaintiffs would not be entitled to compensation even if they were detained for twenty years before a Notice to Appear was filed, then for twenty years more after they were ordered removed, all with no telephone calls or access to a lawyer.  That, of course, does not sound right.  And if it is not right, then the defendants' argument that the particular claims asserted here should not be entertained must be grounded in their belief that the constitutional violations alleged are not serious enough, or that the official conduct involved was reasonable under the circumstances.  That is a merits argument, not a threshold one.

Nor am I persuaded that the events of September 11, 2001 provide any cause to relax enforcement of the rights guaranteed by our Constitution. *See Elmaghraby v. Ashcroft*, 2005 WL 2375202 at *14 (E.D.N.Y.). Rather, as I explained in *Elmaghraby*, the extraordinary factual context that gave rise to the plaintiffs' detention is best considered in the analysis of whether the defendants are entitled to qualified immunity. *Id*.

### 3. Qualified Immunity

The defendants seek dismissal of all of plaintiffs' *Bivens* claims on qualified immunity grounds. Under that doctrine, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Wilson v. Layne*, the Supreme Court declared that "[a] court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'" 526 U.S. at 609, quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). Only if a determination is made that the constitutional right plaintiff alleges to have been violated exists does a court turn to the question of whether the defense of qualified immunity applies. *Wilson*, 526 U.S. at 609; *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002); *Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999).

"In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996). In determining whether a right was clearly established, courts consider the following: (1) whether the law was defined with reasonable clarity; (2) whether Supreme Court

or Second Circuit precedent recognizes the right; and (3) whether a reasonable defendant would have understood from the existing law that his conduct was unlawful. *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). With respect to the second prong of the qualified immunity analysis, an officer may still be entitled to qualified immunity even where his actions were unlawful, provided that the constitutionality of his conduct was debatable. *See Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir. 1998) (immunity applies whenever "officers of reasonable competence could disagree on the legality of defendant's actions") (internal quotation marks omitted); *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable") (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

        4.        <u>The Plaintiffs' Conditions of Confinement Claims</u> (Claims 3 and 23)

Plaintiffs allege that the conditions of their confinement violated their rights to due process under the Fifth Amendment and to be free from unreasonable searches and seizures under the Fourth Amendment.

        a.        <u>The Due Process Standard</u>

Defendants and plaintiffs disagree regarding the proper legal standard applicable to claims by alien detainees that the conditions of their detention violated due process. Plaintiffs argue that these claims are governed by the standard set forth in *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). There, the Supreme Court held that official liability for conditions inflicted upon a retarded man involuntarily committed to a state institution was appropriate upon a showing of a "substantial departure from accepted professional judgment, practice, or standards." *Id*. The defendants contend that claims of unconstitutional conditions of confinement made by

58

INS detainees should be evaluated under the stricter standard applicable to pretrial detainees. Neither plaintiffs nor defendants cite a Second Circuit case addressing the applicable standard for evaluating such claims made by INS detainees, and I have found none.

I consider plaintiffs' claims of unconstitutional confinement under the standard applicable to such claims asserted by pretrial detainees. In doing so, I rely on the Supreme Court's language in *Youngberg* regarding the significance of the purpose of detention in determining how challenges to the conditions of that confinement should be evaluated. *See Youngberg*, 457 U.S. at 320 n.27. In *Youngberg*, a retarded man had been involuntarily committed by his mother because she could no longer adequately care for him. The "purpose of [his] commitment was to provide reasonable care and safety." *Id*. The Court found that the standard of treatment to which he was entitled was determined, at least in part, by the purpose of his confinement. *See id*. at 321-22 ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

The purpose of confinement relied upon in *Youngberg* does not exist in the context of detention for immigration violations. The Attorney General is required to detain all aliens ordered removed until they actually depart, up to a period of 90 days (the "removal period"). 8 U.S.C. § 1231(a)(2); *see also, Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (citing the government's asserted regulatory goals of INS detention as "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community."). The statute that permits an alien to be detained subsequent to the statutory removal period, as these plaintiffs were, indicates that the underlying purposes of detaining aliens ordered removed is to ensure the safety of the community and compliance with the removal order. *See* 8 U.S.C. §

1231(a)(6) ("An alien ordered removed who is inadmissible under section 1182 of this title,

removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been

determined by the Attorney General to be a risk to the community or unlikely to comply with the

order of removal, may be detained beyond the removal period"); 8 C.F.R. § 241.4 (listing alien's

history of flight and potential threat to the community among the factors to consider in

determining whether further detention is warranted). Nothing in the factors to be considered in

determining whether further detention is warranted suggests that the purpose of the detention is

to provide care and safety to the detainee, which was the purpose of the detention in *Youngberg*.

This justification is similarly absent in the context of pretrial detention. Pursuant

to 18 U.S.C. § 3142(e), a person charged with a criminal offense may be detained before trial if it

is determined that detention is necessary to assure his appearance as required or the safety of the

community. Based upon the analogous reasons underlying pre-trial and INS detention, I

conclude that the same standard should govern challenges to both forms of detention. *See*

*Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000).

Pretrial detainees' challenges to the conditions of their confinement are governed

by the Due Process Clause of the Fifth Amendment, rather than the Eighth Amendment's

prohibition against cruel and usual punishment, which applies in the context of convicted

prisoners. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Due process requires that detainees

who have not been convicted of a crime not be punished. *Id*. at 537. The central question in

determining whether conditions of confinement "amount to punishment" is whether the

conditions were "imposed for the purpose of punishment":

> Absent a showing of an expressed intent to punish on the part of detention facility
> officials, that determination generally will turn on whether an alternative purpose
> to which the restriction may rationally be connected is assignable for it, and
> whether it appears excessive in relation to the alternative purpose assigned to it.

Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id*. at 538-39 (internal citations and quotations marks omitted). It may also be possible to infer, from statements and conduct of the defendants, that the conditions were imposed for the purpose of punishment. *See, e.g.*, *Mahase v. City of New York*, No. 96 CV 6105, 2000 WL 263742 at *6 (E.D.N.Y. Jan. 5, 2000) (hostility and accusation that plaintiff was "playing the big shot" by requesting more sanitary facilities were allegations sufficient to permit inference of intent to punish).

### b.     Whether Plaintiffs Have Stated a Claim

### 1.     MDC Plaintiffs

The plaintiffs who were detained at the MDC allege that they were: (1) repeatedly strip searched; (2) repeatedly placed in handcuffs, chains, and shackles; (3) deprived of hygienic implements, such as soap and toilet paper; (4) deprived of nutritious food; (5) subjected to extremely cold temperatures; (6) confined in cells that were illuminated 24 hours per day; and (7) subjected to both verbal and physical abuse.[32]

Defendants contend that the conditions of confinement alleged by plaintiffs were not imposed for the purposes of punishment or for interfering with the plaintiffs' religious

---

[32]     Each individual plaintiff does not allege that he was subjected to each of these conditions or restrictions. However, as explained further below, on these facts, I conclude that any one of these allegations, taken by itself, may have been imposed for the purpose of punishment and may be sufficient to state a claim for punishment without due process of law. *See Bell*, 441 U.S. at 535-38.

practices and therefore did not violate due process. They argue that plaintiffs' conditions of confinement, specifically handcuffing, shackling, and strip searches, were reasonably related to the defendants' interests in maintaining jail security. Def. Br. at 55. In addressing plaintiffs' various challenges to the conditions of their cells, defendants argue that these allegations are too generalized to state a claim.

Whether a due process violation exists "must be considered in light of the particular circumstances of each case and the particular facility in question." *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981) (prison violated due process rights of pretrial detainees by confining them in overcrowded conditions). "[T]he duration of confinement should be taken into account in judging the constitutionality of certain conditions." *Id.* (finding that double-bunked cells and overloaded dayrooms violate the Fourteenth Amendment when they are imposed for more than a 15-day period). Accordingly, in reviewing plaintiffs' claims, I am mindful of the fact that plaintiffs were not accused of any crime and were detained for significant periods of time, up to almost seven months.

