UNITED STATES DISTRICT COURT        <u>FOR PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK

---

IBRAHIM TURKMEN, AKHILSACHDEVA,
AHMER IQBAL ABBASI, ANSER
MEHMOOD, BENAMAR BENATTA,
AHMED KHALIFA, SAEED HAMMOUDA,
and PURNA RAJ BAJRACHARYA on behalf
of themselves and all others similarly situated,

Plaintiffs,

- versus -

JOHN ASHCROFT, former Attorney General
of the United States, ROBERT MUELLER,
Director of the Federal Bureau of Investigation,
JAMES W. ZIGLAR, former Commissioner of
the Immigration and Naturalization Service,
DENNIS HASTY, former Warden of the
Metropolitan Detention Center (MDC),
MICHAEL ZENK, former Warden MDC,
JAMES SHERMAN, former MDC Associate
Warden for Custody; SALVATORE
LOPRESTI, former MDC Captain; JOSEPH
CUCITI, former MDC Lieutenant,

Defendants.

MEMORANDUM
<u>AND ORDER</u>
02-CV-2307

---

A P P E A R A N C E S

      CENTER FOR CONSTITUTIONAL RIGHTS
            666 Broadway, 7th Floor
            New York, New York  10012
      By:   Rachel Anne Meeropol
            George Gardner
            William P. Quigley
            Sunita Patel
            Michael Winger
            *Attorneys for Plaintiffs*

      NEIL H. MacBRIDE
            United States Attorney for the Eastern District of Virginia
            2100 Jamieson Avenue
            Alexandria, Virginia  22314
      By:   Dennis C. Barghaan, Jr.
            *Attorney for Defendant John Ashcroft*

RONALD C. MACHEN, JR.
    United States Attorney for the District of Columbia
    555 4th Street, N.W.
    Washington, District of Columbia  2
By:   R. Craig Lawrence
    *Attorney for Defendant Robert Mueller*

LAW OFFICES OF WILLIAM ALDEN McDANIEL, JR.
    118 West Mulberry Street
    Baltimore, Maryland 21201
By:   William Alden McDaniel, Jr.
    *Attorney for Defendant James Ziglar*

CROWELL & MORING LLP
    1001 Pennsylvania Avenue, N.W.
    Washington, District of Columbia 20004
By:   David Bell
    Michael L. Martinez
    *Attorneys for Defendant Dennis Hasty*

DUVAL & STACHENFELD LLP
    101 Park Avenue
    New York, New York 10178
By:   Joshua Klein
    *Attorneys for Defendant Michael Zenk*

SHAW BRANSFORD VEILLEUX & ROTH, P.C.
    1100 Connecticut Avenue NW, Suite 900
    Washington, District of Columbia  20036
By:   Debra L. Roth
    *Attorneys for Defendant James Sherman*

JOSEPH CUCITI
    United States Department of Homeland Security
    26 Federal Plaza
    New York, NY 10278
    *Defendant* Pro Se

JOHN GLEESON, United States District Judge:

       Plaintiffs Ibrahim Turkmen, Akhil Sachdeva, Ahmer Iqbal Abbasi, Anser

Mehmood, Benamar Benatta, Ahmed Khalifa, Saeed Hammouda, and Purna Raj Bajracharya

bring this putative class action against John Ashcroft, Robert Mueller, James Ziglar, Dennis

Hasty, Michael Zenk, James Sherman, Salvatore Lopresti, and Joseph Cuciti.  Plaintiffs were arrested and detained by federal authorities in connection with the investigation of the terrorist attacks of September 11, 2011. They bring six *Bivens* claims and a seventh claim under 42 U.S.C. § 1985, all arising out of their allegations of discriminatory and punitive detention.  The defendants have now moved to dismiss.  For the reasons set forth below, the defendants' motions are granted in part and denied in part.

Specifically, the claims based on the alleged harsh conditions of confinement and unlawful strip searches (Claims One, Two and Six) shall proceed against Hasty, Zenk, Sherman, Lopresti, and Cuciti.  To the extent they are alleged against Ashcroft, Mueller and Ziglar,[1] the allegations are insufficient and the claims are therefore dismissed as against them.  As for the claimed deprivation of the plaintiffs' free exercise rights (Claim Three), I hold that the *Bivens* damages remedy is extended to this context and that the claim shall proceed against Hasty, Zenk, Sherman, Lopresti, and Cuciti.  It is insufficiently pled against Ashcroft, Mueller and Ziglar and is therefore dismissed as against them.  The claims based on the alleged communications blackout and interference with counsel (Claims Four and Five) are dismissed as to all defendants on the ground of qualified immunity.  Finally, the conspiracy claim (Claim Seven) shall proceed, but only to the extent that the underlying objects of the conspiracy (Claims One through Six) have survived the motion.  Thus, it is dismissed as against Ashcroft, Mueller and Ziglar and shall proceed to the extent it alleges a conspiracy by the remaining defendants to commit the civil rights violations alleged in Claims One, Two, Three and Six.

In sum, the case against Ashcroft, Mueller and Ziglar is dismissed in its entirety.  Only Claims Four and Five (and the part of Claim Seven that alleges a conspiracy to commit the

---

[1] These three defendants are not named as defendants in Claim Six, which focuses specifically on strip searches.

wrongs charged in Claims Four and Five) are dismissed as against the other defendants.  Counsel

for the remaining parties are directed to appear before Chief Magistrate Gold for a status

conference on January 30, 2013 at 2:00 PM.

BACKGROUND

A.    *Factual Allegations*

    1.    *Overview*

The plaintiffs are eight male, non-United States citizens who were arrested on

immigration charges following the terrorist attacks on September 11, 2001 ("9/11 attacks").

They were held in immigration custody for periods ranging from three to eight months after

receiving final orders of removal or grants of voluntary departure.  All but two are Muslims of

Middle Eastern, North African, or South Asian origin; the others, natives of India and Nepal, are

Hindu.  Plaintiffs bring this putative class action on behalf of themselves and a class of male

non-citizens who are Arab or Muslim, or were perceived by the defendants to be Arab or

Muslim,[2] and were (1) arrested by the Immigration and Naturalization Service ("INS") or the

Federal Bureau of Investigation ("FBI") after September 11, 2001, and charged with immigration

violations; (2) treated as "of interest" to the government's terrorism investigation; (3) detained

under a blanket "hold-until-cleared" policy, pursuant to which they were held without bond until

cleared of terrorist ties by the FBI; and (4) confined in the Metropolitan Detention Center

("MDC") or the Passaic County Jail ("Passaic Jail").  I refer to the putative class as the

"Detainees."

---

[2]    Hereinafter, mention of Arab and/or Muslim individuals includes individuals who were perceived by the defendants to be Arab and/or Muslim.

The Complaint names the following individuals as defendants: (1) John Ashcroft, the former Attorney General of the United States, Robert Mueller, the Director of the FBI, and James W. Ziglar, the former Commissioner of the INS (collectively, the "DOJ defendants"); (2) Dennis Hasty and Michael Zenk, both former wardens of the MDC; and (3) James Sherman, Salvatore LoPresti, and Joseph Cuciti, all former MDC officials of a rank below warden.  I refer to Hasty, Zenk, Sherman, LoPresti, and Cuciti collectively as the "MDC defendants."

2. *The Treatment of the Detainees*[3]

In the aftermath of the 9/11 attacks, the defendants acted together to create and implement a series of policies and practices relating to the identification, detention, and treatment of Arab and Muslim noncitizens who had violated immigration laws (*i.e.*, the Detainees).  I refer to this series of policies and practices in the aggregate as the "detention policy."  Pursuant to the detention policy, the Detainees were rounded up and detained on their immigration violations so government officials could question them in connection with the ongoing investigation of the 9/11 attacks (the "PENTTBOM investigation"); they were treated as "of interest" to the PENTTBOM investigation, which meant that they were deemed to be potential terrorists despite the fact that they had been arrested based on immigration violations, not on suspicion of terrorist activity; they were subject to a hold-until-cleared policy, under which they were held for lengthy periods of times – often for months after they were ordered removed from the country – until the FBI affirmatively cleared them of suspicion of wrongdoing; and they were held until their release in extremely restrictive conditions of confinement.  The

---

[3]     The factual allegations set forth herein are drawn from the Complaint and two incorporated reports by the Office of the Inspector General to the extent those reports are not contradicted by the allegations of the Complaint.  ¶ 3 n.1.  All citations in this opinion preceded by "¶" or "¶¶" refer to paragraphs of the Complaint.

only aspect of the detention policy challenged in the Complaint is the confinement of the

Detainees in harsh conditions ("harsh confinement policy").

The harsh confinement policy, which was created by the DOJ defendants, was a

directive to hold the Detainees in restrictive conditions under which they would feel maximum

pressure to cooperate with the PENTTBOM investigation.  Although this policy mandated that

the Detainees' ability to contact the outside world be limited, it did not specify the precise

conditions in which they would be held.  Rather, the harsh confinement policy was a general

mandate, and the exact manner of its implementation was to be determined by officials at the

facilities in which the Detainees were held.[4]

The harsh confinement policy was expressly directed at Arab and Muslim

noncitizens who had violated immigration laws:  It mandated restrictive conditions specifically

for Arab and Muslim individuals.   In other words, it was discriminatory on its face.  This is not

to say that no non-Arabs and non-Muslims were held in harsh conditions of confinement as a

result of the investigation following the 9/11 attacks.  Other individuals may have been held in

such conditions pursuant to other policies or for other reasons.  However, the harsh confinement

policy expressly applied to Arab and Muslim individuals, dictating that those detained under the

policy be held in harsh conditions of confinement – not because of any suspected links to

terrorism, but because of their race, national origin, and/or religion.

---

[4]        Plaintiffs allege that Ashcroft and Mueller "mapped out ways to exert maximum pressure" on the Detainees, and that Ashcroft "created many of the unreasonable and excessively harsh conditions" under which the Detainees were held, ¶ 21.  These allegations imply that the harsh confinement policy mandated some of the specific conditions that the Detainees endured at the MDC, but the plaintiffs have never specified what those particular conditions were.  Moreover, as discussed more fully below, the plaintiffs concede that the specific conditions in which the Detainees were held were created by the MDC defendants in implementing the harsh confinement policy. *See* ¶ 65 ("The punitive conditions in which MDC Plaintiffs and class members were placed were the *direct result* of the strategy mapped out by Ashcroft and Mueller's small working group.") (emphasis added); Pls.' Opp. Mot. to Dismiss 3, ECF No. 749 ("[I]t does not appear that Ashcroft's small group personally designed the details of every restrictive condition . . . .").

The harsh confinement policy was implemented by the MDC defendants in the following way: The Detainees (the "MDC Detainees") were placed in that facility's Administrative Maximum Special Housing Unit (the "ADMAX SHU").  There, they were confined in tiny cells for over 23 hours a day, provided with meager and barely edible food, and prohibited from moving around the unit, using the telephone freely, using the commissary, accessing MDC handbooks (which explained how to file complaints about mistreatment), and keeping any property, including personal hygiene items like toilet paper and soap, in their cells. Whenever they left their cells, they were handcuffed and shackled.  Although they were offered the nominal opportunity to visit the recreation area outside of their cells several times a week, the recreation area was exposed to the elements and the MDC Detainees were not offered clothing beyond their standard cotton prison garb and a light jacket.  Furthermore, detainees who accepted such offers were often physically abused along the way, and were sometimes left for hours in the cold recreation cell, over their protests, as a form of punishment.  As a result, they were constructively denied exercise during the fall and winter.

The MDC Detainees also were denied sleep.  Bright lights were kept on in the ADMAX SHU for 24 hours a day (until March 2002), and staff at the MDC made a practice of banging on the MDC Detainees' cell doors and engaging in other conduct designed to keep them from sleeping.  They also conducted inmate "counts" at midnight, 3:00 a.m., and 5:00 a.m. While such counts are inherently disruptive – officers are required to see the skin of each inmate being counted, *see* BOP P.S. 5500.09 – the officers "went beyond what was required for the count by kicking the door hard with their boots, knocking on the door at night much more frequently than required, and making negative comments when knocking on the door."  ¶ 39. For example, for the first two or three weeks that one detainee was in the ADMAX SHU, one of

the officers walked by about every 15 minutes throughout the night, kicked the doors to wake up

the detainees, and yelled things such as, "Motherfuckers," "Assholes," and "Welcome to

America."  ¶ 36.  In addition, officers used the in-cell camera to watch one detainee, and when he

would appear to fall asleep they would kick the cell door.

The MDC Detainees also were subjected to frequent physical and verbal abuse by

many of the officers in the ADMAX SHU.  The physical abuse included slamming the MDC

Detainees into walls; bending or twisting their arms, hands, wrists, and fingers; lifting them off

the ground by their arms; pulling on their arms and handcuffs; stepping on their leg restraints;

restraining them with handcuffs and/or shackles even while in their cells; and handling them in

other rough and inappropriate ways.  The use of such force was unnecessary because the MDC

Detainees were always fully compliant with orders and rarely engaged in misconduct.  The

verbal abuse included referring to the MDC Detainees as "terrorists" and other offensive names,

threatening them with violence, cursing at them, insulting their religion, and making humiliating

sexual comments during strip-searches.

