UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x
IBRAHIM TURKMEN, AKHIL SACHDEVA, AHMER : 
IQBAL ABBASI, ANSER MEHMOOD, BENAMAR : 
BENATTA, AHMED KHALIFA, SAEED : 
HAMMOUDA, and PURNA RAJ BAJRACHARYA on :    REPORT &
behalf of themselves and all others similarly situated, :    RECOMMENDATION
  :   02-CV-2307 (DLI) (SMG)
           Plaintiffs, : 
  : 
    -against- : 
  : 
JOHN ASHCROFT, ROBERT MUELLER, JAMES W. : 
ZIGLAR, DENNIS HASTY, MICHAEL ZENK, JAMES : 
SHERMAN, SALVATORE LOPRESTI, and JOSEPH : 
CUCITI, : 
  : 
          Defendants. : 
---------------------------------------------------------------------- x
GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

     This case arises out of the turbulent days following the September 11, 2001 terrorist

attacks.  In their Fourth Amended Complaint ("FAC"), Docket Entry 726, plaintiffs

("detainees"), on behalf of themselves and as representatives of a putative class, assert claims

under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) against various federal

officials, including Warden Dennis Hasty ("Hasty" or "Warden Hasty"), the former warden of

the Metropolitan Detention Center in Brooklyn, New York ("MDC"), former MDC Captain

Salvatore LoPresti ("LoPresti"), and former MDC Lieutenant Joseph Cuciti ("Cuciti").[1]

---

[1] The caption of this Report mirrors the one in the Fourth Amended Complaint.  At this point in the litigation, though, only the following plaintiffs have claims pending before the Court: Ahmer Abbasi, Anser Mehmood, Benamar Benatta, Ahmed Khalifa, Saeed Hammouda, and Purna Bajracharya.  Letter from Rachel Meeropol dated February 20, 2018 at 1, Docket Entry 820.  These plaintiffs' remaining claims are asserted only against defendants Hasty, LoPresti, and Cuciti.  *Id.*

The facts underlying plaintiffs' claims are set forth in detail in several prior decisions rendered during the lengthy procedural history of this case, including *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) and *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), *rev'd in part and vacated in part sub nom. Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Familiarity with those decisions is presumed, and the relevant facts are accordingly recounted here only briefly.

The Fourth Amended Complaint alleges that plaintiffs, each of whom defendants believed to be Arab, South Asian, or Muslim, were arrested on immigration violations following the September 11, 2001 terrorist attacks. FAC ¶ 1. Plaintiffs were then detained pursuant to a "hold-until-cleared" policy promulgated by the Department of Justice and held in the MDC's most restrictive unit, the Administrative Maximum Special Housing Unit ("ADMAX SHU"). *Id.* ¶¶ 2, 4, 53. While held in the ADMAX SHU, plaintiffs were physically and verbally abused. *Id.* ¶ 5. "Guards allegedly slammed detainees into walls; twisted their arms, wrists, and fingers; broke their bones; referred to them as terrorists; threatened them with violence; subjected them to humiliating sexual comments; and insulted their religion." *Ziglar*, 137 S. Ct. at 1853.

Plaintiffs originally asserted claims against several high-level Executive Branch officials, including the then-Attorney General, Director of the FBI, and Commissioner of the Immigration Naturalization Services, as well as against several Bureau of Prisons ("BOP") officials then holding positions at the MDC, including two Wardens, an Associate Warden, a Captain, and a First Lieutenant ("MDC Officials"). FAC ¶¶ 21-28. Plaintiffs brought what the Supreme Court would later term "detention policy claims" against all of the defendants, alleging that official policies they adopted violated plaintiffs' Fourth and Fifth Amendment rights by holding plaintiffs in restrictive conditions of confinement and subjecting them to frequent strip searches. *Ziglar*, 137 S. Ct. at 1858-59; FAC ¶¶ 276-83; 292-96.

2

Plaintiffs also brought claims specifically against the MDC Officials for alleged violations of their Fourth and Fifth Amendment rights, alleging in essence that these officials tolerated abuse of detainees, including plaintiffs, by MDC guards. Of particular relevance here, plaintiffs allege that Warden Hasty encouraged lower-level officers to abuse plaintiffs; that he prevented detainees "from using normal grievance procedures"; that he avoided the unit where the detainees were kept; that he ignored evidence of the abuse, even though he was aware of detainee complaints, hunger strikes, and suicide attempts; and that he did not stop or even attempt to stop the abuse. *Ziglar*, 137 S. Ct. at 1864; FAC ¶¶ 77-78; 106-10, 300. In short, in what the Supreme Court would later label their "prisoner abuse claim," a term which this Court adopts for purposes of this Report, plaintiffs allege that Warden Hasty was deliberately indifferent to abuse of the detainees occurring on his watch. *Ziglar*, 137 S. Ct. at 1863.

In *Ziglar*, the Supreme Court considered whether causes of action for plaintiffs' detention policy and prisoner abuse claims could properly be brought pursuant to its holding in *Bivens*. While the Court held that plaintiffs' detention policy claims could not proceed under *Bivens*, it did not decide whether *Bivens* provided a proper basis for plaintiffs' prisoner abuse claim. Instead, noting that the question had not been fully developed by the parties before it, the Supreme Court remanded and directed the lower courts to determine the availability of a cause of action under *Bivens*. 137 S. Ct. at 1863, 1865. Accordingly, today, after multiple appeals to the Second Circuit and the Supreme Court of the United States, this case now hinges on a narrow legal question: whether a *Bivens*-type cause of action may properly be implied under the Fifth Amendment as the basis for plaintiffs' prisoner abuse claim against former Warden Hasty—and, as discussed below, former MDC Captain LoPresti and Lieutenant Cuciti, the only other

remaining MDC Official defendants—for their deliberate indifference to the abuse of plaintiffs by MDC guards. *Id.* at 1864-65.

The Supreme Court remanded this question to the Second Circuit, which in turn issued a mandate directing this Court to "consider what remains of all claims in light of the *Ziglar* decision," and "emphasiz[ing] in particular that the Supreme Court left open the question as to whether a *Bivens* claim may be brought under the Fifth Amendment against the warden of the Metropolitan Detention Center." Mandate at 2, Docket Entry 799.