Plaintiffs' allegations permit the inference that the conditions imposed upon them constituted punishment. First, and most significantly, the allegations of verbal and physical abuse alone permit the inference of an intent to punish. Indeed, assuming plaintiffs' allegations to be true, several MDC defendants expressly communicated their intent to punish plaintiffs. Second, these conditions, such as the strip searches and restraints, seem excessive and arbitrary in light of the fact that plaintiffs were not accused of committing any violent crimes. *See Bell*, 441 U.S. at 539 n.20 ("[L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve

objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish."); *Roundtree v. City of New York*, 778 F. Supp. 614, 623 (E.D.N.Y. 1991) ("[I]it is not difficult to conclude that denial of access to a lavatory or to a telephone after arrest, as well as providing food poorly suited for human consumption, might well be arbitrary or purposeless and a restriction or condition not reasonably related to a legitimate governmental goal such that, accordingly, an intent to punish may be inferred.") (internal quotation marks and citations omitted).

  Based on the allegations in the complaint, I cannot conclude that plaintiffs could prove no set of facts that would entitle them to relief. To the contrary, given the allegations of verbal and physical abuse, and the restraints and conditions imposed upon these detainees, it is not difficult to conclude that various conditions of their confinement were imposed for the purpose of punishment and violated their due process rights. *See Wright v. McMann*, 387 F.2d 519, 526 (2d Cir. 1967) (Eighth Amendment violation occurred where a prisoner was denuded and exposed to bitter cold in solitary confinement cell for substantial period of time and was deprived of soap and toilet paper); *Mahase*, 2000 WL 263742 at *6 (allegations of unsanitary facilities in central booking, denial of toilet paper after having informed guards of menstrual bleeding, insufficient food, denial of contact with family or attorney, and punitive intent sufficient to defeat motion to dismiss); *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (plaintiff stated Eighth Amendment violation where his cell was constantly illuminated and he had no way of telling day from night); *see also Shain v. Ellison*, 273 F.3d 56, 63 (2d Cir. 2001) (policy subjecting persons charged with misdemeanors to a strip search without individualized reasonable suspicion unconstitutional); *cf. Bowman v. City of Middleton*, 91 F. Supp. 2d 644, 665 (S.D.N.Y. 2000) (no due process violation where there was no evidence of punitive intent, and

order that arrestee be cuffed and shackled when outside his cell was based on specific

determination that arrestee was a threat in light of note he had sent to county jail superintendent).

## 2. Passaic Plaintiffs

The plaintiffs who were detained at Passaic Jail (Turkmen and Sachdeva) allege

that they were (1) housed in the general prison population with individuals who were charged

with or convicted of violent crimes (2) under severely overcrowded conditions and (3) threatened

by guards with menacing dogs. The plaintiffs have pointed to no binding authority that assigning

pretrial or immigration detainees to the general population of a jail violates the Due Process

Clause (indeed, this claim is somewhat ironic in light of the MDC plaintiffs' claims that it

violated due process for them to be housed separately). That allegation does not state a due

process violation. With respect to overcrowding, the Second Circuit held in *Lareau* that despite

the Supreme Court's admonition that "there is no 'one man, one cell' principle lurking in the

Due Process Clause," *Bell*, 441 U.S. at 542, housing pretrial detainees in overcrowded conditions

can still amount to punishment and thus violate the Constitution. "The question is one of degree

and must be considered in light of the particular circumstances of each case and the particular

facility in question." *Lareau*, 651 F.2d at 103. Similarly, whether the alleged threats involving

"menacing dogs" were so outrageous as to shock the conscience depends on all the

circumstances. For example, if a guard threatened to do serious harm to a detainee using a dog,

or actually used a dog to place a detainee in fear of being mauled, that could well violate due

process. On the other hand, if a guard merely performed his normal duties accompanied by a

mean-looking dog in order to deter prisoners from challenging her authority, that would not

violate due process. The plaintiffs' allegations do not specify precisely how the "menacing

dogs" were used.[33]  There is no requirement that they do so.  *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 511-14 (2002).  At this stage of the case, it suffices to say that defendants have not

established that there is no set of facts supporting those allegations on which plaintiffs would be

entitled to relief.  In short, these fact-bound due process issues cannot properly be decided on a

motion to dismiss.

c.    <u>Qualified Immunity</u>

With respect to defendants' claim that they are entitled to qualified immunity, it is

clearly established that conditions of confinement may not be imposed for the purpose of

punishment.  *Bell*, 441 U.S. at 538; *Curry v. Kerik*, 163 F. Supp. 2d 232, 236 (S.D.N.Y. 2001)

("A practice or policy constitutes punishment when there is a showing of expressed intent to

punish on the part of detention facility officials, when there is no legitimate non-punitive

government purpose to which the restriction or condition may rationally be connected, or when

the restriction is excessive in light of that alternative purpose.").  If the plaintiffs' allegations are

proven, then clearly established law was violated, and no reasonable officer could conclude

otherwise.  Accordingly, because the defendants' claims of qualified immunity are inextricably

bound up in the disputed facts relating to the conditions of confinement, I cannot conclude at this

stage that defendants are entitled as a matter of law to qualified immunity on these claims.  *See*

*Shain*, 273 F.3d at 66.

d.    <u>Personal Involvement</u>

The moving defendants argue that plaintiffs' claims of unconstitutional conditions

of confinement must be dismissed because plaintiffs fail to allege their personal involvement.

---

[33]  Paragraph 268 of the TAC alleges that Turkmen was "threatened by guards with menacing dogs"; paragraph 282 alleges that Sachdeva "was also threatened by menacing dogs."

It is true that in order to establish a *Bivens* claim, plaintiffs must allege facts showing that the defendant was personally involved in the alleged constitutional violation. *Ford v. Moore*, 237 F.3d 156, 161 (2d Cir. 2001). "Direct participation, however, is not necessary." *Morris v. Eversley*, 205 F. Supp. 2d 234, 241 (S.D.N.Y. 2002). Plaintiffs can state a claim for personal involvement by alleging that the defendants at issue: (1) participated directly in the alleged violation; (2) after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) created a policy or custom, or allowed the continuance of such a policy or custom, under which unconstitutional practices occurred; (4) were grossly negligent in supervising subordinates who committed the unlawful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Although ordinarily the bare assertion that high-level executive officials were responsible for an unconstitutional policy, without more, is insufficient to state a *Bivens* claim, *see Nuclear Transp. & Storage, Inc. v. United States*, 890 F.2d 1348, 1355 (6th Cir. 1989), for the reasons I stated in *Elmaghraby v. Ashcroft*, I conclude that the MDC plaintiffs have alleged, principally through incorporation of the OIG Report, "sufficient facts to warrant discovery as to the defendants' involvement, if any, in [the] polic[ies] that subjected plaintiffs to lengthy detention in highly restrictive conditions while being deprived of any process for challenging that detention." 2005 WL 2375202 at *20 & n.20 ("The April 2003 OIG report ... suggests the involvement of Ashcroft, the FBI Defendants, and the BOP Defendants in creating or implementing a policy under which plaintiffs were confined in restrictive conditions until cleared by the FBI from involvement in terrorist activities."). *See Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (supervisory liability under *Bivens* may be shown by "creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue," or by the "failure to act on information indicating that unconstitutional acts were occurring."). *See also* TAC ¶ 76 (quoting Ashcroft as saying "Islam is a religion in which God requires you to send your son to die for him. Christianity is a faith in which God sends his son to die for you"; and "Let the terrorists among us be warned. If you overstay your visa even by one day, we will arrest you. If you violated a local law we will ... work to make sure that you are put in jail and ... kept in custody as long as possible."). The plaintiffs have argued that the Washington-based defendants created a policy "that the time served by those rounded-up would be 'hard-time' and that their Muslim faith would not be respected while in custody." Plaintiffs' Br. in Opp. to Mtn. to Dismiss Sec. Amend. Cmplt. 44. Alternatively, the plaintiffs have argued that "[t]he widespread and patterned nature of the pleaded violations are themselves evidence of constructive notice" to high-ranking officials. *Id*. at 46. It is too early to tell whether the plaintiffs will be able to prove such allegations, but it is also too early to fairly conclude that they should not be permitted the opportunity to do so.