Both the MDC Detainees and the Detainees held at the Passaic Jail (the "Passaic

Detainees") were subjected to unreasonable and punitive strip-searches.  The MDC Detainees

were strip-searched every time they were removed from or returned to their cells, including

before and after visiting with their attorneys, receiving medical care, using the recreation area,

attending a court hearing, and being transferred to another cell.  They were strip-searched upon

each arrival at the MDC in the receiving and discharge area and again after they had been

escorted – shackled and under continuous guard – to the ADMAX SHU.  These strip-searches

occurred even when they had no conceivable opportunity to obtain contraband, such as before

and after non-contact attorney visits (to and from which they were escorted – handcuffed and

shackled – by a four-man guard).  Supp. OIG Rep. at 3.  The MDC had no written policy governing when to conduct strip-searches, and they were conducted inconsistently.

The strip-searches were unnecessary to security within the MDC.  Rather, they were conducted to punish and humiliate the detainees.  Female officers were often present during the strip-searches; the strip-searches were regularly videotaped in their entirety (contrary to BOP policy, *see* BOP P.S. 5521.05); and MDC officers routinely laughed and made inappropriate sexual comments during the strip-searches.

Officers at the MDC and the Passaic Jail also interfered with the Detainees' ability to practice and observe their Muslim faith.  Specifically, when the Detainees requested copies of the Koran, officers delayed for weeks or months before providing them; the MDC and the Passaic Jail failed to provide food that conformed to the Halal diet, despite the Detainees' requests for such food; the MDC had no clock visible to the MDC Detainees, and officers regularly refused to tell them the time of day or the date so they could conform to daily Islam prayer requirements and observe Ramadan; and officers constantly interrupted the Detainees' prayers by banging on their cell doors, yelling and making noise, screaming derogatory anti-Muslim comments, videotaping them, handing out hygiene supplies, and/or telling them to "shut the fuck up" while they were trying to pray.

In addition, most of the MDC Detainees were held incommunicado during the first weeks of their detention (the "communications blackout").  MDC staff repeatedly turned away everyone, including lawyers and relatives, who came to the MDC looking for the MDC Detainees, and thus the MDC Detainees had neither legal nor social visits during this period. This communications blackout lasted until mid-October 2011.

9

After the initial communications blackout, the MDC Detainees were nominally permitted one call per week to an attorney.  However, MDC officers obstructed Detainees' efforts to telephone and retain lawyers in multiple ways.  They were denied sufficient information to obtain legal counsel; although they were given a list of organizations that provide free legal services, the contact information for these organizations was outdated and inaccurate. Legal calls that resulted in a wrong number or busy signal were counted against their quota of calls, as were calls answered by voicemail.  Officers frequently asked the MDC Detainees, "Are you okay?,"  and if the MDC Detainees responded affirmatively, the officers construed this as a waiver of their already-limited privilege to make legal calls.  The officers also often brought the phone to the MDC Detainees early in the morning before law offices opened for the day.  And they frequently pretended to dial a requested number or deliberately dialed a wrong number and then claimed the line was dead or busy.  They then refused to dial again, saying that the Detainee had exhausted his quota.

When the MDC Detainees managed to reach their attorneys by phone, the officers frequently stood within hearing distance of conversations that should have been treated as privileged.  Legal visits were non-contact and the MDC Detainees were handcuffed and shackled during the entirety of the visits.  The MDC video- and audio-recorded the MDC Detainees' legal visits until April 2002 or later.

The MDC Detainees were nominally permitted one social call per month after the initial communications blackout.  However, these calls were just as severely restricted as the legal calls.  Social visits were restricted to immediate family, yet even immediate family members were sometimes turned away.  As with their legal visits, social visits were non-contact and the MDC Detainees were handcuffed and shackled during the entirety of the visits.

3.      *The Plaintiffs*

       a.      *Ahmer Iqbal Abbasi*

Abbasi, a citizen of Pakistan and a devout Muslim, entered the United States in 1993 on a visitor visa.  He applied unsuccessfully for political asylum, and he remained in the United States illegally after his application was denied.  He initially worked as a taxicab driver in Manhattan, saving enough money to purchase a small grocery store, which he sold sometime before 2001.

Abbasi was arrested by the FBI on September 25, 2001.  He was interviewed by officials from the FBI, INS, and the New York Police Department ("NYPD"), who gave him no information regarding why he was being detained.  The officials asked, among other things, about Abbasi's religious beliefs and practices.  Abbasi later learned that his arrest had resulted from a report that a "male[,] possibly Arab" (apparently Abbasi's houseguest) had presented a false Social Security card at the New Jersey Department of Motor Vehicles and had given Abbasi's address as his own.  Abbasi was detained in the ADMAX SHU at the MDC.

       b.      *Anser Mehmood*

Mehmood, a citizen of Pakistan and a devout Muslim, entered the United States in 1989 with his wife, Uzma (Abbasi's sister), and their three children.  Mehmood entered on a business visa but remained illegally after the visa expired.  He started a trucking business in the United States, making enough money to purchase a home and to send funds to his extended family in Pakistan.  Mehmood and his family settled in Bayonne, New Jersey.  Another child, an American citizen by birth, was born in 2000.  All four of the children attended public school in New Jersey.  In May 2001, another of Uzma's brothers, who is an American citizen, submitted an immigration petition for Mehmood and his family.

11

On October 3, 2001, a team of FBI and INS agents visited Mehmood and his wife in their home based on the same report that led to Abbasi's arrest. The agents interviewed Mehmood and his wife about their immigration status, showed them images of people they did not recognize, and asked whether they were involved in jihad. The agents, who sought information on another of Uzma's brothers, who was living in Pakistan, told Mehmood that they needed to arrest either Mehmood or his wife. They arrested Mehmood at his request. Mehmood was detained in the ADMAX SHU at the MDC.

      c.    *Benamar Benatta*

Benatta, an Algerian citizen and member of the Algerian Air Force, entered the United States on a visitor visa on December 31, 2000. He was granted entry in order to study aviation at Northrop Grumman, but he remained in the United States after the expiration of his visa with the goal of seeking political asylum and gaining employment. On September 5, 2001, six days before the terrorist attacks, he crossed the Canadian border using false documentation with the intent to apply for refugee status there, but was detained by Canadian authorities for investigation. On September 12, he was transported back to the United States and turned over to the INS's custody.

At the Rainbow Bridge border control post in Niagara Falls, New York, Benatta was interrogated by the FBI regarding his false documentation. A report of the interrogation was disseminated, and the INS subsequently commenced removal proceedings. Benatta was served with a Notice to Appear at immigration court in Batavia, New York, but on September 16, 2001, before the proceeding occurred and before Benatta was able to retain counsel, he was transferred to the ADMAX SHU at the MDC.

d.      *Ahmed Khalifa*

Khalifa, a medical student from Egypt, was in the United States for three months on a student visa and had a return ticket to Egypt for October 15, 2001.  On September 30, 2001, the apartment he shared with several other Egyptian friends was raided by FBI, NYPD, and INS agents on a tip that several Arabs living at Khalifa's address were renting out a post office box and possibly sending out large quantities of money.  The agents initially did not seem interested in Khalifa, although they asked him about his roommates, searched his wallet, and asked if he had had anything to do with the recent terrorist attacks.  The agents subsequently determined that they wanted to hold Khalifa as well, and an FBI agent asked an INS agent to arrest Khalifa for working while in the United States on his student visa.  Khalifa was detained in the ADMAX SHU at the MDC.

e.      *Purna Raj Bajracharya*

Bajracharya, a citizen of Nepal, entered the United States in 1996 on a three-month visa.  For the next five years he remained in Queens illegally, working at various odd jobs and sending money to his wife and sons in Nepal.  Bajracharya intended to return to Nepal in the fall or winter 2001, and he began videotaping certain New York streets to show his family.  An employee of the Queens County District Attorney's Office reported to the FBI on October 25, 2001 that an "Arab male" was videotaping a building that contained the District Attorney's office and an FBI branch office.  District Attorney staff promptly detained and searched him.

During Bajracharya's initial detention and interrogation, which lasted for five hours, FBI and INS agents requested that he bring them to his apartment.  He did so, and showed the agents his passport and various identification documents.  He admitted that he had overstayed

his visa and was illegally present in the United States, and the INS then arrested him.  He was
detained in the ADMAX SHU at the MDC.

        f.     *Ibrahim Turkmen*

        Turkmen, a Muslim Imam, is a citizen of Turkey.  He came to the United States
on October 4, 2000 on a six-month tourist visa to visit a friend from Turkey who lived on Long
Island.  Shortly after his arrival, Turkmen found work at a service station in Bellport, New York.
He worked there until January 2001, when he took a job at another service station in the same
town.  In April 2001, he left that job and began to work part-time for a local Turkish construction
company.  He spoke regularly to his wife and four daughters, who remained in Turkey, and sent
money to support them on a weekly basis.

        Turkmen spoke virtually no English when he first arrived in the United States.
During his stay, he learned only the words necessary for his limited daily interaction with
English-speakers.  At the time that he was taken into custody, Turkmen understood very little
spoken English, and he could not read English at all.

        On October 13, 2001, two FBI agents visited Turkmen at the West Babylon, New
York apartment where he was staying with several Turkish friends.  The visit was based on a tip
from the friends' landlady, who reported to an FBI hotline that she had rented her apartment to
several Middle Eastern men and that she "would feel awful if her tenants were involved in
terrorism and [she] didn't call."  ¶ 251.  The agents asked Turkmen whether he had any
involvement in the 9/11 attacks and whether he had any association with terrorists.  They also
inquired as to his immigration status.  Turkmen had difficulty understanding the questions posed
to him in English by the FBI, and no interpreter was provided.  Turkmen denied any involvement

with terrorists or terrorist activity.  The FBI agents accused Turkmen of being an associate of

Osama bin Laden and placed him under arrest.  He was held at the Passaic Jail.

> g.    *Akhil Sachdeva*

Sachdeva is a citizen of India and is Hindu.  He holds a Bachelor of Arts degree in

commerce from the University of Delhi.  Since 1995, he has entered the United States for

extended periods of time.  In December 1998, Sachdeva legally immigrated to Canada.  In 1998

he married a woman who owned a gas station in Port Washington, New York.  He then briefly

returned to Canada until sometime in September or October of 2001, when he returned to the

United States to finalize his divorce.

Sometime in late November 2001, an FBI agent visited his ex-wife's gas station

looking for a Muslim employee who had been overheard having a conversation in mixed Arabic

and English relating to flight simulators and flying.  Failing to locate the employee, the agent left

a note requesting that Sachdeva's ex-wife contact him.  She passed on the request to Sachdeva,

who called the agent in early December 2001.  The FBI agent asked Sachdeva to come to the

agent's offices for an interview, and Sachdeva complied on December 9, 2001.  At the interview,

two FBI agents questioned Sachdeva about the 9/11 attacks and his religious beliefs and

examined his personal identification.  They permitted him to leave, but on December 20, 2001,

INS agents arrested Sachdeva at his uncle's apartment.  He was detained at the Passaic Jail.

> 4.    *The Claims Alleged*

The Complaint sets forth seven claims for relief.  Those claims, which plaintiffs

assert on their own behalf and, in most instances, on behalf of the putative class, are: (1) a

conditions of confinement claim under the Due Process Clause; (2) an equal protection claim

alleging that defendants singled out plaintiffs for harsh conditions of confinement because of

their race, religion and/or ethnic or national origin; (3) a claim under the Free Exercise Clause;

(4) a free speech and free association claim under the First Amendment; (5) a due process claim

alleging interference with access to counsel; (6) a claim under the Fourth and Fifth Amendments

for unreasonable and punitive searches; and (7) a claim alleging a conspiracy among the

defendants to commit the civil rights violations described in the first six claims, in violation of

42 U.S.C. § 1985.

B.      *Procedural History*

        The original complaint in this case was filed on April 17, 2002.  The First

Amended Complaint was filed on July 27, 2002.  The government moved to dismiss on behalf of

all named defendants on August 26, 2002, and oral argument on the motion was held on

December 19, 2002.  On June 2, 2003, the Office of the Inspector General of the United States

Department of Justice released a 198-page report entitled "A Review of the Treatment of Aliens

Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks"

(the "OIG Report").  In light of the OIG Report, the plaintiffs sought leave to amend their

complaint, which I granted.  Around that time, the government withdrew from representing the

named defendants in their individual capacities, and substitute counsel filed notices of

appearance.

        On June 18, 2003, the plaintiffs filed the Second Amended Complaint, attaching

the April 2003 OIG Report.  Supplemental briefs in support of and opposing the motions to

dismiss were filed.  Then, in December 2003, the OIG filed another report – its 47-page

"Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan

Detention Center in Brooklyn, New York" (the "Supplemental OIG Report; the two OIG reports

16

are referred to collectively as the "OIG Reports").  On September 7, 2004, plaintiffs requested leave to file a Third Amended Complaint, which I granted.