As a result, there is now pending before this Court Warden Hasty's renewed motion to dismiss in light of the Supreme Court's decision in *Ziglar*. Defendant's Memorandum in Support ("Def.'s Mem."), Docket Entry 808. Additionally, although defendants LoPresti and Cuciti did not appeal to the Second Circuit, *see Turkmen*, 789 F.3d at 224 n.2, plaintiffs' claims against those defendants are also before the Court. Plaintiffs acknowledge that the legal viability of their claims against defendants LoPresti and Cuciti depends upon this Court's decision with respect to defendant Hasty's motion. *See* Plaintiffs' Memorandum of Law in Support of *Bivens* Liability ("Pls.' Mem.") at 9, Docket Entry 808-7 ("Plaintiffs accept that the Court's determination of the scope of *Bivens* liability will apply to their claims against the non-appealing Defendants—LoPresti and Cuciti—as well.").

Chief United States District Judge Dora L. Irizarry has referred defendant Hasty's motion to me to issue a Report and Recommendation. Order dated January 22, 2018. I heard oral argument on the motion on March 15, 2018. Transcript of Oral Argument ("Tr."), Docket Entry 829. The parties then submitted supplemental authorities for the Court's review. Docket Entries 830-833. Having considered the Supreme Court's decision in *Ziglar* and the arguments presented by the parties, and for the reasons stated below, I respectfully recommend that

defendant Hasty's motion be granted, and that plaintiffs' claims against the remaining defendants
be dismissed.

BACKGROUND

I.     **From *Bivens* to *Ziglar***

In *Bivens*, decided in 1971, the Supreme Court recognized a damages remedy for
violations of the Fourth Amendment's prohibition on unreasonable searches and seizures by
federal law enforcement officers.  *Bivens*, 403 U.S. at 391-97.  For the *Bivens* Court, implying a
cause of action for violations of the Fourth Amendment was simply a natural extension of its
view that a Court should ensure that every violation of a federally protected right has a remedy.
*Ziglar*, 137 S. Ct. at 1855.

After *Bivens*, the Court held that a plaintiff could assert an implied cause of action for
damages directly under the Constitution in only two other cases: *Davis v. Passman*, 442 U.S. 228
(1979) and *Carlson v. Green*, 446 U.S. 14 (1980).  *Ziglar*, 137 S. Ct. at 1854-55.  Of particular
relevance here is *Carlson*, where the Court recognized a *Bivens*-type action brought under the
Eighth Amendment.[2]  *Carlson*, 446 U.S. at 18-23.  In *Carlson*, the plaintiff sought damages on
behalf of her deceased son, a federal inmate.  *Id.* at 16.  The plaintiff alleged that federal
officials' deliberate indifference to her son's need for medical care for his asthma led to his
death.  *Id.* at 16 n.1.  These allegations were considered sufficient under Supreme Court
precedent to state an Eighth Amendment violation.  *Id.* at 17-18, 17 n.3; *see also Estelle v.
Gamble*, 429 U.S. 97 (1976).  In *Carlson*, the Court examined whether there were either "special
factors" counseling hesitation or alternative remedies that would preclude extending *Bivens* to
the plaintiff's Eighth Amendment deliberate indifference claim.  *Carlson*, 446 U.S. at 18-19.

---

[2] *Davis v. Passman* involved a claim of employment discrimination brought by an administrative assistant to a
Congressman who contended she was fired because she was a woman.  *Ziglar*, 137 S. Ct. at 1854.

Finding neither, the Court extended *Bivens* and implied a cause of action for damages. *Id.* at

18-23. As noted above, it has not done so again in the nearly forty years since *Carlson* was

decided.

Since *Carlson*, in fact, the Court has altered its perspective on implied rights of action

under the Constitution, and noted that its "recent precedents cast doubt on the authority of courts

to extend or create private causes of action." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402

(2018). In *Ziglar*, the Supreme Court acknowledged the marked change in its approach to

implying causes of action:

> In the mid-20th century, the Court followed a different approach to recognizing
> implied causes of action than it follows now. During this "*ancien regime*," the
> Court assumed it to be a proper judicial function to provide such remedies as are
> necessary to make effective a statute's purpose.
>
> \*      \*      \*
>
> Later, the arguments for recognizing implied causes of action for damages began
> to lose their force.
>
> \*      \*      \*
>
> Given the notable change in the Court's approach to recognizing implied causes
> of action . . . the Court has made clear that expanding the *Bivens* remedy is now a
> "disfavored" judicial activity.

137 S. Ct. at 1855, 1857 (citations and internal quotation marks omitted). The Court in *Ziglar*

went so far as to say that, were *Bivens*, *Davis*, and *Carlson* being decided today, the analysis—

and, presumably, the outcome—might be different. *Id.* at 1856.

## II.     Determining Whether to Extend *Bivens* After *Ziglar*

The Supreme Court emphasized in *Ziglar* that the central inquiry when faced with a

potential expansion of *Bivens* is "'who should decide' whether to provide for a damages remedy,

Congress or the courts," and that the answer to that question "most often will be Congress." *Id.*

at 1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "[S]eparation-of-powers principles

are or should be central to the analysis." *Id.*

*Ziglar* instructs that the analysis of whether a *Bivens* remedy is available proceeds in two steps.  First, a court must determine whether the plaintiff's claims are different from those asserted in previous *Bivens* cases, such that the case presents a "new *Bivens* context."  *Id.* at 1859-60.  A case presents a "new context" if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]."  *Id.* at 1859.  The Court listed some relevant measures of difference, including the rank of the officers involved, the constitutional right asserted, the level of generality of the official action in question, the extent of the judicial guidance available to the officer in question, whether the officer was operating under specific statutory or other legal mandates, and whether there is a risk that the Judiciary would be interfering with the functioning of another branch of the government.  *Id.* at 1860.