In sharp contrast to the MDC plaintiffs, however, the Passaic plaintiffs make no allegation that they were singled out for harsh treatment as post-September 11 detainees; indeed, they specifically allege that they were lumped in with the general population. The other inmates at Passaic were thus subject to the same overcrowded conditions and, from all the complaint reveals, the same menacing dogs. The plaintiffs' theory of personal involvement, then -- that the Washington-based defendants were the "principal architect[s]," Pl. Br. at 18, of the investigation into the September 11 attacks, including directing the harsh conditions under which detainees were to be held -- does not extend to the Passaic jail, where, according to the complaint, post-

September 11 detainees were treated like the rest of the inmates. Whatever injury the plaintiffs suffered at Passaic from dogs or overcrowding,[34] they have not alleged that such injury was in any way because of a policy initiated in response to the September 11 attacks. Accordingly, the Passaic plaintiffs having failed to sue any official who actually worked at the Passaic Jail, claim 3 is dismissed as to plaintiffs Turkmen and Sachdeva.

6.     Interference With Religious Practices (Claim 7)

The plaintiffs allege the defendants deliberately interfered with their religious practices in violation of the Free Exercise Clause. Specifically, plaintiffs allege they were (1) denied copies of the Koran; (2) denied Halal food; (3) refused information regarding the date or time of day so that they were unable to say the appropriate prayers; and (4) constantly interrupted during daily prayers. The defendants appear to concede that these allegations state a claim for violation of clearly established law under the Free Exercise Clause, *see*, *e.g.*, *Benjamin v. Coughlin*, 905 F.2d 571, 574-75 (2d Cir. 1990), but argue that the "context of those allegations makes clear that the alleged perpetrators were prison guards and staff members," not the moving defendants. For the reasons just explained above, however, it cannot be said, without first permitting some discovery into the matter, that the plaintiffs can prove no set of facts that will entitle them to relief against the moving defendants on this claim. The plaintiffs have alleged that high-level officials had knowledge or reasonably should have known that the religious rights of Muslim detainees were being intentionally violated, and that those officials were complicit in such treatment. If proved, then the plaintiffs are entitled to recover on claim 7. *See Richardson*, 347 F.3d at 435. The defendants motion to dismiss claim 7 is therefore denied.

7.     Procedural Due Process in Assignment to the ADMAX SHU (Claim 20)

---

[34]     Claim 7, on the other hand, can fairly be construed to allege that the Passaic plaintiffs were singled out for mistreatment -- intentional interference with their Muslim faith -- as a result of their status as post-September 11 detainees.

Claim 20 alleges that the defendants violated the plaintiffs' rights to procedural due process by assigning them to the ADMAX SHU "without ... process of any sort" and without affording them any means to challenge their continued detention there. TAC ¶ 391. The Second Circuit clearly established in *Tellier v. Fields*, 280 F.3d 69, 80-81 (2d Cir. 2000), that assignment to the SHU at the MDC affected a protectable liberty interest created by BOP regulations, *see* 28 C.F.R. § 514.22. Taking as true the plaintiffs' allegation that they received no process at all before being assigned to the SHU (and kept there), they have stated a claim. Further, as I explained in *Elmaghraby*, the context of the September 11 investigation does not, as the defendants argue, "extinguish any rights otherwise conferred by [28 C.F.R.] § 541.22." 2005 WL 2375202 at *18. The argument that "constitutional and statutory rights must be suspended during times of crisis ... is supported neither by statute nor the Constitution." *Id*., citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."). I conclude that the plaintiffs have sufficiently alleged the defendants' personal involvement in this claim, and therefore the motion to dismiss claim 20 is denied. *See id*. at *20 & n.20.

8.    The Length of Detention Claims

Plaintiffs allege that their detention for "months longer than necessary to secure their removal from the United States," without either a probable cause hearing or "any legitimate immigration law purpose," violated their Fourth Amendment right to be free from unreasonable seizures and their Fifth Amendment right not to be deprived of their liberty without due process of law. TAC ¶¶ 289, 294. These claims are essentially predicated upon plaintiffs' allegation that

they were ready to be removed immediately and that the Attorney General had a duty of reasonable dispatch to remove them as early as practicable.

As noted earlier, once an alien is ordered removed, the government is required to detain him until removal is effected, at least for the first 90 days.  8 U.S.C. § 1231(a)(2).  If the government fails to secure removal during that time, then the alien may be further detained:

> An alien ordered removed [1] who is inadmissible ... [or] [2] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period ....

*Zadvydas*, 533 U.S. at 682 (citing 8 U.S.C. § 1231(a)(6) (alterations in original)).  Pursuant to INS regulations, the INS District Director or Director of the Detention and Removal Field Office conducts a review of the alien's record ("custody review") prior to the expiration of the 90-day removal period to determine whether post-removal-period detention is warranted.  8 C.F.R. §§ 241.4 (c)(1), (h), (k)(1)(i).  Factors considered in making this determination include the detainee's criminal conduct, mental fitness, ties to the United States, prior immigration violations and history, and the likelihood that the alien is a significant flight risk or a potential danger to the community.  8 C.F.R. § 241.4(f).  In the event that the alien is further detained, the regulations require additional periodic custody reviews.  8 C.F.R. §§ 241.4(k)(1)(ii), (2).  Notice of the review is provided to the alien so that he may submit information in support of his release.  8 C.F.R. § 241.4(h)(2).

The Fifth Amendment prohibits the government from "depriv[ing]" any person of "liberty ... without due process of law."  Plaintiffs argue that their detention violated "substantive due process," which "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *United States v.*

*Salerno*, 481 U.S. 739, 746 (1987) (internal quotation marks and citations omitted). This prohibition applies to citizens and non-citizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982)).

In *Zadvydas*, two aliens who had been ordered removed claimed that the length of their post-removal-period detention violated their due process rights. The government had been unable to remove the aliens, both of whom had been convicted of crimes while in the United States, because no country was willing to accept them. In response to the plaintiffs' claims, the government argued that 8 U.S.C. § 1231(a)(6) authorizes indefinite post-removal-period detention. After concluding that such a reading would render the statute unconstitutional in some applications under the Due Process Clause, the Supreme Court held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

The Court in *Zadvydas* acknowledged the potentially difficult task lower courts face in determining whether a removal is reasonably foreseeable, particularly when they must give appropriate "decisionmaking leeway" to the executive branch based on its particular expertise in this area and the administrative difficulties associated with immigration law enforcement. *Id*. at 700. In order to limit the number of cases in which courts would have to make these "difficult judgments," the Court recognized a presumptively reasonable period of detention. As the Second Circuit has since explained:

> The Court stated that detention is presumptively reasonable for six months following a final removal order, and that, after the first six months, detention violates [the statute] if (1) an alien demonstrates that there is no significant likelihood of removal in the reasonably foreseeable future and (2) the government is unable to rebut this showing.

71

*Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003) (citing *Zadvydas*, 533 U.S. at 701).

Accordingly, detention beyond the six-month period is not *per se* unreasonable. Further

detention is permissible "until it has been determined that there is no significant likelihood of

removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.

Applying *Zadvydas*, the Second Circuit held in *Wang* that the "reasonable

foreseeability" test not only defines when immigration detention is a statutory violation but also

"articulates the outer bounds of the Government's ability to detain aliens (other than those

serving criminal sentences) without jeopardizing their due process rights." *Wang*, 320 F.3d at

146. Thus, detention of an alien when removal is no longer "reasonably foreseeable" violates

both 8 C.F.R. § 241.4(i)(7) and the Due Process Clause. *Wang*, 320 F.3d at 146.

Plaintiffs argue that the analysis set forth in *Zadvydas* should be limited to the

facts of that case, where removal is delayed because no country can be found to accept the aliens

ordered removed. Nothing in *Zadvydas* suggests that it should be so narrowly construed.

Indeed, there is language indicating that the Court intended *Zadvydas* to be applied in all cases

involving aliens covered by the statute. For example, in setting forth the standard, the Court

expressly relied on the fact that the statute had broad applicability, covering both convicted

criminals and ordinary visa violators, such as plaintiffs in this case. *Zadvydas*, 533 U.S. at 697.