The Third Amended Complaint was filed on September 13, 2004.  It raised thirty-one claims for relief that, broadly speaking, fell into two categories.  The first category of claims stemmed from plaintiffs' contention that the government used plaintiffs' status as noncitizens who had violated immigration laws as an excuse to hold them in jail while it pursued its real interest: determining whether they were terrorists or could help catch terrorists.  The second category of claims challenged the conditions of confinement in which the plaintiffs were held.

On June 14, 2006, after another round of briefing, I issued a memorandum and order granting in part and denying in part the motions to dismiss.[5]  *Turkmen v. Ashcroft*, No. 02 Civ. 2307, 2006 WL 1662663 (E.D.N.Y. June 14, 2006) ("*Turkmen I*").  I dismissed the entire first category of claims and let the majority of claims in the second category proceed. Remaining after the motions to dismiss were: (1) the claim that the plaintiffs held in the MDC were subject to punitive conditions of confinement in contravention of their substantive due process rights; (2) the claim that the plaintiffs held in the MDC were unreasonably strip-searched in violation of the Fourth and Fifth Amendments; (3) the claim that defendants interfered with plaintiffs' religious practices in violation of the Free Exercise Clause; (4) the claim that defendants violated plaintiffs' due process rights by assigning them to the ADMAX SHU without process of any sort; (5) the claim that the defendants singled out the plaintiffs for harsh treatment in detention because of their race, religion and/or ethnic or national origin in violation

---

[5]      At a hearing on October 21, 2004, I ordered that discovery could begin on claims involving the conditions of confinement and the use of excessive force.  The MDC Defendants moved to dismiss those claims as against them, arguing that they were entitled to qualified immunity.  That motion was denied by order dated December 3, 2004, *see* ECF No. 149, and a motion for reconsideration and vacatur of the December 3, 2004 order was denied on January 14, 2005.  Familiarity with that order is presumed.  Insofar as the issues addressed in that order are affected by the Supreme Court's decision in *Iqbal*, 556 U.S. at 662, I reconsider them here.

of the Equal Protection Clause; (6) the Due Process and conversion claims arising from defendants' confiscation of several plaintiffs' personal property; (7) the claim that defendants imposed a communications blackout during plaintiffs' detention in violation of plaintiffs' First Amendment and due process rights; and (8) several Federal Tort Claims Act claims and excessive force claims not relevant here.[6]

The Second Circuit ruled on the appeal of *Turkmen I* in *Turkmen v. Ashcroft*, 589 F.3d 542 (2d Cir. 2009) ("*Turkmen II*").  In the period between *Turkmen I* and *Turkmen II*, the Supreme Court issued its decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *Iqbal* dramatically altered the legal landscape in two ways relevant to my decision in *Turkmen I*.  First, it revolutionized federal pleading standards, discarding the traditional "no set of facts" standard established by *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and adopting a new "plausibility" standard.  *Iqbal*, 556 U.S. at 678-80.  In addition, it eliminated the doctrine of supervisory liability for *Bivens* claims.  *Id.* at 676-77.  Accordingly, the Second Circuit vacated my rulings denying the motions to dismiss the conditions of confinement claims, which had applied the outdated pleading standard, and remanded the case for reconsideration of those claims.  *Turkmen II*, 589 F.3d at 547.[7]

On remand after *Turkmen II*, plaintiffs sought leave to amend, which I granted on August 26, 2010.  The instant complaint, entitled the Fourth Amended Complaint (the "Complaint"), was filed on September 13, 2010.  The Complaint includes six claims that were originally raised in *Turkmen I* and a new claim never before raised.  All defendants have moved to dismiss.

---

[6]     Familiarity with *Turkmen I* and its underlying facts is presumed.

[7]     The Second Circuit also addressed plaintiffs' challenge to my dismissal of several other claims, and it affirmed the dismissal of those claims.

18

DISCUSSION

A.    *The Applicable Legal Principles*

    1.    *The Motion to Dismiss Standard*

        The pleading landscape has changed substantially since this case was first before

me.  Instead of holding the Complaint to the standard set by *Conley*, 355 U.S. at 45-46 (1957),

under which a claim could not be dismissed unless the court concluded that there was no set of

facts on which the plaintiff would be entitled to relief, following *Iqbal*, 556 U.S. at 678-80, I

must now decide whether the plaintiffs' allegations, if true, state a claim that is plausible on its

face.  A claim is facially plausible when "the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at

678.  Although the plausibility standard does not require plaintiffs to show that their desired

inferences are more likely than not the correct inferences to draw, the facts alleged must establish

"more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that

"pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line

between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Bell Atl. v. Twombly*,

550 U.S. 544, 557 (2007)).

        Although in considering a motion to dismiss I am required to accept as true the

factual assertions in a complaint, *see Zinermon v. Burch*, 494 U.S. 113, 118 (1990), I am "not

bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at

678 (internal quotation marks omitted).  Thus, I begin my analysis of the facial plausibility of the

asserted claims by identifying, and casting aside, "pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  I then consider only the

well-pleaded factual allegations in the complaint, and assuming their truth, determine whether they plausibly suggest the plaintiffs' entitlement to relief.  *See id.* at 681.

      2.    *Supervisory Liability After* Iqbal

      Prior to the Supreme Court's decision in *Iqbal*, an official could be held liable for a constitutional tort under a theory of "direct liability" as well as "supervisory liability."  Direct liability is liability for "caus[ing] an injury while possessing the mens rea required [for a] particular constitutional [tort]."  Comment, *Supervisory Liability After* Iqbal*: Decoupling* Bivens *from Section 1983*, 77 U. Chi. L. Rev. 1401, 1408 (2010).  In other words, an individual becomes directly liable for a constitutional tort (he becomes a "primary actor") when he acts in a way that satisfies each of the elements of that tort.  For example, a defendant is directly liable for an equal protection violation if he (1) injures a plaintiff (causation) (2) because of discriminatory animus (mens rea).  And if a defendant's (1) deliberately indifferent failure to act in the face of a known risk to an inmate's safety (mens rea) (2) causes injury to that inmate (causation), the defendant will be liable for an Eighth Amendment violation.  As is evident, the elements that must be satisfied for a defendant to be held directly liable for a tort depend on the tort alleged.

      In contrast, supervisory liability is incurred when a supervisory defendant (a "secondary actor") is in some way "personally involved" with a primary actor's constitutional tort and is a cause of the plaintiff's injury.  In the Second Circuit, personal involvement is understood broadly.  A government official is personally involved in a constitutional tort if he: (1) participated directly in the alleged violation; (2) failed to remedy the violation after being informed of the violation through a report or appeal; (3) created a policy or custom, or allowed the continuance of such a policy or custom, under which unconstitutional practice occurred; (4) was grossly negligent in supervising a subordinate who committed the unlawful act; or (5)

exhibited deliberate indifference to an individual's constitutional rights by failing to act on information indicating the unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

For supervisory liability to exist, the secondary actor's behavior need not satisfy each of the elements of the constitutional tort. Rather, as long as a primary actor committed a constitutional tort and the secondary actor was personally involved in that tort (in any of the five ways set forth in *Colon*) and was a cause of the plaintiff's injury, the secondary actor may be held liable. The elements necessary to incur supervisory liability do not vary with the constitutional tort alleged. Thus, the conduct of a secondary actor sued for supervisory liability will be judged under the same standard for personal involvement, regardless of whether the primary actor's tort arises under the Equal Protection Clause or the Fourth Amendment.

Supervisory liability, therefore, extends liability to persons who cannot be held directly liable. While direct liability exists only when all the elements of the tort in question have been established, supervisory liability can operate to relax a mens rea element, allowing liability against a supervisory defendant who does not satisfy that element of the tort. For example, a supervisor who lacked discriminatory intent can never be held directly liable for an equal protection violation, but if he "was grossly negligent in supervising a subordinate" who committed an equal protection violation, he may be held liable on a theory of supervisory liability. Rather than act with the intent to discriminate, the supervisory defendant need only have been negligent in the discharge of his supervisory responsibilities.

Supervisory liability does not, however, relax all of the elements of a constitutional tort. One common element of any recognized constitutional tort is that the defendant caused the plaintiff's injury. Supervisory liability does not dispense with the need to

21

show an affirmative causal link between the supervisor's actions (or inactions) and the injury. *See, e.g.*, *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) (holding that § 1983's causation requirement applies when invoking supervisory liability); *Iqbal*, 556 U.S. at 675 ("In the limited settings where *Bivens* does apply, the implied cause of action is the 'federal analog to suits brought against state officials under [§ 1983].'") (quoting *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006)). In other words, regardless of whether a defendant is sued under a theory of direct or supervisory liability, he must have caused the plaintiff's injury.

In *Iqbal*, the Supreme Court, in no uncertain terms, eliminated supervisory liability in *Bivens* claims. *Iqbal*, 556 U.S. at 676-77. According to the Court, "where masters do not answer for the torts of their servants[,] the term 'supervisory liability' is a misnomer." *Id.* at 677. Thus, after *Iqbal*, in order for a plaintiff to assert a valid *Bivens* claim against a government official, he "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. In other words, only direct liability remains for *Bivens* claims.

This is not to say that supervisors are now immune from *Bivens* actions. A supervisor, just as any defendant, can be held directly liable for a constitutional tort if his actions satisfy the elements of that tort. However, if a supervisor cannot be held directly liable for a constitutional tort, that is, if his conduct has not satisfied the elements of that tort, the doctrine of supervisory liability is now unavailable to relax those elements.

Nor does the elimination of supervisory liability spell the end of *Bivens* liability premised upon a defendant's inaction if such inaction satisfies the elements of a tort. As *Colon* makes clear, nonfeasance – just like malfeasance – *can* be a basis for liability, and nothing in *Iqbal* changed this rule. *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)

22

("*Colon*'s bases for liability are not founded on a theory of *respondeat superior*, but rather on a recognition that 'personal involvement of defendants in alleged constitutional deprivations' can be shown by nonfeasance as well as misfeasance.'" (quoting *Colon*, 58 F.3d at 873)); *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (premising liability upon failure to protect from privately inflicted harms); *cf. City of Okla. City v. Tuttle*, 471 U.S. 808 (1985) (premising § 1983 liability of municipality upon failure to train its employees).

The defendants argue that, of the five forms of personal involvement described by *Colon*, only the first and the first half of the third survive *Iqbal*.  The Second Circuit has never addressed this precise issue, and the district courts in this Circuit, as well as the other courts of appeals, have grappled with this question and reached conflicting results.  *Compare Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at *5-6 (S.D.N.Y. June 26, 2009) (dismissing deliberate indifference claim against a supervisor, holding that *Iqbal* abrogated categories of supervisory liability that do not involve "active conduct"), *with D'Olimpio*, 718 F. Supp. 2d at 347 (holding that each of the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the elements of particular constitutional tort alleged); *see also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) *superseding*, 633 F.3d 1191 (9th Cir. 2011), *rehearing en banc denied*, 659 F.3d 850 (9th Cir. 2011) (holding that plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates)[8]; *Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60, 72 (3d Cir. 2011) (assuming, without holding, that a federal supervisory official may be liable in certain

---

[8]     Dissenting from denial of rehearing en banc, Judge O'Scannlain, joined by seven judges, argued that the majority opinion "conflicts with *Iqbal* in . . . its far-reaching conclusions regarding supervisory liability." *Starr v. Cnty. of Los Angeles*, 659 F.3d 850, 855 (9th Cir. 2011).

circumstances even though he or she did not directly participate in the underlying
unconstitutional conduct); *Santiago v. Warminster Tp.*, 629 F.3d 121, 130 n.8 (3d Cir. 2010)
(noting that *Iqbal* may restrict the incidents in which a "failure to supervise" will result in
liability, but refraining from deciding the question); *Dodds v. Richardson*, 614 F.3d 1185, 1199
(10th Cir. 2010) (holding a defendant-supervisor can be held liable if he "creates, promulgates,
implements, or in some other way possesses responsibility for the continued operation of a
policy" that causes a constitutional tort).

      I don't find this debate over what "remains" of the *Colon* standards for personal
involvement after *Iqbal* to be useful.  *Iqbal* removed supervisory liability from *Bivens* claims.
This means that liability can no longer be shown by alleging *simply* personal involvement under
*Colon* (and causation of the plaintiff's injury) *regardless* of the kind of constitutional tort
alleged.  Direct liability is now the only option in *Bivens* claims – for supervisors and
supervisees – and a plaintiff must now allege that the defendant's conduct satisfies each of the
elements of the tort alleged.  But the demise of supervisory liability in *Bivens* claims does not
mean that the forms of personal involvement under *Colon* can never constitute a basis for *direct*
liability.  If a defendant's personal involvement under *Colon* satisfies the elements of a
constitutional tort, that involvement may trigger liability.