Second, if a case does present a "new *Bivens* context," a court must then consider whether "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'"  *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18).  The Supreme Court has not announced a definitive list of those "special factors" that "counsel[] hesitation."  *Id.*  The Court has stressed, though, that the question to ask is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Id.* at 1858.  A "special factor" is one that "cause[s] a court to hesitate before answering that question in the affirmative."  *Id.*

In *Ziglar*, the Court did identify some criteria for considering whether hesitation is warranted.  First, it noted that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," which entails examining the "burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when . . . the legal system [is] used to bring about the

proper formulation and implementation of public policies." *Id.* Second, some cases will arise "in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." *Id.* It may also be that "feature[s] of [the] case—difficult to predict in advance—cause[] a court to pause before acting without express congressional authorization." *Id.* The Court concluded this aspect of its discussion by noting that, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy[;]" to do otherwise would fail "to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.*

Finally, when a plaintiff seeks to extend *Bivens* to a new context, a court should consider whether alternative remedies are already available. *Id.* The existence of an "alternative remedial structure . . . alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

## III.   The *Ziglar* Court's Decision Regarding Warden Hasty and Plaintiffs' "Prisoner Abuse" Claim

The first step in the analysis of plaintiffs' prisoner abuse claim has already been taken. In *Ziglar*, the Supreme Court held that, although the prisoner abuse claim has "significant parallels" to the claims asserted in *Carlson*, "this case does seek to extend *Carlson* to a new context." *Id.* at 1864.

The Court went on to note that "[t]his case also has certain features that were not considered in the Court's previous *Bivens* cases and that might discourage a court from authorizing a *Bivens* remedy." *Id.* at 1865. First, the Court suggested that plaintiffs may have had access to alternative remedies, such as a writ of habeas corpus or an injunction, that would

8

preclude extending *Bivens*.  *Id.*  Second, noting that "legislative action suggesting that Congress

does not want a damages remedy" is a special factor counseling hesitation, the Court pointed out

that, since *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995

("PLRA"), "which made comprehensive changes to the way prisoner abuse claims must be

brought in federal court," but without "provid[ing] for a standalone damages remedy against

federal jailers."  *Id.*  In short, the Court concluded that the differences between this case and

*Carlson* "are at the very least meaningful ones."  *Id.*  Reasoning that "even a modest extension is

still an extension," the Court vacated the Second Circuit's decision that plaintiffs' prisoner abuse

claim could proceed, and remanded the case so that a "special factors" analysis could be

conducted.  *Id.* at 1864-65.

DISCUSSION

As noted above, the motion now pending before the Court is defendant Hasty's renewed

motion to dismiss pursuant to Rule 12(b)(6).  When deciding a motion brought under Rule

12(b)(6), a court may consider "(1) facts alleged in the complaint and documents attached to it or

incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it,

even if not attached or incorporated by reference, (3) documents or information contained in

defendant's motion papers if plaintiff has knowledge or possession of the material and relied on

it in framing the complaint, . . . and (5) facts of which judicial notice may properly be taken

under Rule 201 of the Federal Rules of Evidence."  *Abiuso v. Donahoe*, 2015 WL 3487130, at *3

(E.D.N.Y. June 3, 2015) (quoting *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57

(S.D.N.Y. 2003)).  Here, the complaint incorporates by reference two reports: the Office of the

Inspector General ("OIG") report entitled "The September 11 Detainees: A Review of the

Treatment of Aliens held on Immigration Charges in Connection with the Investigation of the

9

September 11 Attacks" ("OIG Rep."), FAC ¶ 3 n.1, and a supplemental report entitled

"Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan

Detention Center in Brooklyn, New York" ("Supp. OIG Rep."). *Id.* ¶ 5 n.2. Therefore, the facts

contained in both reports may be considered when deciding Hasty's motion. The facts alleged in

the complaint, moreover, must be taken as true at this stage of the case. *Ziglar*, 137 S. Ct. at

1852.

The gravamen of plaintiffs' claim against Hasty is that he was deliberately indifferent to

the abuse of plaintiffs by MDC guards. *Ziglar*, 137 S. Ct. at 1864; FAC ¶¶ 77-78; 106-10. The

Supreme Court has already held that "the prisoner abuse allegations against Warden Hasty state a

plausible ground to find a constitutional violation *if* a *Bivens* remedy is to be implied." *Ziglar*,

137 S. Ct. at 1864 (emphasis added). Moreover, as noted above, the Court has also already held

that plaintiffs' prisoner abuse claim seeks to extend *Bivens* and *Carlson* to a new context.

Accordingly, the only remaining issue is whether there are "special factors counselling

hesitation" or alternative remedies that would preclude the extension of *Bivens* required for

plaintiffs' claims to proceed.

Before considering whether special factors or alternative remedies are present here, I note

that the parties agree that the strength and number of applicable special factors need not be

greater before hesitation is warranted in cases involving so-called "modest" extensions as

opposed to more substantial ones. In other words, the magnitude of a potential extension of

*Bivens* does not affect the "special factors analysis." *See* Letter from Clifton Elgarten dated

March 13, 2018 ("Elgarten Letter") at 1-2, Docket Entry 826; Letter from Rachel Meeropol

dated March 13, 2018 ("Meeropol Letter") at 1-2, Docket Entry 827. Accordingly, although the

extension here may be a modest one, that has no direct bearing on the analysis of special factors and alternative remedies.

## I.   Warden Hasty

### A. *Special Factors*

Hasty argues that this case presents "special factors" that counsel hesitation before extending *Bivens*.  The special factors identified by Hasty include Congress's failure to enact a law providing a direct cause of action under the Constitution and the disruption to BOP policies and practices that a direct cause of action for money damages would cause.  Def.'s Mem. at 14.  Having considered these factors, I reject the contentions of both parties that Congress has either endorsed, rejected, or is neutral towards *Bivens* and its progeny.  I further find, though, that this case presents a "special factor" counseling hesitation: that extending *Bivens* might negatively impact BOP's investigatory procedures and policies, and that Congress is as a result in the best position to weigh the costs and benefits of allowing a cause of action for damages to proceed.

### 1.   Congress's Silence is Ambiguous

Hasty argues that Congress's failure to codify *Bivens* and enact a damages remedy for violations of constitutional rights is a special factor suggesting that the Court should hesitate before implying a cause of action.  Def.'s Mem. at 19; *see also Ziglar*, 137 S. Ct. at 1865 ("[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation.").  Hasty offers three examples of congressional silence that he contends counsel hesitation.

First, Hasty points to Congress's decision to include in the USA Patriot Act a requirement that OIG investigate potential constitutional violations by BOP officials and provide semiannual reports to Congress.  Def.'s Mem. at 19-20; *see also* USA Patriot Act, Pub. L. No.