The dissent acknowledged the decision's application to all categories of aliens covered by the

statute when it attacked the decision on the ground that it would produce skewed results, making

it easier for the government to detain ordinary visa violators than convicted criminals. *Id*. at 716

(Kennedy, J., dissenting) ("aliens who violate mere tourist visa requirements can in the typical

case be held pending deportation on grounds that a minor offender is more likely to be

removed"). I am mindful that "Cassandra-like predictions in dissent are not a sure guide to the

breadth of the majority's ruling." *United States v. Travers*, 514 F.2d 1171, 1174 (2d Cir. 1974). Justice Kennedy's complaint in *Zadvydas*, however, was not that aliens like the plaintiffs here could be lawfully detained for at least six months, but that violent aliens might not be detained for even longer periods. In any event, the Second Circuit has rejected the plaintiffs' reading of *Zadvydas*, applying its reasonable foreseeability test where there was no allegation that the government was likely to have difficulty securing another nation's acceptance of the alien. *See Wang*, 320 F.3d at 146.

Under *Zadvydas*, aliens' due process rights are "not jeopardized by [their] continued detention as long as [their] removal remains reasonably foreseeable." *Id.* Four out of the seven plaintiffs in this case, Turkmen, Saffi, Jaffri, and Sachdeva, were removed within six months of their final removal or voluntary departure orders, and therefore their detention was presumptively reasonable under *Zadvydas*.[35] While three plaintiffs in this case, Yasser, Hany and Baloch, were detained beyond the six-month period, the complaint does not allege that during the period of their detention there was no significant likelihood of removal in the reasonably foreseeable future.[36] *See Zadvydas*, 533 U.S. at 701; *see, e.g.*, *Wang*, 320 F.3d at 146 (holding that petitioner's due process rights were not violated because his removal was reasonably foreseeable).

What the complaint does allege is that the plaintiffs were detained "longer than necessary" to effectuate their removal and that the government intentionally delayed their

---

[35]    Turkmen was detained for three months and 25 days from the date he accepted a voluntary departure order. Saffi was detained for four months and 18 days after he was ordered removed. Jaffri was detained three months and 12 days after he was ordered removed. Sachdeva was detained for three months and 17 days after he was ordered removed.

[36]    Yasser was detained for six months and 16 days after he was ordered removed. Hany was detained six months and nine days after he was ordered removed. Baloch was detained for six months and 27 days after he was ordered removed.

removal for reasons unrelated to any legitimate immigration purpose. However, such allegations do not state a due process claim, and plaintiffs have failed to cite any case law indicating otherwise. The recognition of such a claim would flood the courts with habeas petitions brought by aliens seeking to be removed as soon as they deemed it practicable (possibly only a matter of weeks after a removal order has issued, according to plaintiffs). Such claims would significantly encroach on the executive branch in a realm where it has particular expertise, since it would require courts to decide what is necessary to effectuate an alien's removal and whether the government's efforts to secure removal have been sufficient. Such extraordinary judicial oversight would be entirely at odds with the Court's reasoning in *Zadvydas*, which demonstrated significant deference to the executive in recognizing the presumptively reasonable six-month period. *See Zadvydas*, 533 U.S. at 700-01.

Further, the plaintiffs' claims assume that all that is required for the Attorney General to secure removal is a deportation order and an airplane. This assumption ignores legitimate foreign policy considerations and significant administrative burdens involved in enforcing immigration law in general, and, specifically, those concerns immediately following a terrorist attack perpetrated on the United States by noncitizens, some of whom had violated the terms of their visas at the time of the attack. *See, e.g.*, 8 U.S.C. § 1231 (b)(2)(C)(4) (Attorney General may disregard the alien's designation of the country to which he would like to be removed if he decides that removing the alien to that country is prejudicial to the United States); *see also* Susan Sachs, *Threats and Responses: Security*, N.Y. Times, Sept. 9, 2002, at A16 ("[s]ome of the 19 hijackers in last year's terror attacks had violated the terms of or overstayed visas").

With respect to plaintiffs' allegations that they were detained in the absence of individualized determinations in a procedurally fair process that they posed a risk of flight or a danger to the community, these allegations also do not establish a due process violation. In *Wang*, a habeas petitioner argued that his continued post-removal period detention without a bail hearing violated his substantive due process rights. *Wang*, 320 F.3d at 146. The Second Circuit squarely rejected this argument and, relying on *Zadvydas*, held that Wang's due process rights were not in jeopardy as long as his removal remained reasonably foreseeable.[37] *Id.* ("Wang asks us to hold that his continued detention without a bail hearing violates his substantive due process rights. But, pursuant to *Zadvydas,* Wang's due process rights are not jeopardized by his continued detention as long as his removal remains reasonably foreseeable.").

In any event, even if plaintiffs' allegations stated a due process violation, the defendants would be entitled to qualified immunity. It can hardly be said, in light of the authorities discussed above, that the plaintiffs had a clearly established due process right to immediate or prompt removal at the time they were held in detention.

In addition to claiming that the length of their detention violated their due process rights, plaintiffs claim that the reason for their detention violated their Fourth Amendment right to be free from unreasonable seizures. I note at the outset that there is significant authority rejecting plaintiffs' assertion that the Fourth Amendment applies to post-arrest detention. *See, e.g.*, *Riley v. Dorton*, 115 F.3d 1159, 1162-64 (4th Cir. 1997) (en banc) (rejecting "continuing seizure" theory under the Fourth Amendment); *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993) ("As the Fourth Amendment protects against unreasonable 'seizures,' it seems

---

[37]     There is no allegation that the INS failed to provide plaintiffs with custody reviews pursuant to the procedures set forth in 8 C.F.R. § 241.4. Nothing in *Zadvydas* or *Wang* suggests that aliens subject to removal orders require any individualized determination beyond the administrative custody review proceedings, where the alien bears the burden of proving that he is not dangerous or a risk of flight. *See Zadvydas*, 533 U.S. at 692 (citing 8 C.F.R. § 241.4(d)(1)).

primarily directed at the *initial* act of restraining an individual's liberty") (emphasis in original). Plaintiffs themselves concede that the Supreme Court has "left open" the question whether the Fourth Amendment applies to post-arrest detention, and they cite no Second Circuit precedent resolving this issue in their favor. Therefore, at the very least, the Fourth Amendment's application in this context is not clearly established, and, thus, defendants are entitled to qualified immunity.

Even assuming, however, that the Fourth Amendment applies to post-arrest detention, I conclude that plaintiffs fail to state a Fourth Amendment claim. Plaintiffs allege that they were held for criminal investigation without probable cause. This claim is entirely dependent upon plaintiffs' contention that their detention was not otherwise authorized. Although plaintiffs concede that they were lawfully arrested for violating the terms of their admission to the United States, they argue that at some point (apparently a short time after they were ordered removed), the government could have effectuated their removal. And after that, plaintiffs argue, their continued detention no longer served any legitimate immigration law purpose. Since the "real" reason for their continued detention was to investigate suspicions that they were involved in terrorist activity, plaintiffs claim that the Fourth Amendment was violated because there was no probable cause.

As explained above, plaintiffs' entire detention was authorized by the post-removal period detention statute. That the government may have been motivated by a desire to keep terrorism suspects in jail pending further investigation does not alter the legality of the detention. It is well-established that the government's "[s]ubjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional." *Whren v. United States*, 517 U.S. 806, 813 (1996) (internal quotation marks omitted). Accordingly, even accepting as true

plaintiffs' allegations regarding defendants' motives, the detention of plaintiffs was authorized pursuant to the post-removal detention statute and thus did not violate the Fourth Amendment.

         9.        <u>Equal Protection Claim</u> (Claim 5)

Plaintiffs assert that defendants violated their equal protection rights by selecting them based on their race, religion and/or national origin for (1) detention beyond the period necessary to secure their and removal and (2) harsh treatment. With respect to harsh treatment, the motion to dismiss is denied for the reasons stated in *Elmaghraby v. Ashcroft*, 2005 WL 2375202 at *29 ("[P]laintiffs allege that they were confined under significantly harsher conditions than other pretrial detainees because of their race and religion, and not because of any evidence that they were involved in terrorist activity. I cannot conclude as a matter of law that there is no set of facts consistent with plaintiffs' allegations that could entitle them to relief."). I am not persuaded that the government's plenary authority in the immigration context provides any basis for affording the defendants extraordinary deference regarding the plaintiffs' conditions of confinement, and I therefore see no reason to distinguish this aspect of the plaintiffs' equal protection claim from the similar claim of the *Elmaghraby* plaintiffs.