      For example, because the mens rea element of an Eighth Amendment violation is
deliberate indifference, a supervisor – like any other defendant – can be held directly liable for
deliberate indifference (the fifth form of personal involvement set forth in *Colon*), assuming his
conduct meets the other elements of the tort.  And, as *Iqbal* itself discussed, because the mens rea
element of an equal protection claim is discriminatory intent, "purpose rather than knowledge is
required to impose *Bivens* [direct] liability on [a] subordinate for unconstitutional discrimination;

the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Iqbal*, 556 U.S. at 677.  Accordingly, if a supervisor, for example, created a policy or custom directing unconstitutional conduct (the third form of personal involvement set forth in *Colon*) because of discriminatory animus, and that policy or custom caused plaintiff's injury, a supervisor may be held liable for that conduct.  What is different after *Iqbal* is that the guiding question is no longer simply whether a plaintiff has pleaded personal involvement under *Colon* but whether a plaintiff has pleaded each of the elements of the constitutional tort alleged.  The "factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," *id.* at 676, and what "remains" of *Colon* depends on the constitutional provision at issue.

        3.     *The Qualified Immunity Standard*

        Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether a right was clearly established, courts look to whether (1) the right was defined with reasonable clarity; (2) Supreme Court or Second Circuit precedent has confirmed the existence of the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.  *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998).  The determination of whether the right at issue was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  An officer is entitled to qualified immunity even when his actions were unlawful provided the constitutionality of his conduct was objectively debatable.

*See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) (holding that "consideration of whether it was 'objectively reasonable' for a defendant to believe his actions were lawful . . . is indispensable" to the qualified immunity analysis); *Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir. 1998) (stating that immunity applies whenever "officers of reasonable competence could disagree on the legality of defendant's actions") (internal quotation marks omitted).

There was a time when the qualified immunity analysis had a prescribed order of operations: judges were directed to first decide whether the defendant's conduct (as alleged by the plaintiff) violated a constitutional right; and only if the answer to that question was "yes" could they proceed to determine whether the right was "clearly established" at the time of the violation.  *Saucier*, 533 U.S. at 201 (emphasis added).  However, following the Supreme Court's decision in *Pearson*, 555 U.S at 242, courts now have discretion to address those questions in reverse order, and to refrain from deciding the first if the asserted right was not clearly established.  *See Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

B.      *Claims One and Six: Conditions of Confinement*

The MDC Detainees allege that the creation and the implementation of the harsh confinement policy violated their Fifth Amendment substantive due process rights.  They assert Claim One against all defendants; Claim Six asserts a Fifth Amendment due process claim against only the MDC Defendants based on the strip searches.[9]  Both are *Bivens* claims seeking damages.[10]

---

[9]      Although Claim Six focuses solely on the strip searches and does not name the DOJ Defendants, the factual allegations incorporated by reference into Claim One embrace the strip search allegations.  I deem Claim One to allege, *inter alia*, strip searches in violation of the Fifth Amendment against the DOJ Defendants.

[10]      Although, as discussed more fully below in relation to the free exercise-based *Bivens* claim, "the Supreme Court has warned that the *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in

1.      *The Elements of the Claim*

I consider plaintiffs' substantive due process claim under the standard applicable to pretrial detainees.  *See Turkmen I*, 2006 WL 1662663, at *31-32, *aff'd in part, vacated in part, remanded*, 589 F.3d 542 (2d Cir. 2009).  For pretrial detainees, such a claim is governed by the Due Process Clause of the Fifth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  In an action challenging conditions or restrictions of pretrial detention he has *purposefully* imposed, a *Bivens* defendant may be held liable if (1) with the intent to punish (mens rea) (2) he engaged in conduct that caused the conditions or restrictions that injured the plaintiff (causation).  *Id.* at 535; *Iqbal v. Hasty*, 490 F.3d 143, 169 (2d Cir. 2007), *rev'd by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  If the plaintiff does not allege that the defendant verbally expressed an intent to punish, punitive intent may be inferred from the nature of the conditions or restraints allegedly imposed.  Specifically, a court may consider "'whether an alternative purpose to which [the condition] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"  *Wolfish*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)).  Thus, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  *Id.* at 539.  In contrast, "if a restriction or condition is

"new contexts'," *Arar v. Ashcroft*, 585 F.3d 559, 582 (2d Cir. 2009) (en banc) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001)).  The conditions-of-confinement claims do not present a new context.  The Second Circuit has long assumed that mistreatment claims like those alleged here give rise to a *Bivens* claim.  *See Arar*, 585 F.3d at 597 (Sack, J., dissenting) (citing cases).  Moreover, as Judge Sack pointed out in dissent in *Arar*, when the Second Circuit reviewed essentially identical claims in *Iqbal*, it "did not so much as hint either that a *Bivens* remedy was unavailable or that its availability would constitute an unwarranted extension of the *Bivens* doctrine."  *Id.*  Indeed, even the en banc majority in *Arar*, which concluded that extraordinary rendition was a new context (into which the *Bivens* remedy would not be extended), acknowledged that *Bivens* claims are already available for the harsh conditions of confinement alleged here.  *See id.* at 580 ("In the small number of contexts in which courts have implied a *Bivens* remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued. The guard who beat a prisoner should not have beaten him; . . . and the immigration officer who subjected an alien to multiple strip searches without cause should have left the alien in his clothes.").  Moreover, in *Turkmen I*, I rejected defendants' arguments that a *Bivens* remedy should not be extended, and I see no reason to revisit that determination here. 2006 WL 1662663, at *29.

27

not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.*

With respect to conditions of pretrial detention not alleged to be *purposefully* caused by the defendants, which I refer to as environmental conditions, a *Bivens* defendant may be held liable on a substantive due process claim if he (1) caused injury to the plaintiff through his (2) deliberate indifference to a substantial risk that the plaintiff would be deprived of a basic human need, such as food, clothing, shelter, medical care, sleep, and reasonable safety. *See Iqbal*, 490 F.3d at 169; *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 200 (1989). A defendant who is deliberately indifferent to a risk must be subjectively aware of that risk. *Caiozzo*, 581 F.3d at 71.

2.    *The Sufficiency of the Allegations*

The plaintiffs allege that the defendants violated their substantive due process rights. Specifically, they complain that the defendants caused them to be, *inter alia*, constructively denied the opportunity to exercise; denied sleep; repeatedly placed in handcuffs and shackles; deprived of hygienic implements, such as soap and toilet paper; subjected to extremely cold conditions; deprived of sufficient food; frequently verbally and physically abused; and repeatedly strip-searched (collectively, the "challenged conditions").

The plaintiffs advance different theories of liability with respect to the DOJ defendants and the MDC defendants. They seek to hold the MDC defendants liable for creating, or being deliberately indifferent to, the challenged conditions. In contrast, they seek to hold the DOJ defendants liable for creating the harsh confinement policy, which directed that the

Detainees be held in restrictive conditions such that they felt maximum pressure to cooperate with law enforcement.  Although that policy did not expressly contemplate the specific challenged conditions, plaintiffs allege that it *caused* those conditions because the challenged conditions were created in the implementation of the harsh confinement policy.

Consistent with my ruling in *Turkmen I*, 2006 WL 1662663, at *32-33, the defendants do not contest that the purpose of the challenged conditions was to punish and/or that the challenged conditions presented a serious risk of depriving the Detainees of their basic human needs.[11]  Instead, the defendants, citing different rationales, argue that they should not be held responsible for injuries caused by those conditions.  In other words, at issue on these motions to dismiss is not whether *someone* may be held liable in a *Bivens* action for the challenged conditions; it is whether each defendant is a proper defendant in such an action.

> a.   *The DOJ Defendants*

Plaintiffs contend that the DOJ defendants should be held liable because (1) with the intent to punish the Detainees (2) they created the harsh confinement policy, which caused the challenged conditions that injured the Detainees.  The DOJ defendants contend that, because the policy did not itself direct unconstitutional action, it cannot be the basis for imposing liability now that supervisory liability has been eliminated.  In other words, these defendants argue that to hold them liable simply because their facially constitutional policy was unconstitutionally applied would be to hold them responsible not for their own acts but for the acts of their supervisees.

---

[11]    Accordingly, I do not revisit the question of whether the challenged conditions evince an intent to punish.

I agree that holding the DOJ defendants liable *solely* on the basis that the MDC defendants unconstitutionally applied their facially constitutional policy would be the equivalent of imposing *respondeat superior* liability – a form of supervisory liability discarded in *Iqbal*. Indeed, one could describe almost *any* act taken by the MDC defendants as having been caused by the DOJ defendants, and holding the latter responsible for the former's acts without more than but-for causation would make a master responsible for the acts of his servants.  *Cf. City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) ("Obviously if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, [a city police officer] would never have killed [the plaintiff] if [the city] did not have a 'policy' of establishing a police force."); *Connick v. Thompson*, 131 S. Ct. 1350, 1365 (2011) (finding that a "stringent standard of fault" is necessary to connect a municipal policy with municipal employees' unconstitutional acts "lest municipal liability under § 1983 collapse into *respondeat superior*.").

However, a substantive due process violation requires more than simply but-for causation.  It also requires an intent to punish, and when punitive intent motivates a facially constitutional policy that is implemented by the creation of unconstitutionally punitive conditions of confinement, imposing liability upon the policymaker is very different from imposing *respondeat superior* liability.  *Cf. Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) (permitting liability where unconstitutional acts were taken in implementation of policy that was ambiguous on its face but was interpreted and intended by the policymaker to call for those acts). A facially constitutional policy that was expressly intended to cause the kind of constitutional violation it ultimately caused constitutes behavior upon which *direct* liability may properly be premised.

I conclude that plaintiffs have failed to state a claim that the DOJ defendants violated their substantive due process rights because the Complaint does not plausibly plead that the DOJ defendants possessed punitive intent.  Although an inference of punitive intent may be drawn from the conditions themselves, in evaluating the sufficiency of the allegations against the DOJ defendants it is useful to bear in mind what the plaintiffs do *not* allege.  They do not allege that the DOJ defendants intended that the MDC defendants create the punitive and abusive conditions in which the plaintiffs were detained.  Nor do they allege that the DOJ defendants were even aware of those conditions.  Rather, they simply contend that the unconstitutional conditions of confinement were the "direct result" of the DOJ defendants' harsh confinement policy, and particularly of their directive to "exert maximum pressure on" the detainees, who "needed to be encouraged in any way possible to cooperate."  ¶ 61.  Plaintiffs' counsel contended at oral argument that those marching orders "encourage[d] illegal means" of obtaining detainee cooperation, which in fact were used, and that encouragement supports an inference at this stage that these defendants intended the resulting detainee abuse.  Oral Arg. Tr. 41, ECF No. 759.   In effect, and plaintiffs' counsel conceded as much at oral argument, plaintiffs would have me infer from the DOJ defendants' failure to specify that the harsh confinement policy should be carried out *lawfully* that they intended to punish the plaintiffs.  This I cannot reasonably do.

"Generally, a supervisory official is entitled to assume that subordinates will pursue their responsibilities in a constitutional manner."  *Smiley by Smiley v. Westby*, No. 87 Civ. 6047, 1994 WL 519973, at *8 (S.D.N.Y. Sept. 22, 1994); *cf. Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065-66 (2d Cir. 1989) (defendant could not be held liable for delegating power to supervisee who acted unconstitutionally in exercising that power because defendant could rely on supervisee to adhere to the Constitution).   The DOJ defendants were entitled to expect that

31

their subordinates would implement their directions lawfully, and I cannot reasonably infer that

the failure to make that expectation explicit suggests punitive intent.  Accordingly, I grant the

motion to dismiss plaintiffs' conditions-of-confinement claims with respect to these defendants.

b.    *The MDC Defendants*

The plaintiffs seek to hold the MDC defendants responsible for the challenged

conditions, some of which were created as a matter of express policy (*e.g.*, regular handcuffing

and shackling, deprivation of hygienic implements, strip-searches, constructive denial of

exercise) and others of which were not (*e.g.*, verbal and physical abuse, sleep deprivation).  I

refer to the former group of conditions as the "official conditions" and the latter group as the

"unofficial abuse."  With respect to the official conditions, the plaintiffs argue that the MDC

defendants (1) created the challenged conditions (2) with the intent to punish.  With respect to

the unofficial abuse, the plaintiffs contend that all the MDC defendants except Zenk[12] (1) caused

plaintiffs' injuries through (2) their deliberate indifference to the risk that such abuse would

occur.[13]

---

[12]        Plaintiffs "do not seek to hold Defendant Zenk responsible for the abuses that occurred [i]n the
AMDAX [SHU] beyond those imposed as a matter of policy." Pls.' Mem. Opp. Mot. to Dismiss 41 n.15, ECF No.
749.  In addition, plaintiffs do not assert against Zenk any claims arising from activities prior to April 22, 2002, the
date he became Warden of the MDC.