107-56, § 1001, 115 Stat. 272, 391 (2001).[3]  Hasty argues that Congress, while considering this provision, could have provided for a private right of action against federal officials for deprivations of constitutional rights, but chose not to do so.  Def.'s Mem. at 20.  In fact, OIG continues to report to Congress, and Congress has still not enacted legislation providing for a *Bivens*-like cause of action.  *See* Tr. 8-11.

Second, Hasty argues that Congress, as a result of the original and supplemental OIG reports, was aware of the allegations of abuse at issue in this very case, yet chose not to create a damages remedy.  Def.'s Mem. at 20; *see also Ziglar*, 137 S. Ct. at 1862 ("[A]t Congress' behest, [OIG] compiled a 300-page report documenting the conditions in the MDC in great detail.").  The Court in *Ziglar* referred to Congress's failure to provide a damages remedy in the wake of the OIG Report as one reason for dismissing plaintiffs' detention policy claims.  *Ziglar*, 137 S. Ct. at 1862.

Plaintiffs counter by arguing that Congress's silence in the face of these reports in fact suggests its tacit approval of extending *Bivens* and allowing plaintiffs to proceed with their claims.  Plaintiffs point out that the OIG reports specifically refer to this litigation, and that Congress was therefore aware of plaintiffs' pending prisoner abuse claim.  Plaintiffs' Response Memorandum ("Pls.' Reply") at 12, Docket Entry 808-9; *see also* OIG Rep. at 2-3, 3 n.4; 92 (referring to this lawsuit and noting that the litigation is pending).  Because of the ongoing litigation, plaintiffs contend, Congress had no reason to step in and provide a damages remedy.  Pls.' Reply at 12.  Moreover, although made aware of plaintiffs' pending case and its reliance on

---

[3] The statute cited in the text provides that "[t]he Inspector General of the Department of Justice shall designate one official who shall – (1) review information and receive complaints alleging abuses of civil rights and civil liberties by employees and officials of the Department of Justice; . . . and (3) submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate on a semi-annual basis a report on the implementation of this subsection and detailing any abuses described in paragraph (1)."

the availability of an implied *Bivens*-type remedy, Congress passed no legislation narrowing the scope of *Bivens* or the authority of courts to extend *Bivens* to new contexts.

Finally, Hasty, echoing the Court in *Ziglar*, argues that Congress "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs" when it passed the PLRA, fifteen years after *Carlson*.  Def.'s Mem. at 21 (quoting *Ziglar*, 137 S. Ct. at 1865).  Though Hasty concedes that the PLRA does not apply to detainees who, like plaintiffs, are held as undocumented aliens, he argues that Congress, by passing the PLRA without enacting a corresponding *Bivens*-type cause of action for prisoner abuse claims, has indicated its reluctance to extend *Bivens* to new contexts.  *Id.*; *see also* 42 U.S.C. § 1997e(h) (defining "prisoner" for the purposes of the PLRA as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program").

Plaintiffs argue in response that, because the PLRA does not apply to immigration detainees, Congress's silence with respect to *Bivens* when it passed the PLRA has no bearing on whether *Bivens* should be expanded to allow plaintiffs' prisoner abuse claim.  Pls.' Mem. at 18. Plaintiffs note as well that the Court in *Ziglar* did not affirmatively conclude that Congress's silence suggested its reluctance to expand *Bivens*; plaintiffs correctly point out that the Court merely stated that "[i]t could be argued" from the fact that the PLRA "does not provide for a standalone damages remedy against federal jailers" that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Ziglar*, 137 S. Ct. at 1865.

Furthermore, and in this Court's view more persuasively, plaintiffs argue that, when Congress passed the PLRA, it presumed the existence of a *Bivens* cause of action for prisoner abuse.  Though at the time the PLRA was passed the Supreme Court had recognized a *Bivens* cause of action for prisoners only in *Carlson*, many Circuit courts had recognized a variety of prisoner and detainee abuse claims under *Bivens*.  Pls.' Mem. at 20 (listing cases in which *Bivens* was recognized as a vehicle for asserting prisoner and detainee abuse claims).  Yet, as plaintiffs point out, the PLRA merely imposed an exhaustion requirement on prison condition lawsuits brought under federal law; the statute in no way otherwise limits the scope of *Bivens*-type claims. *See* 42 U.S.C. § 1997e.

Finally, plaintiffs argue that Congress signaled its approval of *Bivens* when it amended the Federal Tort Claims Act ("FTCA") by passing the Westfall Act in 1988.  Meeropol Letter at 3-4.  The Westfall Act provides that a claim against the United States under the FTCA is the exclusive civil remedy for negligent or wrongful acts or omissions by employees of the federal government.  28 U.S.C. § 2679(b)(1).  The Act also provides, however, that this limitation does not apply to "a civil action against an employee of the Government which is brought for a violation of the Constitution of the United States."  28 U.S.C. § 2679(b)(2)(A).  Arguably, by enacting legislation specifically discussing civil actions against government employees for violations of constitutional rights—but declining to eliminate or narrow them—Congress implicitly approved of such actions.  *See* Meeropol Letter at 3; *see also Ziglar*, 137 S. Ct. at 1880-81 (Breyer, J., dissenting) (arguing that the exception for lawsuits claiming constitutional violations in the Westfall Act makes it clear that Congress views the FTCA and *Bivens* as providing "parallel, complementary causes of action" (quoting *Carlson*, 446 U.S. at 20)); James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*,

14

98 Geo. L.J. 117, 135-36 (2009) (arguing that "[in] the Westfall Act, Congress again chose to retain the *Bivens* action . . . [and that] [b]y accepting *Bivens* and making it the exclusive mode for vindicating constitutional rights, Congress has joined the Court in recognizing the importance of the *Bivens* remedy in our scheme of governmental accountability law").