With respect to the length of the plaintiffs' detention, however, as I have explained above, the government was authorized under the immigration laws to detain the plaintiffs for as long as it did. In light of that conclusion, the plaintiffs' remaining equal protection claim is that they were selected from among other visa violators for especially (but not illegally) lengthy detention based upon impermissible motivations. That is closely akin to a selective enforcement claim, which, in the immigration context, is generally not cognizable. In *Reno v. American-Arab Anti-Discrimination Committee*, the Supreme Court explained as follows:

> What will be involved in deportation cases is not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives and (as in this case) foreign-intelligence products and techniques. The Executive should not have to disclose its "real" reasons for deeming nationals of a particular country a special threat -- or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals -- and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.

525 U.S. 471, 490-91 (1999). In establishing that "general rule" the Court did not "rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." *Id*. at 491. Although "outrageous" is not a self-defining term, a few things the Court did not consider to be outrageous are apparent: "deeming nationals of a particular country a special threat ... [and] antagoniz[ing] a particular foreign country by focusing [enforcement efforts] on that country's nationals." *Id*.

There is thus nothing outrageous about the plaintiffs' claim of national-origin discrimination in this context; the executive is free to single out "nationals of a particular country" and "focus[]" enforcement efforts on them. *Id*. This is, of course, an extraordinarily rough and overbroad sort of distinction of which, if applied to citizens, our courts would be highly suspicious. Yet the Supreme Court has repeatedly held that the political branches, "[i]n the exercise of [their] broad power over naturalization and immigration ... regularly make[] rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *compare*, *e.g,*, *Fiallo v. Bell*, 430 U.S. 787 (1977) (upholding law denying illegitimate child fathered by American citizen the immigration privilege afforded to a legitimate child), *with Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (striking down housing ordinance limiting occupancy of a dwelling to a single family and defining a single family to preclude grandmother from having grandson live with her). Indeed, "any policy toward aliens is vitally and intricately

interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id*. at 589.

Similarly, I do not believe the plaintiffs' claims of selective enforcement on the basis of their race and religion provide any cause to depart from the general rule laid out in *AADC*. In the investigation into the September 11 attacks, the government learned that the attacks had been carried out at the direction of Osama bin Laden, leader of al Queda, a fundamentalist Islamist group; some of the hijackers were in violation of the terms of their visas at the time of the attacks. In the immediate aftermath of these events, when the government had only the barest of information about the hijackers to aid its efforts to prevent further terrorist attacks, it determined to subject to greater scrutiny aliens who shared characteristics with the hijackers, such as violating their visas and national origin and/or religion. Investigating these aliens' backgrounds prolonged their detention, delaying the date when they would be removed.

As a tool fashioned by the executive branch to ferret out information to prevent additional terrorist attacks, this approach may have been crude, but it was not so irrational or outrageous as to warrant judicial intrusion into an area in which courts have little experience and less expertise. *See AADC*, 525 U.S. at 490-91; *Matthews*, 426 U.S. at 81-82 ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."); *see also Zadvydas*, 533 U.S. at 696 (stating that "terrorism" might warrant "special arguments" for "heightened deference to the judgments of the political branches with respect to matters of

national security").  I note, however, that the extraordinary circumstances of September 11 are by no means a prerequisite to the deference owed the political branches in this area.  *See Fiallo*, 430 U.S. at 796 (rejecting attempt to cabin "prior immigration cases as involving foreign policy matters and congressional choices to exclude or expel groups of aliens that were ... perceived to pose a grave threat to the national security").  Such national emergencies are not cause to relax the rights guaranteed in our Constitution.  Yet regarding immigration matters such as this, the Constitution assigns to the political branches all but the most minimal authority in making the delicate balancing judgments that attend all difficult constitutional questions; "nothing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require [courts] to equate [their] political judgment with that of" the executive or the Congress.  *Harisiades*, 342 U.S. at 590.

In any event, if an equal protection violation did occur, it certainly was not clearly established in light of the above precedent, and therefore the defendants are entitled to qualified immunity.  To the extent claim 5 is based on the length of the plaintiffs' detention, it is dismissed.

          10.      <u>Confiscation of Personal Property Claim</u> (Claim 8)

Plaintiffs allege that defendants adopted, promulgated, and implemented a policy of depriving them of property without due process of law.  TAC ¶¶ 322-26.  Specifically, plaintiffs allege that personal items, including personal identification and cash, were confiscated when they were taken into custody and that many of these items have not been returned to them.  Relying on *Hudson v. Palmer*, 468 U.S. 517 (1984), defendants argue that this claim is not actionable under *Bivens* because the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b),

provides an adequate postdeprivation remedy.[38]  In *Hudson*, the Supreme Court held "that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  468 U.S. at 533.  As the Second Circuit has explained:

> When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees.  In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy.  When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process.

*Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citing *Palmer*, 468 U.S. at 531-33; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982); *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986)).  Accordingly, an adequate postdeprivation remedy is only a defense to a due process claim where the deprivation is "random and unauthorized."  *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir. 1998) (quoting *Butler v. Castro*, 896 F.2d 698, 700 (2d Cir. 1990)).[39]  The rationale for distinguishing between random (and unauthorized) deprivations and

---

[38]     The FTCA gives federal district courts "exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government ...."  Under the FTCA, the United States is vicariously liable for the acts of its employees "in the same manner and to the same extent as a private" employer under state law.  28 U.S.C. § 2674.  The Second Circuit has construed those provisions to authorize recovery for conversion of property and for negligent damage to property.  *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999).

[38]     Although the Supreme Court cases articulating and applying this doctrine address violations of Fourteenth Amendment due process, federal courts have also applied it in the context of a Fifth Amendment due process claim.  *See, e.g.*, *Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1526 (11th Cir. 1986); *Del Raine v. Williford*, 32 F.3d 1024, 1046 (7th Cir. 1994) (citing *Orebaugh v. Caspari*, 910 F.2d 526 (8th Cir. 1990)).

81

those resulting from established policy is that, in the former instance, the government "cannot predict when the loss will occur .... [Therefore] it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." *Palmer*, 468 U.S. at 532 (internal quotation marks and citations omitted).

Plaintiffs allege that they were deprived of their property pursuant to an established policy or practice, and thus their claims are not within the scope of *Hudson v. Palmer*. In support of that claim, they allege that defendants refused the requests of Saffi, Jaffri, Baloch, and Sachdeva that their identification documents be returned prior to their removal. As of the filing of the TAC, only Sachdeva's had been returned, despite the others' repeated requests. The plaintiffs argue that the defendants had a motive to create such a policy, in that "[d]eprivations of identity documents might facilitate the continuing investigation, and limit Plaintiffs' mobility in their home countries." Pl. Br. 77. These allegations of a pattern are sufficient to withstand the defendants' motion. If, after the plaintiffs are given the opportunity to take discovery, they can adduce evidence to support their allegations, then the existence of a postdeprivation remedy will not constitute a defense to their claim.[40]

Despite the defendants' assertion of qualified immunity from liability on this claim, they do not (and could not) argue that it was not clearly established that the alleged conduct constituted a constitutional violation. Rather, in essence, they argue that the purpose of the doctrine of qualified immunity would be undermined by allowing such unsupported claims to stand. But support for such allegations is not the issue on a motion to dismiss. And deficiency

---

[40] Defendants argue that plaintiffs have not alleged the uniform confiscation of property that might be indicative of a controlling policy or practice. I disagree. While it is true that the specific factual allegations of a policy or practice involve only four of the seven named plaintiffs, they sufficiently allege an established government procedure. Moreover, the defendants seek a blanket dismissal of this claim, not just a dismissal as to the plaintiffs who do not specifically allege the deprivation. Accordingly, I do not address this claim with respect to each individual plaintiff.

on that score will be addressed after discovery, as will defendants' claim that it was objectively reasonable for them to believe their acts did not violate plaintiffs' rights. The facts are not sufficiently developed at this time for me to conclude as a matter of law that there is no set of facts on which plaintiffs will be entitled to relief.