[13]        The archetypal substantive due process claim for environmental conditions is a claim against
prison officials for failing to protect the plaintiff against *privately* inflicted harms.  As the Supreme Court has
explained, government actors do not generally have a duty to protect persons from private harms, but when the
government takes a citizen into its care, such a "duty to assume some responsibility for his safety and general well-
being" arises.  *DeShaney*, 489 U.S. at 200.  The "rationale for this principle is simple enough: when the State by the
affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself,
and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and
reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment and the Due
Process Clause."  *Id.*  Accordingly, when a government official is deliberately indifferent to known risks to a
prisoner's basic human needs and yet fails to discharge his duty to protect, he may be held liable under the
Substantive Due Process Clause.  *See Wolfish*, 441 U.S. at 335-36.  In this case, plaintiffs allege that the MDC
defendants failed to protect them from harms inflicted by their subordinates – *i.e.*, not private individuals but
government employees under their supervision.  The logic of *Deshaney* and *Wolfish* applies with just as much force
to this kind of claim.  Thus, because a government official may be held liable for his inaction when he is deliberately
indifferent to the known risk of private harms to a prisoner, he may be held liable when he is deliberately indifferent

The Complaint states a plausible claim against all of the MDC defendants for the official conditions.  The plaintiffs allege that Hasty ordered the creation of the ADMAX SHU and ordered two of his subordinates, Lopresti and Cuciti, to design extremely restrictive conditions of confinement for those assigned to it; that Cuciti and Lopresti created the written policy setting forth the official conditions; that Hasty and Sherman then approved and implemented that written policy; and that, when Zenk replaced Hasty, he approved and implemented the conditions created under Hasty's watch.  These allegations establish that each defendant was a cause of the official conditions, and the conditions themselves permit an inference of punitive intent with respect to every defendant because every defendant had a hand in creating or implementing them. *See Wolfish*, 441 U.S. at 538-39.

The plaintiffs have also stated a claim against all of the MDC defendants for the unofficial abuse.  No one questions that the abuse constituted a grave risk to plaintiffs' reasonable safety, and the Complaint plausibly alleges that all of the defendants were deliberately indifferent to – that is, subjectively aware of – that risk and yet did nothing to mitigate it.  Indeed, plaintiffs allege that Hasty "was made aware of the abuse that occurred through inmate complaints, staff complaints, hunger strikes, and suicide attempts," ¶ 24; Zenk and Sherman made rounds in the ADMAX SHU and were aware of the abusive conditions there; Lopresti was frequently present in the ADMAX SHU, regularly reviewed documentation of some of the abuses, and received numerous complaints from the Detainees about abuse and mistreatment; Cuciti made rounds in the ADMAX SHU, reviewed logs created by the unit, and

---

to a known risk of harm at the hands of his own subordinates.  This is not supervisory liability or even liability that arises from the discharge of supervisory responsibilities.  The same theory of liability applies identically to supervisors and subordinates alike:  When an officer is deliberately indifferent to a known risk of any threat (public *or* private) to a prisoner's basic human needs and fails to act to mitigate that risk, he may be liable.

heard complaints from the Detainees about the unofficial abuse; and all of the MDC defendants failed to take steps to rectify the abuse.  These specific factual allegations suffice to raise the reasonable inference that the MDC defendants had the requisite mens rea and that their inaction in the face of the unofficial abuse caused plaintiffs' injuries.

3.    *Qualified Immunity*

The defendants are not entitled to qualified immunity.  It was clearly established in 2001 that punitive conditions of confinement could not be imposed upon unconvicted detainees.  *Iqbal*, 490 F.3d at 169; *Turkmen I*, 2006 WL 1662663, at *34.  *See Bell*, 441 U.S. at 538; *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  The unique context of the 9/11 attacks did not render the law unclear.  As the Second Circuit has observed, the "right not to be subjected to needlessly harsh conditions of confinement" does "not vary with surrounding circumstances."  *Iqbal*, 490 F.3d at 159.  This right was among those that were "clearly established prior to 9/11, and [it] remained clearly established even in the aftermath of that horrific event."  *Id.* at 160.

The MDC defendants argue that even if the law was clearly established, they should be granted qualified immunity because, in holding the plaintiffs in the ADMAX SHU, they were following the facially valid orders of their superiors at the BOP.  Specifically, they suggest that their BOP superiors designated the plaintiffs for restrictive confinement, and that they were entitled to assume that their BOP superiors did so because they suspected the plaintiffs of links to terrorism.  Therefore, they contend, reasonable officers in their position would not have known that their behavior violated clearly established law.  But this argument conflicts with

34

the express allegations in the Complaint[14] that the harsh confinement policy was facially

discriminatory and that the MDC defendants were informed that law enforcement had no

information linking the plaintiffs to terrorism.  Accordingly, I find the argument without merit

and deny qualified immunity.

C.      *Claim Two: Equal Protection Claims*

Plaintiffs bring a *Bivens* claim for violation of their equal protection rights under

the Due Process Clause of the Fifth Amendment.[15]  They contend that defendants created and

implemented the harsh confinement policy because of their race, religion, and national origin.

Specifically, plaintiffs assert that the harsh confinement policy was facially discriminatory, as it

was expressly directed at Muslim and Arab men.[16]

1.      *The Elements of the Claim*

To prevail at this stage on their equal protection claim, plaintiffs must plausibly

allege that defendants' (1) discriminatory animus (2) caused plaintiffs' injuries.  *Washington v.

Davis*, 426 U.S. 229, 240 (1976); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *cf.

Hartman v. Moore*, 547 U.S. 250, 259-61 (2006) (explaining, in the context of First Amendment

retaliatory discharge claims, that discriminatory animus is insufficient if the complained-of

adverse action would have occurred anyway).  They may plead discriminatory animus in any of

---

[14]     The defendants contend that the plaintiffs cannot partially incorporate the OIG Reports, i.e., that they must incorporate them wholesale rather than only to the extent they do not conflict with the allegations of the Complaint. I reject this suggestion. There is a difference between disputing the words that appear in an incorporated document (impermissible) and disputing the truth of those words (permissible). Although plaintiffs could not incorporate the OIG Reports and then allege that they do not say what they plainly say, they need not incorporate all of the allegations in the Reports for their truth.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[15]     The availability of a *Bivens* remedy for violations of the Equal Protection Clause has been conclusively established.  *See Davis v. Passman*, 442 U.S. 228 (1979).

[16]     Because the Passaic plaintiffs were not injured by the alleged discrimination – they were held in the general population of the Passaic Jail and thus cannot claim that they were held in harsher conditions than they would have been held if not for their race, religion, and/or national origin – I dismiss their equal protection claims.

35

three ways.  First, they may plead that defendants adopted or implemented a policy that classifies on the basis of race, religion, or national origin.  A "policy is discriminatory on its face if it expressly classifies persons" on the basis of such an unlawful characteristic.  *Hayden*, 180 F.3d at 48.  Second, they may plead that a facially neutral policy was applied to them in an intentionally discriminatory fashion.  *Id.*  Third, they may plead that a facially neutral policy was motivated by discriminatory animus and its application resulted in a discriminatory effect.  *Id.*

Plaintiffs follow the first route, contending that the harsh confinement policy, which the DOJ defendants created, expressly dictated that Arab and Muslim noncitizens should be detained in restrictive conditions.  Oral Arg. Tr. 59-61, ECF No. 759.  They allege that the MDC defendants then implemented that facially discriminatory policy by placing Muslim and Arab noncitizens in the ADMAX SHU because of their race, religion, and/or national origin, causing injury to plaintiffs.  Accordingly, plaintiffs must plausibly allege that the DOJ defendants adopted and the MDC defendants implemented such a facially discriminatory policy, which injured the plaintiffs.

2.    *The Sufficiency of the Allegations*

The Complaint alleges that Ashcroft, Mueller, and Ziglar created, and Hasty, Zenk, Sherman, Lopresti, and Cuciti implemented, the detention policy, which was expressly directed at Arab and Muslim men.[17]  Although only the harsh confinement policy is challenged here, the Complaint alleges that each piece of the detention policy – including the initial arrest,

---

[17]    *See, e.g.*, ¶ 7 ("Plaintiffs' and class members' race, religion, ethnicity, and national origin played a decisive role in Defendants' decision to detain them initially and to subject them to punitive and dangerous conditions of confinement . . . ."); ¶ 282 ("In subjecting Plaintiffs and class members to harsh treatment not accorded similarly-situated non-citizens, Defendants . . . singled out Plaintiffs and class members based on their race, religion, and/or ethnic or national origin . . . ."); ¶ 48 ("Ashcroft, Mueller, and Ziglar's decision to hold [the Detainees] for criminal investigation without evidence of any ties to terrorism was based on their discriminatory notion that all Arabs and Muslims were likely to have been involved in the terrorist attacks, or at least to have relevant information about them.").

"of interest" treatment, and application of the hold-until-cleared policy – overtly targeted Arab and Muslim individuals.  Such allegations "can provide the framework of a complaint, [but] they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  And after careful review of the Complaint, taking due note of the Supreme Court's analysis in *Iqbal*, I conclude that the facts alleged adequately support the plaintiffs' claims against the MDC defendants, but not against the DOJ defendants.

a.    *The DOJ Defendants*

The Complaint fails to allege facts sufficient to raise a reasonable inference that Ashcroft, Mueller and Ziglar created the alleged harsh confinement policy.  To be sure, there are ample allegations that these defendants – particularly Ashcroft and Mueller – classified persons on the basis of race, religion and national origin for purposes of arrest and detention.  *See, e.g.*, ¶¶ 40, 41, 43, 44.  But those alleged actions do not constitute equal protection violations standing alone.  For example, Ashcroft's direction to arrest all male immigration violators between the ages of 18 and 40 from a Middle Eastern country did not, in light of the executive branch's plenary power over immigration, amount to an equal protection violation.  *See Turkmen* I, 2006 WL 1662663, at *41-43; *Turkmen II*, 589 F.3d at 550.  I have considered whether the discriminatory animus suggested by that direction and the other allegations – regardless of whether they are actionable in themselves – may properly be relied on to suggest animus on the part of Ashcroft, Mueller, and Ziglar with respect to the sole equal protection violation alleged, *i.e.*, the facially discriminatory harsh confinement policy.  But there is a critical distinction between a decision to round up violators of the immigration laws and a decision to treat them harshly once they are in federal custody.  There is no "equal protection right to be free of selective enforcement of the immigration laws based on national origin, race or religion."

37

*Turkmen II*, 589 F.3d at 542.  Because of the broad powers of the political branches in the areas of immigration and naturalization, in that one setting discrimination on grounds of race, religion and national origin is not invidious.  *See Reno v. Arab-American Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999).  There is indeed an equal protection right to be free of excessively harsh conditions of confinement on those bases, but I am reluctant to allow allegations of lawful conduct to support an inference that the DOJ Defendants created the facially discriminatory confinement policy alleged here.

      Plaintiffs' allegations fall short of raising a reasonable inference that Ashcroft, Mueller, and Ziglar created the alleged overtly discriminatory harsh confinement policy.  For example, the allegation that the head of the New York FBI field office thought that national origin and religion were relevant to the PENTTBOM investigation requires inference upon inference – that the office head thought these traits were relevant because of Ashcroft, Mueller, or Ziglar's orders and that discrimination with respect to the PENTTBOM investigation translated into discrimination with respect to conditions of confinement – and those inferences are very weakly suggested.  Similarly, that Ashcroft, Mueller, and Ziglar were aware that Arab and Muslim noncitizens encountered during the PENTTBOM investigation were, without individualized assessment, automatically treated as "of interest" potentially raises an inference these defendants harbored discriminatory animus.  However, because the same allegation is also consistent with a policy to treat everyone encountered during the PENTTBOM investigation as "of interest," this allegation standing alone would be insufficient to render the plaintiffs' equal protection claim plausible.

      In making this determination, I acknowledge that the factual allegations before me now are distinguishable from those alleged in *Iqbal*, where the Supreme Court determined that

the plaintiffs failed to state a plausible claim.  556 U.S. at 683.  In *Iqbal*, the plaintiffs alleged

that Ashcroft and Mueller designated them as of high interest to the PENTBOMM investigation

and held them in the ADMAX SHU because of discriminatory animus.  *Id*. at 668-69.  However,

the only relevant factual allegations plaintiffs made at the time were (1) that Ashcroft and

Mueller approved of holding "of high interest" detainees in harsh conditions of confinement until

they were cleared of suspicion and (2) that thousands of Arab and Muslim individuals were held

in harsh conditions of confinement.  *Id*. at 681.  The Court concluded that the former allegation

plausibly suggested only that "the Nation's top law enforcement officers, in the aftermath of a

devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions

available until the suspects could be cleared of terrorist activity."  *Id*. at 683.  And it found that

the latter allegation, although consistent with discriminatory animus, was not suggestive of such

animus because "[i]t should come as no surprise that a legitimate policy directing law

enforcement to arrest and detain individuals because of their suspected link to the attacks would

produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy

was to target neither Arabs nor Muslims."  *Id*. at 682.