The problem with plaintiffs' Westfall Act argument is that it failed to persuade the *Ziglar* majority. Plaintiffs candidly acknowledge that they argued before the Supreme Court that the Westfall Act essentially ratified *Bivens*, but that the *Ziglar* majority did not accept their argument. Meeropol Letter at 3. In his dissent, Justice Breyer likewise invoked passage of the Westfall Act as an indication of Congress's "accept[ance of] *Bivens* actions as part of the law." *Ziglar*, 137 S. Ct. at 1880 (Breyer, J., dissenting). The *Ziglar* majority, though, while making explicit reference to the Westfall Act, nevertheless held, largely on separation-of-powers grounds, that extending *Bivens* to new contexts is now a "disfavored" judicial activity." *Id.* at 1856-57 (majority opinion). In reaching that conclusion, the Court observed that Congress has failed to enact a *Bivens*-like damages remedy, and that Congress's "silence is telling." *Id*. at 1862. Clearly, then, the majority in *Ziglar*—though plainly aware of plaintiffs' and Justice Breyer's arguments to the contrary—rejected the notion that, by passing the Westfall Act, Congress suggested its support for *Bivens* actions.

The *Ziglar* Court relied on Congress's silence, among other things, to hold that plaintiffs' detention policy claims could not proceed under *Bivens* and should be dismissed. This holding at least arguably suggests the same result here; Congress was just as silent with respect to plaintiffs' prisoner abuse claim as it was with respect to their detention policy claims. However, in dismissing plaintiffs' detention policy claims in *Ziglar*, the Court pointed out that Congress's "silence is notable because it is likely that high-level policies will attract the attention of

Congress." *Id.*  Because plaintiffs' prisoner abuse claim does not involve "high-level policies," this aspect of *Ziglar*'s holding is not controlling here.

Inferring intention from inaction necessarily involves speculation.  The degree of speculation involved increases greatly when an inference about intent is based upon the inaction of a legislative body with hundreds of members, each of whom may have his or her own reasons for not acting.  Having considered the parties' arguments, I conclude that the evidence of congressional intent here is too ambiguous to provide meaningful support for either side's position.  *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007) ("It would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim.").  I therefore decline to infer what views Congress may have with respect to extending *Bivens* from its failure to pass a law that either provides or precludes a *Bivens*-type remedy for violations of constitutional rights.

2. The Potential Impact on BOP's Investigatory Procedures and Policies is a Special Factor Counseling Hesitation

Hasty argues that a second factor that should counsel hesitation is the impact that recognizing a *Bivens* cause of action in this case would have on BOP's procedures for investigating and addressing prisoner and detainee abuse claims.  *See Ziglar*, 137 S. Ct. at 1858; Def.'s Mem. at 15.  More specifically, Hasty points to procedures in place both before and after the September 11 terrorist attacks that purposely limited a warden's role in investigating allegations of abuse by correctional officers.  Def.'s Mem. at 15.  *See generally* Def.'s Mem., Ex. C, PS 1210.22, Office of Internal Affairs ("OIA") Memorandum dated October 1, 2001 ("Ex. C."),  Docket Entry 808-4;  Def.'s Mem., Ex. D, PS 1210.17, OIA Memorandum dated August 4, 1997 ("Ex. D."),  Docket Entry 808-5.

16

Under the procedures cited by Hasty, physical abuse of a detainee by a correctional officer is a "significant incident" (1997 Memorandum) or Classification 1 case (2001 Memorandum), and threatening assault is a Classification 2 case (2001 Memorandum).  Ex. C § 7.a-7.b; Ex. D § 6.  Under the regulations in effect in 1997, a warden who learned of an allegation of physical abuse was required to make a report to OIA, which would then "advise how to proceed."  Ex. D § 6.a.  Incidents deemed "significant" were referred to OIG for review, and the warden would be precluded from taking further action if OIG accepted the case.  *Id.* § 6.f.

New procedures announced on October 1, 2001 require wardens to notify OIA of Classification 1 and 2 cases within twenty-four hours of learning about them.  Ex. C § 8.b.1. These procedures also prohibit wardens or others under their supervision from interviewing or questioning the subject of allegations without prior approval from OIG and OIA.  *Id.* § 8.b.3. The procedures designate OIA as responsible for overseeing all staff investigations.  *Id.* § 9. When presented with allegations in Classification 1 or 2, OIA is required to refer the allegations to OIG for review and may refer criminal matters, explicitly including allegations of physical abuse, to the Civil Rights Division of the Department of Justice.  *Id.* § 8.c.

The Bureau of Prisons also directed that certain practices be implemented specifically with respect to the September 11 detainees.  Def.'s Mem. at 18.  Shortly after the attacks, BOP directed that video cameras be installed in the cells of each September 11 detainee.  Supp. OIG Rep. at 39.  At least at the MDC, the movements of the September 11 detainees were also videotaped beginning on October 5, 2001.  *Id.*  As a result of these measures, "incidents and allegations of physical and verbal abuse significantly decreased."  *Id.* at 45 ¶ 5.  Finally, as Hasty

points out, after October 2001, OIG investigators were present at MDC looking into allegations of abuse.  OIG Rep. at 144.

It is reasonable to think that imposing personal liability on a warden who is indifferent to abuse by correctional officers under his or her command might impede, or at least affect, the efficacy of these practices and procedures.  For example, a warden subject to personal liability for the acts of correctional officers might fail to report those acts to OIA, or decide to do so only after conducting the sort of preliminary inquiry that might influence how an investigation unfolds and that BOP procedures—no doubt for that reason—explicitly prohibit.  Similarly, a warden facing the possibility of personal liability might be less likely to enforce procedures requiring video recording of detainee movements, or might neglect to retain and catalogue recordings that memorialize abuse.

The costs to the government of imposing personal liability on wardens for deliberate indifference go beyond possible adverse effects on investigations of correctional officer abuse of detainees.  "Claims against federal officials often create substantial costs, in the form of defense and indemnification."  *Ziglar*, 137 S. Ct. at 1856.  Moreover, the time and attention required to participate in a litigation as a party may distract supervisory officials, such as wardens, from their management responsibilities.  *Id.*  Finally, the possibility of being called to account for failing to monitor and control the actions of officers under their command might lead wardens to adopt supervisory practices and procedures they might otherwise not.

The threshold for concluding that a factor counsels hesitation "is remarkably low. . . . Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. 'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider."  *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009).  Measured against this "remarkably low" bar, the

18

concerns discussed above—and, in particular, the question of who should decide how those concerns should be balanced against affording detainees a cause of action against a supervisory official who is deliberately indifferent to abuse—rises to the level of a special factor counseling hesitation.