11.    Delay in Serving Charging Documents Claim (Claim 17)

Ebrahim, Ibrahim, Sachdeva, and Jaffri claim that defendants delayed the issuance and service of Notices to Appear, impairing the plaintiffs' ability to know the charges on which they were being held, to obtain legal counsel, and to seek release on bond, thereby violating their Fifth Amendment due process rights.[41]  A Notice to Appear informs an alien of the nature of the proceedings and the charges against him.  8 U.S.C. § 1229.  At the time an alien is served with the document, he must also receive a current list of legal counsel who are available to represent aliens on a *pro bono* basis.  *Id.*  Plaintiffs allege that plaintiffs Ebrahim and Ibrahim were not served with Notices to Appear until sixteen days after their respective arrests; plaintiff Sachdeva was not served until seven days after his arrest; and plaintiff Jaffri was not served until five days after his arrest.[42]  Defendants argue that plaintiffs have failed to state a claim and, in any event, that defendants' alleged conduct did not violate clearly established law, and therefore they are entitled to qualified immunity.

I conclude that the plaintiffs have failed to state a claim.  They have cited no statutory or other legal authority prescribing when, after an alien has been arrested without a warrant, he must be served with a Notice to Appear.  The regulations provide that "a *determination* will be made within 48 hours of the arrest, *except in the event of an emergency or*

---

[41]     While this claim is not asserted by all named plaintiffs, it is brought on behalf of the class.

[42]     Although it may be that other members of the putative class were detained longer before being served with a Notice to Appear, no class has been certified.  Therefore, in order for plaintiffs' complaint to survive this motion to dismiss, the allegations of the named plaintiffs must state a claim for relief.

*other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time* ... whether a notice to appear ... will be issued."  8 C.F.R. § 287.3(d) (emphasis added).  I have little trouble concluding that the events of September 11, 2001 qualify as extraordinary circumstances and, in light of those events, the several days it took plaintiffs to be served with Notices to Appear was a reasonable period of time.

Although plaintiffs are correct in their assertion that the defendants' compliance with 8 C.F.R. § 287.3(d) does not necessarily render their conduct consistent with the Constitution, they fail to cite any controlling authority in support of their claim that a delay of as little as five days in serving an INS charging document constitutes a substantive due process violation.  Urging me to look to the criminal context, plaintiffs rely on *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), which addresses the length of permissible delay between a warrantless arrest and an appearance before a judicial officer for a probable cause determination. The Supreme Court held that, absent a showing by the government of "the existence of a bona fide emergency or other extraordinary circumstance," *id*. at 57, a probable cause determination must be provided within 48 hours, and sooner if the determination was delayed unreasonably, such as for the purpose of gathering additional evidence to support the arrest.  *Id*. at 56. Plaintiffs argue that *County of Riverside* supports their argument that they have stated a claim for both Fourth and Fifth Amendment violations, though their claim as pleaded is only for a violation of their due process rights.  I disagree.

First, I am not persuaded that the same rule that applies in the context of a warrantless arrest should apply here, and plaintiffs cite no authority suggesting that it does.  As stated earlier in addressing plaintiffs' length of detention claims, the protections of the Due Process Clause extend to aliens.  *Zadvydas*, 533 U.S. at 693 (citing *Plyler v. Doe*, 457 U.S. at

210).  There is no doubt that at *some point* after arrest, an alien's due process rights would be violated if he were detained without being served a Notice to Appear.  But I do not believe that this case requires me to draw that line, merely to find that it was not crossed on these facts.  Moreover, even assuming that *County of Riverside* controlled here, the exception it carved out for extraordinary circumstances would be applicable.[43]  *See* OIG Report at 31-34 (delays in serving Notices to Appear caused directly or indirectly by the September 11 attacks).  In any event, the application of *County of Riverside*'s 48-hour rule to this context is certainly not clearly established, and therefore defendants are entitled to qualified immunity.

> In addition to claiming a substantive due process violation in connection with the service of the notices to appear, plaintiffs bring a procedural due process claim.  Determining whether such a violation has occurred requires a balancing of the governmental and private interests involved.  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  In making this determination, the Supreme Court has stated that three factors are to be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335.  Although on some sets of facts -- *e.g.*, a length of detention prior to receiving notice greater than 16 days, the absence of extraordinary circumstances putting a strain on administrative resources -- the risk of an erroneous deprivation may be high, and a detained alien's interest in having notice of the charges against him may outweigh any government interest, those facts are not alleged here.  In any event, plaintiffs, failing to cite any controlling

---

[43]  Plaintiffs argue that the *County of Riverside* exception should not apply here because the defendants delayed serving Notices to Appear in order to investigate plaintiffs for ties to terrorist organizations.  Assuming *arguendo* that the delays in service of the Notices to Appear were for this purpose, I would still find that plaintiffs had failed to state a claim for relief.

legal precedent, do not show that it was clearly established that under these or similar circumstances, an alien's procedural due process rights are violated if they are not served with a Notice to Appear within 16 days of their arrest and detention. Qualified immunity is thus available to the defendants as a matter of law on this claim as well.

12. "Communications Blackout" Claims (Claims 21 and 22)

Plaintiffs assert two claims relating to the alleged "communications blackout": first, that it violated their right to freedom of speech, and second, that it violated their right of access to the courts and to legal counsel.

a. Freedom of Speech

Claim 21 alleges that the communications blackout violated the plaintiffs' first amendment right to freedom of speech. Although the applicable legal standard for such claims brought by pretrial and immigration detainees is not quite clear, the Second Circuit has used, as a fallback position in the context of pretrial detainees, the standard articulated in *Turner v. Safley*, 482 U.S. 78 (1987), which ordinarily applies to claims of convicted prisoners. *See Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) (declining to articulate precise standard for pretrial detainees because "the policies and practices at issue here would not survive scrutiny under *Turner*, if in fact that standard is applicable."). Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Here, of course, penological must be taken to mean "relating to prison management" rather than "relating to punishment"; as discussed above, the government was not permitted to adopt the communications blackout for the purpose of punishing the plaintiffs. *See Bell v. Wolfish*, 441 U.S. at 538-39. But with that caveat, the

*Turner* standard proves useful nonetheless in balancing the government's legitimate interests against the plaintiffs' asserted rights:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Turner*, 482 U.S. at 89-91 (internal citations and quotation marks omitted).

The defendants argue that "concern over communications between possible terrorists and potential escape and attack plans" after September 11, 2001 justified the communications blackout as reasonable. The plaintiffs counter, however, that they have alleged (and it must be taken as true at this stage) that the defendants never had any basis to believe the plaintiffs had any connection to terrorists. Whatever the basis for suspecting the plaintiffs of terrorism may have been, it cannot be said at this stage that the defendants' justifications require dismissal. For example, the plaintiffs allege that they were taped (video and audio) while speaking with their attorneys, and that as a result they could not speak candidly; that family members and lawyers who came to visit them at the MDC were falsely told they were not there; and that guards purposely dialed incorrect phone numbers when they tried to call their lawyers and their families. These allegations, if proved, may well constitute a violation of clearly established rights. And for the reasons I have explained above, in light of the OIG report, it is too early to tell whether the plaintiffs will be able to prove the personal involvement of the moving defendants. The motion to dismiss claim 21 is denied.

b.        Access to the Courts

The plaintiffs in claim 22 allege that the communications blackout violated their right of access to the courts.  As the defendants point out, however, the plaintiffs have not identified a particular affirmative claim for legal redress that the communications blackout is presently keeping them from asserting or any claim "that cannot now be tried (or tried with all material evidence)."  *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002).  The plaintiffs argue they need not identify any such claim because they assert a "direct" violation of the right of access to the courts, and that an underlying claim that was prejudiced must be asserted only where a "derivative" violation of the right of access has been alleged.