Now, however, the plaintiffs have amplified their claim with more factual

allegations.  For example, the Complaint alleges that Ashcroft, Mueller, and Ziglar knew that law

enforcement lacked any information tying the Detainees to terrorism, suggesting that the harsh

confinement policy was not simply about keeping suspected terrorists in secure conditions.  And

plaintiffs allege that the few individuals initially detained in harsh conditions who were not Arab

or Muslim were cleared quickly or moved into the general population without clearance,

demonstrating that at least some non-Arab and non-Muslim individuals were treated differently

than the MDC Detainees.  I find the issue to be a close one, but after applying the *Iqbal* pleading

standard I conclude that these allegations, viewed together with all the allegations in the Complaint, do not plausibly suggest that the DOJ Defendants purposefully directed the detention of the plaintiffs in harsh conditions of confinement due to their race, religion or national origin.

   b.   *The MDC Defendants*

   With respect to Hasty, Zenk, Sherman, Lopresti, and Cuciti, I conclude that the Complaint raises the reasonable inference that they effectuated the harsh confinement policy and held the Detainees in restrictive conditions of confinement because of their race, religion, and/or national origin.  In so determining, I rely upon the allegations set forth above, as well as the allegations that:

- Hasty, Zenk, Sherman, Lopresti, and Cuciti created the harsh conditions at the ADMAX SHU and either personally witnessed or received complaints about how the MDC Detainees were treated there.  ¶¶ 24-28.

- The Detainees were placed in the ADMAX SHU without hearings or individualized determinations of dangerousness. ¶¶ 68-74.

- Lopresti signed a document that was prepared by Cuciti, and approved by Hasty and Sherman, which untruthfully stated that the executive staff at MDC had classified the "suspected terrorists" as "High Security" based on an individualized assessment of their "precipitating offense, past terrorist behavior, and inability to adapt to incarceration."  ¶ 74.

- Hasty, Sherman, and Lopresti continued to hold the MDC Detainees in the ADMAX SHU even after learning that the FBI had not developed any information to tie them to terrorism. ¶ 69.

- Staff verbally abused the MDC Detainees by, for example, referring to them as terrorists, insulting their religion, and referring to them as camels.  ¶¶ 109-10.  Hasty too referred to the Detainees as terrorists.  ¶¶ 77, 109.

- Staff refused the MDC Detainees' requests to keep the Koran in their cells, to be provided with Halal food, to be told the time of day so they could pray at proper times, and to be told the date so that they could acknowledge Ramadan.  ¶ 132-34.  They also frequently interrupted the MDC Detainees' prayers by banging on cell doors, screaming derogatory anti-Muslim comments, videotaping them, and telling them to "shut the fuck up," among other things.  ¶ 136.

In light of these factual allegations, and because there is no reasonable dispute that the MDC defendants' conduct caused plaintiffs' injuries, I conclude that the Complaint pleads a plausible equal protection claim against the MDC defendants.

3.      *Qualified Immunity*

Qualified immunity is unavailable to any of the MDC defendants.  It was clearly established in 2001 that creating and implementing a policy expressly singling out Arabs and Muslims for harsh conditions of confinement violates their Fifth Amendment equal protection rights.  *See Iqbal*, 490 F.3d at 174 ("The Plaintiff also alleges that 'Defendants specifically targeted [him] for mistreatment because of [his] race, religion, and national origin.'  These allegations are sufficient to state a claim of animus-based discrimination that any 'reasonably competent officer' would understand to have been illegal under prior case law." (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Hayden*, 180 F.3d at 48 (stating that racial classifications violate the Equal Protection Clause where motivated by racial animus and having a discriminatory effect).  In addition, insofar as the MDC defendants seek qualified immunity on the theory that they were following facially valid orders, this gets them nowhere; the Complaint alleges that the harsh confinement policy was facially discriminatory, not facially valid.  The defendants are not entitled to qualified immunity on plaintiffs' equal protection claim.

D.      *Claims Four and Five: Interference with Communications*

The MDC plaintiffs allege that Ashcroft, Mueller, and Ziglar created an explicit policy to limit MDC Plaintiffs' and class members' access to the outside world and that the MDC Defendants implemented that policy in violation of the First Amendment and Fifth

41

Amendment substantive due process rights ("communications claims").[18] ¶¶ 288-96; Pls.' Mem.

Opp. Mot. to Dismiss 69, ECF No. 749.   These communications restrictions are alleged to have

taken multiple forms: (1) an express policy to hold them incommunicado until mid-October 2001

despite the lack of any basis to believe they had any link to terrorism; (2) the MDC guards

effectively denied them one-legal call per week and one social visit per month after the complete

communications blackout was lifted; and (3) the MDC defendants permitted the video and

audiotaping of the detainees' visits with their attorneys, including the use of sound recording.

      1.   *Qualified Immunity*

      When qualified immunity is raised in a motion to dismiss, court must determine

(1) whether the alleged facts demonstrate that a defendant violated a constitutional right; and, if

yes, (2) whether this constitutional right was clearly established at the time of the challenged

action. *Saucier*, 533 U.S. at 201.   As discussed above, following the Supreme Court's decision

in *Pearson v. Callahan*, 555 U.S. 223 (2009), courts have discretion to elect which prong of the

qualified immunity inquiry to consider first.   *See Pearson*, 555 U.S. at 236 ("The judges of the

district courts . . . should be permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand.").   When a court grants immunity at step two of the

qualified-immunity analysis, it is within its discretion to decline to address the constitutionality

of the defendants' conduct.   *Pearson* identified a number of factors that might influence a court

to exercise its discretion not to reach the constitutional question:  (1) the constitutional violation

---

[18]     The Complaint also appears to raise a due process claim for defendants' alleged interference with their right to access the courts. ¶ 294.  As plaintiffs' counsel conceded at oral argument, *see* Oral Arg. Tr. at 56, I dismissed that claim in *Turkmen I*, 2006 WL 1662663, at *48-49, and I see no reason to revisit that decision.  To the extent plaintiffs press a claim with respect to their right of access to the courts, it is dismissed.

question "is so factbound that the decision provides little guidance for future cases"; (2) "it
appears that the question will soon be decided by a higher court"; (3) deciding the constitutional
question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at
the pleading stage" and "the precise factual basis for the . . . claim  . . . may be hard to identify";
(5) tackling the first element "may create a risk of bad decisionmaking" due to inadequate
briefing; (6) discussing both elements risks "bad decisionmaking" because the court is firmly
convinced the law is not clearly established and is thus inclined to give little thought to the
existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the
wisdom of passing on the first constitutional question because "it is plain that a constitutional
right is not clearly established but far from obvious whether in fact there is such a right."  555
U.S. at 236-42.

### a.   *The Initial Communications Blackout*

The inquiry into whether a particular right is clearly established for purposes of
qualified immunity looks to "whether it would have been clear to a reasonable officer that his
conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202.   This is a
context-specific inquiry.  The question, therefore, is whether an officer could believe it was
objectively reasonable – in light of the specific context – to impose a complete communications
ban where, as here, the officers have no basis to form any individualized suspicion that any
detainee has any connection to terrorism.

No court has considered whether – in exigent circumstances analogous to those
present here – access to telephones or to outside persons can be curtailed for persons detained for
civil immigration violations.  As plaintiffs' counsel conceded during oral argument, in the
abstract it is (and was in 2001) hard to draw the line between communications restrictions that

are constitutional and those that are not.  *See* Oral Arg. Tr. at 49-52.  For example, counsel

agreed that it may be permissible to impose an "emergency lockdown . . . for a day," but argued

that it is clearly established that such a lockdown is unconstitutional when imposed for a longer

period.  Oral Arg. Tr. at 51.  I disagree.  Even assuming a lengthier blackout crossed the

threshold from permissible to impermissible conduct, I cannot agree that this was so clearly

established that qualified immunity is unavailable.[19]

        In reaching this conclusion, I take guidance from the Second Circuit's decision in

*Iqbal*, 490 F.3d at 143, regarding the significance of the post-9/11 context.  Specifically, the

court stated that most of the rights asserted here "do not vary with the surrounding

circumstances."  *Id*. at 159.  That category of rights, the court observed, includes "the right not to

be subjected to needlessly harsh conditions of confinement, the right to be free from the use of

excessive force, and the right not to be subjected to ethnic or religious discrimination."  *Id.*  On

the other hand, "the gravity of the situation" in the aftermath of the attacks caused the Second

Circuit to "recognize that some forms of governmental action are permitted in emergency

situations that would exceed constitutional limits in normal times."  *Id.*

The court suggested as an example the Fourth Amendment right to be free from unreasonable

searches.  Whereas a detainee's "right not to be needlessly harassed and mistreated in the

confines of a prison cell by repeated strip and body-cavity searches" and "the right to be free

from excessive force and not to be subjected to ethnic or religious discrimination" are not

diminished by exigent circumstances, the court observed that those circumstances might justify

an otherwise impermissible warrantless entry into a home.  *Id.* at 159-60.

---

[19]    I acknowledge that I saw this issue differently in *Turkmen I*, 2006 WL 1662663, at *26; however, taking cues both from the Second Circuit's decision in *Iqbal*, 490 F.3d at 159 and the briefing and oral argument on this motion, I have revisited these earlier conclusions.

In addition to its potential effect on the *lawfulness* of government conduct, the Second Circuit held that the post-9/11 context has an important bearing on whether law enforcement officers might be justified in *believing*, however incorrectly, that their actions were lawful. *Id.* at 160. Specifically, in reversing on qualified immunity grounds my decision upholding plaintiffs' procedural due process claim, the court referred to the national security concerns at the time in determining that the procedural due process right was not firmly established:

> [U]ncertainty in existing case law is heightened by the fact that, even on the facts alleged in the complaint, which specified that the "of high interest" designation pertained to the Government's post-9/11 terrorism investigation, the investigation leading to the Plaintiff's separation from the general prison population could be reasonably understood by all of the Defendants to relate to matters of national security, rather than an ordinary criminal investigation. Prior to the instant case, neither the Supreme Court nor our Court had considered whether the Due Process Clause requires officials to provide ordinary administrative segregation hearings to persons detained under special conditions of confinement until cleared of connection with activities threatening national security. *Cf.* [*Mitchell v.*] *Forsyth*, 472 U.S. [511] at 534-35 [(1985)] (granting Attorney General qualified immunity for warrantless wiretapping for national security purposes despite prohibitions of warrantless wiretapping in criminal context).

*Id.* at 167

Assuming *arguendo* that plaintiffs' had a right to make phone calls and to be in contact with persons outside the detention facility, and that the right was violated, I conclude that officers of reasonable competence could nonetheless have disagreed about whether their conduct violated that right in light of national security concerns in the aftermath of the 9/11 attacks. Considering the context and the lack of clear case law from the Supreme Court and the Second

Circuit, reasonable officers could believe that such a policy – though crude and overbroad – was permissible.  Accordingly, I find qualified immunity on these claims for all Defendants.[20]

b.  *The Interference with Access to Families and Friends*

It was not clearly established in September of 2001 that social calls and visits could not be carefully restricted, as a matter of policy, for inmates and detainees in administrative segregation.  *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) (Michigan's severely restrictive visitation program did not violate the Constitution because it constituted "a proper and even necessary management technique to ensure compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose.").[21]  This conclusion is not changed even assuming, as I must, that the restrictions were imposed here without any individualized assessment of the need for them or suspicion of any connection to terrorism.   Even if it were clearly established that the measures alleged here could not be taken lawfully in the absence of individualized intelligence linking each detainee to a security threat, reasonable officers could have concluded otherwise.

The frequency of attorney visits is governed by a regulation stating that "The Warden *generally* may not limit the frequency of attorney visits."  28 C.F.R. § 543.13(b)

---

[20]      I do not reach the merits of whether Plaintiffs' allegations of an express policy to hold the plaintiffs incommunicado states a claim under the First and Fifth Amendments.  As discussed above, I am not required to.  Moreover, I am mindful of the Supreme Court's admonition in *Camreta v. Greene*, 131 S. Ct. 2020 (2011), that lower courts should "think hard, and then think hard again" before unnecessarily deciding the merits of a constitutional issue.  *Id.* at 2032.   In light of the lack of guidance from the Second Circuit and the Supreme Court on constitutional restrictions on communication rights of pretrial detainees, I conclude that it is appropriate to decline to reach the constitutional question.

[21]      Several district courts in the Second Circuit have since held that various types of restrictions on inmate social contacts do not violate the Constitution.  *See, e.g.*, *Griffin v. Cleaver*, 2005 WL 1200532, at *6 (D. Conn. 2005) (inmate had "no constitutional right to telephone use, social visits and commissary privileges"); *Allah v. Poole*, 506 F. Supp. 2d 174, 184-85 (W.D.N.Y. 2007) (not clearly established that a prison could not forbid inmates from speaking languages other than English); *Zimmerman v. Burge*, 2008 WL 850677, at *3 (N.D.N.Y. March 28, 2008) (denial of contact visits for drug-addicted inmate for indefinite period of time exceeding two and one-half years bore rational relationship to legitimate penological interests and therefore did not violate Eighth Amendment).