### B. Alternative Remedies

The Supreme Court has held that "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Ziglar*, 137 S. Ct. at 1858, 1865. Alternative remedies were available to plaintiffs in this case, and dismissal is accordingly warranted on this ground as well.

### 1. The FTCA Provides a Sufficient Alternative Remedy

It is clear that plaintiffs could have asserted their claims for abuse pursuant to the Federal Torts Claims Act and, if they were successful, recovered compensation. Indeed, the Third Amended Complaint in this very case included claims based upon the conduct of MDC officials, including Hasty, for assault and battery, sleep deprivation, and intentional infliction of emotional distress, all brought pursuant to the FTCA. Third Amended Complaint ¶¶ 426-40, Docket Entry 109.[4] Five plaintiffs reached settlements with the United States on these FTCA claims. Letter from Rachel Meeropol dated November 16, 2009, Ex. A, Docket Entry 687-2 (stipulations settling the FTCA claims of five plaintiffs for amounts ranging from $181,250 to $356,250 per plaintiff). There does not appear to be any reason why the current plaintiffs could not have brought similar claims on their own behalf.[5]

---

[4] Generally, the FTCA's waiver of sovereign immunity does not apply to claims for assault and battery and certain other torts. 28 U.S.C. § 2680(h). This limitation does not apply, however, to law enforcement officers. *Id.* Bureau of Prisons officials are considered law enforcement officers for purposes of this statute. *See, e.g.*, *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-224 (2008); *Chapa v. United States Dep't. of Justice*, 339 F.3d 388, 390 (5th Cir. 2003); *Lewis v. United States*, 2005 WL 589583, at *3 (W.D.N.Y. Mar. 8, 2005).

[5] The record is silent as to why the current plaintiffs did not bring claims under the FTCA. I note, however, that the FTCA requires that a plaintiff exhaust administrative remedies within two years after a claim accrues. *See* 28

Plaintiffs' argument that the FTCA should not be considered an alternative remedy precluding a *Bivens*-type claim rests on language from the holding in *Carlson*. The Supreme Court did state in *Carlson* that,

> when Congress amended [the] FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, 28 U.S.C. § 2680(h), the congressional comments accompanying that amendment made it crystal clear that Congress views [the] FTCA and *Bivens* as parallel, complementary causes of action.

*Carlson*, 446 U.S. at 19-20.

The analysis in *Carlson*, though, cannot survive *Ziglar*. In *Carlson*, the Court held that a *Bivens* claim is precluded

> when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

*Carlson*, 446 U.S. at 18-19 (emphasis in original). In contrast, *Ziglar* takes a far broader view of those alternative remedies that foreclose assertion of a claim under *Bivens*:

> [I]f Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.

*Ziglar*, 137 S. Ct. at 1858 (internal alterations and quotation marks omitted). Thus, while the absence of an explicit declaration by Congress that the FTCA is intended to be a substitute for *Bivens* may have been dispositive to the Court that decided *Carlson*, that absence is of little significance after *Ziglar*. No doubt this is among the reasons the Court in *Ziglar* declared that, "in light of the changes to the Court's general approach to recognizing implied damages

---

U.S.C. §§ 2401, 2675. The exhaustion requirement is jurisdictional and cannot be waived. *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005).

remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Ziglar*, 137 S. Ct. at 1856.

Since *Ziglar*, other courts have questioned the continued vitality of *Carlson*'s holding that FTCA and *Bivens* claims may proceed as parallel, complementary causes of action, and have declined to permit *Bivens* claims to proceed because the FTCA provides an adequate alternative remedy. *See, e.g.*, *Huckaby v. Bradley*, 2018 WL 2002790, at *6 (D.N.J. Apr. 30, 2018) (finding that "the availability of a remedy against the United States on a claim of negligence under the FTCA, in light of *Ziglar*, is a factor weighing against . . . recognizing a *Bivens* remedy"), *appeal filed*, No. 18-2204 (3d Cir. June 1, 2018); *Abdoulaye v. Cimaglia*, 2018 WL 1890488, at *7 (S.D.N.Y. Mar. 30, 2018) (questioning whether the analysis of the FTCA as an alternative remedy in *Carlson* survives *Ziglar* and finding that "the existence of the FTCA as a potential remedy counsels hesitation in extending a *Bivens* remedy"); *Free v. Peikar*, 2018 WL 905388, at *5-6 (E.D. Cal. Feb. 15, 2018) (declining to extend *Bivens* to a First Amendment claim because the FTCA provides an adequate alternative remedy), *report and recommendation adopted by* 2018 WL 1569030 (E.D. Cal. Mar. 30, 2018); *Morgan v. Shivers*, 2018 WL 618451, at *5-6 (S.D.N.Y. Jan. 29, 2018) (declining to extend *Bivens* to pre-trial detainee's Fifth Amendment excessive force and sexual assault claims because the FTCA provides an alternative remedy).

Plaintiffs have submitted a letter positing that the Ninth Circuit's recent decision in *Rodriguez v. Swartz*, 2018 WL3733428 (9th Cir. Aug. 7, 2018), supports their contention that the FTCA does not preclude extensions of *Bivens* to new contexts. Pls.' Letter Dated August 10, 2018, Docket Entry 833. *Rodriguez* involved a claim that a U.S. Border Patrol agent stationed on the American side of our border with Mexico fired between fourteen and thirty bullets across the border at a sixteen-year-old boy, striking the boy with about ten bullets and killing him. *Id.*

at *1.  As plaintiffs suggest, the majority in *Rodriguez* did opine that Congress did not intend for

the FTCA, and in particular the Westfall Act, to preclude victims of constitutional torts from

suing government employees who allegedly violated their constitutional rights.  *Id.* at *11.  The

reasoning in *Rodriguez* is at least arguably *dicta*, though, because the majority first concluded

that the FTCA was not an available alternative remedy because it "specifically provides that the

United States cannot be sued for claims 'arising in a foreign country.'" *Id.* (quoting 28 U.S.C.

§ 2680(k)).  To the extent *Rodriguez* holds that the FTCA does not as a general matter provide an

alternative remedy to a *Bivens* claim, I respectfully disagree with that holding for the reasons

stated above.

Because plaintiffs could have brought their claims under the FTCA and been awarded

damages for their injuries if they prevailed, *Ziglar* counsels that their *Bivens* claims should be

dismissed.