Although this direct/derivative distinction has some basis in Second Circuit case law, *see Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) (holding that no additional prejudice need be alleged other than violation of the Sixth Amendment by a criminal defendant bringing access claim), in my view it does not survive *Christopher v. Harbury*, in which the Supreme Court explained:

> Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.  We indicated as much in our most recent case on denial of access, *Lewis v. Casey*, [518 U.S. 343, 353 (1996)], where we noted that even in forward-looking prisoner class actions to remove roadblocks to future litigation, the named plaintiff must identify a "nonfrivolous," "arguable" underlying claim, ... and we have been given no reason to treat backward-looking access claims any differently in this respect.  It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.  It follows, too, that when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought.  There is, after all, no point in spending time and money to establish the facts constituting denial of

access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

536 U.S. at 414-15 (internal citations and quotation marks omitted). This reasoning leaves little doubt that the plaintiffs are required to show some underlying claim or right that was prejudiced as a result of their having been denied access to the courts. The Second Circuit's decision (though perhaps not its terminology) in *Benjamin v. Fraser,* is entirely consistent with this view; *Benjamin* points out another type of access case, brought by one who claims not that the violation has precluded the prosecution of a case, but the defense of one. Indeed, the court explained:

> [H]ere we are concerned with the Sixth Amendment right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense. It is not clear to us what "actual injury" would even mean as applied to a pretrial detainee's right to counsel. *Lewis* describes "actual injury" as a showing that a "non-frivolous legal claim had been frustrated or was being impeded" due to the action of prison officials .... The reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them.

*Benjamin*, 264 F.3d at 186.

Thus, the rule of *Christopher v. Harbury* does not mean the plaintiffs are out of luck. As I noted above, immigration detainees have a right to counsel rooted in the Due Process Clause and the INA. *See Michel v. INS*, 206 F.3d 253, 258 (2d Cir. 2000) ("Under the Due Process Clause and the Immigration and Nationality Act, an alien is entitled to representation of his own choice at his own expense.") Reading the complaint liberally, it can be construed as alleging that the communications blackout prejudiced the plaintiffs in defending the immigration proceedings against them by limiting their access to counsel, a right they enjoyed independently under the Constitution and laws of the United States. The motion to dismiss claim 22 is denied.

C.        International Law Claims (Claims 9-11)

Plaintiffs seek damages personally against defendants for violations of customary international law.  Specifically, they assert claims for violations of international law prohibitions against "arbitrary detention" and "cruel, inhuman or degrading treatment" pursuant to the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and violations of the consular notification requirement under the Vienna Convention on Consular Relations, April 24, 1963, T.I.A.S. No. 6820, 21 U.S.T. 77, Art. 36.

Defendants argue that these claims fall within the scope of the Liability Reform Act, 28 U.S.C. § 2679.  The Liability Reform Act provides that for civil actions based on the wrongful conduct of federal employees acting within the scope of their employment, the only remedy is an action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, against the government itself.  28 U.S.C. § 2679(b)(1).  There are two exceptions to this exclusive remedy provision.  It does not apply to actions against an employee of the government "which is brought for a violation of the Constitution of the United States, or ... for a violation of a statute of the United States under which such action against an individual is otherwise authorized."  *Id*. at § 2679(b)(2)(A), (B).  If an action does not fall within these two exceptions, the government employee defendants enjoy absolute immunity because the lawsuit may proceed only against the United States pursuant to the requirements of the FTCA.  *See United States v. Smith*, 499 U.S. 160, 163 (1991) ("The Liability Reform Act establishes ... absolute immunity for Government employees ....").  In order to institute an action under the FTCA, a claimant is required to exhaust his administrative remedies.  28 U.S.C. § 2675; *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (1994).

Plaintiffs' claims do not fall within the scope of either exception to the exclusive remedy provision. These claims are plainly not brought for violations of the United States Constitution. Although it is less clear, I also conclude that these claims do not allege violations of statutory law. Plaintiffs argue that their international law claims fall within this exception because they are asserted pursuant to the ATCA. The ATCA provides that "th[e] district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States ...." 28 U.S.C. § 1350. This statute is analogous to 42 U.S.C. § 1983, which creates a cause of action against state actors for violations of federal rights committed under the color of state law. Section 1983 and the ATCA do "not create substantive rights, but simply provide[ ] the procedural mechanism[s] through which a plaintiff may bring ... suit for violation[s] of ... federal right[s]" and the law of nations or a treaty of the United States. *Bruneau ex rel. Schofield v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 756 (2d Cir. 1998) (discussing 42 U.S.C. § 1983), *cert. denied*, 526 U.S. 1145 (1999). Accordingly, "one cannot go into court and claim 'a violation of § 1983'" or the ATCA. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979) (discussing § 1983 actions). Therefore, the exception provided for statutory violations is inapplicable here. *See Smith*, 499 U.S. at 174 (holding that there could be no violation of the Gonzalez Act because it imposed no duties or obligations, and therefore, it did not fall within any express exception under the Liability Reform Act).

Because plaintiffs' international law claims are subject to the exclusive remedy provision of the Liability Reform Act, the United States is substituted for the individual government defendants, and therefore the international claims must proceed under the FTCA if at all. The plaintiffs' international law claims, however, are not "cognizable" under 28 U.S.C. §

1346(b):  "[T]o be actionable under the [FTCA], a claim must allege ... that the United States

would be liable to the claimant ... in accordance with the law of the place where the act or

omission occurred," and "the 'law of the place' means the law of the State -- the source of

substantive liability under the FTCA."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 477-78 (1994) (internal

quotation marks omitted).  Because claims 9, 10, and 11 arise instead under international law,

they must be dismissed for lack of jurisdiction, as the United States has not waived its sovereign

immunity with respect to these claims.

D.      FTCA Claims

        The defendants argue that several of the plaintiffs' FTCA claims against the

United States should be dismissed.

        1.      False Imprisonment (Claim 24)

        Claim 24 alleges that by "detaining the Plaintiffs ... months longer than necessary

to secure their removal or voluntary departure from the United States without probable cause to

suspect them of any crime, the MDC defendants ... intentionally, without consent or privilege,

completely confined [the] Plaintiffs so as to constitute false imprisonment."  TAC ¶ 415.  Under

New York law, in order to make out a claim of false imprisonment, a plaintiff must show that the

detention was "not otherwise privileged."  *Broughton v. State*, 37 N.Y.2d 451, 456 (1975).  For

the reasons explained above in dismissing the plaintiffs' constitutional length-of-detention

claims, the plaintiffs detention was privileged under the post-removal-period detention statute, 8

U.S.C. § 1231(a)(6).  Each plaintiff was properly found removable from the United States, and

the BOP officials who detained the plaintiffs were acting pursuant to facially valid INS

commitment papers.  *Murray v. Goord*, 1 N.Y. 3d 29, 32 (2003) ("[P]rison officials are

*conclusively bound* by the contents of commitment papers accompanying a prisoner.").

Accordingly, claim 24 is dismissed.

2.     <u>Negligent Delay in Clearing Plaintiffs</u> (Claim 25)

Claim 25 alleges that "[i]n allowing the clearance investigations to linger for months ... due to failure to timely act and follow up on leads, misplaced files, poor communication, [and] disorganization ... Defendants ... breached their duty of swift dispatch toward Plaintiffs .... [so as to] constitute negligence under the laws of [New York and New Jersey]." TAC ¶ 419. As I have explained above, however, the government had no such duty of dispatch in removing the plaintiffs within the six-month presumptively reasonable period established by *Zadvydas*. Under 8 U.S.C. § 1231(a)(2) & (6), the Attorney General had the authority to detain the plaintiffs as ordinary visa violators pending their removal. *See Zadvydas*, 533 U.S. at 691 (explaining that § 1231(a)(6), by reference to § 1227(a)(1)(C), "does not apply narrowly to a small segment of particularly dangerous individuals ... [like] suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations."). I cannot ignore this objectively sufficient basis for the plaintiffs' detention and treat the plaintiffs as if they were actually being detained on the basis of the FBI's authority to investigate crimes. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional.").

The full length of the plaintiffs' detention was thus authorized regardless of whether they were suspected of or found to be involved in terrorist activity. Apart from their detention, however, the plaintiffs offer no hint as to the source of the duty of dispatch they assert; they do not, for example, argue that law enforcement officials owe ordinary criminal suspects a duty swiftly to either charge them or clear them of wrongdoing. Accordingly, because claim 25

fails to allege a legal duty owed to the plaintiffs, it must be dismissed.  *See*, *e.g.*, *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 340 (1928) ("Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right."); 28 U.S.C. § 1346(b) (government liable under FTCA only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred").