46

(emphasis added).  The regulation permits the warden to "set the time and place for visits" and to "make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney."  I owe substantial deference to the institution's interpretation of the regulation.  *See Bell*, 441 U.S. at 547 ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal discipline and to maintain institutional security.")  In light of these considerations, and given the breadth of the discretion conferred by the regulation and the lack of case law interpreting the term "generally," I conclude that the alleged limitations on the frequency of attorney visits and phone calls did not violate clearly established law.  *See Schick v. Apker*, 2009 WL 2016933, at *9 (S.D.N.Y. March 5, 2009) (collecting pre-2001 cases); *Smith v. O'Connor*, 901 F. Supp. 644, 648 (S.D.N.Y. 1995) (while inmate has constitutional right of access to counsel, this access need not be more than "reasonable"); *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988) (no constitutional violation where plaintiff "does not allege that he was denied absolute access to his counsel by the restrictions on his phone calls, but rather that he was delayed in communicating with his attorney") (citing *Lock v. Jenkins*, 464 F. Supp. 541, 551 (N.D. Ind. 1978) (provision of weekly calls with counsel was sufficient to satisfy Constitution)).

        Even though "[a] prison inmate's rights to communicate with family and friends are essentially First Amendment rights," *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975), the uncertain contours of those rights, taken together with the national security concerns that permeated the context, sufficed to raise a legitimate question among government officials as to whether the First Amendment required the prison officials to afford the Detainees greater access

to legal and social calls.  *Iqbal*, 490 F.3d at 167-68.  Accordingly, I find that there is qualified

immunity for all Defendants for these claims.

c.  *Video-taping attorney visits*

The most troubling strand of the interference-with-communications claim is the

plaintiffs' allegation that the guards overheard or recorded attorney-client telephone calls and

meetings.  With some reluctance, I nonetheless conclude that it was insufficiently clear that civil

immigration detainees' discussions with their attorneys may not be subject such monitoring

under any circumstances, and that qualified immunity is therefore available.  Plaintiffs point to

no case law from the Second Circuit or the Supreme Court – nor can I find any – that renders it

clear that such a policy violates federal constitutional rights.  In so holding, I am mindful that

there is no need for precedents exactly on point in order for a right to be clearly established.  *See*

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (holding that a constitutional right is clearly

established, if "its contours [are] sufficiently clear that a reasonable official would understand

that what he is doing violates that right.").  Rather, it is sufficient if, in light of the pre-existing

law, "the unlawfulness [is] apparent." *Id.* (internal citations and quotation marks omitted);  *See*

*also Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on

point . . .").

Plaintiffs point out that the recording of inmates' meetings with attorneys is

prohibited by 28 C.F.R. § 543.13(e), but "[o]fficials sued for constitutional violations do not lose

their qualified immunity merely because their conduct violates some statutory or administrative

provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984).  The claim for damages here asserts a

violation of the First and Fifth Amendments, not § 543.13(e), and it was not clearly established

that video and auditory recordings of attorney visits with civil immigration detainees offends the

48

Constitution.  *But see Lonegan v. Hasty*, 436 F. Supp. 2d 419, 422 (E.D.N.Y. 2006) (denying

qualified immunity because the regulation at issue "was in effect during the time period at issue

and remains in effect at present," rendering the prohibition clearly established); *Malik v.

Hershberger*, 1995 WL 135558, at *7 (S.D.N.Y.  March 29, 1995) (clearly established that

guards could not "aural[ly] monitor . . . an attorney-client conversation").   Here again, I

conclude that the context of the alleged claims has a legitimate impact on the range of conduct

that prison officials could reasonably have believed was justified in the interests of national

security.  *Iqbal*, 490 F.3d at 167.[22]

F.       *Claim Three: Interference with Religious Practice*

            The plaintiffs[23] allege that the DOJ defendants' creation and the MDC

defendants' implementation of the harsh confinement policy violated their free exercise rights

under the First Amendment.   Specifically, they contend that the defendants intentionally

burdened the exercise of their religion by (1) subjecting them to verbal and physical abuse; (2)

denying them Halal food; (3) refusing to let them keep a Koran in their cells; and (4) interfering

with their daily prayer requirements.   They assert this claim against all defendants.

   1.  *The Availability of a Bivens Remedy*

      In *Iqbal*, the Supreme Court assumed without deciding that a *Bivens* claim is available to

remedy a deprivation of a prisoner's free exercise rights, but the Court's opinion suggested

---

[22]       Because I find that qualified immunity is available, I need not decide whether a *Bivens* remedy is
available for these communications-based claims.

[23]       Sachdeva and Bajracharya do not assert this claim at all, and Turkmen asserts this claim only
against the DOJ defendants.

skepticism on the issue.[24]  Defendants contend that a damages remedy under *Bivens* is not available, and thus I must first decide whether to extend *Bivens* to this new context.

      *Bivens* held that the Fourth Amendment implied a damage remedy against an officer who violated it.  *Bivens*, 403 U.S. at 389.  The remedy was extended by *Davis v. Passman*, 442 U.S. 228 (1979) to a former congressional employee's claim under the equal protection component of the Fifth Amendment Due Process Clause based on her employer's sex discrimination, and again by *Carlson v. Green*, 446 U.S. 14 (1988) to a federal prisoner's Eighth Amendment claim based on deliberate indifference to his medical needs.  But in the 24 years "[s]ince *Carlson*, the Court has had to decide in several different instances whether to imply a *Bivens* action.  And in each instance it has decided against the existence of such an action." *Minneci v. Pollard*, 132 S. Ct. 617, 622 (2012).  Moreover, two members of the Court have repeatedly described *Bivens* as "a relic of the heady days in which this Court assumed common-law powers to create causes of action by constitutional implication," which they would end by limiting the *Bivens* damages remedy "to the precise circumstances" of the three cases in which it was implied.  *Id.* at 626 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring) (internal quotation marks omitted).  Nevertheless, for the reasons discussed

---

[24]    The Court wrote as follows on the subject:

> Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination.  For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, we have not found an implied damages remedy under the Free Exercise Clause.  Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).  Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*.

*Iqbal*, 556 U.S. at 675 (some citations and internal quotation marks omitted).

below, I hold that *Bivens* should be extended to afford the plaintiffs a damages remedy if they prove the alleged violation of their free exercise rights.

For new contexts in which a *Bivens* remedy has not yet been recognized, deciding the question involves a two-part inquiry: (1) is there an alternative remedial scheme available to the plaintiffs?; and (2) are there "special factors" that "counsel hesitation" in creating the remedy? *Arar v. Ashcroft*, 585 F.3d 559, 563 (2d Cir. 2009) (en banc). I answer both questions in the negative.

There is no remedy for the violation of plaintiffs' free exercise rights in the absence of a *Bivens* claim. The defendants do not contend otherwise. To the contrary, they argue that Congress deliberately chose not to create one. Specifically, they contend that the Immigration and Nationality Act (the "INA") is a comprehensive remedial scheme for the "interest at issue," Ashcroft's Mem. of Law Support Mot. to Dismiss 6, ECF No. 736, presumably referring, at least in part, to the interest in not being subjected to deliberate interference with respect to religious practices. Defendants then admit that the INA affords no remedy for the deprivation of that interest. This decision not to provide plaintiffs with a monetary remedy, the argument concludes, means Congress wanted the judiciary to refrain from extending the *Bivens* remedy into this setting.

This argument, which parallels the Second Circuit's reasoning in *Arar*, does not work in this setting. Arar had been ordered removed by the INS, and the Deputy Attorney General determined that his removal to Syria, where he was tortured, was consistent with the Convention Against Torture. *Arar*, 585 F.3d at 586. The Second Circuit observed that the provision by Congress of a comprehensive and intricate statutory scheme for review of orders of removal, including review of the government's designation of a particular destination country,

would ordinarily[25] warrant the conclusion that another remedy for the wrongful delivery of Arar to the Syrians, *i.e.*, a *Bivens* damage remedy, is unwarranted.  *Id.* at 572-73.

The plaintiffs in this case do not complain about their deportations.  They are complaining about their treatment before they were deported.  "Although . . . the INA provides a comprehensive *regulatory* scheme for managing the flow of immigrants in and out of the country, it is by no means a comprehensive *remedial* scheme for constitutional violations that occur incident to the administration of that regulatory scheme."  *Turkmen I*, 2006 WL 1662663, at *29 (emphases in original).

Most importantly, the plaintiffs are not complaining simply about facially neutral BOP policies that substantially burden their free exercise of religion.  If they were, I might conclude that their "full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief . . . and grievances filed through BOP's Administrative Remedy Program," *Malesko*, 534 U.S. at 62, provides sufficiently meaningful redress to preclude the implication of a *Bivens* damages remedy.  But the plaintiffs allege a series of acts that were directed only at them (and the class of detainees they seek to represent) with the specific intent to deny them the right to practice their religion.  They have sued the individuals who they allege engaged in those acts, and there is no scheme – statutory or regulatory, comprehensive or otherwise – for a person detained in a federal facility to seek *any* remedy from an officer for intentionally and maliciously interfering with his right to practice his religion.  The precise purpose of the *Bivens* damages remedy is to deter individual officers from engaging in such

---

[25]     Since the government actively prevented Arar from availing himself of that statutory scheme, the Second Circuit did not rest its decision on this ground.  Rather, proceeding to the second step of the analysis, it concluded that there were special factors counseling hesitation before extending the *Bivens* remedy.  *Arar*, 585 F.3d at 573.

unconstitutional conduct.  *FDIC v. Meyer*, 510 U.S. 471, 485 (1994).  In short, for these

plaintiffs, as for Bivens himself and the plaintiff in *Passman*, "'it is damages or nothing.'"

*Passman*, 442 U.S. at 245 (quoting *Bivens*, 403 U.S. at 410 (Harlan, *J.*, concurring in

judgment)).[26]

      The second inquiry in determining whether a *Bivens* claim should be implied is

whether special factors counsel hesitation before doing so.  *Arar* makes abundantly clear that

"'[s]pecial factors' is an embracing category," and that it takes very little for a particular factor to

counsel sufficient hesitation to preclude the *Bivens* remedy.  *Arar*, 585 F.3d at 573-74

("Hesitation is a pause, not a full stop, . . . . and to counsel is not to require.")  As a result, federal

officials seeking to fend off extensions of the *Bivens* remedy into other contexts face a

"remarkably low" threshold.  *Id*. at 574.  Yet I conclude the officers here have failed to cross it.

      Among the special factors that have counseled sufficient hesitation to foreclose

the extension of *Bivens* are "military concerns; separation of powers; the comprehensiveness of

available statutory schemes; national security concerns; and foreign policy considerations."  *Id*.

at 573 (citations omitted).  The defendants here contend that the national security concerns

implicated by the September 11 attacks and their aftermath counsel hesitation in implying a

*Bivens* remedy for the violation of the detainees' right to free exercise of religion, and thus

preclude me from doing so.

---

[26]     Because *Bush v. Lucas* may be the source of the Supreme Court's apparent hesitation regarding the availability of a *Bivens* remedy to a First Amendment claim, *see Iqbal*, 556 U.S., at 675 (citing *Lucas*, 462 U.S. 36 (1983)), I have examined the case carefully, but I remain confident that the remedy is available here.  *Lucas* involved an aerospace engineer's effort to seek a *Bivens* remedy for a free speech claim even though he had already obtained a remedy under a federal workplace protection statute.  The key to the Court's refusal to find an implied damages remedy under the Free Exercise Clause was the fact that Congress had already provided "comprehensive procedural and substantive provisions giving meaningful remedies against the United States."  *Lucas*, 462 U.S. at 368.  There are no analogous alternative remedies available to the plaintiffs here.

Though the argument has some merit, it does not cover as much ground as the defendants want it to.  As discussed above, the Second Circuit recognized in *Iqbal* that national emergencies like the September 11 attacks not only furnish the occasion for the full exercise of government power, but may enlarge that power as well.  490 F.3d at 159-60.  Thus, though the government ordinarily detains and commences removal proceedings in furtherance of immigration policies, I previously held in this case that its use of that authority in furtherance of an ulterior motive to hold the detainees until they were cleared of suspicions of terrorism was a lawful (even if rarely used) exercise of its existing power.  *Turkmen I*, 2006 WL 1662663, at *1.  And that existing power can be enlarged by a national security emergency; for example, as Judge Newman observed in *Iqbal*, the exigent circumstances created by such an emergency "might justify governmental action that would not otherwise be permitted" under the Fourth Amendment.  *Iqbal*, 490 F.3d at 159.