2.  <u>Other Alternative Remedies</u>

Although I conclude that the availability of a remedy pursuant to the FTCA is sufficient

to preclude plaintiffs' *Bivens* claims, I note that plaintiffs might have invoked other remedies as

well.  For example, at least two courts have taken into account BOP's administrative grievance

process when concluding that alternative remedies preclude *Bivens* claims.  *Free*, 2018 WL

905388, at *6; *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 60 (E.D.N.Y. 2017), *appeal filed*, No. 17-

3790 (2d Cir. Nov. 21, 2017).  Plaintiffs might also have sought injunctive or habeas relief.

Indeed, the Supreme Court's opinion in *Ziglar* suggests as much.  137 S. Ct. at 1865.

Plaintiffs raise serious questions about whether the administrative grievance process, or

the possibility of injunctive or habeas relief, provided them with sufficiently meaningful

alternative remedies to warrant precluding their *Bivens* claims.  Plaintiffs first argue that

equitable relief, when compared to a *Bivens* claim, would not afford them "roughly similar

22

compensation" for their injuries or provide defendants with "roughly similar incentives" to respect their constitutional rights.  Pls.' Mem. at 15; *see Minneci v. Pollard*, 565 U.S. 118, 130 (2012).  *But see Gonzalez*, 269 F. Supp. 3d at 62 (noting that "there is no precedent suggesting that the unavailability of money is a factor that carries any weight in determining the expansion of a *Bivens* remedy.  Rather, the emphasis is simply on the existence of an avenue to protect the right.").  Plaintiffs are plainly correct that an award of equitable relief would not provide them with monetary compensation for violations of their rights that had already occurred, and likely would not provide defendants with as strong an incentive to avoid violating constitutional rights as would money judgments entered against them personally.

Plaintiffs also argue that their conditions of confinement precluded them, as a practical matter, from filing a grievance or pursuing either injunctive or habeas relief.  Pls.' Mem. at 13.  Plaintiffs allege that they were not provided with the handbooks that explain to detainees how to file an administrative complaint about mistreatment until long after they were taken into custody.  FAC ¶ 140.  Plaintiffs further contend that, until mid-October 2001, they were subjected to a "communications blackout," which denied them social or legal visits or telephone calls.  *Id.* ¶¶ 79-81.  Plaintiffs further allege that MDC staff "repeatedly turned away any relative or lawyer who came to the MDC in search of a detainee by falsely stating that the detainee was not there." *Id.* ¶ 81.  Even after the blackout was lifted, plaintiffs' ability to make legal and social calls was at best severely limited and, in reality, virtually nonexistent.  *Id.* ¶¶ 83-85.  As a result, plaintiffs argue, they were not able to seek an injunction until April 2002.  By that time, plaintiffs had been released and their application for injunctive relief was moot.  Pls.' Mem. at 14.

Defendants dispute plaintiffs' claim of inability to seek relief prior to April 2002, noting that a case based on allegations of abuse similar to those plaintiffs raise here was filed in

December of 2001.  Defendants' Reply ("Def.'s Reply") at 11-12, Docket Entry 808-8; *see*

Complaint ¶¶ 14-18, Baloch v. Ashcroft, No. 01-cv-8515 (E.D.N.Y. Dec. 21, 2001), Docket

Entry 1.  The complaint in *Baloch*, though, largely corroborates plaintiffs' claims, in that it

alleges that Baloch was unable to communicate with an attorney, despite his efforts to do so,

from September 22, 2001, the day he was detained, until some time in November, 2001.

Complaint ¶¶ 12-15, Baloch v. Ashcroft, No. 01-cv-8515 (E.D.N.Y. Dec. 21, 2001).  Baloch's

complaint, moreover, was not filed until December 21, 2001, by which time Baloch had been

detained for three months, and was ultimately dismissed as moot before the Court could decide

whether relief was warranted.  Order Dismissing Case as Moot, Baloch v. Ashcroft, No. 01-cv-

8515 (E.D.N.Y. June 27, 2002), Docket Entry 4.  Finally, the motion pending before the Court is

one to dismiss, and the factual allegations of plaintiffs' complaint must therefore be accepted as

true for purposes of deciding the motion.

Because I conclude that the FTCA provided plaintiffs with an alternative remedy

precluding their *Bivens* claims, I need not decide whether injunctive or habeas relief, or an

administrative grievance, did as well.  Nevertheless, the District Court may not agree that the

FTCA provides an alternative remedy.  I therefore note my conclusion that, for the reasons stated

above and in light of the particular facts of this case, neither an administrative grievance, a

motion for injunctive relief, nor a petition for a writ of habeas corpus were sufficiently available

to plaintiffs to provide them with alternative remedies warranting preclusion of their *Bivens*

claims.

### C.  *District Court Decisions Rendered After* Ziglar

Plaintiffs contend that *Ziglar* does not restrict *Bivens* claims as narrowly as the discussion

above suggests, and should not be read to preclude their abuse claim from proceeding.  As

support, plaintiffs point to three post-*Ziglar* cases that permitted *Bivens* claims arising in new

24

contexts to go forward.  *See generally Cuevas v. United States*, 2018 WL 1399910 (D. Colo.

Mar. 19, 2018), *appeal filed* No. 18-1219 (10th Cir. May 18, 2018); *Leibelson v. Collins*, 2017

WL 6614102 (S.D. W. Va. Dec. 27, 2017), *appeal filed sub nom. Leibelson v. Cook* No. 18-1202

(4th Cir. Feb. 23, 2018); *Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017).

 The cases cited by plaintiffs are distinguishable because they involve relatively low-level

individual officers and do not implicate or touch upon prison policy.  *See Cuevas*, 2018 WL

1399910, at *1-4 (allowing an inmate's *Bivens* claim to proceed against BOP correctional

officers who allegedly relayed sensitive information to other inmates with the intention that they

retaliate violently against the plaintiff, after finding that "[t]he challenged actions are ordinary

incidences of day-to-day prison operations, for which there is law clearly establishing that the

practice is unconstitutional, such that there is no risk that this litigation will tread on complex

matters of BOP policymaking"); *Leibelson*, 2017 WL 6614102, at *12-13 (denying summary

judgment and permitting a *Bivens* claim to proceed against a BOP captain for alleged

indifference to the ability of a transgender inmate plaintiff to eat in the prison cafeteria without

risk of assault); *Linlor*, 263 F. Supp. 3d at 625 (allowing a *Bivens* claim to proceed against a

TSA officer for allegedly using excessive force because the case "present[ed] a relatively simple,

discrete question of whether a federal officer applied excessive force during a Fourth

Amendment search").