3.      Conversion of Property (Claim 30)

Claim 30 alleges that "in refusing to return the possessions of Plaintiffs ... Defendants intentionally deprived them completely and forever of all rights and use of those possessions so as to constitute the tort of conversion ...."  TAC ¶ 442.  The United States argues that because Claim 30 "arises out of the detention of goods by law enforcement officers, [it is] barred by 28 U.S.C. § 2680(c)."  Def. Br. 90.  That subsection provides, with certain exceptions not at issue here, that the United States retains sovereign immunity against any "claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer."  28 U.S.C. § 2680(c).  The question the parties dispute is whether "any other law enforcement officer" means, as the United States contends, any law enforcement officer in the course of any kind of duty, or rather, as the plaintiffs insist, it means merely other law enforcement officers engaged in activities similar in kind to those of an officer of customs or excise.  The question is not new; in fact, nearly all the courts of appeals have ruled on it, but they are quite divided.  *Compare Bramwell v. U.S. Bureau of Prisons*, 348 F.3d 804, 806 (9th Cir. 2003) (reading § 2680(c) "expansively to include federal law enforcement officers beyond those

who assess taxes or collect duties"); with *Ortloff v. United States*, 335 F.3d 652, 657-58 (7th Cir. 2003).

The Second Circuit expressly reserved the question "whether the exemption would apply to searches by law enforcement officers with no relationship to the customs or excise functions" in *Formula One Motors, Ltd. v. United States*, 777 F.2d 822, 823-24 (2d Cir. 1985). Judge Oakes, however, wrote separately to express the view that "where no nexus exists between customs activity and the act complained of, [he] would hold that § 2680(c) does not bar recovery." *Id.* at 825. As the D.C. Circuit noted in *Buzuaye v. United States*, 83 F.3d 482, 484 (1996), "The Second ... Circuit[] ha[s] [thus] suggested -- without deciding -- that [it] would reach the same conclusion" as did the D.C. Circuit: "that the words 'any other law-enforcement officer' should be read to mean law-enforcement officers acting in a tax or customs capacity." I agree with this assessment, and conclude that the Sixth, Seventh, and D.C. Circuits, though outnumbered by the circuits holding to the contrary, have the better of the argument. *See Kurinksy United States*, 33 F.3d 594, 597 (6th Cir. 1994); *Ortloff*, 335 F.3d at 657-58 (7th Cir.); *Buzuaye*, 83 F.3d at 484 (D.C. Cir).

The debate between the circuits (and the parties here) pits several canons of statutory interpretation against each other. On the government's side is the canon of construing a term that appears in separate places in a statute to mean the same thing. In that regard, the government points out that § 2680(h) says that "'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," and argues that the same broad definition should apply in construing § 2680(c). The government fails to point out, however, that the definition in § 2680(h) expressly applies only "[f]or the purpose of this subsection," meaning §

2680(h).  In my view, the negative implication of that disclaimer -- that the definition should not be transported to other subsections of the statute -- is compelling.  Had the Congress meant "for the purpose of this section," instead of "subsection," it likely would have said as much.

The government also resorts to the canon that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *See Lane v. Pena*, 518 U.S. 187, 192 (1996).  In the context of construing § 2680, however, the Supreme Court has specifically called this approach "unhelpful."  *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984).  Instead, the Court advised in *Kosak* that "the proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the exception -- no less and no more." *Id*. (internal quotation marks omitted).

That advice leads quite naturally to the two related canons advanced by the plaintiffs:  *ejusdem generis*, that "a general term should be understood in light of the specific terms that surround it," *Hughey v. United States*, 495 U.S. 411, 419 (1990); and *noscitur a sociis*, that "a general term is interpreted within the context of the accompanying words 'to avoid the giving of unintended breadth to the Acts of Congress.'"  *Kurinsky*, 33 F.3d at 597 (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  The D.C. Circuit has explained the former principle and its application to this setting as follows:

> The principle of *ejusdem generis* -- or "of the same kind, class or nature" -- suggests that a general term should be read in light of the more specific terms preceding it.  Thus, if a statute lists fishing rods, nets, hooks, bobbers, sinkers and other equipment ... [then] "other equipment" might mean plastic worms and fishing line, but not snow shovels or baseball bats.  In the clause "any officer of customs or excise or any other law-enforcement officer," the words "any other law-enforcement officer" might mean other officers involved in customs and excise work, but not officers involved in unrelated duties.  Otherwise, "any officer of customs or excise" would be surplusage, subsumed by the more general "any other law-enforcement officer."

*Buzuaye*, 83 F.3d at 484 (internal citations and quotation marks omitted).

I find this reasoning persuasive, and accordingly conclude that because the officers in question in this case were not "involved in customs and excise work," the United States is not shielded from liability under the detention of goods exception. The motion to dismiss claim 30 is denied.

4. <u>Deprivation of Medical Treatment</u> (Claim 26)

The government argues that plaintiffs Baloch, Saffi, and A. Ibrahim failed to give the BOP a fair opportunity to address their claims for deprivation of medical treatment, and therefore those claims must be dismissed for lack of exhaustion. *See* 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing ...."); 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."). The Second Circuit has explained that "a Notice of Claim filed pursuant to the FTCA must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998). Although a plaintiff is not required to advance specific legal theories in his administrative claims, he "cannot present one claim to the agency and then maintain a suit on a different set of facts." *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012 (7th Cir. 1991) (internal quotation marks omitted).

As the United States points out, "from a review of the administrative claims presented, none of these three Plaintiffs so much as alluded to having requested [and being denied] medical treatment ...." Def. Br. 96. The plaintiffs do not dispute that they failed to mention medical treatment in their administrative complaints, but argue that "[t]his elevates form over substance," explaining as follows:

> Each claim specifically alleges physical injury to the Plaintiffs by Defendants. In investigating claims of physical injury, the government would necessarily review Plaintiffs' medical records while in detention. Those medical records in turn are relevant to Plaintiffs' claims concerning medical treatment. Accordingly, Plaintiffs' administrative claims are adequate to exhaust their claims with respect to their medical treatment ....

Pl. Br. 89-90. This reasoning falls apart merely by repeating it: claiming an injury is not at all the same thing as claiming a deprivation of adequate medical treatment; an injury does not imply a wrongful denial of medical treatment. *See Palay v. United States*, 349 F.3d 418, 425 (7th Cir. 2003) (affirming dismissal of claim of inadequate medical care for failure to exhaust where "[a]lthough [plaintiff] described the injuries he sustained and the physical effects -- including the recurrent seizures -- that he suffered, he stated no facts suggesting that the prison medical staff had treated him inappropriately."). Accordingly, claim 26 is dismissed as to plaintiffs Baloch, Saffi, and A. Ibrahim for failure to exhaust administrative remedies.

<u>CONCLUSION</u>

For the reasons set forth above, defendants' motion to dismiss is denied in part and granted in part.

Claims 4 (self-incrimination) and 6 (speedy trial) have been withdrawn.

Claims 9-11 (international law) and 18-19 (bond) are dismissed for lack of jurisdiction.

Claims 1-2 (length of detention), 17 (delay in serving charging document), 24 (false imprisonment), and 25 (negligent delay in clearance investigations) are dismissed for failure to state a claim. Claim 3 is dismissed as to the Passaic plaintiffs for failure to state a claim.

Claim 26 (inadequate medical treatment) is dismissed as to plaintiffs Baloch, Saffi, and A. Ibrahim for failure to exhaust administrative remedies.

The motion to dismiss is denied as to claims 3 and 23 (conditions of confinement, MDC plaintiffs only), 7 (interference with religious practices), 8 (taking of property), 20 (assignment to the ADMAX SHU, procedural due process), 21-22 (communications blackout), and 30 (conversion).

The motion to dismiss claim 5 (equal protection) is granted in part and denied in part.

So Ordered.


John Gleeson, U.S.D.J.


DATED:      June 14, 2006
            Brooklyn, New York