But context matters, and the right of a person detained in an American prison not to be subjected to malicious mistreatment by federal officers that is specifically intended to deprive him of his right to free exercise of his religion was not diminished by the September 11 attacks.  *Id*. at 159-60.  Moreover, the defendants have not even attempted to explain why the availability of a damages remedy if the plaintiffs prove their claim would adversely impact our national security even in the slightest.  Intuition suggests the opposite: if an American jury finds that federal officers deprived detainees of the Koran and Halal food, refused to tell them the correct time of day, and banged on their cell doors while screaming profanities and anti-Muslim epithets, all for the specific purpose of interfering with their exercise of their Muslim faith, one would think our national security interests would only be enhanced if the world knew that those officers were held liable for the damages they caused.

54

In sum, the Supreme Court's treatment of this issue in *Iqbal* indeed suggests the "unsettling possibility" that individuals have no right "to pursue a damages claim for intentional, religiously-based mistreatment at the hands of the federal government."  James F. Pfander, Iqbal, Bivens, *and the Role of Judge-Made Law in Constitutional Litigation*, 114 Penn St. L. Rev. 1387, 1400 (2010).  However, because both of the prerequisites for an extension of *Bivens* have been met, I reject that outcome here and hold that the remedy is available.

2.      *The Elements of the Claim*

Plaintiffs allege that the defendants created and implemented the harsh confinement policy with the express intention of burdening their right to practice their religion. Accordingly, they must plead that defendants, with the (1) intent to suppress their religious practices, (2) burdened those practices.[27]  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).  However, if such a burden advances interests of the highest order and is narrowly tailored in pursuit of those interests, no claim will lie.  *Id*. at 546.

3.      *The Sufficiency of the Allegations*

a.      *The DOJ Defendants*

As with their equal protection claim, plaintiffs' free exercise claim against the DOJ defendants is premised upon the DOJ defendants' creation of a facially constitutional policy that was implemented unconstitutionally.  Specifically, plaintiffs appear to contend that the DOJ defendants created the harsh confinement policy with the intent to suppress the Detainees'

---

[27]      When a *neutral* prison policy impinges on inmates' fundamental constitutional rights, the policy is valid if it is "reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987); *accord O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (1990). However, because *intentional* burdening of religious practices is involved here, the *Turner v. Safley* standard does not apply.

religious practices and that this policy, when implemented by the MDC defendants, did ultimately cause such a burdening of the exercise of their religion.[28]

The Complaint fails to plausibly plead that the DOJ defendants intended to burden the plaintiffs' free exercise of their religion.  As with plaintiffs' substantive due process claim, this claim appears to rest on an argument that, because their policy was implemented unconstitutionally, they must have intended that result.  Thus, for the same reasons set forth in my discussion of the substantive due process claim, I conclude that the DOJ defendants' failure to specify that their policy be implemented lawfully does not raise the reasonable inference that they intended for the policy to be implemented unlawfully.  Accordingly, I dismiss the free exercise claim against the DOJ defendants.

> b.    *The MDC Defendants*

The MDC defendants are alleged to have implemented policies (*e.g.*, forbidding the MDC Detainees from keeping any items, including the Koran, in their cells) that burdened the exercise of their religion.  They are also alleged to have failed to stop MDC guards from engaging in abusive conduct unsanctioned by express policy (*e.g.*, verbal and physical abuse) that further burdened the Detainees' religious practices.  The Complaint contends that the MDC defendants engaged in such conduct with the intent to suppress the MDC Detainees' religious practices.

With respect to the abusive conduct unsanctioned by express policy, the plaintiffs have adequately pleaded that the MDC defendants were deliberately indifferent to the known

---

[28]        It may be possible to state a free exercise claim against government officials who cause a burden on a plaintiff's free exercise of his religion not with the specific intent to burden that exercise but with the more general intent to subject people of a particular religion to an adverse action on the basis of that religion.  *See Iqbal*, 556 U.S. at 676 (assuming that intentional discrimination with respect to placement in the ADMAX SHU burdens free exercise rights) (citing *Lukumi*, 508 U.S. at 540-41); *cf. McDaniel v. Paty*, 435 U.S. 628 (1978).  This kind of more general religious discrimination claim does not appear to be advanced by the plaintiffs in this case, and I thus do not consider whether the Complaint might adequately plead such a claim.

risk that their subordinates, MDC prison guards, would violate the Detainees' free exercise

rights.  Indeed, as with the First and Fifth Amendment claims discussed above, the Complaint

adequately alleges that the MDC defendants were aware of the abusive conduct of the MDC

guards.  *See* ¶¶ 24-28.  None of the MDC defendants contest – and it cannot be reasonably

contested – that this policy of inaction satisfies the strict scrutiny required under *Lukumi*.  *See*

508 U.S. at 546.  And defendants' inaction in the face of such outrageous abuse suffices, at this

stage, to render plausible plaintiffs' allegation that the MDC defendants intended to suppress

their religious practices and that the MDC defendants' misconduct caused the plaintiffs' injuries.

> With respect to the burdens imposed as a matter of express policy, no question

exists that defendants' actions caused the injuries alleged and, as already established, the

Complaint adequately pleads intent.  Finally, while it is possible that these challenged

restrictions may in fact be narrowly tailored to a sufficiently important interest, this is not

obvious on the face of the Complaint and defendants must await discovery to so prove.  *See*

*Iqbal*, 490 F.3d at 173-74.

> 4.    *Qualified Immunity*

> I reject the MDC defendants' argument that they are entitled to qualified

immunity.  The plaintiffs' right to a reasonable opportunity to worship has long been clearly

established.  *See*, *e.g.*, *Cruz v. Beto*, 405 U.S. 319, 322 (1972) ("If Cruz was a Buddhist and if he

was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded

fellow prisoners who adhere to conventional religious precepts, then there was palpable

discrimination by the States against the Buddhist religion"); *see also Salahuddin v. Coughlin*,

993 F.2d 306, 308 (2d Cir. 1993) (holding that it is "well established that prisoners have a

constitutional right to participate in congregate religious services.")  And if the well-pleaded

allegations of intentional interference with the plaintiffs' religious practices are proven, no officer could reasonably believe that the conduct at issue was lawful.  Accordingly, I conclude, as did the Second Circuit in *Iqbal*, that the plaintiffs' allegations in claim three "suffice to preclude a qualified immunity defense at this stage of the litigation."  490 F.3d at 173.[29]

E.    *Claim Six: Unreasonable Strip Searches (Fourth Amendment)*[30]

The MDC plaintiffs also bring Fourth Amendment claims against the MDC defendants for subjecting them to unreasonable strip searches.[31]  ¶¶ 297-302.  They allege that they were strip-searched repeatedly and unnecessarily, in a humiliating and unreasonable manner.

1.    *Elements of the Claim*

In order to state a claim that the MDC defendants subjected them to unreasonable strip searches in violation of the Fourth Amendment, the plaintiffs must plead that the MDC defendants (1) caused them to be strip searched and (2) that the strip searches were not reasonably related to legitimate penological interests.  *See Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992); *Iqbal*, 490 F.3d at 172.  A search conducted in an unreasonable manner is not reasonably related to legitimate penological interests.  *See Schmerber v. California*, 384 U.S. 757, 768 (1966).

---

[29]    It bears emphasis that the qualified immunity defense to this claim and the others as well may need to be revisited as the case progresses.  I assume, as I must at this stage, the truth of the plaintiffs' factual allegations.  At later stages, more will be required of the plaintiffs, and if only some of their allegations are properly supported by admissible evidence, the qualified immunity defense may be available.  *See, e.g.*, *Coley v. Smith*, 441 F. App'x. 627, 629 (11th Cir. 2011) (failure to provide Muslim inmate with exact food he requested for Eid-ul-Fitr feast on correct day did not violate clearly established law).

[30]    Plaintiffs also allege in Claim Six that the strip searches violated their right to substantive due process.  That aspect of the claim is discussed above in tandem with Claim One.

[31]    Only Benatta and Hamouda assert this claim again Zenk.

2.      *Sufficiency of the Allegations*

The Complaint alleges that the searches were conducted to punish and humiliate, without any penological justification.  The MDC plaintiffs allege that they were strip searched every time they were removed from or returned to their cells, including after non-contact legal and social visits, and were subject to random strip searches even while in their cells.  They also allege that they were, for example, strip searched multiple times in a row – even though they had no opportunity to acquire anything between the strip searches – and verbally abused and videotaped during the strip searches.  The Complaint alleges that these searches were conducted pursuant to a facially unconstitutional policy created and implemented by the MDC defendants.

The Complaint states an unreasonable search claim against all of the MDC defendants.  The defendants are alleged to have created a policy that, by its terms, mandated searches that were untethered to any legitimate penological purpose, *see Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983) (holding that consecutive body cavity searches of inmates are unreasonable); *Covino*, 967 F.2d at 80 (searches used to harass and punish inmate are unreasonable); *Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980) (strip searches of inmates after non-contact visits are unreasonable unless there is some risk that contraband will be smuggled into prison), and performed in a humiliating manner, *cf. Schmerber*, 384 U.S. at 768.  According to the Complaint, Hasty and Zenk ordered the creation of an unreasonable and punitive strip search policy, and Cuciti, with the help of Sherman and Lopresti, developed the specific policy. The MDC defendants do not challenge the plausibility of these allegations, and they clearly suffice to plead that each of the MDC defendants' own actions caused the unreasonable strip searches alleged.

3.      *Qualified Immunity*

The allegations against the MDC defendants state a violation of clearly

established Fourth Amendment law.  It was clearly established at the time that a strip search

policy designed to punish and humiliate was not reasonably related to a legitimate penological

purpose and thus violated the Fourth Amendment, and no reasonable officer could have believed

that the policy alleged was constitutional.  *See Iqbal*, 490 F.3d at 173 ("It was clearly established

that . . . strip and body-cavity searches be rationally related to legitimate government

purposes."); *Hodges*, 712 F.2d at 35.

F.      *Claim Seven: Conspiracy to Violate Civil Rights*

Plaintiffs' final claim is brought under 42 U.S.C. § 1985(3), which prohibits

conspiracy "for the purpose of depriving . . . any person or class of person of the equal protection

of the laws," and provides a private cause of action against the alleged conspirators.  The

plaintiffs allege that the DOJ defendants and, separately, the MDC defendants conspired together

to hold them in the harsh conditions of confinement discussed herein in violation of their equal

protection rights.[32]

1.      *Elements of the Claim*

To make out a claim under Section 1985, plaintiffs must plead and prove four

elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

person or class of persons of equal protection of the laws, or of equal privileges and immunities

---

[32]      The defendants challenge whether this statute is applicable to them as federal officials in their
individual capacities.  The Second Circuit has held that, although it was not clearly established in 2001 that Section
1985 prohibited conspiracies among federal officials, "federal officials could not reasonably have believed that it
was legally permissible for them to conspire with other federal officials to deprive a person of equal protection of
the laws" where the officials' behavior "would violate the equal protection clause."  *Iqbal*, 490 F.3d at 176.  The
defendants were thus on notice in 2001 that an allegation of conspiracy could arise from their alleged treatment of
the plaintiffs.

under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). The conspiracy must be motivated by some class-based animus. *Iqbal*, 490 F.3d at 176 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

        2.      *Sufficiency of the Allegations*

For the reasons set forth above, the plaintiffs plausibly plead that Hasty, Zenk, Sherman, Lopresti, and Cuciti implemented the facially discriminatory harsh confinement policy and the interference with their free exercise of their religion, all as alleged in Claims One, Two, Three, and Six. The same allegations state a claim for a conspiracy motivated by class based animus and, accordingly, I conclude plaintiffs' § 1985(3) claim is plausibly pleaded as against these MDC Defendants only. *See Iqbal*, 490 F.3d at 177.

        3.      *Qualified Immunity*

Defendants also suggest that they are entitled to qualified immunity because in 2001 it was not clearly established that Section 1985 applied to federal officials. As the Second Circuit has already explained, however, although it may not have been clearly established in 2001 that § 1985 prohibited conspiracies among federal officials, "federal officials could not reasonably have believed that it was legally permissible for them to conspire with other federal officials to deprive a person of equal protection of the laws." *Id.* at 176. "[T]he proper inquiry is whether the *right* itself – rather than its *source* – is clearly established." *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007) (emphases in original). Accordingly, qualified immunity is inappropriate.

CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are denied in part and granted in part.  The motions filed by the DOJ defendants are granted in their entirety.  The motions filed by the MDC defendants are granted in part and denied in part.  Specifically, they are denied with respect to the claims based on the alleged harsh conditions of confinement and unlawful strip searches (Claims One, Two and Six) and the free exercise claim (Claim Three).  They are granted with respect to the claims based on the alleged communications blackout and interference with counsel (Claims Four and Five).  Finally, the motion to dismiss the conspiracy claim (Claim Seven) is denied to the extent that the underlying objects of the conspiracy in Claims One through Six have survived the motion and granted to the extent they have not.

Counsel for the remaining parties are directed to appear before Chief Magistrate Gold for a status conference on January 30, 2013 at 2:00 PM.

So ordered.


_____
John Gleeson, U.S.D.J.

Dated: January 15, 2013
       Brooklyn, New York