 The holdings in two of the cases cited by plaintiffs are distinguishable on other grounds

as well.  In *Cuevas*, the Court expressly declined to consider whether the FTCA provided

plaintiff with an alternative remedy because defendants did not argue that it did.  *Cuevas*, 2018

WL 1399910, at *4 n.4.  Similarly, while the Court in *Leibelson* permitted one of plaintiff's

*Bivens* claims to proceed, it dismissed several others, including one dismissed at least in part

because plaintiff was simultaneously pursuing a cause of action under the FTCA based upon overlapping allegations.  *Leibelson*, 2017 WL 6614102, at *11.

There are, moreover, several lower courts decisions dismissing *Bivens* claims in the wake of *Ziglar* on grounds comparable to those discussed in this Report.  In *Abdoulaye*, for example, the Court declined to extend Bivens to a claim against a deputy U.S. Marshal who allegedly pushed a wheelchair-bound detainee into a wall, exacerbating the detainee's back injury. *Abdoulaye*, 2018 WL 1890488, at *1, *7.  The Court held that the availability of an alternative remedy under the FTCA, and the decision of Congress not to include a stand-alone remedy for damages in the PLRA, counseled hesitation and warranted dismissal of the plaintiff's *Bivens* claim.  *Id.* at *7; *see also Free*, 2018 WL 905388, at *6 (declining to extend *Bivens* to an inmate's First Amendment retaliation claim because the FTCA, BOP's administrative grievance process, and habeas corpus are adequate alternative remedies and because congressional silence counsels hesitation); *Morgan*, 2018 WL 618451, at *6-7 (declining to extend *Bivens* to an inmate's claim of abusive conduct in connection with a search of his rectum because the FTCA provides an adequate alternative remedy, because Congress failed to establish a private right of action even when legislating in the area of prisoners' rights, and because "balanc[ing] the challenges prison administrators and officers face in maintaining prison security against the expansion of [a] private right of action for damages . . . is more appropriately suited for Congress, not the Judiciary"); *Gonzalez*, 269 F. Supp. 3d at 59-62, 65 (declining to extend *Bivens* to an inmate's Fifth and Eighth Amendment claims with respect to his confinement in MDC's ADMAX SHU because BOP's administrative grievance process and habeas corpus provided adequate alternative remedies, and because Congress has not established a private right of action despite being active in the area of prisoners' rights).  These post-*Ziglar* cases suggest that courts

26

are resistant to efforts to expand *Bivens*, even when considering claims that do not implicate

high-level policy concerns, and particularly when those claims arise in prisons or jails.

## II.     Defendants LoPresti and Cuciti

As noted above, plaintiffs "accept that the Court's determination of the scope of *Bivens*

liability will apply to their claims against the non-appealing defendants—LoPresti and Cuciti—

as well." Pls.' Mem. at 9.

Insofar as is relevant here, LoPresti was the Captain of the MDC and was responsible for

supervising all MDC correctional officers, including those assigned to the ADMAX SHU. FAC

¶ 27. Plaintiffs allege that LoPresti was frequently present in the ADMAX SHU, reviewed logs,

and received complaints from plaintiffs and other detainees about ongoing abuse and conditions

on the unit, yet did nothing to stop the abuse or address the misconduct of officers under his

supervision. *Id.* Cuciti was a First Lieutenant at the MDC, where he was responsible for

processing detainees, escorting them, and overseeing their legal and social visits. *Id.* ¶ 28. Like

LoPresti, Cuciti made rounds in the ADMAX SHU, reviewed logs, and received complaints from

plaintiffs and other detainees about ongoing abuse and adverse conditions on the unit, but did

nothing to rectify the abuse of which he was aware. *Id.* In short, plaintiffs claim that LoPresti

and Cuciti were deliberately indifferent to the abuse of the plaintiffs by other MDC officers.

Plaintiffs' Supplemental Brief in Support of *Bivens* Liability ("Pls.' Supp.") at 4-5, Docket Entry

823.

LoPresti and Cuciti adopt Hasty's arguments. Defendant LoPresti's Memorandum in

Support of the Motion to Dismiss ("LoPresti Mem.") at 2, Docket Entry 818.[6] They argue that,

---

[6] Counsel for LoPresti submitted the memorandum cited in the text on behalf of defendants LoPresti and Cuciti, subject to obtaining authorization to appear on Cuciti's behalf. LoPresti Mem. at 2 n.1. Counsel subsequently filed a notice of appearance as attorney for defendant Cuciti. Docket Entry 821.

even though LoPresti and Cuciti held ranks lower than Warden, plaintiffs' allegations against them are similar to those made against Warden Hasty. *Id.* at 4. LoPresti and Cuciti contend that, while they were closer in rank to the line officers who are alleged to have abused plaintiffs, they did not themselves commit the acts of abuse that underlie plaintiffs' claims. *Id.* at 5.

The discussion above with respect to the availability of the FTCA as an alternative remedy forecloses plaintiffs' *Bivens* claims against LoPresti and Cuciti. Moreover, the threshold for finding a special factor that counsels hesitation is so low that—while the result is less clear with respect to LoPresti and Cuciti than it is with respect to Hasty—I conclude that the impact on BOP's investigatory procedures and policies is such a factor. I accordingly recommend that plaintiffs' *Bivens* claims against defendants LoPresti and Cuciti, like those against defendant Hasty, be dismissed.

### CONCLUSION

The Supreme Court in *Ziglar* confined *Bivens* to an extremely narrow space. That space is too narrow to accommodate plaintiffs' remaining abuse claim. Therefore, and for the reasons stated above, I respectfully recommend that plaintiffs' remaining claims be dismissed.

Any objections to the recommendations made in this Report must be submitted within fourteen days after filing of the Report and, in any event, no later than August 27, 2018. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
August 13, 2018

*U:\#VAR 2017-2018\Turkmen V. Hasty 02-Cv-2307\Turkmen_V_Hasty_02_CV_2307_FINAL.V2.Docx*